## IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| Juan Isidro Itzep *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | SA-06-CA-0568-XR |
| TARGET CORPORATION; JIM'S | ) | |
| MAINTENANCE & SONS, INC. | ) | |
| d/b/a JIM'S MAINTENANCE and | ) | |
| JIM'S COMMERCIAL CLEANING | ) | |
| SERVICES; and JAMES | ) | |
| FUNDERBURGH, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT TARGET CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF AS TO PLAINTIFFS' FLSA CLAIMS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant Target Corporation ("Target") moves the Court for summary judgment on all claims asserted by plaintiffs. There are no material facts in dispute and defendant is entitled to judgment as a matter of law.

## I.  BACKGROUND

Although a full statement of relevant facts is included in the Appendix to this Motion, a summary of the facts is included here. Beginning in June 2000, cleaning contractor Jim's Maintenance, Inc. ("Jim's Maintenance") and Target entered into a series of contracts whereby Jim's Maintenance was to provide overnight cleaning services to a number of Target stores in the Midwest and Southwest. Although the contracts explicitly provided that the cleaning crew members would be employees of Jim's Maintenance and that Jim's Maintenance was prohibited from subcontracting these services out, Jim's Maintenance later admitted that it hired all of its

cleaners as independent contractors who were paid by the shift and were not entitled to overtime. Upon receiving the results of a third-party audit of Jim's Maintenance conducted in late March 2006, Target concluded that Jim's Maintenance was in fact subcontracting its work and was otherwise violating the terms of the contract.  Accordingly, in May 2006 Target terminated its contractual relationship with Jim's Maintenance.  Plaintiffs subsequently brought suit against both Jim's Maintenance and Target, asserting that the companies are "joint employers" and therefore are jointly and severally liable for overtime and/or minimum wage violations under the FLSA.

## II.   LEGAL STANDARDS

### A.   Summary Judgment Standard

The rules governing summary judgment practice are well established.  A defendant may move for summary judgment at any time, with or without supporting affidavits.  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Fed. R. Civ. P. 56(c).

### B.   Joint Employer Analysis Under the FLSA

The FLSA defines an "employer," in part as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The Fifth Circuit has held that the FLSA's definition of "employer" is "sufficiently broad to encompass an individual who, though lacking a possessory interest in the employer corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees."  Reich v. Circle C Investors., Inc., 998 F.2d 324, 329 (5th

2

Cir. 1993) (quoting Donovan v. Sabine Irrigation Co., 695 F.2d 190, 194-95 (5th Cir. 1983)).

Whether an entity is an employer for purposes of the FLSA turns on the "economic reality" of

the working relationship. Quintanilla v. A&R Demolition, Inc., 2005 U.S. Dist. Lexis 34033, at

*20 (S.D. Tex. Aug. 30, 2005) (quoting Goldberg v. Whitaker House Co-Op., Inc., 366 U.S. 28,

33 (1961)). In that regard, the Fifth Circuit has set out a five-factor test for determining whether

a person or corporation is an "employer" or "joint employer." Wirtz v. Lone Star Steel Co., 405

F.2d 668, 669 (5th Cir. 1968). These factors include:

1.    Whether or not the work takes place on the premises of the company;

2.    The amount of control and supervision the company exerts over the workers;

3.    The extent to which the company had the power to hire, fire, or modify the employment conditions of the workers;

4.    Whether the workers performed a "specialty job" and;

5.    Whether the workers worked exclusively or predominately for the purported employer (*i.e.* may the employee refuse to work for the company or work for others?)

Id.; accord Gonzalez v. Puente, 705 F. Supp. 331, 334 (W.D. Tex. 1988). The Second Circuit

Court of Appeals has set forth a similar, six-factor test, citing Rutherford Food Corp. v. Comb,

331 U.S. 722 (1947), additionally includes such factors as whether the employer's equipment

was used; "whether liability could shift as a unit from one putative employer to another;" "the

extent to which the plaintiff performed a discrete line-job that was integral to the purported

employer's business;" and "whether responsibility under the contract could pass from one

subcontractor to another without material changes." Quintanilla, 2005 U.S. Dist. Lexis 34033, at

*23 (citing Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2nd Cir. 2003)).    Accordingly,

courts also consider whether the alleged employer determined the rate and method of payment;

whether the alleged employer maintained employment records on the workers; whether the

alleged employer's equipment was used; and the extent to which the workers performed a discrete job that was integral to the alleged employer's business.  Watson v. Graves, 909 F.2d 1549, 1553 (5th Cir. 1990); Quintanilla v. A&R Demolition, Inc., 2006 U.S. Dist. Lexis 12264, at *5 (S.D. Tex. Mar. 6, 2006) ("Quintanilla II").  No one factor is determinative; rather, the court must consider the totality of the circumstances to determine whether a worker is the employee of a particular alleged employer.  Quintanilla II, 2006 U.S. Dist. Lexis 12264, at *5; Rutherford Food Corp., 331 U.S. at 730.[1]

## C.   **Exemption Under the FLSA**

If an employee meets one of the "exemptions" outlined in the FLSA, he or she is not entitled to overtime.  29 U.S.C. § 213(a).  One such exemption exists for "executive" employees. An "executive" for purposes of this exemption is any employee "(1) Compensated on a salary basis at a rate of not less than $ 455 per week . . .; (2) Whose primary duty is management of the enterprise in which the employee is employed . . .; (3) Who customarily and regularly directs the work of two or more other employees; and (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement,

---

[1]   Similarly, the Department of Labor ("DOL") regulations state that whether a joint employment relationship exists for the purpose of FLSA liability depends on all the facts of the particular case.  29 C.F.R. § 791.2(a).  If all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee, each employer may disregard all work performed by the employee for the other employer (or employers) in determining its own responsibilities under the Act.  *Id.*  The DOL regulations further state that a joint employment relationship exists when (1) there is an arrangement between employers to share an employee's services; (2) one employer is acting directly or indirectly in the interest of the other employer or employers in relation to the employee; or (3) the employers are associated with one another, directly or indirectly, with respect to the employment of the employee because one employer controls, is controlled by, or is under common control with the other employer.  29 C.F.R. § 791.2(b).  Here, there is no agreement between Target and Jim's Maintenance to share the plaintiffs' labor and Target does not control, is not controlled by, and is not under common control with Jim's Maintenance.

promotion or any other change of status of other employees are given particular weight." 29

C.F.R. § 541.100.[2]

With respect to the term "management," the regulations list the following activities as

typically managerial:

> interviewing, selecting, and training of employees; setting and adjusting their
> rates of pay and hours of work; directing the work of employees; maintaining
> production or sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purpose of recommending
> promotions or other changes in status; handling employee complaints and
> grievances; disciplining employees; planning the work; determining the
> techniques to be used; apportioning the work among the employees; determining
> the type of materials, supplies, machinery, equipment or tools to be used or
> merchandise to be bought, stocked and sold; controlling the flow and distribution
> of materials or merchandise and supplies; providing for the safety and security of
> the employees or the property; planning and controlling the budget; and
> monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  As to the requirement that an employee's duties be "primarily" managerial,

the regulations state:

> The term "primary duty" means the principal, main, major or most important duty
> that the employee performs.  Determination of an employee's primary duty must
> be based on all the facts in a particular case, with the major emphasis on the
> character of the employee's job as a whole. Factors to consider when determining
> the primary duty of an employee include, but are not limited to, the relative
> importance of the exempt duties as compared with other types of duties; the
> amount of time spent performing exempt work; the employee's relative freedom
> from direct supervision; and the relationship between the employee's salary and
> the wages paid to other employees for the kind of nonexempt work performed by
> the employee.

29 C.F.R. § 541.700.

---

[2]  Prior to August 23, 2004, the "short test" included the following criteria: 1) the employee is paid a salary of more
than $ 250 per week; 2) the employee's primary duty is the management of the enterprise or a subdivision and 3) the
employee regularly directs the work of two or more employees.  29 C.F.R. § 541.1(f) (1973).

### III. ARGUMENT

**A.    Target Did Not Jointly Employ Plaintiffs.**

Assuming that Jim's Maintenance improperly classified plaintiffs as independent contractors rather than employees, Target is not liable for the wage and hour claims of plaintiffs because, applying the "joint employer" multi-factor analysis adopted by the courts, Target did not jointly employ them.  As an initial matter, it is clear that the contract between Target and Jim's Maintenance unequivocally contemplated that the cleaners would be employees of Jim's Maintenance and not of Target.  See Pl. Exh. 1 to Smith Depo. ("All personnel of [Jim's Maintenance] used to perform services under this agreement shall be employees of [Jim's Maintenance] and not Target.").  Nevertheless, because this fact is not dispositive, Secretary of Labor v. Lauritzen, 835 F.2d 1529, 1544-45 (7th Cir. 1987), Target will address the relevant factors in turn.

**1.    Whether or Not the Work Takes Place on Company Premises**

It is undisputed that the work performed by the cleaners occurred on Target's premises because the very nature of the contract between Target and Jim's Maintenance was for the latter to clean Target stores.  Such a fact is a necessary condition of the contract, not an indicia of joint employment, any more than to say that a customer at a Target store is employed by Target because he or she shops at a Target store.  Thus, this factor at most minimally supports the existence of a joint employment relationship.

**2.    Control and Supervision**

Plaintiffs contend that Target's management effectively became their supervisors because they gave them direction as to when to clean certain areas of the store (so as not to interfere with the store's stocking operations), sometimes coordinated the taking of breaks, and required them to stay at the store at the end of their shifts to resolve any cleaning issues prior to departing.

Such actions do not amount to sufficient supervision and control to establish a joint employer relationship. "An employer receiving contracted labor services will of necessity exercise sufficient control over the operations of the contractor at its facility so that it will be in a position to take action to prevent disruption of its own operations or to see that it is obtaining the services it contracted for. It follows that the existence of such control, is not in and of itself, sufficient justification for finding that the customer-employer is a joint employer of its contractor's employees." Southern Cal. Gas Co. v. Hospital & Serv. Employees Union, 302 NLRB 456, 461 (1991) (finding no joint employer relationship for janitorial employees); accord Quintanilla II, 2006 U.S. Dist. Lexis 12264, at *5.

Because the alleged employer has the right to monitor and address contract performance to ensure that services meet contract standards, *even extensive supervision* under a services contract generally does not amount to joint employment unless the alleged employer demonstrates effective control over the terms and conditions of the workers' employment. Quintanilla II, 2006 U.S. Dist. Lexis 12264, at *5-*6; Zheng, 355 F.3d at 74-75 (quoting Rutherford Food, 331 U.S. at 372); see also Southern Cal. Gas, 302 NLRB at 462 ("[The employer's] orders and directions . . . were in the nature of routine directions of what tasks were required and where they were to be performed. [Such direction is] consistent with [the employer's] object of obtaining results, *i.e.* the work it contracted for.") (finding that such assignment and direction does not establish evidence of supervision of contractor's employees); Moreau v. Air France, 343 F.3d 1179, 1183 (9th Cir. 2003) ("[I]t would be a foolish business practice to contract with a company to perform a service, but provide it with little or no guidance on exactly what services are to be performed"); AT&T v. NLRB, 67 F.3d 446, 452 (2nd Cir. 1995) ("Limited and routine supervision, without an ability to hire, fire, or discipline, cannot

justify a finding of joint employer status."). As addressed herein, effective control of the relevant "terms and conditions" – hiring, firing, promotions, compensation, etc. – remained with Jim's Maintenance.   Therefore, the supervision alleged by plaintiffs fails to support their joint employment contention.

### 3.   Power To Hire, Fire or Modify Employment Conditions

It is undisputed that Jim's Maintenance hired all of the cleaners it used to service Target stores (Smith Depo. pp. 232; J. Funderburgh Depo. pp. 15, 16-17).  Jim's Maintenance's cleaners were assigned that company's identification badges and were provided with t-shirts with "Jim's Maintenance" printed on them (Smith Depo. p. 297; Vasquez Depo. p. 44; Itzep Depo. pp. 41-42).  Moreover, the contracts themselves explicitly provided that Jim's Maintenance, and not Target, retained such authority and responsibility.  See, e.g. Pl. Exh. 1 to Smith Depo.

Plaintiffs contend that Target had the right to fire Jim's Maintenance cleaners and that Target store management sometimes would request that a cleaning crew be retained when Jim's maintenance took over cleaning duties from a previous contractor (Smith Depo. pp. 185-92, 303-04; J. Funderburgh Depo. pp. 223, 226-28; E. Hernandez Depo. pp. 90-91, 102-03).  On some occasions, Target did request that Jim's Maintenance replace a particular cleaner who was not performing well and, on rare occasions, would notify Jim's Maintenance that it did not want a particular cleaner or cleaning crew servicing its stores any more, for example, if the cleaner or crew repeatedly failed to show for work or otherwise was not performing well, or if a cleaner was caught sleeping on the job or engaged in theft or other misconduct (Smith Depo. pp. 185-92, 303-04; J. Funderburgh Depo. pp. 226-28; E. Hernandez Depo. pp. 90-91, 102-03).  However, on some of these occasions, Jim's Maintenance simply transferred the individual to another store (Riojas Depo. pp. 269-74, 277; E. Hernandez Depo. p. 103; V. Alcaraz Depo. p. 41; R. De Leon Depo. pp. 49-50).

Such circumstances do not demonstrate that Target had the authority to fire these individuals; rather, the fact that Target "did not suffer quietly [the employee's] conduct because it consistently sought satisfactory performance of the contract . . . seem merely to be the exercise of the right of an owner or occupant to protect his premises." <u>Southern Cal. Gas</u>, 302 NLRB at 462 (finding that employer's informing contractor that it no longer wanted employee on its premises who was caught sleeping on job did not amount to employer discharge of employee where contractor chose to discharge employee rather than transfer him to another location); <u>Flores v. Albertson's Inc.</u>, 2003 U.S. Dist. Lexis 26857, at *11-*12 (C.D. Cal. Dec. 8, 2003) ("Although Plaintiffs have produced evidence that [defendants] exercised control in the retention and expulsion and of certain individuals and crews from the stores when the quality of work was found to be particularly satisfactory or unsatisfactory, or individual employees were found to be performing their duties in an unprofessional manner, there is no evidence that [defendants] had the power to hire or fire the employees directly.  However, there is evidence that requests by the [defendants] to retain or dismiss an individual employee were routinely granted.  The fact that [the contractor] routinely attempted to accommodate [the defendants], however, does not give the [defendants the power to hire or fire members of the plaintiff class.").

Plaintiffs also point to the fact that Target controlled their working hours because Target dictated that they were required to perform the work during the hours that the stores were closed. Such circumstances indicate noting more than Target receiving the services for which it contracted and in the manner for which they were contracted.  Naturally, Target would expect that the operation of heavy-duty cleaning equipment occur when the stores are closed to customers, particularly when that equipment is rendering the floors potentially dangerous to walk on.  "It is not surprising that [the defendant] would require that cleaning be done at times most

convenient for [it]. . ..   This does not give [the defendant] the type of control over individual employees that indicates an employer-employee relationship."   <u>Local 254, SEIU v. Women & Infants Hosp.</u>, 324 NLRB 743, 749 (1997).   Thus, Target did not control the employment conditions of plaintiffs for purposes of establishing a joint employer relationship.

      **4.**        **<u>Whether the Workers Performed a "Specialty Job"</u>**

The work performed by plaintiffs was not a specialty job on a production line, but instead was routine janitorial services requiring minimal training, and therefore does not support a joint employment relationship.

      **5.**        **<u>Whether the Workers Worked Exclusively or Predominately For the Alleged Employer</u>**

Target concedes that during the majority of the time Jim's Maintenance provided cleaning services to Target, that Target was its primary contract and therefore plaintiffs worked predominantly or exclusively providing cleaning services to Target.   However, the contracts explicitly provided that Jim's Maintenance was in no way precluded from providing cleaning services to other businesses (Pl. Exh. 1 to Smith Depo., at para. 12).   In fact, Jim's Maintenance had been providing cleaning services to more than 250 Service Merchandise stores until 2001 and ceased that business only because Service Merchandise went out of business (J. Funderburgh Depo. pp. 25, 26, 27-28, 107, 155-56; Smith Depo. pp. 13-14; B. Funderburgh Depo. p. 21).   In addition, during the time that it service Target stores, Jim's Maintenance also provided cleaning services to Mar's Music stores, Barnes & Noble bookstores, Ross Dress-For-Less stores and to a technical college in Choctaw, Oklahoma (Smith Depo. pp. 52, 234-35; J. Funderburgh Depo. p. 28).   Thus, the fact that Jim's Maintenance made a business decision to focus on Target as its primary contract does not demonstrate that Target was controlling the ability of Jim's Maintenance employees to work elsewhere.   <u>See</u> <u>Zheng</u>, 355 F.3d at 75 ("[W]here a

subcontractor performs merely a majority of its work for a single customer, there is no sound basis on which to infer that the customer has assumed the prerogatives of an employer."). Thus, the supervision and "control" alleged by plaintiffs does not support the existence of a joint employer relationship.

6.   **Whether Alleged Employer Determined Rate and Method of Payment**

Jim's Maintenance paid the cleaning crew members, set the pay (shift) rates for the cleaners, maintained the pay records for the cleaners, provided them with benefits and determined what store(s) the cleaners would service (Smith Depo. pp. 123-27, 134, 135-43, 274-75, 287; Pl. Exhs. 13 - 17 to Smith Depo.; Riojas Depo. p. 132; Vasquez Depo. p. 43; Itzep Depo. pp. 58, 60; E. Hernandez Depo. p. 15; Becerra Depo. p. 61).  Plaintiffs have suggested that because Target considered prevailing wage rates as part of its formula in determining a proposed per-store monthly fee, that it set plaintiffs' wages.  However, such general wage rates were used as a secondary factor and only where such data existed for major markets as provided by the Bureau of Labor Statistics (Fisher Depo. pp. 89-92, 275-81, 284).  There is no evidence that Target ever mandated any particular pay rates; on the contrary, Jim's Maintenance testified it determined such rates (Smith Depo. pp. 123-27, 134, 135-43, 274-75, 287).  Thus, this factor does not support the contention that Target jointly employed plaintiffs.

7.   **Whether Alleged Employer Maintained Employment Records On the Workers**

It is undisputed that Jim's Maintenance maintained the employment records for all of its cleaners (Smith Depo. pp. 122-26, 135-44, 286-87, 306-09; Pl. Exhs. 12 - 17 to Smith Depo.; Def. Exh. 4 to Smith Depo.).  Target did maintain sign-in/sign-out logs for all of its contractors for security purposes (Smith Depo. pp. 179-82, 294-95; Besson Depo. pp. 67-69 Pl. Exh. 20 to

Smith Depo.) but such logs hardly qualify as plaintiffs' employment records. Accordingly, this factor does not support a joint employment relationship.

### 8.   Whether Alleged Employer's Equipment Was Used

The contracts set forth, and it is undisputed, that Jim's Maintenance provided the floor scrubbers, propane burnishers ("buffers"), vacuum cleaners, carpet extractors and other heavy equipment needed to perform the cleaning services (Pl. Exh. 1 to Smith Depo., at Exhibit A) (Bates 04001-J – 04002-J; Smith Depo. pp. 30, 52-53, 193-94, 254-55; J. Funderburgh Depo. pp. 33-35, 36, 137-39, 145; Fisher Depo. pp. 181-83). Further, Jim's Maintenance provided all pads, dust mops, wet mops, buckets, ringers, floor finish and carpet cleaning supplies and other cleaning products, unless Target otherwise agreed to provide such cleaning items. Id. (Bates 04002-J). Target did not mandate how or where Jim's Maintenance obtained its equipment (Smith Depo. pp. 30, 52-53, 193-94, 254-55; J. Funderburgh Depo. pp. 33-35; Fisher Depo. pp. 181-83).

By contract, Target did provide the chemical cleaning products and the disposable pads for the cleaning equipment, as well as the consumable products used by customers in the restrooms (*e.g.* toilet paper, paper towels and soap) (Fisher Depo. pp. 176-80). Compared to the "heavy" equipment provided by Jim's Maintenance, these consumable items provided by Target were minimal and do not support the existence of a joint employment relationship. See, e.g. Moreau v. air France, 356 F.3d 942, 951 (9th Cir. 2003) (noting that contractor's significant capital investment in expensive equipment compared to "minimal" items provided by alleged employer did not support joint employer relationship). Moreover, the cost of these materials was figured into the contract and therefore does not support a joint employer relationship. Compare Moreau, 356 F.3d at 952 (noting that plaintiffs' use of an office belonging to alleged employer

12

"was obviously a negotiated point which was factored into the economics of the deal in some respect" and therefore did not support joint employer relationship).  Because Target did not provide the significant equipment used by the cleaners, this factor does not support a joint employer relationship.

**9.     Extent to Which the Workers Performed a Discrete Job Integral to the Alleged Employer's Business**

The "integral-job" factor is applicable only in the production-line context, not at issue here.  Rather, production-line jobs "occup[y] a special status under the FLSA." Zheng, 355 F.3d at 73; see also Moreau, 343 F.3d at 1189 (questioning whether "integral" factor is applicable outside of production-line context); Tumulty v. Fedex Ground Package Sys., Inc., 2005 U.S. Dist. Lexis 26215, at *19 (W.D. Wash. Mar. 7, 2005) (refusing to applying "integral" factor outside of production-line context).  Regardless, Target is in the business of selling retail goods. Thus, while clean stores are important to Target, janitorial services are not an integral part of Target's business.  See Flores, 2003 U.S. Dist. Lexis 26857, at *15 ("Finally, it is clear to the Court that [the defendants] are in the business of selling food, and that the janitorial services provided by the plaintiff class are not an integral part of that business.").

Plaintiffs have suggested that because clean stores are part of Target's "Brand," or image, that janitorial services are integral to Target's business.  Whether a job is "integral" is not interpreted so broadly; if it were, "this factor could be said to be implicated in *every* subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service."  Zheng, 355 F.3d at 73 (emphasis in original).  To the extent that the "integral factor" test applies outside of the production-line context, industry custom and historical practice must be consulted.  Id.  Custodial services have

routinely and customarily been outsourced in the retail store industry. Thus, "insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws." Id. Therefore, this factor, even if applicable, does not support the existence of a joint employment relationship.

In light of all of the circumstances addressed above, it is clear that Target did not jointly employ plaintiffs and therefore that all claims against Target are due to be dismissed as a matter of law.

**B.      Plaintiffs Riojas and Vasquez Were Exempt Employees.**

Regardless of whether Target and Jim's Maintenance jointly employed the cleaners at issue, the claims of two of the plaintiffs – Elvia Riojas and Baudel Vasquez – are due to be dismissed because they were exempt employees. Mr. Vasquez and Ms. Riojas initially were paid $1100 twice a month (Vasquez Depo. pp. 9-10; Riojas Depo. p. 42). Mr. Vasquez's salary subsequently was increased to $1300 bi-weekly (Vasquez Depo. p. 17). Clearly, then, these plaintiffs met the salary portion of the exemption test.

In addition, these plaintiffs were responsible for gathering, preparing and/or reviewing, and submitting to headquarters the payroll time sheets maintained by the cleaning crews at the stores (Smith Depo. pp. 126-27; J. Funderburgh Depo. pp. 17-18); interviewing, hiring, training and firing cleaning crew members; transferring cleaners; making recommendations to the regional supervisor for promotion of cleaners to crew leaders; visiting the stores in their district and interacting with Target store management to ensure the cleaning crews were adequately performing their tasks; approving time off for cleaning crew members; resolving pay issues for cleaning crew members; ensuring that cleaning crew time records were submitted for pay purposes; and ensuring that the cleaning equipment and supplies were in place and that the

14

equipment was functioning properly (J. Funderburgh Depo. pp. 16-17; Vasquez Depo. pp. 10, 14, 18-20, 22, 25-29, 30, 33, 42-43, 47-53, 59, 66-68; Riojas Depo. pp. 20-21, 37-39, 43-44, 53-54, 55-56, 78; B. Hernandez Depo. p. 46; Def. Exh. 3 to Riojas Depo.).   All of these circumstances demonstrate that plaintiffs Riojas and Vasquez were exempt supervisors.   See Aguirre v. SBC Comms., Inc., 2007 U.S. Dist. Lexis 27666, at *56 (S.D. Tex. Sep. 30, 2007) (noting that "supervision of other employees is clearly a management duty" and that "[e]nsuring that company policies are carried out constitutes the very essence of supervisory work") (quoting Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982)).

In addition, as district supervisors Riojas and Vasquez did not have any regular cleaning responsibilities, did not have set hours or schedules and normally did not remain on site at the stores overnight (J. Funderburgh Depo. pp. 17, 81, 219; Vasquez Depo. pp. 13-14; Riojas Depo. pp. 22, 130).   Instead, they typically arrived in the morning and throughout the week met with Target managers at each of the stores for which they were responsible (Vasquez Depo. pp. 13-14; Vasquez Depo. II pp. 15-16; Riojas Depo. pp. 22, 26-28, 29-30, 54-55).   They had discretion as to when they could take time off from work (Vasquez Depo. p. 46).   Jim's Maintenance provided the district supervisors with cell phones so that they could be contacted by the cleaning crews and reimbursed them for automotive expenses (Riojas Depo. pp. 99-100, 102).

Although on some occasions these district supervisors would fill in when a cleaner did not show for work at a store for which that supervisor was responsible or if some particular cleaning issue arose (Vasquez Depo. pp. 11-12, 13; Vasquez Depo. II p. 22; Riojas Depo. pp. 57-58, 127-28, 130), such a fact does not remove them from the executive exemption.   See, e.g. Jones v. Virginia Oil Co., 69 Fed. Appx. 633, 637 (4th Cir. 2003) (unpublished) (per curiam) (holding that manager who spent 75 to 80 percent of her time performing basic line-worker tasks

held exempt because she "could simultaneously perform many of her management tasks"); Murray v. Stuckey's, Inc., 939 F.2d 614, 617-20 (8th Cir. 1991) (store managers who spent 65 to 90 percent of their time on "routine non-management jobs such as pumping gas, mowing the grass, waiting on customers and stocking shelves" were nevertheless exempt executives); Johnson v. Home Team Productions, Inc., 2004 U.S. Dist. Lexis 13251, at *12-*30 (E.D. La. Jul. 15, 2004) (holding employer entitled to summary judgment on executive exemption where principal value or most important work of plaintiff was managerial, notwithstanding that plaintiff also performed manual labor with his crew while supervising).  Accordingly, because they were exempt employees under the FLSA, the claims of plaintiffs Elvia Riojas and Baudel Vasquez are due to be dismissed as a matter of law.

## **CONCLUSION**

As the foregoing demonstrates, Target did not employ the plaintiffs, jointly or otherwise. The FLSA is limited "to cases in which defendants, based on the totality of circumstances, function as employers of the plaintiffs rather than mere business partners of plaintiffs' direct employer [and] also ensures that the statute is not interpreted to subsume typical outsourcing relationships."   Zheng, 355 F.3d at 76.   "[I]t is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA."   Id.   In this case, Target and Jim's Maintenance maintained nothing more than a "strategically-oriented contracting scheme" to which the joint-employer test does not apply.  Accordingly, the claims of the plaintiffs are due to be dismissed as a matter of law.  Moreover, the claims of former district supervisors Elvia Riojas and Baudel Vasquez are due to be dismissed because they were exempt employees under the FLSA.

Respectfully submitted,


*s/ David T. Wiley*
Thomas A. Davis
David T. Wiley
Shannon L. Miller
JACKSON LEWIS LLP
First Commercial Bank Building
800 Shades Creek Parkway, Ste. 870
Birmingham, Alabama 35209
Tel:     (205) 332-3101/3102/3104
Fax:    (205) 332-3131
davist@jacksonlewis.com
wileyd@jacksonlewis.com
millers@jacksonlewis.com

Aaron R. Ramirez
JACKSON LEWIS LLP
3811 Turtle Creek Blvd., Suite 500
Dallas, Texas  75219-4497
Tel:     (214) 520-2400
Fax:    (214) 520-2008
ramireza@jacksonlewis.com

Counsel for Defendant Target Corporation

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2007, a copy of the foregoing has been served upon all counsel of record via the CM/ECF System:

William H. Beardall, Jr.
Victoria Gavito
EQUAL JUSTICE CENTER and
TRANSNATIONAL RIGHTS CLINIC
510 S. Congress Ave., Ste. 206
Austin, TX 78704

B. Craig Deats
DEATS, DURST, OWEN & LEVY, PLLC
1204 San Antonio Street, Ste. 203
Austin, TX 78701

Joseph P. Berra
LAW OFFICE OF JOSEPH P. BERRA
214 Avant Avenue
San Antonio, TX 78210

Richard A. Pizzo
The Pizzo Law Firm
1515 South Denver Avenue
Tulsa, Oklahoma 74119-3828


*s/ David T. Wiley*
Counsel of Record

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

|  |  |  |
|---|---|---|
| Juan Isidro Itzep *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | SA-06-CA-0568-XR |
| TARGET CORPORATION *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT TARGET CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

Before the Court comes defendant Target Corporation and moves the Court for summary judgment on all claims asserted by the plaintiffs.  Having considered the submissions of the parties and applicable law, the Court is of the opinion that the motion, is due to be, and hereby is, **GRANTED**.  Applying the applicable legal factors, plaintiffs have failed to demonstrate a genuine issue of material fact as to whether Target jointly employed them.  As this is the only basis upon which Target could be liable for the Fair Labor Standards Act claims asserted by plaintiffs, such claims necessarily must be dismissed as a matter of law.  Further, as to plaintiffs Elvia Riojas and Baudel Vasquez, the evidence clearly demonstrates that they were exempt employees under the FLSA and that their claims are due to be dismissed on this alternative basis.

IT IS SO ORDERED this the __ day of _____, 2008.

_____
UNITED STATES DISTRICT JUDGE