**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

|  |  |  |
|---|---|---|
| Juan Isidro Itzep *et al.*, | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. SA-06-CA-0568-XR |
| TARGET CORPORATION; JIM'S MAINTENANCE & SONS, INC. d/b/a JIM'S MAINTENANCE and JIM'S COMMERCIAL CLEANING SERVICES; and JAMES FUNDERBURGH, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**APPENDIX TO DEFENDANT TARGET CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON CROSS CLAIMS AGAINST JIM'S MAINTENTANCE**

Defendant Target Corporation ("Target") files the following Appendix to its Motion for Summary Judgment on its cross claims against defendant Jim's Maintenance:

**I. SUMMARY JUDGMENT EVIDENCE**

Defendant relies on the following documents in support of its Motion for Summary Judgment:

| Exhibit | Description |
|---|---|
| 1 | Trent Smith Deposition, with Exhibits |
| 2 | James Funderburgh Deposition, with Exhibits |
| 3 | Bryan Funderburgh Deposition, with Exhibits |
| 4 | Ted Fisher Deposition, with Exhibits |
| 5 | Declaration of Ruth Tallant |
| 6 | Declaration of Vicki Stover |

**STATEMENT OF MATERIAL FACTS**

A.     **History and Organization of Jim's Maintenance**

1.     Cleaning contractor Jim's Maintenance, Inc. (also known as Jim's Commercial Cleaning Services and JMSI) (hereinafter referred to as "Jim's Maintenance") was formed in 1979 by Jim Funderburgh and his wife (J. Funderburgh Depo. pp. 5, 9, 11).[1]

2.     Jim's Maintenance's headquarters was located in Harrah, Oklahoma and consisted of CEO James Funderburgh; his son, Bryan Funderburgh, as President; Account Representative Trent Smith; administrative assistant and personnel record keeper Ruth Tallant; and payroll clerk Vickie Stover (Smith Depo. pp. 9-11; J. Funderburgh Depo. pp. 12-13; B. Funderburgh Depo. pp. 6, 45-46).  Bryan Funderburgh additionally acted as the operations manager for the "northern" region of the company (Oklahoma, Kansas and Missouri) and Jim Funderburgh's other son, Jimmy Funderburgh, was the operations manager in charge of the "southern" region (Texas and New Mexico) (Smith Depo. p. 325; J. Funderburgh Depo. pp. 13-14).

3.     In 2000, Jim's Maintenance submitted a bid to provide overnight cleaning services at Target store T-1024 in Selma, Texas at a cost of $9,338.33 per month (Smith Depo. pp. 18-19; J. Funderburgh Depo. pp. 30-31).  In June 2000, defendants Target Corporation ("Target") and Jim's Maintenance, Inc. ("Jim's Maintenance") entered into a contract under these terms (Pl. Exh. 1 to Smith Depo.).

4.     The contract was signed on behalf of Jim's Maintenance by Bryan Funderburgh, the company's President (B. Funderburgh Depo. p. 10; Pl. Exh. 1 to Smith Depo.).

5.     Generally speaking, the terms of the contract between Target and Jim's Maintenance were not negotiated (B. Funderburgh Depo. p. 11).  As President Bryan

---

[1] Both Jim Funderburgh and his son, Bryan Funderburgh, were deposed during discovery in this case.  To avoid confusion, their deposition transcripts will be referred to as "J. Funderburgh Depo." and "B. Funderburgh Depo.," respectively.

2

Funderburgh acknowledged, "in all janitorial work, when you're dealing with a big-box [*i.e.* large-store retail chain] or a major corporation, . . . there's not much to negotiate. They have a standard contract, I'm sure, that is used for every contractor." Id. pp. 11, 27.

6.	Within a year, Jim's Maintenance bid on, and was awarded contracts to clean, additional Target stores in the San Antonio area (Smith Depo. pp. 24-25; B. Funderburgh Depo. pp. 19-21).

7.	In 2001, Target reorganized its approach to obtaining overnight cleaning services, whereby it reduced the number of cleaning contractors to approximately twenty-five companies, geographically located by region (Smith Depo. pp. 33-35; B. Funderburgh Depo. pp. 25-26). Jim's Maintenance was selected as one of these preferred providers and, beginning in approximately October 2001, was offered and accepted contracts to clean a substantial number of additional stores (Smith Depo. pp. 27-28, 31; B. Funderburgh Depo. pp. 24, 28; Pl. Exh. 2 to Smith Depo.).

8.	Jim's Maintenance was in no way obligated by Target to enter into contracts to clean additional stores and did so only as a business decision for its own financial benefit, given its anticipated loss of Service Merchandise's business (J. Funderburgh Depo. pp. 114-16).

9.	Over the next four years, the number of stores Jim's Maintenance was servicing increased to approximately eighty (80) (Smith Depo. p. 80).

10.	In the Fall of 2005, Target changed its contract procedure to a more traditional bidding process (Smith Depo. pp. 64-65). After cancelling all of its cleaning contracts, Target generally allowed its previously-identified preferred providers to bid on stores in districts that it wanted to continue cleaning. A contractor could bid on as few or as many districts as it desired to service. Each contractor interested in servicing a particular store or stores would bid on those

3

stores and all contractors who bid on those stores would be notified how their bid compared in general to other bidders (*e.g.* non-competitive or competitive). After three rounds of bidding, a bidder was selected based on a combination of price and the ability to meet Target's quality expectations (Smith Depo. pp. 69-75, 78-79, 110-12, 118; Pl. Exh. 11 to Smith Depo.; Fisher Depo. pp. 130-38, 145-46, 151-54).

11. Under the revised process, Jim's Maintenance successfully bid on sixty-eight (68) stores (J. Funderburgh Depo. pp. 54, 68).

12. The contracts provided in part that:

a. Jim's Maintenance would "provide all tools, labor, supervision and products necessary" to perform the cleaning services (Pl. Exh. 1 to Smith Depo., at para. 1);

b. Target would pay for completed services within thirty (30) days after receipt of an invoice for such services, id. at para. 3;

c. Target and Jim's Maintenance intended to create an independent contractor relationship under which,

> 4. **Independent Contractor**. . . . while [Jim's Maintenance' agrees to perform the Service in accordance with and to Target's standards and specifications, [Jim's Maintenance] retains sole and exclusive control over the manner and method in which the Services are performed. All Services performed pursuant to this Agreement are subject to Target's right of inspection and must meet with Target's approval. All personnel of [Jim's Maintenance] used to perform services under this agreement shall be employees of [Jim's Maintenance] and not Target. [Jim's Maintenance] shall comply with all applicable federal, state and local laws regarding compensation, eligibility and conditions of employment. [Jim's Maintenance] shall, at the commencement of the term and from time to time as may be required by Target, to provide a notarized Certification Statement to Target in writing that all employees of [Jim's Maintenance] and any subcontractor working on Target premises are properly documented to legally work in the United States. . ..
>
> [Jim's Maintenance] shall pay all federal, state and local payroll, social security, unemployment and other taxes, contributions and

4

premiums required to be withheld or paid with respect to its employees, and shall file all returns incident to such taxes, contributions and premiums. Target shall have no obligation to provide [Jim's Maintenance] or any of [Jim's Maintenance's] employees with any employee benefits provided for employees of Target. . ..

In the event any court of administrative tribunal or agency with appropriate jurisdiction determines that an employment relationship has been or will be established by the performance of this Agreement, the Agreement shall immediately cease and [Jim's Maintenance] shall reimburse and indemnify Target for expenses of any nature, including, but no limited to, tax withholding and insurance claims in the nature of unemployment compensation and/or workers' compensation, imposed by any level of government.

7. **Indemnification**. . . . [Jim's Maintenance] shall defend, indemnify and hold harmless Target, its agents and employees, from and against (1) any and all claims, suits, losses, damages, judgment or expenses (including attorney's fees incurred in responding to claims or suits) which relate to, arise out of, or are asserted or incurred as a result of, [Jim's Maintenance's] performance of Services, [Jim's Maintenance's] failure to perform its obligations under this Agreement, or the negligence or wrongful acts of [Jim's Maintenance] or its agents or employees
. . ..

[Jim's Maintenance] shall, at its expense, be responsible for the defense of any claims or suits for which it is obligated to indemnify Target and shall, in connection with such defense, provide Target with counsel reasonably satisfactory to Target. Target shall have the right, and its option and at its own expense, to defend (with or without [Jim's Maintenance] any such actions, claims, demands and suits. . ..

If any claims are made against Target as a result of the work or as a result of any actions or failure to act by [Jim's Maintenance], or if Target reasonably believes that such claims will be made, Target may withhold from the amount otherwise due or to become due under this agreement such amount as Target reasonably determines may be necessary to cover such claims and to cover any costs which Target reasonably anticipates may be incurred in connection with defending against such claims. The foregoing right shall not be Target's exclusive remedy and shall be in addition to any other

remedies which Target may have under this agreement or at law or in equity.

. . .

12.     **Non-Exclusive**.  Target does not agree to use [Jim's Maintenance] exclusively or to provide any minimum amount of work. [Jim's Maintenance] is free to perform similar services to others during the term of this Agreement.

. . .

14.     **Default**.  In the event [Jim's Maintenance] breaches any of its obligations hereunder, Target may undertake any one or more of the following remedies (provided, however, that Target shall not be allowed to receive double recoveries for any damages):

   (a)   terminate this Agreement effective (i) upon three (3) days prior written notice or (ii) immediately upon the written notice if the breach is such that Target believes, in its sole opinion, that it must take immediate steps to cure such a breach;

   (b)   cure or begin to cure such breach and (i) invoice [Jim's Maintenance] or (ii) set off from any amounts due to [Jim's Maintenance] hereunder to Target's reasonable costs in connection therewith including, without limitation, the cost of enforcing [Jim's Maintenance's] obligations hereunder;

   . . .

   (d)   set off any damages incurred by Target arising from such breach against and from any amounts due to [Jim's Maintenance] hereunder;

   (e)   sue [Jim's Maintenance] for damages and/or specific performance hereunder, or for any other remedy available at law or in equity.

Id.

   13.   In addition to the contractual provisions obligating Jim's Maintenance to comply with all wage and hour laws, see, e.g. Pl. Exh. 1 to Smith Depo. (Bates No. 03992-J) and Pl. Exh. 2 to Smith Depo. (Bates No. 0010), Jim's Maintenance acknowledged separately in writing its

continued obligation to comply with all such laws (B. Funderburgh Depo. pp. 72-73, 75-77, 80-81; J. Funderburgh Depo. pp.161, 162-63; Def. Exh. 15 to Smith Depo.; Def. Exhs. 8 & 9 to J. Funderburgh Depo.).

14. In approximately November 2005, Target notified Jim's Maintenance that, through PriceWaterhouse Coopers (PwC), it would be conducting wage, hour and employment eligibility audits of its vendors' employee records (J. Funderburgh p. 66; Fisher Depo. p. 197).

15. In late March 2006, PwC conducted an onsite audit of the employee records maintained by Jim's Maintenance (Smith Depo. pp. 93-96; J. Funderburgh Depo. pp. 66-67; Pl. Exh. 23 to Smith Depo.).

16. At the close of the audit, PwC discussed its findings with Jim's Maintenance President Bryan Funderburgh, who acknowledged in writing, "[we] are responsible for the completeness and accuracy of the information provided to PwC;" "[w]e have made available to [PwC] all significant information that we believe is relevant to the wage, hour and employment eligibility compliance review;" and "[t]here are no known matters contradicting the information we have provided to PwC" (B. Funderburgh Depo. pp. 97-98, 101; Pl. Exh. 23 to Smith Depo.).

17. The audit revealed that of the fifty (50) I-9 eligibility to work forms reviewed, more than one half (27) were missing employee information, almost all (49) were missing employer review and verification information and none of the sampled documents had the translator/preparer section completed (Pl. Exh. 23 to Smith Depo., at p. 2). In addition, despite Jim's Maintenance's claim that it performed background checks for newly-hired exempt employees, not a single sample file contained a background check. Id. Furthermore, none of the exempt employees were paid the appropriate minimum compensation for the most recent pay period, almost every sample personnel file lacked a W-4 form (46 of 50) and Jim's Maintenance

stated that they did not withhold wages for tax purposes. Id. at p. 3. Moreover, Jim's Maintenance's time sheets did not reconcile with its stated "Shift Pay Policy," which purportedly limited employees to working no more than eight hours per day and six days per week. Id. at p. 4; Def. Exh. 2 to Smith Depo. Instead, the company's time sheets merely used "tick marks" to indicate days worked, with no record maintained as to the actual hours worked. Id. Finally, Jim's Maintenance stated to PwC that they did not use subcontractors for their work. Id. at p. 5.

18. In the verbal and written reports submitted to Target, PwC expressed its concerns that, in addition to the obvious shortcomings in recordkeeping, Jim's Maintenance was in fact hiring its cleaners as independent contractors (Fisher Depo. pp. 202-03, 207-09, 212-14, 223-38, 248-49, 252; Exhs. 18, 19 to Fisher Depo.).

19. Based on the results of the audit, Target concluded that Jim's Maintenance was breaching its contract with respect to the prohibited use of subcontractors and was otherwise failing to ensure the employment eligibility of its cleaners. Accordingly, on or about May 23, 2006, Target notified Jim's Maintenance that it was terminating its cleaning contract for cause (Smith Depo. p. 86-87, 92; Pl. Exh. 6 to Smith Depo.; Fisher Depo. pp. 253-55, 349, 422).

20. During discovery in this lawsuit, Jim's Maintenance admitted that, in complete contradiction of its contract with Target, it had been hiring all of its cleaners as independent contractors on shift pay throughout the time that it had been servicing Target stores (J. Funderburgh Depo. pp. 75, 81, 129; Smith Depo. pp. 308-312; Def. Exh. 4 to Smith Depo.; Tallant Declaration, at para. 5; Stover Declaration, at para. 4). In fact, just prior to the PwC audit, President Bryan Funderburgh directed his administrative staff to remove from the personnel files the independent contractor agreements entered into by each of the cleaners and area supervisors because such agreements were in violation of the company's contract with

Target (Tallant Declaration, at para. 6; Stover Declaration, at para. 5).  When asked why the company hired its cleaners and area supervisors as independent contractors with knowledge that such actions violated the contract, CEO Funderburgh replied only that that it did so because that is how the company had always done it (J. Funderburgh Depo. pp. 206-08).

21. Jim's Maintenance also admitted that it paid its cleaners by shift only based on an eight-hour shift, regardless of how many hours an individual worked on a given shift or during a given workweek, and that it never paid overtime to such individuals (Smith Depo. pp. 97-98, 125-26, 133-34, 287-89; J. Funderburgh Depo. p. 213; Def. Exh. 2 to Smith Depo.).

Respectfully submitted,

*s/ David T. Wiley*
Thomas A. Davis
David T. Wiley
Shannon L. Miller
JACKSON LEWIS LLP
First Commercial Bank Building
800 Shades Creek Parkway, Ste. 870
Birmingham, Alabama 35209
Tel:     (205) 332-3101/3102/3104
Fax:    (205) 332-3131
davist@jacksonlewis.com
wileyd@jacksonlewis.com
millers@jacksonlewis.com

Aaron R. Ramirez
JACKSON LEWIS LLP
3811 Turtle Creek Blvd., Ste. 500
Dallas, Texas  75219-4497
Tel:     (214) 520-2400
Fax:    (214) 520-2008
ramireza@jacksonlewis.com

**Counsel for Defendant Target Corporation**

**CERTIFICATE OF SERVICE**

     I hereby certify that on the 17th day of December, 2007, a copy of the foregoing has been served upon all counsel of record via the CM/ECF System:

          William H. Beardall, Jr.
          Victoria Gavito
          EQUAL JUSTICE CENTER and
          TRANSNATIONAL RIGHTS CLINIC
          510 S. Congress Ave., Ste. 206
          Austin, TX 78704

          B. Craig Deats
          DEATS, DURST, OWEN & LEVY, PLLC
          1204 San Antonio Street, Ste. 203
          Austin, TX 78701

          Joseph P. Berra
          LAW OFFICE OF JOSEPH P. BERRA
          214 Avant Avenue
          San Antonio, TX 78210

          Richard A. Pizzo
          The Pizzo Law Firm
          1515 South Denver Avenue
          Tulsa, Oklahoma 74119-3828

          *s/ David T. Wiley*
          Counsel of Record