**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JUAN ISIDRO ITZEP, et al.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO. SA-06-CA-0568-XR** |
| | § | |
| **TARGET CORPORATION, et al.** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' APPENDIX OF SUMMARY JUDGMENT FACTS**

TO THE HONORABLE JUDGE OF THE COURT:

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule CV-7, the Plaintiffs

submit this Appendix setting forth the undisputed facts which support their Motion for Partial

Summary Judgment.  Record citations for each fact in this Appendix are cited after each fact,

including the exhibits:

**INDEX TO EXHIBITS**

| Exhibit | Description |
|---|---|
| | Note: Exhibits 1-44 below are all exhibits to the depositions of Target representatives Ted Fisher and/or Scott Besson and correspond to the exhibit numbers as used in those depositions |
| 1 | Target Brand Maintenance Guide<br>Exh. 1 to depositions of Target witnesses Ted Fisher and Scott Besson<br>Exh. 20 to deposition of Elvia Riojas |
| 2 | Target contract with Jim's Maintenance signed 1/13/01<br>Exh. 2 to deposition of Target witness Ted Fisher |
| 3 | Target contract with Jim's Maintenance signed 1/29/01<br>Exh. 3 to deposition of Target witness Ted Fisher |
| 4 | Target contract with Jim's Maintenance signed 10/15/01<br>Exh. 4 to deposition of Target witness Ted Fisher |
| 5a | Target Corporation Contractor Handbook<br>• Handbook cover page<br>• Index |

| Exhibit | Description |
|---|---|
| | • Tab: GENERAL TARGET CORPORATE INFO |
| 5b | Target Corporation Contractor Handbook<br>• Tab: CONTRACT |
| 5c | Target Corporation Contractor Handbook<br>• Tab:  COMMUNICATIONS PROCESS |
| 5d | Target Corporation Contractor Handbook<br>• Tab:  BEST METHODS |
| 5e | Target Corporation Contractor Handbook<br>• Tab:  TRAINING |
| 5f | Target Corporation Contractor Handbook<br>• Tab:  SUPPLY ORDER PROCESS |
| 5g | Target Corporation Contractor Handbook<br>• Tab:  NEW STORES INFO<br>• Tab:  REMODEL STORES INFO<br>• Tab:  HOLIDAY STRATEGY<br>• Tab:  NOTES |
| 6 | Contract Data Sheet 9/1/03 |
| 7 | Contract Data Sheet 2/9/04 |
| 8 | Contract Data Sheet 5/18/04 |
| 9 | Contract Data Sheet 2/21/05 |
| 10 | Contract Data Sheet 9/2/04 |
| 11 | 8/2/05 Letter terminating old contracts |
| 12 | Target contract with Jim's Maintenance signed 9/02/2005<br>Exh. 12 to deposition of Target witness Ted Fisher |
| 13 | Scope of Work |
| 14 | Contract Data Sheet 9/21/05 |
| 15 | UPS Air Bill for Notice Terminating Jim's |
| 16 | Target pamphlet: See Yourself Here |
| 17 | Miscellaneous Emails |
| 18 | Price Waterhouse Coopers Draft Report re: Jim's Maintenance |
| 19 | Price Waterhouse Coopers Final Report re: Jim's Maintenance |
| 20 | Overnight Cleaning Crew Sign-in Log |
| 21 | Internal Target emails about termination and replacement of Jim's Maintenance |
| 22 | Email messages about Jim's not getting last payment from Target |
| 23 | Documents re: Target contractor, Global, failure to pay overtime |
| 24 | Contract Data Sheet for 8/13/2002 |
| 25 | Jim's Maintenance Payroll Timesheet |
| 26 | Target Morning Checklist |
| 27 | 4/24/01 Email from Target manage Oscar Hernandez to Becky Nielsen |
| 30 | 7/13/01 email from BST Contracts |
| 31 | 10/28/03 email from Chris Carlson |
| 32 | Compliance Certification |
| 33 | 3/31/05 email from Trent Smith |
| 34 | Compliance Certification, version dated 9/2/04 |

2

| Exhibit | Description |
|---------|-------------|
| 35 | 4/26/05 email from Becky Nielsen |
| 36 | 4/26/05 email from Becky Nielson |
| 37 | 4/26/05 letter to Corporate Counsel, Human Resources, Target Corporation from P. Hurtt |
| 38 | PWC report on Sanitors, Inc. Closing  Meeting 3/2/06 Summary of Observations |
| 39 | 5/22/06 letter to Jim's Maintenance Corporation |
| 40 | 5/22/06 email from B. Churchill to R. Tallent |
| 41 | 6/28/06 letter to Jim's Maintenance from M. Wojtaskiak, Target |
| 42 | Housekeeping Brand Scorecard Report |
| 43 | 2/20/04 email from B. Churchill |
| 44 | 3/14/06 email from B. Churchill to R. Talent |
| 50 | Defendant Jim's Maintenance Inc.  Responses to Target 's Requests for Admissions and Interrogatories |
| 51 | Overnight Cleaning Crew Sign-in and Out Log  (Elvia Riojas depo Exh. 13) |
| 52 | Overnight Cleaning Crew Sign-in Log (Elvia Riojas depo Exh. 23) |
| 53 | New York Times story, 8/26/2004, *U.S. Wins Back Pay for Janitors* |
| 54 | Consent Judgment, *Chao v. Global Building Services, Inc,* August 20, 2004 |
| 101 | Deposition of Target witness Ted Fisher |
| 102 | Deposition of Target witness Scott Besson |
| 103 | Deposition of Jim's Maintenance witness Trent Smith |
| 104 | Deposition of Jim's Maintenance witness James Funderburgh |
| 105 | Deposition of Jim's Maintenance witness Bryan Funderburgh |
| 201 | Deposition of Plaintiff Alcaraz Hernandez, Jose de Jesus (Cesar Diaz Benitez) |
| 202 | Deposition of Plaintiff Alcaraz Ramirez, Daniel |
| 203 | Deposition of Plaintiff Alcaraz Ramirez, Jose Alejandro (Javier Rubalcaba) |
| 204 | Deposition of Plaintiff Alcaraz, Victor |
| 205 | Deposition of Plaintiff Balderas, Maria del Rosario |
| 206 | Deposition of Plaintiff Becerra, Ruben |
| 207 | Deposition of Plaintiff Cabrera, Gloria (Nayeli Soto) |
| 208 | Deposition of Plaintiff De Leon Ramirez, Rene |
| 209 | Deposition of Plaintiff Diaz Benitez, Clementina |
| 210 | Deposition of Plaintiff Garcia, Jose |
| 211 | Deposition of Plaintiff Hernandez Arriaga, Belen |
| 212 | Deposition of Plaintiff Hernandez Rodriguez (David Hernandez??), Antonio |
| 213 | Deposition of Plaintiff Hernandez Rodriguez (David Hernandez??), Efren |
| 214 | Deposition of Plaintiff Hernandez Valdivia, Rito |
| 215 | Deposition of Plaintiff Hernandez, M. Irene |
| 216 | Deposition of Plaintiff Itzep, Juan |
| 217 | Deposition of Plaintiff Malagon Leal, Jesus (Francisco Javier Hernandez) |
| 218 | Deposition of Plaintiff Malagon Lopez, Saul (Joshua Hernandez) |
| 219 | Deposition of Plaintiff Mendoza Salinas, Paul (Eric Zapata) |
| 220 | Deposition of Plaintiff Perez, Jose |
| 221 | Deposition of Plaintiff Puga Hernandez, M. Guadalupe  (Blanca Rodriguez) |

| Exhibit | Description |
|---------|-------------|
| 222 | Deposition of Plaintiff Ramos, Maria del Carmen |
| 223 | Deposition of Plaintiff Rivera, Sergio |
| 224 | Deposition of Plaintiff Riojas, Elvia |
| 225 | Deposition of Plaintiff Solis Perez, Mario Hector  (Carlos Guimac) |
| 226 | Deposition of Plaintiff Valdivia Perez, Abigail (Mercedes Aceves) |
| 227 | Deposition of Plaintiff Vazquez Medina, Javier |
| 228 | Deposition of Plaintiff Vazquez, Baudel, 4/12/2007 |
| 229 | Deposition of Plaintiff Vazquez, Baudel  5/23/2007 |
| 230 | Deposition of Plaintiff Zuniga, Marta |

## STATEMENT OF UNDISPUTED FACTS

Preliminary note:  Throughout this statement of facts, the term "Target" is used as a shorthand term referring to Target Corporation and the term "Jim's" is used to refer to Jim's Maintenance Service, in order to maintain consistency with the shorthand terms of reference most often used in the depositions and many documents.

1.  Plaintiff cleaning workers cleaned Target stores for periods of from about one year to about five years. (Exh. 202: p.9-12;  Exh. 204: p.8-14;  Exh. 205: p.16; Exh. 211: p.16-23).

2.  They worked only in Target stores and other stores owned by the Target Corporation. (Exh. 207: p.28; Exh. 214: p.10-11).

3.  The cleaners' work was unskilled in nature: they performed the same easy tasks every night. (Exh. 227: p.44-46).  Their tasks were so simple that an English-speaking manager could and did instruct a cleaning worker by pantomiming the action. (Exh. 207: p.67).  It took less than an hour to train a new cleaning worker. (Ex. 224: p.17).

4.  The cleaning crews worked a regularly-scheduled shift typically starting at 10:00 pm or 11:00 pm. (Exh. 202: p.30-32; Exh. 211: p.24; Exh. 7).  Target managers set the shift starting time and directly instructed the cleaners when to come in. (Exh. 211: p.42-43).  The shift was typically supposed to end at 7:00 am or 8:00 am. (Exh. 202: p.32; Exh. 211: p.24; Exh. 7).  However, the cleaning workers could not leave a store until the Target manager gave them permission. (Exh. 212: p.37-38; Exh. 213: p.33-34, 80).  The cleaning workers were locked into the store for the duration of their shift. (Exh. 299: p.24).

5.  No cleaning worker received compensation for the extra time the Target managers required her to work past the scheduled ending time: for example, one plaintiff asked Jim's Maintenance if the cleaning workers would be paid for their extra work; she was told they would not, and that it was the Target manager who was requiring them to work the extra hours. (Exh. 229: p.24).

6.  The cleaning crews worked 7 days per week; some cleaners got one day off every 15 days. (Exh. 228: p.47; Exh. 211: p.37-38).  Others worked for an entire year without a day off (Exh. 206: p.30).  Still others worked their entire time at Target without ever getting a day off (Exh. 214: p.50).

7.  No cleaner received overtime pay for the hours she worked over forty per week at Target. (Exh. 103: p.133).  The cleaners' earnings often worked out to less than minimum wage (*see, e.g.,* Exh. 212: one plaintiff worked from 11:00 pm to 8:00 am daily (p.22) with sometimes a 30 to 60 minute break twice per week (p.22) and no days off (p.23).  Paid $700.00 semimonthly, his hourly wage was $4.86; *see also* Exh. 225: another plaintiff worked from 10:30 pm to 8:00 am (p.19) with a one hour lunch break (p.21) with two days off per month (p.21).  Paid $6.50 semimonthly, his hourly wage alternated between $4.35 and $5.08).

8.  Jim's hired the cleaning workers. (Exh. 103: p.186).  However, if Jim's Maintenance replaced a previous cleaning contractor at a Target store, it frequently hired the crews who already worked at that store: "If the store manager wanted them, we hired them.  If he didn't, we didn't." (Exh. 104: p.223; Exh. 229: p.6).  Target was well ware that the normal practice was for the cleaning crew to stay on at a store even as one cleaning contractor replaced another. (Exh. 30: p.03959_J).

9.  The cleaning workers received their pay from Jim's. (Exh. 103: p.135-39).  Jim's did not pay payroll taxes or withhold FICA. (Exh. 105: p.165).  Jim's kept no pay records of hours worked; rather, it only kept records of days worked. (Exh. 103: p.126).

10. Target kept a sign-in log showing the days the cleaners worked and the times they entered and left. (Exh. 103: p.179).  Target directed that the cleaning workers sign in and out individually on this form. (Exh. 103: p.179).

11. The cleaning workers never received their last paycheck because Target fired Jim's Maintenance's and withheld $493,300 it owed for the cleaners' work. (Exh. 104: p.8).

12. The precise specifications for cleanliness which the cleaning workers maintained were a key part of Target's brand image. (Exh. 102: p.179-80). The importance of having a clean store was that it was part of Target's brand statement. (Exh. 102: p.46-47). "The cleaning of the stores and having a clean store is a key part of Target's marketing strategy: Asked to explain the importance to Target's business of having a clean store, a Target official testified that "It is part of what we stand for…it is part of our brand statement. It is part of what helps differentiate us from our competitors." (Exh. 102: p.28-29; Ex. 101: p.53-56). "It is hopefully what differentiates us and drives sales, which drives profitability. It is part of our success formula" (Exh. 102: p.28-29). At a training put on by Target, Jim's Maintenance officials were instructed that "…clean, shiny stores" was one of "the four things that Target was founded on." (Exh. 103: p.217).

13. Jim's Maintenance had contracts to clean Target stores from approximately the summer of 2000 (Exh. 104: p.29) through May 25, 2006 (Exh. 21).

14. Target used the identical form of contract with all its cleaning contractors, including Jim's Maintenance. (Exh. 101 Target/Fisher depo: p.106). If Target began using a new contractor, Target would use the same contract for that new cleaning contractor. (Exh. 101: p.106-07). The provisions of the contract were written by Target. (Exh. 103: p.38-41). Jim's Maintenance had no role in writing the contract. (Exh. 101 Target/Fisher depo: p.107). During the period relevant to this case, two contracts governed Target's relationship with the cleaning workers and Jim's Maintenance: the contract dated October 15, 2001 (Exh. 4) and the contract dated September 2, 2005 (Exh. 12).

15. Under the contracts that Target began with Jim's in August 2001 and in September 2005, Jim's Maintenance was bound to comply with the contract for the full three year term of each contract. (Exh. 4: p.327, §4).  Those contracts gave Target the power to terminate its contract with Jim's at any time without cause on 30 days notice, but gave Jim's no similar right. (Exh. 4: p.335, §2; Exh. 101 Target/Fisher depo: p.98).  Those contracts also gave Target the power to terminate its contract with Jim's without any advance notice, "if in Target's sole reasonable opinion" the contractor failed to perform or otherwise breached its agreement. (Exh. 4: p. 335, §2; Exh. 12: p.451-52; Exh. 101 Target/Fisher depo: p.97-99).  Jim's had no similar power under the contract.  (Exh. 4; Exh. 12).

16. By 2003, Target stores constituted virtually all of Jim's business. (Exh. 104: p.42).  A Jim's Maintenance official recalled that beginning around the time of the 2005 contract with Target, Jim's was cleaning only the Target Corporation's Mervyn's and Target stores. (Exh. 103: p.81).  At the time Target fired Jim's Maintenance, Jim's Maintenance had contracts only with Target and one local school in Oklahoma. (Exh. 103: p.13).

17. On May 22, 2006, Target notified Jim's Maintenance that it was terminating all Jim's contracts as of 10:00 am on May 25, 2006. (Exh. 21).  The termination of these contracts put Jim's Maintenance out of business. (Exh. 104: p.65).

18. Of these prices, a Target official told the Jim's Maintenance president: "…there's other contractors out there that will take it if you don't want it. (Exh. 105: p.25)."

19. During the period governed by the 2001 contract (August 2001 – August 2004), Target unilaterally added and deleted stores to the contract. (Exh. 105: p.31).  In addition, throughout this period Target unilaterally changed the monthly fee for individual stores.

(Exh. 105: p.37).  Jim's Maintenance was told that the reason for this change in contract pricing was Target's budget and the performance of Target stores. (Exh. 105: p.39).

20. In 2005, Target conducted three rounds of bidding in which its cleaning contractors had to submit bids for Target stores. (Exh. 103: p.72-74).  Target controlled the bidding process in a way that pitted its cleaning processes against one another, forcing them to underbid one another. (Exh. 101 Target/Fisher depo: p.148-54).  Target structured this bidding process to consist of three rounds with a rule that each cleaning contractor could submit a lower bid – but not a higher bid – in each successive round. (Exh. 101 Target/Fisher depo: p.148-154). As a result of this bidding process, Jim's number of Target stores declined, as did the average price it received per store. (Exh. 104: p.55).

21. The Target manager for each store set the start time for the cleaning workers' shift at that store. (Exh. 103: p.153; Exh. 104: p.87; Exh. 224: p.189-91; Ex. 228: p.43-44).  Sometimes Target managers set a special starting time before the regularly scheduled time because they wanted the cleaners to start early on some project, such as moving gondolas or stripping and waxing. (Exh. 224: p.191-2).  Jim's Maintenance officials had no control over the beginning or end times of the shift. (Exh. 103: p.334).

22. Jim's Maintenance officials asked Target that the cleaners be able to start their shift later to adjust for the extra hours Target managers were holding the cleaners over at the end of the shift. (Exh. 105: p.52).  Their request was denied because Target required one of its managers to lock the cleaners into the store at night, and that manager had to leave at 10:30 pm. (Exh. 105: p.92).  Once the shift began, the locked-in cleaning workers could not leave except for a medical emergency, because Jim's Maintenance personnel did not have keys to the store. (Exh. 104: p.88).

23. Incorporated in the contract between Target and Jim's was a thick binder called the Contractor Handbook, containing detailed directions about how the cleaning contractor was to perform their work. (Exh. 5a – 5g).

24. Through its store managers, Target enforced the cleaning specifications it precisely spelled out in the Contractor Handbook Housekeeping Expectations (Exh. 5g: p.13 et seq.), including which tasks the Contractor Handbook directs the cleaners to perform daily and which are to be done with some other frequency (e.g. Exh. 5g: p.13-14: "Once a month: clean air vents…") and the manner in which to perform those tasks (e.g. Exh. 5b: p.14): "Stains on concrete are removed by aggressively scrubbing with repeated passes with the Auto Scrubber.").

25. Many of the instructions in the Contractor Handbook control the most minute details of how the cleaning worker is to perform her task, e.g. "plug the vacuum into the wall outlet.  Begin vacuuming nearest the outlet.  Vacuum in long straight passes.  Use overlapping passes. Replace any furniture you have moved…" (Exh. 5e: Carpet Vacuum and Spot Removal: p.2). According to a Jim's Maintenance official, the purpose of the Contractor Handbook was "to tell us what our duties were (Exh. 103: p.45)."

26. As part of the 2005 contract, Target prescribed similar directions in its Target Housekeeping Scope of Work (Exh. 13).  Jim's could not deviate from the methods Target mandated in both the Contractor Handbook and in the Scope of Work, even if it thought a different practice might be more effective. (Exh. 103: p.145).

27. A Target manager gave the Brand Maintenance Guide to Jim's supervisor Elvia Riojas. (Exh. 224: p.180).  The Brand Maintenance Guide was part of the instructions she gave to the cleaning crew. (Exh. 224: p.181-2).  All the information she gave to the cleaning crews to the

cleaning crews about how to do their job came from Target managers. (Exh. 224: p.181-2). Neither she nor the crew leader could decide to do the job differently from the requirements in the Brand Maintenance Guide. (Exh. 224: p.123-35).

28. Target managers directed the tasks the cleaning crew performed on a given night, and the location in the store where they performed those tasks. (Exh. 103: p.210; Ex. 228: p.18-19). For example, the Target manager instructed Jim's supervisor Baudel Vasquez on which nights to do extraction on which part of the carpet. (Exh. 228: p.18-19). Jim's Maintenance did not normally have a supervisor in the stores during the shift. (Exh. 103: p.210; Exh. 224: p.181-2). Jim's Maintenance supervisor Elvia Riojas received an average of two calls per day from a Target store manager with instructions such as what area she should tell the crew to work in. (Exh. 224: p.206-7). The owner of Jim's Maintenance testified that "[a]reas was (sic) organized by the Target managers, that they wanted done at a particular time. (Exh. 104: p.82). The Target managers directed that as Target regular employees moved through the store to restock it, the cleaning crew must be "behind that wave." (Exh. 103: p.83). This "wave" varied depending upon what items Target employees needed to restock. (Exh. 104: p.83).

29. Target managers had the authority to decide when the cleaning crew would do specific tasks, such as stripping or waxing the floors. (Exh. 103: p.210). Target managers had the power to instruct the cleaning crews to clean walls in the bathroom when they stared to look dirty. (Ex. 102: p.83-84). When Target managers brought a matter to the cleaners' attention, they expected it to be fixed immediately. (Ex. 102: p.87-89). A Target manager instructed Jim's supervisor Elvia Riojas to pressure wash the bathroom immediately, over her preference to

do this the next day. (Exh. 224: p.149-50).  On another occasion, a Target manager instructed her to get on her knees and scrub the floor around the cash registers. (Exh. 224: p.151-2).

30. Target managers directed the cleaning crews as to the time and location of their breaks. (Exh. 103: p.184).  The Target managers coordinated these breaks with where Target regular restocking employees were working at the time and with the time those regular employees took their breaks. (Ex. 103: p.184).

31. At the end of the shift, a Target manager "walked the store" with the cleaning crew leader as the Target Morning Checklist was filled out. (Exh. 103: p.158).  The manager would then instruct the cleaners to go back and re-clean certain areas. (Exh. 103: p.159).  Until the areas were cleaned to the manager's satisfaction, she would not let the cleaners out of the store. (Exh. 103: p.160).  The cleaning crew could not control when this review was done, and Target managers frequently required the crew to stay longer than their normal shift. (Exh. 103: p.162).  Jim's Maintenance had no power to override a Target manager who held-over the cleaning crew. (Exh. 103: p.170).  Individual Target managers had the power to require use of the Target Morning Checklist or not. (Exh. 103: p.159).  A majority of the managers required a walk-through before allowing the cleaning crews to leave. (Exh. 104: p.90).

32. Target managers would call Jim's Maintenance supervisors into the store during the night and assign them tasks such as stripping and waxing the floor. (Exh. 224: p.122-8; Exh. 227: p.41-42).  For example, Target officials called Jim's supervisor Baudel Vasquez into the store and instructed him on where to sweep and clean because they had some visitors coming in. (Ex. 227: 13-14).  One plaintiff cleaning worker was called back into the store hours after her shift had ended because there was a spill on the carpeting. (Exh. 205 p.30-31).  The

Target manager said that if her crew did not return at that time, the store would be taken away. (Exh. 205 p. 30-31).

33. Target managers had the authority to fire a cleaning worker whenever they wanted to. (Exh. 104: p.91; Exh. 103: p.192). On more than one occasion, a Target manager called Jim's Maintenance and ordered that an entire crew be fired. (Exh. 104: p.93). Jim's Maintenance had no authority to oppose this decision. (Exh. 104: p.93).

34. Target managers had the power to instruct Jim's Maintenance supervisors to remove a cleaning worker from the crew in their store. (Exh. 107, p.252-3). On various occasions Target managers gave this order to Jim's supervisor Elvia Riojas. (Exh. 107: p.252-3; p.268-72; p.272-74; p.272-75). The Jim's Maintenance supervisor had no authority to oppose these decisions. (Exh. 107: p. 252-3).

35. Target provided, ordered, and paid for the supplies and cleaning products the cleaning crews used. (Exh. 101 Target/Fisher depo: pp. 174-89).

36. For certain cleaning supplies, Target assigned Jim's Maintenance a chemical budget for each store. (Exh. 103: p.19-20). Jim's Maintenance was not able to negotiate the amount of this budget. (Exh. 103: p.38). Target instructed Jim's Maintenance to order the cleaning products from a particular company and from a Target-approved list of items. (Exh. 103: p.196). The cleaning products company then billed Target, not Jim's Maintenance. (Exh. 103: p.202). Jim's Maintenance had to use only the brands and supplier ordered by Target, even if in its judgment other brands would save money from the chemical budget. (Exh. 103: p.203).

37. Target required that Jim's Maintenance use all new cleaning equipment. (Exh. 104: p.33). In order to comply with this in its new Target stores, Jim's Maintenance often had to borrow money. (Exh. 104: p.43). For Jim's Maintenance to acquire this new equipment, the CEO of

13

Jim's Maintenance had to cash out his personal assets and invest them in the cleaning equipment. (Exh. 104: p126).

38. Target specified particular brands of cleaning equipment, as well as what size and what kind of equipment to use. (Exh. 104: p.34). "There was a Target equipment package that was set up through Tenant [scrubber company (Exh. 104: p.34)] that you would order for a new store setup." (Exh. 105: 109). Target negotiated a discount with Tenant to be given to Jim's if it bought from Tenant. (Exh. 105: 40). If Jim's Maintenance did not use Tenant and Eagle brand equipment of a certain size, or if Jim's tried to introduce a vacuum cleaner that was rebuilt or too loud, "that would send a direct e-mail from that manager or building services person through the chain of command -- the Target chain of command that we needed to perform our contract." (Exh. 105: p.36).

39. Jim's Maintenance failed to maintain records of the hours the cleaning crews worked. (Exh. 104: p.77). Jim's Maintenance knew of the cleaning crews' long hours: the Jim's Maintenance president complained to Target officials on several occasions that Target store managers were holding the cleaning crews past their scheduled stopping time. (Exh. 105: p.50-51).

40. Target required the cleaning workers to record their days and hours of work in a sign-in log book. (Exh. 102: p. 66-69).

41. Frequently, cleaning workers or entire cleaning crews continued to clean the same Target store as one cleaning contractor replaced another. (e.g. Exh. 208: p.18; Exh. 205: p. 40-41; Exh. 218: p.40; Exh. 203: p.45-49). One plaintiff remained crew leader after Target replaced Jim's Maintenance with Kustom Klean. (Exh. 208: p.18). At his Target store, the new contracting company simply asked Target store managers if they wanted to keep the crew; if

the Target managers thought the crew was doing a good job, the crew would remain. (Exh. 208: p.45-56).  At least two plaintiffs worked at Target under three different cleaning contractors. (Exh. 203: p.45-49; Exh. 208: p.45-56).

42. A Target manager would unlock the door to let the cleaning crew in at the start of their shift and then locked the door once they were inside. (Exh. 102: p. 66).  A Target manager normally had to unlock the door to let the crew out at the end of their shift. (Exh. 102: p.103).

43. The Target Contractor Handbook Cleaning requires cleaning crew workers to be checked in and checked out by the Target manager designated as the Leader on Duty (LOD) upon entering and exiting the store. (Exh. 20; Exh. 5a: General Target Corporate Info tab, p.7).

44. Sometimes the Target manager (Leader on Duty) who let the workers out of the store at the end of their shift in the morning, was the same manager who had let them into the store at the start of their shift. (Exh. 102: p. 105).

45. Target required cleaning crew workers to sign in on an Overnight Cleaning Crew Sign-in Log when they entered the store, showing the time they entered and then sign out when they left the store, showing the time they left. (Exh. 102: p.66-69; Exh. 20; Exh. 5a: General Target Corporate Info tab, p.7).

46. This Overnight Cleaning Crew Sign-in Log was a Target document (Exh. 224; p. 208-10; Exh. 51, 52; Exh. 101 Target/Fisher depo: p. 214-16).

47. These sign-in logs were kept at the Target store in a binder type log book at the team member (employee) service desk. (Exh. 102: p.66-70).  Target required each store to maintain such a logbook. (Exh. 102: p. 75; Exh. 5a: General Target Corporate Info tab, p.7).

48. The sign-in logs were available for the Target store managers to look at if they wanted to. (Exh. 102: p. 69-71).  Target would retain those sign-in logs for about 90 days and then

would throw them away without transcribing any of the information contained in the sign-in logs. (Exh. 102: p.70-71; Exh. 101 Target/Fisher depo).  No one in the Target Housekeeping Division ever attempted to review the sign-in logs or request copies, prior to the Price Waterhouse Coopers audit in the spring of 2006. (Exh. 101 Target/Fisher depo: p.218).

49. The morning checklists which the Target managers and crewleader signed each day had blanks for filling in the entry and departure times of the cleaning crew workers. (Exh. 26). Sometimes the cleaning workers' entry and departure times were recorded on this morning checklist and sometimes not. (Exh. 102: p.108-10).  The completed checklists were kept in a separate binder in the Target employee (team member) service area. There they were open for Target managers to review; but the Target managers never did. (Exh. 102: p.108-10). No one from Target ever inquired about or asked to look at the morning checklists in the binder (Exh. 102: p. 10).  The morning checklists were kept by Target for only 60-90 days, then disposed of. (Exh. 102: p. 108-10).

50. The sign-in logs stayed at the Target stores.  They were never sent to Jim's unless there was an investigation of a particular payroll problem. (Exh. 224: p.208-11; Exh. 228: p.64-65).

51. Target managers were aware that cleaning crew workers had to stay late at least a couple of times a week following the morning walk through to correct tasks required by managers. (Exh. 102: p.107-08, p.194).

52. Jim's supervisor Elvia Riojas complained to Target managers about the cleaning workers having to stay late to complete work required by the managers and about the workers having to work overtime for which they weren't compensated. However, the Target managers did not care and her Jim's supervisor told her she had to do what the managers wanted. (Exh. 224: p.142-44).

53. Target store managers were aware that the Jim's Maintenance cleaning crew workers were working 7 nights a week (Exh. 102: p.63-64), and that the workers daily worked from 10:00-10:30 pm until 7:00-8:00 am or later. (Exh. 194).

54. As early as the summer of 2004, Target was aware that one its cleaning contractors, Global Building Services, was failing to pay overtime to cleaning crews who worked in Target stores, including Target stores in Texas. (Exh. 23, Exh. 53; Exh. 54)  Global paid almost $2 million in unpaid overtime wages to settle an enforcement action by the U.S. Department of Labor. (Exh. 23, Exh. 53, Exh. 54)  Target was aware or had reason to know that the violations by Global involved in the USDOL action, included failure to pay workers a flat rate twice a month with no overtime and at a rate that fell below minimum wage, failure to pay payroll taxes, and failure to keep proper pay records. (Exh. 23, Exh. 53; Exh. 54; Exh. 101 Target/Fisher depo: p.314-315).

55. At the time of the Global Building Services wage enforcement action, Target did not collect further information or take further action with respect to Jim's or its other cleaning contractors other than require them to sign a conclusory certification that they were complying with the wage laws. (Exh. 101 Target/Fisher depo: p.311-313, 322-26).

56. Target did require Global to take specific corrective measures with regard to its internal business practices, including pay method and practices, payroll tax practices, recordkeeping, and its engagement of an third party monitoring organization. (Exh. 23; Exh. 101 Target/Fisher depo: p.316-22)  Target did not require any such measures from Jim's or its other cleaning contractors. (Exh.316-22).

57. Until 2006, Target did not take any steps to look beneath the conclusory certifications by Jim's or other contractors to determine whether the certifications were true. (Exh. 101 Target/Fisher depo: p.311-313.)

58. Target managers and corporate officials were well aware of frequent complaints about pay problems experienced by Jim's Maintenance cleaning workers. (Exh. 33; Exh. 35; Exh. 36; Exh. 37; Exh. 27; Exh. 224: p.242-45).  Individual workers would complain to Target managers about their pay and the Target managers would intervene on their behalf by contacting the Jim's Maintenance head office.  The workers usually got a more immediate and definite response if they directed their pay complaints to the Target manager than if they directed the complaint to their Jim's supervisor. (Exh. 224: p.242-45; Exh. 229: p.12-13).

59. In early 2006, Target required all of its cleaning contractors to submit to an audit of their wage and hiring practices by Price Waterhouse Coopers whom Target had engaged to conduct the audit. (Exh. 18; Exh. 19; Exh. 38; Exh. 101 Target/Fisher depo: p. 196-209). The Price Waterhouse Coopers audit confirmed that Jim's Maintenance was treating the cleaning workers in its crews as independent contractors and failing to keep required wage and hour records. In addition the record keeping deficiencies prevented Price Waterhouse Coopers from conducting an assessment of Jim's compliance with overtime requirements. (Exh. 19).

60.  Based on the Price Waterhouse Coopers audit, Target made a decision to terminate all of its store contracts with Jim's Maintenance. (Exh. 101 Target/Fisher depo: p.233-38).

61. Target's principal concern leading to termination of its contract with Jim's was *not* the potential wage violations documented in the Price Waterhouse Coopers audit as those might impact the overnight cleaning crews. (Exh. 101 Target/Fisher depo: p.238). Rather Target's

principal concern was Jim's failure to properly classify its exempt administrative staff for wage purposes and Jim's failure to obtain the proper tax documents, the W-4 forms, for the cleaning workers (Exh. 101 Target/Fisher depo: p.236-38). The Price Waterhouse Coopers audit had determined that Jim's was giving its workers W-9 independent contractor forms instead. (Exh. 19).

62. Target was aware that Price Waterhouse Coopers had found that Jim's inadequate record keeping had prevented the auditors from determining whether the cleaning workers were getting the required overtimes pay. (Exh. 101 Target/Fisher depo: p.220; Exh. 19: §4.2). However, Target did not make any additional inquiries to determine whether the workers were receiving the required overtime pay. (Exh. 101 Target/Fisher depo: p.220-21).

63. Target is not aware of any steps that were taken to follow up on the Price Waterhouse Coopers findings regarding proper payment of payroll taxes nor did Target report to the IRS that payroll taxes apparently weren't being paid by Jim's Maintenance. (Exh. 101 Target/Fisher depo: p.221-22). Target is not aware of any steps that were taken to follow up the Price Waterhouse Coopers findings with the Department of Labor of the Texas Workforce Commission. (Exh. 101 Target/Fisher depo: p. 222).

64. Target never reported Jim's apparent violations of wage, recordkeeping, or payroll tax requirements to the U.S. Department of Labor, the IRS, or the Social Security Administration, or the applicable state unemployment insurance agencies. (Exh. 101 Target/Fisher depo: p.385-86).

65. At the time Target decided to terminate all of Jim's store contracts, Jim's had workers cleaning 68 Target stores. (Exh. 21).

66. On May 23, 2006, Target first notified Jim's Maintenance that it would be terminating all of its business with Target two days later on May 25, 2006. (Exh. 101 Target/Fisher depo: p.253-55; Exh. 39; Exh. 15).

67. Target had already made its decision to terminate Jim's and had begun lining up replacement contractors seven weeks earlier at the start of April, 2006. (Exh. 21; Exh. 101 Target/Fisher depo: 239-42).  Target lined up several of its other current cleaning contractors to take over cleaning the stores where Jim's would be terminated. (Exh. 21).

68. Target made a decision not to notify Jim's Maintenance about the termination of its contracts until two days before the termination. (Exh. 101 Target/Fisher depo: 253-55; Exh. 21: p.0311).  Target did inform the replacement contractors well in advance that Jim's Maintenance would be terminated. (Exh. 21).  Target also informed the store managers at the stores Jim's was currently cleaning seven days in advance of the termination.  However, Target took care to ensure that those store managers did not themselves give any prior notice to Jim's or to the cleaning workers in advance of the two days notice Target had determined to provide. (Exh. 21; p.0311).

69. Target did not consider that the Jim's Maintenance cleaning workers who had been cleaning Target's stores might lose their jobs. (Exh. 101 Target/Fisher depo: p. 255-258).  Target did not consider that the Jim's cleaning workers might be owed overtime wages for the work they had done cleaning Target stores.  Target did not consider that terminating the Jim's contracts on only two days notice might cause the cleaning workers to not received their last paycheck.  Target did not feel it had any responsibility to let those workers know even a week in advance that the contracts they were employed under were about to be terminated.  Target did not consider that those cleaning workers might need a little more time to find

another job, nor that they might need the income from that job to support themselves, nor that their families might be counting on that income for their basic support. (Exh. 101 Target/Fisher depo: p.256-58).  Target's corporate representative, Ted Fisher, did believe, that if some of his own employees were to be terminated through no fault of their own, it would have been the right thing to do to give them more advance notice than Target gave the Jim's cleaning workers. (Exh. 101 Target/Fisher depo: p.258-59).

70.  When Target terminated its contracts with Jim's Maintenance on May 25, 2006, this put Jim's out of business. (Exh. 104: p.65).  Jim's 68 store contracts with Target were essentially its entire business at the point (with the sole exception of three employees cleaning a vocational school in Oklahoma). (Exh. 103: p.12-13).  Since at least 2003, Target stores had constituted essentially the entire business of Jim's Maintenance (Exh. 104: p.42).

71. Target had been aware of the percentage of Jim's business that was solely with Target at least since mid-2005 when Target obtained that information as part of rebidding store contracts with Jim's and its other cleaning contractors. (Exh. 101 Target/Fisher depo: p.387-89).

72.  After Target terminated Jim's Maintenance's contracts, Target also unilaterally decided to retain all of the fees it owed to Jim's for the cleaning services Jim's Maintenance had performed in all 68 Target stores for the entire month of May 2006. (Exh. 101 Target/Fisher depo: p.351-53; Exh. 22; Exh. 23: Exh. 40; Exh. 41).  The amount that was owed to Jim's and Target retained $496,414.00. (Exh. 41).

73. As a consequence of  Target's decision not to pay Jim's the $496,000.00 in store cleaning fees it had earned for the month of May 2006, Jim's was not able to pay the last paycheck it owed to its cleaning workers. (Exh. 104: p.8-9).

74. As a consequence of Target's retaining the store cleaning fees owed to Jim's for the month of May 2006, none of the Jim's cleaning workers who had cleaned Target stores received their last paycheck for the labor they had performed cleaning Target's stores from May 16 through May 25, 2006. (Exh. 104: p.8-9).

75. Target states that it retained the $496,414.00 in order to use those funds to defend itself in this lawsuit. (Exh. 101 Target/Fisher depo: p.352).

76. Target retained the $496,414.00 is still owed to Jim's pursuant to a right Target claims it reserved to itself in its contract with its cleaning contractors, to use such funds to pay its legal expenses in this lawsuit. (Exh. 12: p. 7, §11, 3rd ¶; Exh. 101 Target/Fisher depo: p.368, p.532).

77. Target has refused to answer why Target has decided not to use the $496,414.00 that it retained to pay the Jim's cleaning workers their last pay check – based on the advice of its counsel claiming attorney-client privilege. (Exh. 101 Target/Fisher depo: 363).

78. Target has refused to answer why Target has decided not to use the $496,414.00 that it retained to pay the Jim's cleaning workers the minimum wages and overtime pay they are due – based on the advice of its counsel claiming attorney-client privilege. (Exh. 101 Target/Fisher depo: 363-65).

79. Target contends that it "is committed to conducting business with the highest level of ethics integrity and honesty." (Exh. 101 Target/Fisher depo: p.375-76; Exh. 33).

80. Target has refused to answer whether it believes that keeping the $496,000 that would have been used to pay the Jim's Maintenance cleaning workers is in keeping with the highest level of ethics and integrity  –  based on the advice of its counsel claiming attorney-client privilege (Exh. 101 Target/Fisher depo: p.375-81).

81. Target has refused to answer whether it believes that most members of the public would think that preventing workers from being fully paid is in keeping with the highest level of ethics and integrity – based on the advice of its counsel claiming attorney-client privilege (Exh. 101 Target/Fisher depo: p.380-85).