Smith, Trent - Vol. I
```
0001
 1              IN THE UNITED STATES DISTRICT COURT
 2                  WESTERN DISTRICT OF TEXAS
 3   JUAN ISIDRO ITZEP, et al.,   )

 4       Plaintiffs,              )

 5   -vs-                         )  No. SA-06-CA-0568-XR

 6   TARGET CORPORATION, et al.,  )

 7       Defendants.              )
 8
 9
10
11
12         VIDEO DEPOSITION OF TRENT SMITH
13
         TAKEN ON BEHALF OF THE PLAINTIFFS
14
         IN OKLAHOMA CITY, OKLAHOMA
15
16            ON AUGUST 27, 2007
17
18
19
20
21
22
              CITY REPORTERS, INC.
23          117 PARK AVENUE, FIRST FLOOR
            OKLAHOMA CITY, OKLAHOMA  73102
24              (405) 235-3376
25   REPORTED BY:  KIM GLOVER, CSR, RPR, RMR
0002
 1             A P P E A R A N C E S
 2
   FOR THE PLAINTIFFS:
 3
          R. CRAIG DEATS
 4        Attorney at Law
          DEATS, DURST, OWEN & LEVY
 5        1204 San Antonio Street, #203
          Austin, Texas  78701
 6
          WILLIAM H. BEARDALL, JR.
 7        Attorney at Law
          EQUAL JUSTICE CENTER
 8        510 S. Congress Avenue, #206
          Austin, Texas  78704
 9
   FOR THE DEFENDANT TARGET:
10
          SHANNON L. MILLER
11        DAVID T. WILEY
          Attorneys at Law
12        JACKSON LEWIS
          2001 Park Place North, #650
13        Birmingham, Alabama  35201
   FOR JIM'S MAINTENANCE:
14        RICHARD A. PIZZO
          Attorney at Law
15        1515 South Denver Avenue
16
```
Page 1

Smith, Trent - Vol. I
```
17        Tulsa, Oklahoma  74119

          PHILIP HURTT
18        Attorney at Law
          BRANCH, CONNER-HUETT & HURTT
19        1525 Southwest 89th
          Oklahoma City, Oklahoma  73159
20   ALSO PRESENT:
21        ELENOR BRYANT
          JOHN MYRICK
22        JUSTIN TULLIUS
          JIM FUNDERBURGH
23        BRYAN FUNDERBURGH
24
25
0003
 1             S T I P U L A T I O N S
 2        It is hereby stipulated and agreed by and
 3   between the parties hereto, through their respective
 4   attorneys, that the deposition of Trent Smith may be
 5   taken on behalf of the Plaintiffs, on August 27,
 6   2007, in Oklahoma City, Oklahoma, by Kim Glover,
 7   Certified Shorthand Reporter within and for the State
 8   of Oklahoma, pursuant to Notice.
 9        It is further stipulated and agreed by and
10   between the parties hereto, through their respective
11   attorneys, that all objections, except as to the form
12   of the question and the responsiveness of the answer,
13   are reserved until the time of trial, at which time
14   they may be made with the same force and effect as if
15   made at the time of the taking of this deposition.
16             * * * * * * * *
17
18
19
20
21
22
23
24
25
0004
 1                 TRENT SMITH,
 2   of lawful age, being first duly sworn, testified on
 3   his oath as follows:
 4             DIRECT EXAMINATION
 5   BY MR. DEATS:
 6        Q   Would you, please, state your name?
 7        A   Trent Smith.
 8        Q   And your address and telephone number?
 9        A   5921 Holzman, H-o-l-z-m-a-n, Avenue,
10   Choctaw, Oklahoma, 405-391-7648.
11        Q   And what's the zip code there?
12        A   73020.
13        Q   And is that a home address or a
14   business address?
15        A   Home.
16        Q   Okay.  Are you currently employed?
17        A   I work for myself.
18        Q   Okay.  And what sort of work do you
19   do?
20        A   We own some rental property and try to
21   build duplexes --
```
Page 2

Smith, Trent - Vol. I
```
22        Q   Uh-huh.  And when --
23        A   -- for sale.
24        Q   And when you say "we," who is "we"?
25        A   Bryan Funderburgh is my partner.
0005
 1        Q   Okay.  Have you ever had your
 2   deposition taken before?
 3        A   Yes, a long time ago.
 4        Q   In what sort of circumstances?
 5        A   In Texas.  I think I was probably 17.
 6   There was a glass door exploded on me in Arlington,
 7   and there was a lawsuit, trying to get the medical
 8   expenses paid.
 9        Q   Okay.  A personal injury claim?
10        A   Yes.
11        Q   Okay.  So are you generally familiar
12   with the way a deposition works and the uses that can
13   be made of deposition testimony?
14        A   Not -- no.
15        Q   Okay.  Well, do you understand that
16   you're here today testifying under oath?
17        A   Yes.
18        Q   And that, in some circumstances, at
19   least, the deposition testimony that you give today
20   could be used in court, in lieu of actual live
21   testimony.
22             Do you understand that?
23        A   Yes.
24        Q   If I ask you a question today and you
25   don't understand the question or you don't hear it,
0006
 1   would you ask me to repeat or explain the question?
 2        A   Yes.
 3        Q   And, by the same token, if you don't
 4   do that, can I assume that you at least felt that you
 5   understood the question?
 6        A   Yes.
 7        Q   Now, you understand that you're here
 8   today because of your former capacity with Jim's
 9   Maintenance & Sons, Incorporated; right?
10        A   I -- yes.
11        Q   And did I correctly say the name of
12   the company?
13        A   Jim's Maintenance & Sons,
14   Incorporated.
15        Q   Yes.
16        A   And it sometimes went by Jim's
17   Maintenance?
18        Q   And there was another name, Jim's
19        A   Yes.
20        Q   And there was another name, Jim's
21   Commercial Cleaning Services?
22        A   I'm not familiar with that one.
23        Q   Okay.  Now, prior to today's
24   testimony, have you and I met before?
25        A   Yes.
0007
 1        Q   Do you recall about how long ago that
 2   was?
 3        A   Two months.
 4        Q   And was that with the advice and
 5   consent of your attorney?
 6        A   Yes.
```
Page 3

Smith, Trent - Vol. I
```
 7        Q   And, approximately, how long did we
 8   meet?
 9        A   An hour.
10        Q   And was anybody else present while the
11   two of us met?
12        A   Yes.
13        Q   And who else do you recall being
14   present?
15        A   Jim Funderburgh, Bryan Funderburgh,
16   and this gentleman in the white.  (Indicating)
17        Q   You're pointing to a gentleman, Justin
18   Tullius?
19             THE WITNESS:  Are you Justin
20   Tullius?
21             MR. TULLIUS:  Yes.
22        Q   (By Mr. Deats)  And what sorts of
23   things did we discuss during that conversation?
24        A   Employment capacity for your clients,
25   I suspect.
0008
 1        Q   Okay.  In talking about the cleaning
 2   operation that Jim's Maintenance did for Target
 3   stores?
 4        A   Yes.
 5        Q   Now, have you had any prior contact
 6   with Target's attorneys concerning this case?
 7        A   No.
 8        Q   Do you know whether or not Target's
 9   attorneys have visited with any other representatives
10   of Jim's Maintenance in connection with this suit?
11        A   No.
12        Q   Now, what was your relationship to
13   Jim's Maintenance?
14        A   I was the account representative.
15        Q   And what did your duties, as account
16   representative, entail?
17        A   To seek clients and then take care of
18   them, be a customer service person for that account.
19        Q   And were you the account
20   representative, then, for Target Corporation?
21        A   Yes.
22        Q   And I'll just refer -- can we agree
23   that we will just refer to Target Corporation as
24   Target?  Okay?
25        A   Yes.
0009
 1        Q   Are you aware of any other trade names
 2   that Jim's Maintenance & Sons, Incorporated, went by,
 3   other than Jim's Maintenance?
 4        A   No.
 5        Q   And if -- if you can, who -- how was
 6   Jim's Maintenance originally formed?
 7        A   I don't know.
 8        Q   Do you know who originally formed
 9   Jim's Maintenance?
10        A   Jim Funderburgh, is what I've been
11   told.
12        Q   Okay.  And do you know approximately
13   when Jim's Maintenance came into existence?
14        A   Our business cards say "established
15   1979."
16        Q   But I take it you weren't part of the
17   company at that time?
```
Page 4

Smith, Trent - Vol. I

```
18      A       No.
19      Q       When did you first join the company?
20      A       I believe it was, maybe, 1999.
21      Q       And did you start out as an account
22 representative or in another capacity?
23      A       Account representative.
24      Q       And who else was in the company at the
25 time you joined?  Who was its president, if you know?
0010
1       A       Jim Funderburgh.
2       Q       And beneath Jim Funderburgh, were
3 there -- was there a vice-president?
4       A       I don't know.
5       Q       Okay.  Who are the other people -- or
6 the other principals in the company?
7       A       Bryan Funderburgh.
8       Q       And what position did Bryan
9 Funderburgh hold?
10      A       I don't know.  It -- I wasn't part of
11 that.
12      Q       Did he -- was he somehow related to
13 the operations side of the business?
14      A       Yes.
15      Q       Okay.
16      A       Yes.
17      Q       And -- so we have Jim Funderburgh,
18 Bryan Funderburgh, yourself.
19              Were there others involved in
20 operating the business on a day-to-day basis?
21      A       No.
22      Q       Okay.
23      A       I mean, there were many other people
24 within the company, but those were --
25      Q       Okay.
0011
1               -- the principals, I guess.
2       Q       Did you -- where was the company
3 headquartered?
4       A       Harrah, Oklahoma.  Harrah, Oklahoma.
5       Q       Okay.  And, in headquarters office,
6 approximately, how many employees did you have?
7       A       Five, including myself.
8       Q       And would that also include Bryan and
9 Jim Funderburgh?
10      A       Yes.
11      Q       By the way, what's the relationship
12 between Bryan and Jim Funderburgh?
13      A       Father/son.
14      Q       And who were the other two
15 employees, besides the three of you?
16      A       Ruth Talent and Vickie.
17      Q       Do you recall Vickie's last name?
18      A       Vickie -- no.
19      Q       And what did Ruth Talent and Vickie
20 do?
21      A       Ruth was in charge of my secretary and Vickie
22 was in charge of paperwork.
23      Q       Did you have any obligations with
24 regards to the payroll function?
25      A       Paying people?  I did not pay people
0012
1 or cut checks or any of that.
2       Q       Did you play any part in setting up
                        Page 5
```

Smith, Trent - Vol. I

```
3 the payroll system?
4       A       No.
5       Q       Were you generally familiar with how
6 the payroll system operated?
7       A       Yes.
8       Q       Is Jim's Maintenance still in business
9 today?
10      A       No.
11      Q       Why is that?
12      A       I think our obligations were more than
13 our -- how much was coming in.
14      Q       When did Jim's Maintenance cease
15 operations?
16      A       Right after we were fired by Target.
17      Q       That would have been in May of 2006?
18      A       Yes.
19      Q       At that point in time, May 2006, was
20 Jim's Maintenance providing cleaning services for any
21 entities other than Target?
22      A       A local school.
23      Q       Okay.  And, approximately, how many
24 Target stores, if you know, was Jim's Maintenance
25 cleaning prior to May of 2006?
0013
1       A       Around 80.
2       Q       So, other than the 80 Target entities
3 and this one local school, were you providing -- was
4 Jim's Maintenance providing cleaning services for any
5 other entities?
6       A       No.
7       Q       Do you have any plans at present to
8 move or change your location?
9       A       No.
10      Q       Now, did you start working for Jim's
11 Maintenance before Jim's started working for Target?
12      A       Yes.
13      Q       And I believe you said that you
14 started in, approximately, 1999?
15      A       Yes.
16      Q       And what sorts of service was Jim's
17 providing at that time?
18      A       They were providing cleaning services
19 for Service Merchandise.
20      Q       And when you say "Service
21 Merchandise," are you talking about things like big
22 box stores, that sort of thing?
23      A       There was a store called Service
24 Merchandise --
25      Q       Oh, I --
0014
1               -- that is now out of business.
2       Q       Oh, okay.  So it was a specific
3 entity?
4       A       Yes.
5       Q       And how long did you keep that
6 contract with Service Merchandise?
7       A       Until they closed their doors.  I
8 don't remember.  Approximately 2001, I'm guessing,
9 when they shut down.
10      Q       Okay.  And did you have any
11 relationship or know Jim or Bryan Funderburgh before
12 you came to work for Jim's Maintenance?
13      A       Yes.
                        Page 6
```

Smith, Trent - Vol. I

```
14      Q       What -- briefly, describe for me --
15 what's your educational history?
16      A       High school, college.
17      Q       And when did you graduate high school?
18      A       '87.
19      Q       And was that -- where was that high
20 school?
21      A       Choctaw High School.
22      Q       And you went to college after that?
23      A       Yes, I did.
24      Q       And where did you go to college?
25      A       University of Oklahoma.
0015
1       Q       Did you graduate from Oklahoma?
2       A       Yes.
3       Q       What year?
4       A       '92.
5       Q       And what degree did you have?
6       A       Business.
7       Q       And where did you have employment
8 prior to coming to Jim's Maintenance?
9       A       Many places.
10      Q       Okay.  Why did you decide to come to
11 work for Jim's Maintenance in 1999?
12      A       I was offered a position as an account
13 representative; that they had a feeling that Service
14 Merchandise was not doing very well and they needed
15 to go out and get some more accounts.
16      Q       Okay.  Now, do you recall the first
17 time that Jim's Maintenance began doing work for
18 Target?
19      A       Yes.
20      Q       Approximately, when did that occur?
21      A       2000.
22      Q       Does the summer of 2000 sound about
23 right?
24      A       Probably, yes.
25      Q       And what were the circumstances under
0016
1 which Jim's first went to work for Target?
2       A       (No verbal response)
3       Q       I guess what I'm asking is:  How did
4 you get your first contract with Target?
5       A       We contacted the regional building
6 operations person in San Antonio, which was Harlin
7 Murray, and got the information from him on a store
8 that was opening -- soon to open, was under
9 construction, and we bid on it.
10      Q       (Short Break)
11              (Reporter read back previous
12              question and answer)
13      Q       (By Mr. Deats)  And was that store
14 located in a small town called Selma?
15      A       Yes.
16      Q       And, if you know, how did Jim know to
17 call Harlin Murray with regards to the opening of
18 that store, if you know?
19      A       I called him.
20      Q       Okay.  You called Mr. Murray?
21      A       Yes.
22      Q       Okay.  And how did you know to call
23 Mr. Murray?
24      A       I called a Target store and asked for
                        Page 7
```

Smith, Trent - Vol. I

```
25 -- asked who to talk to.
0017
1       Q       Okay.  And had you been doing any
2 business, other than local business, prior to that
3 time in the local Oklahoma area?
4       A       No.
5       Q       Where else had you been working for
6 Service Merchandise?
7       A       All over the country.
8       Q       Okay.  So when you called -- were you
9 still working for Service Merchandise at the time you
10 started working for Target?
11      A       Yes.
12      Q       And how many Service Merchandise
13 stores were you cleaning at that time, approximately?
14      A       I don't know.
15      Q       Were you -- was your cleaning contract
16 for any specific region or was it just, generally,
17 all over that place?
18      A       I believe it was regionalized.
19      Q       And -- and what region were you
20 working for Service Merchandise in, if you recall?
21      A       I don't remember.
22      Q       Okay.  So you contacted Harlin Murray
23 an expressed an interest in the Selma store?
24      A       Yes.
25      Q       And did you know, at the time you
0018
1 contacted Mr. Murray, that the Selma store was being
2 built?
3       A       Yes.
4       Q       And, as a result of your discussions
5 with Mr. Murray, were you able to reach an agreement
6 on a contract?
7       A       Yes.
8               (Plaintiff's Exhibit No. 1 was
9               marked for identification)
10      Q       (By Mr. Deats)  I'm handing you a
11 document that's been labeled for identification
12 purposes as Plaintiff's Exhibit No. 1.  I'll ask you
13 to look at that document for a moment.
14              Do you recognize that as a copy of the
15 original contract between Jim's Maintenance and
16 Target?
17      A       I believe so.
18      Q       And, if you look on the first page,
19 what's the date of that contract?
20      A       Date agreement was printed was June
21 6th, 2000.
22      Q       And it was signed by representatives
23 of Target and Jim's Maintenance in June of 2000?
24      A       Yes.
25      Q       And this was a contract at that time
0019
1 for a single store located in Selma, was it not?
2       A       Yes.
3       Q       And if we look at Page 2 of the
4 contract, was there a price established for providing
5 cleaning services for the store in Selma?
6       A       Yes.
7       Q       And what was that price?
8       A       Under base fee -- "basic services," it
9 says $9,338.33 a month.
                        Page 8
```

Smith, Trent - Vol. I

```
10      Q    Okay.  And there's also a column, I
11 see, on Page 2 of Exhibit 1, for -- that's entitled
12 "Maximum Chemical Budget."
13           Do you see that?
14      A    Yes.
15      Q    And what does that represent?
16      A    It was for $7,500 a year.  That was
17 how much -- the chemical budget that Target had
18 allocated for that store.
19      Q    Okay.  Now, how was the price that you
20 were going to clean the store at -- how was that
21 determined?
22      A    This price, we bid.  We turned a bid
23 in.  (Indicating)
24      Q    Okay.  And when you say "this price,"
25 you're talking about the $9,338.33?
0020
 1      A    Yes.
 2      Q    If you recall, were you bidding
 3 against other cleaning services for the store?
 4      A    Yes.
 5      Q    And what about the chemical budget?
 6 Did -- how was that arrived at?
 7      A    That's assigned by Target.
 8      Q    Okay.  And the store indicates that
 9 it's Store T-1204?
10      A    Yes.
11      Q    And located in Selma?
12      A    Yes.
13      Q    Now, if you recall, what were the
14 arrangements for doing things, like supplying
15 employees to clean the store, that were made between
16 you and Target?
17      A    I don't understand your --
18      Q    You had a -- you had an established
19 operation for -- for providing employees, did you
20 not?
21      A    Yes.
22      Q    Okay.  And I noticed on -- beginning
23 on Page 3 of Deposition Exhibit 1, there is an item
24 called "Terms and Conditions."
25           Does that set forth the terms and
0021
 1 conditions of the contract as you understood them?
 2      A    Where are we at?
 3      Q    I'm looking on Page 3.
 4           MR. PIZZO:  Terms and conditions.
 5           THE WITNESS:  What was the
 6 question again?
 7      Q    (By Mr. Deats)  Did -- did this set
 8 forth the terms and conditions of the contract?
 9      A    Yes.
10      Q    And if you go a little bit further
11 down, you will see a document, Exhibit A, "Floor
12 Maintenance Specifications."
13      A    Yes.
14      Q    Now, with regards to each of these
15 documents -- first, with regards to the terms and
16 conditions, were you able to negotiate the language
17 of this contract?
18      A    There was -- no.  No.  That was
19 assigned.
20      Q    To your knowledge, who wrote the terms
```
Page 9

Smith, Trent - Vol. I

```
21 of this part of the contract labeled "Terms And
22 Conditions"?
23      A    Target.
24      Q    And, then, if we look at Exhibit A,
25 "Floor Maintenance Specifications," was there any
0022
 1 negotiation with regards to these floor maintenance
 2 specifications?
 3      A    No.
 4      Q    Who wrote the floor maintenance
 5 specifications, to your knowledge?
 6      A    Target.
 7      Q    And, then, if we turn three more
 8 pages, you will see a document entitled "Cleaning
 9 Specifications Daily Requirements."
10           Was this part of the original
11 contract?
12      A    I suspect.
13      Q    And did you play any role in
14 negotiating these daily requirements?
15      A    No.
16      Q    Who established those?
17      A    That's Target.
18      Q    Okay.  Then, turning one more page in
19 the exhibit, there is a document entitled "Frequency
20 As Necessary To Meet Contract Spec -- Expectations."
21           Did you have any part in negotiating
22 these expectations?
23      A    No.
24      Q    Then, there is an Exhibit B and an
25 addendum to Exhibit B, and Exhibit B is entitled
0023
 1 "Security Regulations."
 2           Did you have anything -- any role in
 3 negotiating Exhibit B?
 4      A    No.
 5      Q    Who, if you recall, drafted Exhibit B?
 6      A    Target.
 7           MR. PIZZO:  Can I interject
 8 something and ask the question.  There's numbers.
 9 Are these Bates stamp numbers you have down at the
10 bottom, Craig?
11           MR. DEATS:  Yeah.  For
12 clarification, these are documents that were received
13 from Target and represented to us to be documents
14 that had been obtained, in turn, from Jim's
15 Maintenance.
16           MS. MILLER:  Yeah.  These were
17 documents that we received pursuant to a subpoena we
18 issued in the case.
19           MR. PIZZO:  Okay.
20           MS. MILLER:  So, for
21 clarification purposes, we Bates stamped them by
22 number, with a "J" on the end of it, to indicate that
23 we received them from Jim's Maintenance.
24           MR. PIZZO:  Okay.  Thank you.
25           I didn't mean to interrupt,
0024
 1 Craig.
 2           MR. DEATS:  No.  No problem.
 3      Q    (By Mr. Deats)  Then, finally, the
 4 very last page of the exhibit is an Exhibit D,
 5 "Certification Statement."
```
Page 10

Smith, Trent - Vol. I

```
 6      Q    Do you recall whether or not this was
 7 part of the original contract?
 8      A    I don't know.
 9      Q    Okay.  And it's signed by Bryan
10 Funderburgh, as president.  So maybe these questions
11 would be more appropriately addressed to Mr.
12 Funderburgh?
13      A    Yes.
14      Q    I guess I'm going to call him Bryan,
15 for ease of reference, since we have got two Mr.
16 Funderburghs in the room, but --
17      A    Okay.  Now, how long, after June of
18 2000, did you continue cleaning just one store for
19 Target?
20      A    Probably less than a year.
21      Q    Okay.  And what happened at that
22 point?
23      A    Well, we started bidding -- bidding on
24 all the new stores that were coming open in the area.
25      Q    And when you say "in the area," you're
0025
 1 talking about the San Antonio area?
 2      A    Yes.
 3      Q    And were you successful in bidding on
 4 the stores?
 5      A    Yes.
 6      Q    If you know, who were some of your
 7 competitors in bidding for these stores?
 8      A    I don't remember.  They were local.
 9      Q    And what was the second store you were
10 successful in bidding on, if you recall?
11      A    I'll guess.  It was either 1354 or
12 1785.
13      Q    And 1354 was a store located in San
14 Antonio, on Blanco Road?
15      A    Yes.
16      Q    And when you were awarded that store,
17 did you execute another contract similar to
18 Plaintiff's Exhibit 1?
19      A    I suspect, yes.  I didn't do that.
20      Q    Okay.  It's possible that Bryan
21 Funderburgh did?
22      A    Yes.
23      Q    To your knowledge, was there any
24 difference in the terms under which you would have
25 cleaned the second store than the terms for cleaning
0026
 1 this first store?
 2      A    No.
 3      Q    And, as with the first store, did you
 4 actually set a bid price for the monthly price that
 5 you would charge to clean the stores?
 6      A    Yes.  We turned in a bid and were
 7 awarded the contract.
 8      Q    After you got that second store in San
 9 Antonio, were you successful in bidding on any other
10 stores?
11      A    Yes.
12      Q    And what were the next -- what
13 was the next store or stores that you obtained?
14      A    I -- I vague -- I think it was 1785.
15      Q    And where is 1785 located, if you
16 recall?
```
Page 11

Smith, Trent - Vol. I

```
17      A    Right in San Antonio somewhere, close
18 to 1354.
19      Q    And did you execute -- do you know
20 whether or not you executed a contract for that
21 store?
22      A    No.  I know that they would send us
23 out a new contract -- when we were awarded a contract
24 for a store that was going to open, they would
25 reprint all of this, with the new -- you know, it
0027
 1 would be -- it would look similar to this and it
 2 would just have the next store below it, send it out,
 3 sign it, and send it back.  (Indicating)
 4      Q    And I'm referring to -- that's what
 5 happened when we got new stores.
 6      Q    Okay.  Now -- it looks like store 1785
 7 is located on Bandero Road in San Antonio.
 8           Does that accord with your
 9 recollection?
10      A    That sounds correct, yeah.
11      Q    Okay.  At some point, do you recall
12 whether or not you were awarded additional stores in
13 the Oklahoma City area?
14      A    Yes.
15      Q    And when did that occur, if you
16 recall?
17      A    Within the next year, they came to us
18 and said that their contractor was not performing in
19 Oklahoma.
20      Q    So, rather than you approaching them
21 and bidding on a new store, in the case of these
22 Oklahoma stores, then, Target approached you?
23      A    Yes.
24      Q    Did Target ask you to submit a bid to
25 clean the Oklahoma stores?
0028
 1      A    No.
 2      Q    How -- did you sign a contract to
 3 clean stores in Oklahoma?
 4      A    Yes.
 5      Q    And did that store -- did that
 6 contract cover all stores in Oklahoma, some stores?
 7 What do you recall?
 8      A    All stores in Oklahoma.
 9      Q    And, approximately, how many stores
10 was that?
11      A    Seven, I believe.
12      Q    Now, at this point in time, were you
13 still cleaning Service Merchandise stores?
14      A    I'm not sure.  That's about the same
15 time when we stopped -- when they stopped.
16      Q    Okay.  And the reason you stopped
17 cleaning Service Merchandise stores was because
18 Service Merchandise went out of business?
19      A    Yes.
20      Q    How was the price per store determined
21 when you started cleaning the Oklahoma stores?
22      A    That was given to us.  They told us,
23 if we could do it at the same price that the previous
24 contractor was in there and provide new equipment for
25 their stores, then we could have it.
0029
 1      Q    And -- so they didn't want you to use
```
Page 12

Smith, Trent - Vol. I

2  any of the equipment that had been used by the prior
3  contractor?
4       A     No.  They were very disappointed in
5  the prior -- they had been putting new equipment
6  -- and when they get a new contractor, they expect
7  new equipment coming in.  That's part of -- that goes
8  along with the change.
9       Q     Okay.  So the deal was, if you would
10 clean the stores at the same price as the old
11 contractor, Jim's Maintenance could have them?
12      A     With new equipment.
13      Q     And did you sign a contract to clean
14 those Oklahoma stores?
15      A     I did not.
16      Q     Okay.  But do you know whether --
17      A     I'm sure they did, yes.
18      Q     And do you recall whether or not it
19 was similar to this contract which is Plaintiff's
20 Exhibit No. 17
21      A     I suspect.
22      Q     Now, do you recall what the name of
23 the former cleaning company was?
24      A     No.  No, I don't.
25      Q     And with regards to these stores, the
0030
1  chemical budget, was that something that was, more or
2  less, the same from store to store --
3       A     No.
4       Q     -- or did it vary?
5       A     It was assigned.  It's a percentage of
6  their store size.
7       Q     Okay.  And if you know, how did Target
8  arrive at the price -- other than it was the price
9  the former contractor did it, was there any formula
10 or anything that went into the price they set for
11 cleaning these stores in Oklahoma?
12      A     For -- no.  We were just given those
13 prices.
14      Q     And you don't know how they arrived at
15 them with the other contractor?
16      A     No.
17      Q     Now, were you able -- you said that
18 you had to provide new equipment.  Could you bring in
19 used equipment, that you had used in other locations,
20 or did you have to buy new equipment?
21      A     They asked for new equipment.
22      Q     Was that considered part of the deal
23 that you made with them, that you would provide
24 brand-new equipment?
25      A     Yes.
0031
1       Q     Did you have to make any special
2  arrangements to be able to provide new equipment for
3  these seven stores?
4       A     We had to lease new equipment.
5       Q     Okay.  Did you -- so you leased
6  equipment at that point, rather than trying to buy
7  equipment?
8       A     I believe so.
9       Q     Okay.  Now, at some point in time in
10 2001, did you enter into a contract with Target to
11 clean additional stores?
12      A     That might be the time frame.  I'm not

Page 13

Smith, Trent - Vol. I

13 familiar with the -- the exact date
14      A     MR. BEARDALL:  I don't have a
15 copy of -- or I can -- I can get a copy of this.
16      Q     Do you all have copies of these
17 contracts that you want to use your copy of?  This is
18 the one that's signed on October 15th.
19      A     I can pull out another one and
20 make it for you, if you want it.
21      A     MR. PIZZO:  October 15th of what
22 year?
23      A     MR. DEATS:  2001.
24      A     MR. PIZZO:  All right.
25      A     MR. BEARDALL:  Do you want to
0032
1  work off of yours, or I can get another copy of it?
2       A     MS. MILLER:  I do, and I have an
3  additional copy.
4       A     MR. BEARDALL:  Do you?  That
5  would be great.
6       A     MS. MILLER:  Let me -- let me
7  double-check it, to make sure it's the same.
8       A     MR. BEARDALL:  Okay.  Because
9  0001 are the ones that were numbered --
10      A     MS. MILLER:  Yeah.  The copy I
11 have is not based on that.
12      A     MR. BEARDALL:  And then it goes
13 through the 0035.
14      A     What are you looking for?
15      A     MS. MILLER:  My copy is not Bates
16 stamped, so --
17      A     MR. BEARDALL:  I understand.  I
18 was going to tell you the last thing in it is this --
19      A     MR. PIZZO:  Do you want to go off
20 this off the record or on the record?
21      A     MR. DEATS:  Yeah.  Let's go off
22 the record.
23      A     (Short Break)
24      A     (Plaintiff's Exhibit No. 2 was
25 marked for identification)
0033
1       Q     (By Mr. Deats)  I'm handing you a
2  document that's been labeled for identification
3  purposes as Plaintiff's Exhibit 2.
4       A     Do you recognize that as a copy of a
5  contract entered into between Target and Jim's
6  Maintenance in October of 2001?
7       A     Yes.
8       Q     And was this contract different in
9  some ways from prior contracts you had entered into
10 to clean other stores?
11      A     It has additional stores.
12      Q     Okay.  And how did you come to have
13 these additional stores, if you recall?
14      A     We were offered these areas.
15      Q     Now, if you know, at this point in
16 time, in August -- or October of 2001, was Target
17 changing the way it was approaching providing
18 cleaning services to its stores?
19      A     Yes.
20      Q     And what was your understanding of the
21 nature of that change?
22      A     In the past, we had bid on contracts --
23 or regions, or if somebody was getting kicked out,

Page 14

Smith, Trent - Vol. I

24 like in Oklahoma, they would -- they would come to
25 you and offer it to you, I suspect -- is what
0034
1  happened with us.
2       A     In this, they reduced -- they had
3  approximately 200 housekeeping companies that they
4  were paying, across the board, all different kinds of
5  prices for different reasons, whatever the regional
6  person negotiated with that store.
7       A     And, at this time, they decided to
8  stop doing that, and they -- in Minneapolis, Mike
9  Bell, the Building Services -- they started
10 negotiating these contracts out of Minneapolis,
11 instead of the regional people in the field.
12      Q     Okay.  Now, you mentioned a guy, Mike
13 Bell.  He was a Target employee?
14      A     Yes.
15      Q     And he was located in Minneapolis,
16 Minnesota?
17      A     Yes.
18      Q     And what was his title, if you know?
19      A     This stamp here says "vice-president,
20 Building Services."
21      Q     And, at that point in time, do you
22 know whether or not Target reduced the number of
23 cleaning contractors it was using nationwide?
24      A     Yes.
25      Q     Approximately, how many cleaning
0035
1  contractors did Target start using after this point
2  in time?
3       A     25.
4       Q     And were you assigned stores
5  individually, by region, on some other basis?  How?
6       A     By region.
7       Q     Okay.
8       A     By city.
9       Q     And what region or regions were
10 covered by this contract?
11      A     I recognize Oklahoma; Austin; Kansas
12 City; Kansas; San Antonio; Waco; West Texas.
13      Q     And we could determine the number of
14 stores simply by counting the stores that are listed
15 there on the first page of the contract; right?
16      A     Yes.
17      Q     And, at the point in time that you
18 agreed to this contract, did Jim's Maintenance
19 actually want all of the stores that were assigned to
20 it?
21      A     No.  There are a few stores that are
22 remote stores, that you lose a lot of money, that --
23 we were assigned the prices for each one of these
24 stores.
25      Q     Okay.
0036
1       A     And some of these stores are -- are
2  what we call "losers."  They're out in remote areas
3  and very difficult to supervise, provide
4  transportation, find employment for people.
5       A     It's -- it's more cost effective in
6  the urban areas.
7       Q     And were the stores that were less
8  cost effective located primarily in west Texas

Page 15

Smith, Trent - Vol. I

9       A     And rural Kansas.
10      Q     By the way, you mentioned -- among the
11 areas that you cleaned, you said Kansas City.  Are
12 you talking about Kansas City, Kansas, or Kansas
13 City, Missouri, or both?
14      A     Both.
15      Q     Did -- was there any negotiation?  Did
16 you, for example, say to Target, "Well, we want some
17 of these other stores, but we don't want west Texas,"
18 for example?
19      A     Yes.
20      Q     And what do you recall Target's
21 reaction being?
22      A     "No.  You -- you must take them all
23 together."
24      A     That was part of their price
25 reduction.  They -- on -- on lowering the prices of
0037
1  the contracts, they could -- they could -- there was
2  a -- it was less expensive for us to supervise urban
3  areas, cities, and they knew that.  So, instead of
4  having three contractors in Kansas City, they could
5  negotiate the price down lower and give one person
6  the contracts for Kansas City.
7       A     These Kansas City stores were offered
8  to another company before us, that couldn't do it at
9  that price and turned it down, and then they called
10 us and asked us if we would take Kansas City.
11      A     We were not former -- formerly in the
12 Kansas City market before this.
13      Q     Okay.  Now, you already were in the
14 San Antonio market, were you not?
15      A     Yes.
16      Q     Did Target, in negotiating this
17 contract, Plaintiff's Exhibit 2, with you, say that
18 you had to take certain stores in order to get some
19 of the more favorable stores in the urban areas?
20      A     You had to take all the stores.
21      Q     Okay.  Including stores like in west
22 Texas?
23      A     Yes.  You -- you couldn't give west
24 Texas away by itself.  You have to give something
25 good with it.  Like Kansas, rural Kansas goes along
0038
1  with Kansas City.
2       Q     Okay.  And when we're talking about
3  west Texas, like stores in Midland, Odessa, those
4  sort of places?
5       A     Lubbock, Wichita Falls.
6       Q     And you already mentioned this, but
7  did -- were you able to negotiate at all on the price
8  per store?
9       A     No.  It was take it or leave it.
10      Q     And were you able to negotiate at all
11 on the chemical budget for each store?
12      A     No.
13      Q     Were you able -- if we look down into
14 the contract after several pages of listings of
15 stores -- and, by the way, each store has the price
16 listed by it, does it not?
17      A     Yes.
18      Q     Okay.  But I don't see a chemical
19 budget listed for each store.  Do you know where, in

Page 16

Smith, Trent - Vol. I

20  the contract, the chemical budgets might be found?
21     A     It was a separate document.
22     Q     Do you recall what the name of that
23  document was?
24     A     No.
25     Q     And, then, if you get past that, you
0039
1  see another sheet marked "Terms And Conditions";
2  correct?
3     A     Yes.
4     Q     Were you able to negotiate with
5  regards to the language of this "Terms And
6  Conditions" document?
7     A     No.
8     Q     If you know, who drafted the "Terms
9  And Conditions" document?
10     A     Target.
11     Q     And, then, after "Terms And
12  Conditions," you will see a document "Contractor's
13  Procedural Rules."  It begins on a Bates stamp
14  Target/Itzep Confidential 14.
15                Do you see that?
16     A     Yes.
17     Q     Was this document part of the original
18  contract?
19     A     I suspect.
20     Q     Did you have any -- was Jim's
21  Maintenance able to negotiate the terms of the
22  contractor's procedural rules?
23     A     No.
24     Q     And, then, if you look on Page 2 of
25  the procedural rules, it talks about equipment and
0040
1  supplies.
2                And I assume you were not able to
3  negotiate with regards to that, either?
4     A     No.
5     Q     Then, if we go down a little bit
6  further, there are some instructions for housekeeping
7  contractor security regulations and, then,
8  housekeeping security regulations.
9                Were these part of the original
10  contract?
11     A     I suspect.
12                MR. PIZZO:  Wait a minute.  Oh,
13  okay.  I'm sorry.
14                THE WITNESS:  I suspect.
15                (By Mr. Deats)  Did you have -- were
16  you able to negotiate at all with regard to the
17  language of these documents?
18     A     No.
19     Q     Then, if you go down a little bit
20  further, you will see, on Page 23, a set of
21  housekeeping expectations.
22                MR. PIZZO:  Can you point me to
23  what page it is on the contract, since I don't have
24  the Bates stamped --
25                MR. DEATS:  Sure.  It's Page 10.
0041
1                MR. PIZZO:  Okay.  Thank you.
2                (By Mr. Deats)  Did -- was this part
3  of the original contract?
4     A     I suspect.
5     Q     And were you able to negotiate at all

Page 17

Smith, Trent - Vol. I

5  with regards to this?
6     A     No.
7     Q     Now, it also has some housekeeping
8  expectations for Marshall Fields, but were you
9  cleaning any Marshall Fields stores?
10     A     And I'm looking at Page 21 of the
11  contract -- excuse me.  21 is Mervyn's.
12                MS. MILLER:  Page 16.
13                THE WITNESS:  I believe --
14                (By Mr. Deats)  Page 16.
15     A     I believe we took the Mervyn's over at
16  the same time --
17     Q     Okay.
18     A     -- with the Targets -- with -- with
19  those Targets.  On or about that same time.
20     Q     But what about Marshall Fields?  Were
21  you doing any --
22     A     No.  Sorry.
23     Q     -- Marshall Fields stores?
24     A     No, we were not doing any Marshall
25  Fields.
0042
1     Q     And, then, looking at Page 21, there's
2  some housekeeping expectations for Mervyn's.
3                Now, did you have any -- did Jim's
4  have any role in negotiating those expectations?
5     A     No.
6     Q     Now, looking back at Page 1, it lists
7  the stores that you were cleaning when you first
8  signed this contract; correct?
9     A     Yes.
10     Q     And Mervyn's stores begin with an "M,"
11  followed by a number, do they not?
12     A     Yes.
13     Q     So does it appear to you, from looking
14  at the contract, whether or not you were cleaning any
15  Mervyn stores at this point in time?
16     A     This contract does not show that.
17     Q     And this contract, if you look on Page
18  1, shows a print date, does it not, in the lower,
19  left-hand corner?
20     A     Yes.
21     Q     And what's that printed date?  It's
22  rather small.
23     A     Printed 10/9/2001.
24     Q     And, then, Bryan Funderburgh, again,
25  signed for Jim's, as its president?
0043
1     A     Yes.
2     Q     And what's the date that he signed the
3  contract?
4     A     10/15/2001.
5     Q     And, then, the contract is signed for
6  Target by Michael A. Bell; correct?
7     A     Yes.
8     Q     And there's no date by his signature?
9     A     Yes.  Correct.
10     Q     And you have already indicated who Mr.
11  Bell is; correct?
12     A     Yes.
13     Q     And, again, looking at the contract as
14  an entirety, did Jim's have any role in negotiating
15  the language of this contract?

Page 18

Smith, Trent - Vol. I

16     A     No.
17     Q     Including the prices?
18     A     (No verbal response)
19     Q     No --
20     A     Correct.
21     Q     Okay.  Including the chemical budgets?
22     A     Correct.
23     Q     Now, there was also something called a
24  contractor's handbook, was there not?
25                MR. PIZZO:  Counsel, can you
0044
1  point the page out again?
2                MR. DEATS:  I -- I'm -- I'm not
3  looking at a page --
4                MR. PIZZO:  Oh, okay.  I'm sorry.
5                MR. DEATS:  -- right now of the
6  exhibit.
7                (By Mr. Deats)  There was something
8  called a contractor's handbook, was there not?
9     A     I believe.
10                Was it -- was it a brochure?
11     Q     I'm going to show you --
12     A     Oh, yes.  Yes.
13     Q     And we'll introduce that as an exhibit
14  later on, but --
15     A     Yes.
16     Q     Not my copy.
17     Q     (By Mr. Deats)  If you recall, was the
18  contractor's handbook made part of the contract, as
19  well, if you recall?
20     A     I -- that was given to us by Target at
21  the same time.
22     Q     And did you have any role in
23  negotiating the language of the contractor's
24  handbook?
25     A     No.
0045
1     Q     What was the purpose, as you
2  understood it, of the contractor's handbook?
3                That was to tell us what our -- to
4  tell us what our duties were.
5                MR. PIZZO:  I've got a lot of
6  marking in here, privately, so work product.  I think
7  I would rather have you -- and I think they copied it
8  almost identical, if not identical.
9                MR. DEATS:  Okay.  I'll tell you
10  what.  Let's mark it, right now, as Plaintiff's
11  Exhibit 3.
12                (Plaintiff's Exhibit No. 3 was
13                marked for identification)
14                MR. DEATS:  Shannon, if you want
15  to look it over.  It's just a copy of what we have
16  already provided to you.  If you want, I'll let you
17  go over it, at a break, page by page, to make sure
18  you have got a copy of everything.
19                (Short discussion held off the
20  record)
21     Q     (By Mr. Deats)  Looking back at
22  Plaintiff's Exhibit No. 2 --
23     A     And I'm looking at
24  the page Bates stamped 9, and it's Page 1 of the
25  "Terms And Conditions."
0046

Page 19

Smith, Trent - Vol. I

1                MR. PIZZO:  Oh, okay.
2     Q     (By Mr. Deats)  And I'm looking at
3  Paragraph No. 1, and do you see the second paragraph
4  under No. 1?
5     A     Yes.
6     Q     That paragraph does purport to
7  incorporate, by reference, the contractor handbook
8  into this agreement, does it not?
9     A     Yes.
10     Q     And I'm handing you a document that's
11  been labeled for identification purposes as
12  Plaintiff's Exhibit 3.
13                Do you recognize that document?
14     A     Yes.
15     Q     What is that document?
16     A     This is the contractor handbook.
17     Q     And was Jim's Maintenance provided a
18  copy of that handbook?
19     A     Target.
20     Q     And who provided Jim's Maintenance --
21     A     Target.
22     Q     Did you get that contractor's handbook
23  at the time Plaintiff's Exhibit 2 was signed, before,
24  or do you recall?
25     A     I was given this at this contractor
0047
1  meeting -- on the front of that housekeeping
2  contractor meeting, June 11th through 13th, that's
3  when we were provided these.
4     Q     Okay.  I see.  You were given this
5  contractor handbook at a contractor meeting June 11th
6  through 13th, 2002?
7     A     Yes.
8     Q     Is that the first time you recall
9  seeing this handbook?
10     A     Yes.
11     Q     But if we look back at Depo -- excuse
12  me, Plaintiff's Exhibit 2, and we've already looked,
13  it was actually incorporated, by reference, into the
14  contract that you signed with Target, was it not?
15     A     Yes.
16     Q     And when I say "you," of course, I
17  mean Jim's Maintenance.
18     A     I mean, I -- I'm reading that.  Yes,
19  it says -- it refers to the contractor handbook in
20  this contract.
21     Q     Now, did Jim's Maintenance have any
22  role in negotiating the contents of this handbook?
23     A     No.
24     Q     And you have already indicated the
25  purpose of the handbook, but, again, briefly, what
0048
1  was the purpose of your handbook, your understanding?
2     A     This was our guideline, our training.
3                Your training specifically for
4  providing cleaning services to Target?
5     A     Yes.
6     Q     And did you utilize this same handbook
7  later on, when you provided services for Mervyn's?
8     A     Yes.  I believe so.
9     Q     Now, you indicated that the contract
10  price per store was not negotiated; correct?
11     A     Yes.

Page 20

Smith, Trent - Vol. I

```
12        Q    what, if anything, do you know about
13   how Target arrived at assigning a price that a store
14   would be cleaned at?
15        A    We were told that they went online to
16   some kind of government web site on how much janitors
17   should be paid per hour, and then it was assigned per
18   -- per region or by state.
19             So Texas was the least paid, and then
20   it went all the way up.  Like the further north you
21   went -- New York was really high.  Their contracts
22   were ridiculous on how much they were paying people
23   in New York.
24        Q    Okay.  And do you recall Target
25   telling you anything else about how they assigned a

0049
1    price per store?
2         A    Also, with the amount of snow by
3    region.  You know, the further you got north, the
4    more snow you had, the more snow removal, possibly --
5    not removal, but the more salt that's tracked in.
6             So they would -- they would allocate
7    more -- you got a percentage more.
8             Oklahoma was paid a percentage -- a
9    small percentage more than Texas, and then it went
10   up.  Kansas was a little bit more.
11        Q    As a result of these new prices per
12   store, if you recall, did the amount you were getting
13   per store go up, go down, did it stay the same?
14        A    When we were assigned these stores?
15        Q    Yes, sir.
16        A    The prices went down.
17        Q    By, approximately, how much on
18   average, if you recall?
19        A    I don't remember.
20        Q    Did it vary from store to store,
21   though?  Did some stores actually go up, some go
22   down?  How did that work?
23        A    Yes.  I believe that to be the case.
24        Q    But, on average, the actual amount

0050
1    that you were being paid lessened?
2         A    Yes.
3         Q    Were there any stores where you saw
4    drastic cuts?
5         A    I don't know if it was this, but
6    following this contract, there was another contract
7    where we had a price reduction --
8         Q    Okay.
9         A    -- from -- so --
10        Q    I'm thinking specifically with regards
11   to -- I think you said that the store you originally
12   bid on was Selma; right?
13        A    Yes.
14        Q    Now, what happened to the price that
15   you were cleaning the Selma store under this
16   contract, if you recall?
17        A    It was a drastic -- there was a
18   drastic change.
19        Q    Selma is --
20        A    1204.
21        Q    -- 1204?
22        A    So, if we looked -- now, you said the
                              Page 21
```

Smith, Trent - Vol. I

```
23   original price was somewhere in the $9,300 range?
24        A    Yes.
25        Q    what was the new price for the Selma

0051
1    store under this contract?
2         A    $7,618.
3         Q    Do you recall whether or not the
4    chemical budget stayed the same?
5         A    I do not remember.
6         Q    Now, was there any change, at this
7    point in time, in the manner in which you provided
8    services to individual stores?
9         A    No.
10        Q    You kept doing business the same way
11   you had been doing it before?
12        A    Yes.
13        Q    Just had a larger number of stores;
14   correct?
15        A    Yes.
16        Q    Now, at this point in time, in late
17   2001, were you still cleaning stores for Service
18   Merchandise?
19        A    I believe so.
20        Q    Okay.
21        A    I don't remember.
22        Q    Did you phase out Service Merchandise
23   shortly after this?
24        A    I do not remember.  I didn't handle
25   Service Merchandise, and these stores -- they were

0052
1    not phased out.  When they closed, that was it.  We
2    -- we -- Jim's Maintenance cleaned them until the day
3    they closed.
4         Q    At this point in time, in 2001, other
5    than Service Merchandise and that school that you
6    talked about, were you doing cleaning services for
7    anybody, other than Target?
8         A    We were attempting to work with Marr's
9    Music and we were cleaning some of their stores.
10   Probably had 10 stores.
11        Q    And were those Marr's Music stores
12   located here, in Oklahoma?
13        A    One.
14        Q    Okay.
15        A    It was Oklahoma City.
16        Q    And others were located where?
17        A    Florida, New York, Texas.
18        Q    And, at some point, did you phase out
19   cleaning for the Marr's Music stores?
20        A    Yes.
21        Q    Why was that?
22        A    I think they went bankrupt, too.
23        Q    Now, did you have to purchase any new
24   equipment when you got this contract in 2000?
25        A    Yes.

0053
1         Q    Was it a sizable amount of equipment,
2    a little equipment, or what?
3         A    A sizable amount.
4         Q    How did you go about doing that?
5         A    Lease.
6         Q    Okay.  You continued to lease
7    equipment?
                              Page 22
```

Smith, Trent - Vol. I

```
8         A    From Tenant.  Tenant Corporation
9    provides the scrubbers and the vacuums and the -- the
10   carpet cleaners.
11        Q    Okay.
12        A    That's who we leased from.
13        Q    And when you lease them, you have
14   to lease new equipment?
15        A    Yes.
16        Q    And did you make the decision to lease
17   from Tenant?
18        A    I did not.
19        Q    Do you know who did make the decision?
20        A    I suspect Jim Funderburgh.
21        Q    Okay.  Did Target, in any way,
22   determine who you were to lease equipment from?
23        A    The -- they recommended the Tenant
24   scrubber.
25        Q    Now, over the course of the next

0054
1    couple of years, did you continue cleaning Target
2    stores under this contract?
3         A    And I'm looking at --
4         Q    There was a -- there was --
5         Q    -- Plaintiff's Exhibit 2.
6         A    We continued until it changed, until
7    -- either there was a new store -- if there was a new
8    store opened and we were awarded it, then we would
9    just get an updated contract.
10        Q    And when you say "an updated
11   contract," you got additional data service sheets
12   that indicated you were being assigned additional
13   stores?
14        A    Yes.  We would get this all over
15   again, the same front pages.
16        Q    Now, I want to turn your attention
17   to Page 1 of the "Terms And Conditions" document.
18             MR. PIZZO:  That's Bates stamped
19   what?
20             MR. DEATS:  It's Bates stamped
21   Target/Itzep 9.
22        Q    (By Mr. Deats)  And I'm looking
23   specifically with regards to Paragraph 2,
24   "Termination."
25             Now, the agreement --

0055
1         A    Yes.
2         Q    -- itself, is -- if we look back on
3    the first page of the document, it covers a term from
4    August of 2001 to August of 2004; correct?
5         A    Yes.
6             MR. DEATS:  Where do you see
7    that?  I'm sorry.
8             MR. DEATS:  On Page 1.
9             MR. DEATS:  Oh, I see.  It's on
10   Par -- Paragraph 4.
11             MR. PIZZO:  Uh-huh.
12             MR. PIZZO:  Okay.  Okay.  I got
13   you.
14        Q    (By Mr. Deats)  Now, going back to
15   Page 1 of "Terms And Conditions," did Jim's
16   Maintenance have the right to terminate this contract
17   prior to the time -- prior to the end of the term?
18        A    I don't know.  I --
                              Page 23
```

Smith, Trent - Vol. I

```
19        Q    Okay.
20        A    Probably.
21        Q    Okay.  But did -- did -- well, the
22   document speaks for itself, doesn't it?
23        A    Sure.  Yes.
24        Q    Do you know whether or not Target had
25   the right to terminate this agreement during the

0056
1    term?
2         A    I suspect that it's written in the
3    document.
4         Q    Okay.  Now, in the years following the
5    execution of this contract in October 2001, did you
6    receive additional stores to clean from Target?
7         A    What was the question again?
8         Q    Did you receive additional stores to
9    clean from Target?
10        A    After this?
11        Q    Yes, sir.
12        A    Yes.
13        Q    Okay.  And you have already indicated
14   that you would get updates to your data service
15   agreement indicating those stores?
16        A    Yes.
17        Q    And did you ever lose stores?
18        A    In other words, did they take stores
19   away from you?
20        A    No.  Not for a long period of time.
21        Q    why would you get new stores during
22   the term of this agreement?  Do you recall?
23        A    Any store opening in your region, that
24   you cleaned, was automatically given to you.
25        Q    Now, you were aware that Target could

0057
1    terminate the contract to clean a particular store
2    for cause; correct?
3         A    Yes.
4         Q    And, in the two or three years
5    following the execution of this agreement, do you
6    recall any time in which you lost a store?
7         A    No.
8         Q    At some point in time, you began
9    cleaning Mervyn stores, as well?
10        A    Yes.
11        Q    And do you recall how it came to be
12   that you started cleaning Mervyn stores, as well?
13        A    We were given the Mervyn stores in our
14   area, all the ones -- when we were assigned these
15   Target stores for this region, we were given the
16   Mervyn's, also.
17        Q    By the way, you indicated that, when
18   you executed this contract, this Plaintiff's Exhibit
19   2, that Target reduced to somewhere in the
20   neighborhood of 25 contractors nationwide; is that
21   correct?
22        A    From, approximately, 200 down to 25
23   contractors.
24        Q    Okay.  And do you recall the names of
25   any of the other contractors that Target continued to

0058
1    use at that time?
2         A    Global Services was one.  Custom Clean
3    of Texas was one.
                              Page 24
```

Smith, Trent - Vol. I

```
 4                 I can't remember the names.
 5        Q        Okay.
 6        A        I met all of them at this meeting.
 7        Q        Now, going back to the Mervyn stores,
 8 did the way you -- did you clean the Mervyn stores in
 9 the same manner in which you cleaned the Target
10 stores?
11        A        No.  It was morning cleaning.
12        Q        Okay.  And Target --
13                 MR. PIZZO:  I'm sorry.  It was
14 what?
15                 THE WITNESS:  Morning cleaning.
16                 MR. PIZZO:  Oh, okay.  I'm sorry.
17                 THE WITNESS:  We would come in in
18 the morning.
19        Q        (By Mr. Deats)  Okay.  And at Target,
20 when would you do your cleaning?
21        A        That was all night.
22        Q        And cleaning the Mervyn stores during
23 the morning, was that an entire day, was it a half
24 day, or what?
25        A        It was part-time.  A person might be
0059
 1 in there three hours.
 2        Q        Okay.  Now, at Target stores, how many
 3 days a week do you provide cleaning services?
 4        A        Seven days a week.
 5        Q        And at Mervyn stores, how many days a
 6 week did you provide cleaning services?
 7        A        I think six.
 8        Q        As time passed, after the execution of
 9 this contract, which is Plaintiff's Exhibit 2, did
10 Target ever change the price per store that you were
11 cleaning at?
12        A        Yes.  There was a price reduction
13 after this contract, I believe.
14        Q        And, approximately, when did that
15 price reduction occur?
16        A        I don't know.
17        Q        Would it have been a year later, two
18 years?
19        A        Within a year, I would say.  I thought
20 it was within a year.
21        Q        And how did that price reduction come
22 about?
23        A        Oh, we were notified that -- that they
24 were looking at all areas to save money and that --
25 how did they do that?
0060
 1 I've forgot how they notified us.
 2        Q        But -- and when you say "they," do you
 3 recall who might have notified you?
 4        A        I believe that was -- Chris Carlson
 5 was in charge at that time.
 6        Q        And who is Chris Carlson?
 7        A        A Target employee with Building
 8 Services.
 9        Q        Did he work for Michael Bell --
10        A        Yes.
11        Q        -- or did he replace Michael?
12        A        No.  He works underneath Michael Bell.
13        Q        And was that primarily who you were
14 dealing with at Target by this time, Building
                          Page 25
```

Smith, Trent - Vol. I

```
15 Services?
16        A        Yes.
17        Q        Other than Mike Bell and Chris
18 Carlson, do you remember the name of other employees
19 in Building Services that you dealt with on a regular
20 basis?
21        A        I don't.
22        Q        Now, you mentioned a gentleman, Harlin
23 Murray --
24        A        Yes.
25        Q        -- that you had contacted with regards
0061
 1 to the original store.
 2        A        Yes.
 3        Q        Did you continue to have contact with
 4 Harlin Murray?
 5        A        Yes.
 6        Q        What type of contacts did you have
 7 with Harlin Murray during this time?
 8        A        What type of contacts?  Weekly
 9 contact.
10        Q        And why would he call you or why would
11 you call him?
12        A        Well, Target was going through some
13 changes and the Field Building Services, who we had
14 always reported to in the past, is who the store team
15 leader -- the store manager would look to for help on
16 cleaning their store.
17                 But whenever this was all -- when this
18 -- these changes came about and we got the contractor
19 handbook and we started working through Minneapolis,
20 we were supposed to report to Chris Carlson and the
21 home office, but the stores continued to lean on
22 Building Services in their store, or their regional
23 guy, who had always provided their support.
24                 So -- if that answers your question.
25        Q        Sure.  And that regional guy that the
0062
 1 store managers looked to was Harlin Murray?
 2        A        For Texas and Oklahoma.
 3                 Brian Kenny was in charge of the other
 4 areas in Kansas, Kansas City, until there was a
 5 change and then he picked up Oklahoma.
 6        Q        Okay.  Now, other than they were
 7 looking at savings reductions in all areas of their
 8 operations, did Target provide you any other reason
 9 for the price reduction?
10        A        No.
11        Q        Was there any negotiation of the price
12 reduction which occurred?
13        A        No.
14        Q        Did you receive any benefit in
15 exchange for the price reduction?
16        A        In other words --
17        Q        Yes.
18        A        -- did they say, "we'll give you more
19 stores," or anything like that?
20        A        No.  No.  He mentioned that, "Maybe it
21 will go back in a couple of years, when" -- I think,
22 at that time, retail was down or stock -- Target was
23 down, or something, and that he indicated, you know,
24 "Maybe there will be a raise in there for you in the
25 future," or something.
 1        Q        Did the price reduction have any
                          Page 26
```

Smith, Trent - Vol. I

```
0063
 1 impact on your operations?
 2        A        Yes.
 3        Q        What kind of impact did it have?
 4        A        Price reductions down the line,
 5 everywhere.  We had -- I mean, everybody had to -- we
 6 received a pay cut.
 7        Q        When you say "everybody," all the
 8 people that you were using to provide cleaning
 9 services had their pay cut?
10        A        Yes.
11        Q        And did you have your pay cut at the
12 same time?  Do you recall?
13        A        Yes, I did.
14        Q        Again, when they informed you of the
15 price reduction, did they give you any opportunity to
16 negotiate on the amount of the reduction?
17        A        No.
18                 MR. PIZZO:  Can we --
19                 MR. DEATS:  Let's go off the
20 record a second, please.
21                 (Short Break)
22                 (Plaintiff's Exhibit No. 4 was
23                 marked for identification)
24        Q        (By Mr. Deats)  I'm going to hand you
25 a document that's been labeled for identification as
0064
 1 Plaintiff's Exhibit 4.
 2                 Do you recognize this as a copy of a
 3 contract between Jim's Maintenance and Target that
 4 was entered into in 2005?
 5        A        Yes.
 6        Q        And what were the circumstances under
 7 which this contract was negotiated?
 8        A        I don't remember on this one.  This
 9 one -- this one might have been the one first we did
10 by computer, where we turned in our bids by computer,
11 I believe.
12        Q        Okay.  Well, let's go through it.  If
13 I could ask you to turn to Page -- well, it's
14 actually Page 13 of the contract.  The pages are
15 numbered on the bottom.
16                 Okay.  And it shows that it was,
17 again, signed for Target by Michael Bell; correct?
18        A        Yes.
19        Q        And it was signed for Jim's
20 Maintenance by Bryan Funderburgh?
21        A        Yes.
22        Q        And both of the two men apparently
23 signed the contract in August of 2005?
24        A        Yes.
25        Q        Now, prior to August of 2005, do you
0065
 1 recall whether or not an audit had been performed of
 2 Jim's Maintenance at Jim's behest?
 3        A        I don't believe so.
 4        Q        Do you recall an audit that had been
 5 conducted by a group -- Price-Waterhouse?
 6        A        Yes.
 7        Q        Do you recall whether or not that
 8 audit occurred in the spring of 2005?
 9        A        I don't remember the dates.
10        Q        But you do remember that an audit was
                          Page 27
```

Smith, Trent - Vol. I

```
11 conducted?
12        A        Yes.  Two people from Price-Waterhouse
13 came into our office for a week or three days or
14 something.
15        Q        Okay.  And do you know why -- shortly
16 before this 2000 contract was entered into, you
17 received some sort of notice from Target canceling
18 your old contract, did you not?
19                 MR. PIZZO:  Did you mean 2005
20 contract?
21                 MR. DEATS:  Yes.
22                 MR. PIZZO:  Okay.
23                 THE WITNESS:  Now, what?
24        Q        (By Mr. Deats)  Did -- did your old
25 contract, which is Plaintiff's Exhibit 2 -- did it
0066
 1 get canceled shortly before or simultaneously with --
 2        A        Yes.  I think so.  I think they send a
 3 letter out -- it scares everybody, everybody calls,
 4 "Hey, we got a termination letter," and they say,
 5 "No.  We just have a new contract coming out."
 6        Q        That sounds familiar.
 7        A        Yes.
 8        Q        Okay.  Did -- when -- were you dealing
 9 -- and by "you," I mean Jim's Maintenance.
10                 Was Jim's Maintenance continuing to
11 deal with Michael Bell at this point?
12        Q        Okay.  But were you having phone
13 conversations about this termination and new contract
14 with Chris Carlson, or do you recall?
15        A        No.  At this time, it was a person
16 named Ted.
17        Q        Do you recall what Ted's last name
18 was?
19        A        Ted Fischer.
20        Q        Okay.  Had Ted Fischer replaced Chris
21 Carlson?
22        A        I believe so.
23        Q        Okay.  So he held the same position
24 that Chris Carlson had previously?
25        A        I believe so.
0067
 1        Q        And in discussing this new contract,
 2 which is Plaintiff's Exhibit 4, with Target, Jim's
 3 Maintenance was dealing primarily, then, with Ted
 4 Fischer?
 5        A        Yes, kind of.  They had -- I'm sorry.
 6 They -- they were making further changes.  We weren't
 7 negotiating directly, at this time, with Ted Fischer.
 8 He was in charge of, like, housekeeping, and he would
 9 put together the -- this -- this -- the scope of
10 work, and then they were centralizing -- they had
11 Contract Services, I believe was the name.
12                 That was another organization, and
13 Contract Services was to -- to provide all the
14 contracting, not -- they were taking it out of
15 Building Services.
16                 Building Services would run it, would
17 write down what was -- what needed to be done, and,
18 then, I believe Contract Services, a separate group,
19 was in charge of asking for bids and doing the
20 bidding online, that kind of stuff.
21        Q        Okay.  So Contract Services, to your
                          Page 28
```

Smith, Trent -- Vol. I

```
22  understanding, was another division of Target?
23       A    Yes.
24       Q    And, at the point in time that this
25  new agreement was signed in 2005, you had some of
0068
 1  your dealings with Contract Services, as opposed to
 2  Building Services?
 3       A    Yes.
 4       Q    Do you recall the name of any people
 5  in Contract Services that you dealt with?
 6       A    I cannot remember her name.
 7            THE WITNESS:  Do you remember her
 8  name, the girl's name?  Michelle.
 9            THE WITNESS:  Michelle.
10            MR. JIM FUNDERBURGH:  It's
11  Michelle.
12            MR. PIZZO:  Unless you're going
13  to object, I --
14            MS. MILLER:  I object to the
15  form, and I object to the witness having a
16  conversation with somebody --
17            THE WITNESS:  Okay.
18            MS. MILLER:  -- who has not been
19  sworn in.
20            THE WITNESS:  Michelle.  It's
21  Michelle, and her middle initial was "X" something.
22  Michelle Fischer, Michelle -- Michelle.
23            It would be easy to find.  I
24  don't have it --
25       A    -- off the top of my head.
0069
 1       Q    So somebody named Michelle, in
 2  Contract Services, was one of your contact points?
 3       A    Yes.
 4       Q    Okay.
 5       A    kind of.  We -- we weren't -- we
 6  didn't deal with her.  She was -- she's a computer
 7  person and was in charge -- she's in purchasing, like
 8  purchasing was what she did.
 9       Q    Okay.  And looking at Plaintiff's
10  Exhibit 4, did you -- did Jim's Maintenance have any
11  role in the negotiation of the language that appears
12  in the contract?
13       A    No.
14       Q    To the extent that there were changes
15  in the contract, did Target go over those changes
16  with anybody at Jim's Maintenance prior to asking you
17  to sign the new agreement?
18       A    I do not know that.
19       Q    But you, certainly, had no such
20  conversations?
21       A    I did not, no.
22       Q    And I noticed that there -- if you
23  look at Page 2 of the contract, it begins to list a
24  number of stores.
25            Were these all the stores that Jim's
0070
 1  Maintenance was to clean under this contract?
 2       A    Yes.
 3       Q    And did you keep, more or less, the
 4  same stores that you had had in the past, did the
 5  stores change, or what?
 6       A    It changed a little bit.
                    Page 29
```

Smith, Trent -- Vol. I

```
 7       Q    And were you given any reason for the
 8  change -- any reason for the change in the stores
 9  that you were cleaning?
10       A    No.
11       Q    Do you know why Target decided to
12  change the stores you were cleaning at this point?
13       A    No.
14       Q    I noticed that -- if you look on Page
15  4 of the contract, there are some Houston stores
16  listed.
17            Had Jim's cleaned Houston stores
18  previously?
19       A    Not Houston Targets.
20       Q    Okay.  Do you recall whether or not
21  Jim's was provided any reason why you were being
22  assigned to clean Houston stores?
23       A    No.  We -- we asked for those stores.
24  They gave them to us.
25       Q    When had you asked for those stores?
0071
 1       A    Prior to this.
 2       Q    Okay.  You had just said, "Hey, we
 3  would be interested in cleaning your Houston stores,
 4  too"?
 5       A    No.  We bid on these stores.
 6       Q    Okay.  You actually bid on the Houston
 7  stores?
 8       A    Yes.
 9       Q    And to the prices that are listed on Pages
10  3 -- or, actually, 2, 3, and 4 of Exhibit 4 were
11  those bid prices in all cases?
12       A    Yes.
13       Q    And do the prices go up or down?
14       A    (No verbal response)
15       Q    Did it vary from store to store?
16       A    It varies from store to store.  They
17  were bid on each store.  We bid on different -- where
18  they were, if they were in a rough part of the market
19  or if they were in a high-end area -- different
20  prices.
21            Some of them are the same.  You can
22  see where they're different size stores.
23       Q    Did you continue cleaning stores, for
24  example, in the west Texas area?
25       A    No.  We lost those stores.
0072
 1       Q    Okay.
 2       A    Actually, I guess for a little while.  We
 3  did not bid on the west Texas stores.
 4       Q    When do you recall being asked to make
 5  bids on stores that you wanted to clean?
 6       A    A year before this, maybe.  They did a
 7  -- they did a practice run -- they were doing this --
 8  this was all by computer, where you e-mail in.  They
 9  -- They would send you a form, you would type in how
10  much you wanted.
11            It was three rounds.  The first round
12  was -- they would send you back feedback, saying
13  you're -- you're within 15 percent, you are -- you're
14  way out there, you know, telling you how close you
15  were to the -- to other bids for that area.
16            Then, you would do it again, then you
17  would do it again.  It was a practice that we
                    Page 30
```

Smith, Trent -- Vol. I

```
18  did.
19            And whenever they were doing this,
20  they were -- the questions -- we would all be on
21  conference calls and the question would be, "Okay.
22  So when will these be assigned," and the answer was,
23  "These may be assigned and they may not."
24            So we did a practice round, and, then,
25  they did not make any changes.  They just left
0073
 1  everything the same, and then they did --
 2       Q    Now, did Target contact you at some
 3  point, approximately a year prior to this, and tell
 4  you they were -- they were going to conduct a round
 5  of bidding for the various stores?
 6       A    Yes.
 7       Q    And did they do that during the
 8  conference call that included you and other
 9  contractors, or how did that work?
10       A    Yes, I believe so.  Yeah.
11       Q    So when you say "we were on a
12  conference call," you're talking about Target
13  representatives and the various cleaning contractors?
14       A    Yeah.  Yes.
15       Q    And, approximately, a year prior to
16  entering this contract, then, you engaged in the
17  first round of bidding; correct?
18       A    Yes.  Yes.
19       Q    And how did you select the stores that
20  you wanted to bid on, or did you select the stores
21  that you wanted to bid on?
22       A    Yes, we did.
23       Q    And when you did that first round of
24  bidding, what input, if any, did Target have into the
25  price that you bid the stores at?
0074
 1       A    None.
 2       Q    Okay.  So you made a determination on
 3  your own; correct?
 4       A    Yes, sir.
 5       Q    Okay.  And after you made that
 6  determination, you say that you got feedback from
 7  Target?
 8       A    It was -- there were three rounds
 9  before it was over, and you would turn in a bid and
10  then they'd send you an e-mail that said -- that had
11  all of the stores that you bid on.
12            And you had to bid on the entire
13  region.  You couldn't bid like in one store in Kansas
14  City.  You had to bid on the region.
15            There were forms -- lots of forms in
16  there about how many people would be in each store,
17  who the supervisors would be, how many stores the
18  supervisor would be over, who would be the regional
19  over that supervisor, and how many -- how many stores
20  he would be over, how many hours you were expected to
21  be in the store, and you would turn all of that in as
22  a packet, like an e-mail downloaded packet, and you
23  would have the pricing -- your monthly pricing.
24            You would send it in, and, then, they
25  would -- they would -- they would -- somehow they
0075
 1  would go over all of this by computer or something
 2  and then they would notify you and you would get an
                    Page 31
```

Smith, Trent -- Vol. I

```
 3  e-mail back with just the pricing and it would tell
 4  you if you were, you know, kind of hot or cold or,
 5  you know, if you were close or not close.
 6       Q    Okay.  Now, you said that you got a
 7  packet of information from which to construct your
 8  bid.
 9            Did that packet include the number of
10  employees that were going to be required to work at
11  the store?
12       A    Yes.
13       Q    And did that packet -- was there any
14  ability to negotiate about the number of hours that
15  you would spend in the store?
16       A    No.  They just wanted, total, how many
17  people would be in the store and how many hours.
18       Q    So there was a set number of people
19  and, also, a set number of hours that you were to bid
20  on?
21       A    No.
22       Q    Okay.
23       A    They wanted -- they wanted to know --
24  when we turned our bid in, they wanted the price.
25  That was number one.
0076
 1       Q    Okay.
 2       A    And, then, this was like additional
 3  pages that you had to fill out, and you had to fill
 4  in -- they had an Excel spreadsheet, put the store
 5  number and how many employees would be in the store
 6  and how many hours.
 7       Q    Okay.  Did -- did Target assign the
 8  number of employees to be in the store or --
 9       A    No.
10       Q    You were to come up with that?
11       A    We were to fill all of that in, yes.
12       Q    Okay.  Did Target assign the hours
13  that you were to work?
14       A    No.
15       Q    You were to fill that in?
16       A    We were to fill that in.
17       Q    And was that simply an estimate of how
18  many hours you thought it would take to clean the
19  store?
20       A    Yes.
21       Q    And did Target indicate any price
22  range which you were to pay the employees?
23       A    No.
24       Q    But did they want to know that
25  information?
0077
 1       A    I don't remember if they wanted that
 2  or not.
 3       Q    Look at Page 6 of Deposition Exhibit
 4  4.
 5       A    (Complies)
 6       Q    Do you see a paragraph numbered 7,
 7  "Workers Performing Services Under This Agreement"?
 8       A    Yes.
 9       Q    Now, you can see that this contains --
10  it asks you to identify the estimated number of
11  workers --
12       A    Uh-huh.
13       Q    -- to perform services; it asks you to
                    Page 32
```

Smith, Trent – Vol. I

14  specify an hourly wage per hour; correct?
15          MS. MILLER:  I'm going to object
16  to the form.  The document reflects that this is for
17  -- to be completed for those providing services in
18  the State of California, which I don't believe you
19  have established that they were providing services in
20  the State of California.
21          MR. DEATS:  Okay.
22          Q  (By Mr. Deats)  Do you know whether or
23  not you had to complete a form providing this sort of
24  information at or before the time this contract was
25  executed?
0078
1          A    Yes, we did.
2          Q    Okay.  And did -- I noticed that, in
3  this particular document, that is blank.  How did you
4  go about providing this information to Target?
5          A    It was a separate sheet.
6          Q    And was that Excel spreadsheet
7  that you were talking about?
8          A    Yes.
9          Q    So, on an Excel spreadsheet, for every
10  store that you bid, you provided the information
11  indicated here in Paragraph 7?
12          A    Yes.
13          Q    And did you do that before the
14  contract was awarded or after?
15          A    Before.  Whenever we were turning in
16  our -- our bids, it was all together in a packet --
17  an e-mail packet.
18          Q    Okay.  And then you would receive
19  feedback from Target, indicating whether they thought
20  your number was a good number or too high?
21          A    Or very high, yes, on just the
22  pricing.
23          Q    And did Target explain to you why they
24  were going through three rounds of bidding?
25          A    That was to allow you to bid lower,
0079
1  bid lower, and bid lower.  You couldn't bid up.
2  There was -- that was the rule.
3          Q    And when you were awarded stores with
4  regards to the new contract, were the stores, again,
5  awarded by region or were they awarded individually?
6          A    By region.
7          Q    And so, looking back at Pages 2
8  through 4, you were awarded a region of Houston to
9  clean?
10          A    Yes.  The whole district.
11          Q    And do you know what cleaning company
12  had been cleaning those stores prior to the time --
13          A    Custom Clean of Texas.
14          Q    Okay.  So looking at those Houston
15  stores as an example, when you took over from Custom
16  Clean, how did you go about obtaining employees to
17  clean these newly assigned stores?
18          A    We had supervisors go down there and
19  try to round up employees, go to Albertson's, go to
20  Target, go to Wal-Mart and make contact with people.
21          Q    Did you attempt to make any contact
22  with the Custom Clean employees?
23          A    No, not directly.
24          Q    Do you know whether or not your
Page 33

Smith, Trent – Vol. I

25  supervisors contacted the Custom Clean employees?
0080
1          A    I'm sure that they did.
2          Q    Okay.  Do you recall whether or not a
3  lot of the Custom Clean employees that had been in
4  those stores previously continued to work for you?
5          A    Most likely.
6          Q    Okay.  Who would be the best person,
7  do you think, to obtain that information from?  Would
8  it be --
9          A    Supervisor.
10          Q    -- the supervisor?
11          A    The Houston supervisor.
12          Q    Do you recall who was the person that
13  you assigned to supervise those Houston stores?
14          A    In the beginning?
15          Q    Yes, sir.
16          A    I don't remember.
17          Q    Do you recall a gentleman by the name
18  of Valdel Vasquez?
19          A    Valdel?
20          A    Uh-huh.
21          A    It might have been Valdel, yeah.  I
22  think we brought him from San Antonio over there, to
23  help us get set up, yes.
24          Q    So do you feel like he would have the
25  best information about how he went about getting
0081
1  employees for those new --
2          A    Yes.
3          Q    -- Houston stores?
4          A    Yes, he would.
5          Q    Do you know why you were successful in
6  obtaining those stores that had been cleaned by
7  Custom Clean previously?
8          A    They didn't notify us why.
9          Q    At this point in time, in 2005, was
10  Jim's continuing to provide cleaning services for
11  other than Target and Mervyn stores?
12          A    I don't remember.  We were cleaning
13  Marr's and then Marr's went out.  We only had about
14  10 stores.
15          Q    So, most likely, just Target and
16  Mervyn's.
17          A    And, again, did you negotiate any of
18  the language of the contract --
19          A    No.
20          Q    -- that is Deposition Exhibit 4?
21          A    No.
22          Q    (Plaintiff's Exhibit No. 5 was
23          marked for identification)
24          Q    (By Mr. Deats)  I'm handing you a
25  document that's been labeled for identification
0082
1  purposes as Deposition Exhibit 5.
2          A    This is a document that's been labeled
3  "Target Housekeeping Scope of Work."  Do you recall
4  that document?
5          A    Yes.
6          Q    Was that part of the 2005 contract, if
7  you recall?
8          A    I believe they incorporate the
9  wording, that it's included in the contract.
Page 34

Smith, Trent – Vol. I

10          Q    Did you have -- play any role in
11  negotiating this document?
12          A    No.
13          Q    Were you given this document at or
14  prior to the time that you went through the bidding
15  process for the stores that you were awarded?
16          A    I believe so.
17          Q    Now, at the point in time that you
18  were awarded the 2005 contract, if you recall, did
19  Target make any change in the way it paid you for the
20  services you were providing?
21          A    Not that I know of.
22          Q    When you first started providing
23  services to Target, how did you go about billing them
24  for services?
25          A    Oh.  Oh, yeah.  We -- we would turn a
0083
1  bid -- we would turn our invoice in on -- around the
2  beginning of the month, and, then, they would pay
3  around the 20th of the -- the month.
4          Q    Okay.  In the month in which services
5  were performed?
6          A    Yes.
7          Q    So your bill for a store for January,
8  let's say, you would turn in that bill at the
9  beginning of the month?
10          A    Yes.
11          Q    At the beginning of January?
12          A    Before the 10th.  I believe she would
13  turn it in before the 10th and we would get paid on
14  about the 20th or so.
15          Q    And you would be paid on January 20th
16  for services to be performed during the month of
17  January?
18          A    Yes.
19          Q    Did that procedure change any under
20  the 2005 contract?
21          A    The payment method changed.
22          Q    And how did the payment method change?
23          A    They elected to -- it says, I believe
24  -- in the contract, it says that they have up to 45
25  days after the service is provided to pay, and they
0084
1  notified us that they elected to go ahead and do
2  that.
3          Q    Okay.  So were you still allowed to
4  bill early in the month for the month in which
5  services were performed?
6          A    Yes.
7          Q    Okay.  So taking January, again, as an
8  example would you bill for January during the month
9  of January or after the end of the month of January?
10          A    We could still turn it in by the 10th
11  of that month.
12          Q    Okay.  But did they continue to pay
13  during the month in which services were performed?
14          A    No.
15          Q    When, if you recall, did they start
16  paying for services after this new 2005 contract?
17          A    About 45 days after the last day that
18  we were -- that we billed them for.  So January,
19  whatever that would be, the 30th, they would have 45
20  days after that to pay.
Page 35

Smith, Trent – Vol. I

21          Q    Okay.
22          A    So they could skip a month -- they
23  skipped one month.
24          Q    And did that create any financial
25  hardship --
0085
1          A    Tremendous.
2          A    -- for Jim's --
3          A    For -- yes.  For all the contractors.
4          Q    And why did it create a financial
5  hardship for you?
6          A    There were millions of dollars that
7  weren't given to the contractor to pay their
8  employees.
9          Q    And was the largest part of your
10  budget your payroll?
11          A    Absolutely.
12          Q    By this time, what percentage of your
13  work would you say was being performed for Target?
14          A    Jim's Maintenance?
15          Q    Yes, sir.
16          A    The majority.  All of it, virtually.
17          Q    So was there a problem for you, then,
18  with regards to paying your employees?
19          A    Yes.
20          Q    Did you need to get the payment from
21  Target in order to be able to pay your employees?
22          A    Yes.
23          Q    As a result of the change in this
24  payment practice, do you recall whether or not you
25  had to borrow money to make payroll?
0086
1          A    I believe so.  It's not -- I wasn't a
2  part of that, but, yes, I believe so.
3          Q    Okay.  Do you think that that
4  information might be better known to Bryan or Jim
5  Funderburgh?
6          A    Yes.
7          Q    (Plaintiff's Exhibit No. 6 was
8          marked for identification)
9          Q    (By Mr. Deats)  I'm handing you a
10  document that's been labeled for identification
11  purposes as Plaintiff's Exhibit 6.
12          MR. PIZZO:  Do you have another
13  copy of that?
14          MR. DEATS:  I have several copies
15  of this.
16          MR. PIZZO:  Do you have -- can I
17  I've already -- Do you want to go off the record for
18  a minute?
19          MR. DEATS:  Yeah.  Let's go off
20  the record.
21          (Short break)
22          Q    (By Mr. Deats)  I'm handing you a
23  document that's been labeled for identification
24  purposes as Plaintiff's Exhibit 6.
25          Q    Do you recognize that document?
0087
1          A    Yes.
2          Q    What is that document?
3          A    This was our notification that we had
4  been terminated.
5          Q    Okay.  And what's the date of the
Page 36

Smith, Trent - Vol. I

6    notification?
7        A    The date at the top is May 22nd.
8        Q    Okay.  Was this the first notice you
9    had that your contract was about to be terminated?
10       A    Yes.
11       Q    Do you recall whether or not other
12   contractors who were working for Target were
13   terminated before Jim's?
14       A    Yes.  Custom Clean was terminated
15   before us.
16       Q    Okay.  Do you recall approximately
17   when Custom Clean was terminated?
18       A    You know, I -- February, maybe.
19   February of 2006.
20       Q    Okay.  And how did you find out that
21   Custom Clean had been terminated?
22       A    I don't remember.  Through the --
23   supervisors had called me and said that they had
24   let us go.
25       Q    Do you recall a contractor by the name

Page 37

(Page 0088)

2    of Sanitor?
3        A    I heard that they had been terminated
4    before us, also.
5        Q    I called Custom Clean.  I called Bob
6    and said, "what is going on," and he said, "Oh, they
7    let us go," and he said, "And Sanitor just picked up
8    80 stores and they let them go, also," because all
9    these -- this contract was from September.
10       Q    And when you say "this contract,"
11   you're looking at Plaintiff's Exhibit 4?
12       A    Yes.  That contract was in September
13   of '05 and this was happening in the spring of '06.
14       Q    And do you recall whether or
15   not you heard anything from individual Target store
16   managers prior to receiving this letter which is
17   Deposition Exhibit 6?
18       A    We had heard from a Target store that
19   somebody was in our stores, trying to hire our
20   people.
21       Q    And do you recall who -- what company
22   it was that was in your stores trying to hire your
23   people?
24       A    I think it was Global.
25       Q    At about the same point in time -- I'm

Page 89

2    not you failed to receive a scheduled payment?
3        A    We were not paid for the month up to
4    this date.
5        Q    Okay.  So the month prior to May 22nd,
6    2006, you failed to receive a payment?
7        A    Yes.
8        Q    And did you -- did you or anybody at
9    Jim's Maintenance make any calls to Target, trying to
10   learn why you had not been paid?
11       A    Yes.
12       Q    Do you recall who made that telephone
13   call?
14       A    Jim -- we had called and left
15   messages, and they -- with Ted Fischer, and they had
16   gone unanswered.
17            And then I believe Jim called and left

Page 37

---

Smith, Trent - Vol. I

17   a message for Mike Bell, asking what's going on, and
18   I think, within an hour, Ted Fischer called us and
19   told us that they had -- and -- and read a statement
20   in the contract that said that they had the ability
21   to withhold payment -- you know, he referred to a
22   paragraph in the contract, without indicating
23   anything else.
24            And, then, at some point, you received
25   this May 22nd, 2006, letter?

(Page 0090)

2        A    Yes, ma'am.
3        Q    Okay.  Now, did you ever receive that
4    final payment?
5        A    Not that I know of.
6        Q    Do you know, approximately, how much
7    money was withheld?
8        A    I -- I don't know.
9        Q    But do you think Bryan Funderburgh or
10   Jim Funderburgh --
11       A    Yes, they would know.
12       Q    -- might know that?
13       A    Yes.
14       Q    What was the result of your failure to
15   receive that payment?  Were you able to pay your
16   employees?
17       A    No.
18       Q    During what period were you unable to
19   pay the employees that were working for you, cleaning
20   the Target stores?
21       A    I would suspect the whole last month
22   that they worked.
23       Q    What was the effect on Jim's
24   Maintenance of losing the Target contract?
25       A    We were bankrupt.

Page 91

2    was Jim's providing cleaning services for any entity
3    other than Target?
4        A    No.  Other than a school, vocational,
5    one building.
6        Q    And I take it that that vocational
7    school was a very, very small part of your business?
8        A    Yes.
9        Q    And, so, when you -- at the point in
10   time that this contract was terminated, you were a
11   company that worked for Target and, essentially,
12   nobody else; correct?
13       A    Yes.
14       Q    Sort of a subsidiary of Target?
15            MS. MILLER:  Object to the form.
16            (By Mr. Deats)  Go ahead and answer.
17       Q    How many employees did you have
18   employed cleaning the vocational school, if you
19   recall?
20       A    I believe three.
21       Q    Okay.  Were you able even to keep
22   cleaning at the vocational school once you lost the
23   Target Contract?
24       A    I don't know.  I didn't handle that.
25       Q    Did Target ever provide you any

(Page 0092)

2    explanation, other than what is in Plaintiff's

Page 38

---

Smith, Trent - Vol. I

2    Exhibit 6, about the reason that the contract was
3    terminated?
4        A    Not that I know of.  Not to me.
5        Q    And what's the reason that's listed in
6    the letter?
7        A    For cause.
8        Q    But does it specify what the cause is?
9        A    No.
10       Q    To this day, do you know what was the
11   cause that your contract was terminated?
12       A    No.
13       Q    Do you recall whether or not anybody
14   at Target ever provided you with an explanation why
15   they felt they had cause to terminate your services?
16       A    They did not.
17       Q    And did they terminate your services
18   at all stores that were being cleaned by you?
19       A    All stores.
20       Q    I want to follow up on something that
21   we talked about a little bit earlier at Price-water
22   -- by Price-warehouse.
23       A    (Discussion held off the record)
24       Q    (By Mr. Deats)  I want to go back to
25   Plaintiff's Exhibit 5, the housekeeping-scope-of-work

(Page 0093)

2    exhibit step.
3            Was all of that language drafted by
4    Target?
5        A    Yes.
6        Q    Did Jim's Maintenance have any role in
7    negotiating the language of the scope-of-work
8    document?
9        A    No.
10       Q    Did the scope-of-work document govern
11   how you were to provide cleaning services to Jim's --
12   excuse me, to Target?
13       A    Yes.
14       Q    Now, going back to the audit by
15   Price-Warehouse, you have indicated that you don't
16   recall exactly when that occurred?
17       A    I don't know.  Fall of '05, spring of
18   '06, somewhere -- maybe fall.
19       Q    Well, now, the spring of '06 was when
20   you lost the contract with Target, is it not?
21       A    Yes.
22       Q    Was that audit occurring at about the
23   same time that you lost the contract?
24       A    I believe it would have been in the
25   spring.

Page 94

2    spring," do you mean the spring of '05 or the spring
3    of '06?
4        A    I don't know.
5        Q    Okay.
6        A    I remember they were here, they were
7    from out of the country, and they were scared of
8    tornados.  So I believe it was in the spring.
9        Q    When you say "from out of the
10   country," do you mean out of the country of Oklahoma
11   or out of --
12       A    One was from Brazil, one was from --
13   they were from -- they were international students or

Page 39

---

Smith, Trent - Vol. I

13   something.
14       Q    And what was your understanding of the
15   purpose of the audit?  Why was Price-Warehouse
16   auditing you?
17       A    You know, I -- there's a document
18   somewhere that -- that -- that I thought Target sent
19   out about why they were doing it, for best practices
20   or to help with this or -- I don't remember.
21       Q    Okay.
22       A    I didn't see it.
23       Q    But Price-Warehouse sent two
24   employees?

(Page 0095)

2        A    Yes.
3        Q    And, if you recall, what sorts of
4    documents did the auditors look at?
5        A    They looked at personnel files.
6        Q    Anything other than personnel
7    files?
8        A    I don't remember.  I wasn't in charge
9    of that.  I was in a different --
10       Q    Who -- who was in charge of working
11   with them during the audit?
12       A    I suspect Bryan or Jim.  I don't know,
13   but somebody answered their questions and got them
14   their documents.  I didn't do this.
15       Q    And was it your understanding that
16   Price-Warehouse had been hired by Target to conduct
17   the audit?
18       A    Yes.  They were paid by Target.
19       Q    Do you know whether or not
20   Price-Warehouse made copies of any documents from
21   the files that they looked at?
22       A    I -- I think they did.  I believe so.
23   I don't remember.
24       Q    But Bryan might better be able to
25   answer --

(Page 0096)

2        Q    -- those questions?
3        A    Yes.
4        Q    Do you recall whether or not
5    Price-warehouse prepared a report as a result of
6    their audit?
7        A    I suspect.  I don't know.
8        Q    Okay.  Do you know whether or not
9    Price-warehouse provided a report to Target
10   concerning their audit?
11       A    I suspect that to be the case.  I
12   didn't see one.
13       Q    After the Price-Warehouse employees
14   visited Jim's Maintenance headquarters here, in
15   Oklahoma, did they call back for any additional
16   information?
17       A    I don't know.
18       Q    Do you recall whether or not
19   Price-warehouse phoned and asked whether or not
20   employees of Jim's Maintenance were working extra
21   hours at their cleaning duties?
22       A    I don't know.

Page 40

Smith, Trent – Vol. I

```
24        Q    And, as we sit here today, you don't
25   know whether or not that audit occurred before the
0097
 1   revised 2005 contract?
 2        A    I don't -- I do not know the dates.
 3   That seems easy to ascertain, but I don't know when
 4   they were.
 5        Q    Okay.  Now, you've already indicated
     what your role was with the company.  What was Jim's
 6   role with the company?
 7        A    Owner.
 8        Q    And Bryan Funderburgh was the
 9   president?
10   president?
11        A    Yes.
12        Q    And, at the headquarters office, you
     have indicated there were five employees, the three
13   of you and Ms. Talent and one other; correct?
14        A    And Vickie, yes.
15        Q    Okay.  And Ms. Talent and Vickie were
     sort of clerical support employees?
16        A    Yes.
17        Q    Who was primarily responsible for
     payroll?
18        A    Vickie paid payroll.
19        Q    Did Vickie set up the payroll system,
20   if you recall?
21        A    I don't know.
22        Q    How -- the -- the people that provided
23   cleaning services under your contract with Target,
24   how were they paid?
0098
 1        A    They were paid a shift pay.
 2        Q    What is a shift pay?
 3        A    It varied.  It was $50 a day, $60 a
 4   day.  It depended on their level of experience and
     what they were in charge of.
 5        Q    And, as people grew more experienced,
     did they occasionally receive pay raises?
 6        A    They could move up, like a carpet -- a
 7   person in charge of the carpets could move up to be
 8   in charge of the tile, and, then, the tile guy could
 9   move up to be the -- you know, lead.
10        Q    And what was the method that was used
11   to pay people with?
12        A    In the beginning, we -- we mailed
13   checks to people, but that was a terrible system.
14        So, when they came out with being able
15   to download, giving them a debit card, when that was
16   first being developed a few years, we jumped onto
17   that, and we gave them cards and account numbers and,
18   then, they could get their money immediately, like
19   after midnight of the day after they're -- when they
20   were paid.
21        Q    And when you say "cards," these are
0099
 1   so-called CashLynk cards?
 2        A    CashLynk, I think, is the name of the
 3   company we used.
 4        Q    Okay.  And, so, how did -- how was the
 5   CashLynk used?  Money is placed into an account
 6   for an employee; is that correct?
 7        A    Yes.
 8        Q    And then the employee is able to use
                        Page 41
```

Smith, Trent – Vol. I

```
 9   the CashLynk card to obtain the money?
10        A    Yes.
11        Q    And does the employee go to a bank or
12   how does the employee utilize them?
13        A    They can go to any ATM or bank and
14   withdraw the money.
15        Q    Okay.  And when an employee was newly
16   hired, were you able to get that employee a CashLynk
17   card right away?
18        A    No.  We usually waited a month,
19   because some people would wash out, it wouldn't be
20   what they wanted, and that -- so we would pay checks
21   for, you know, the first month.
22        They would get two paychecks.  If --
23   if it looked like -- you know, if they were there for
24   a month, then our rule was then we put them on a card
25   -- got them a card.
0100
 1        Q    And how often were employees paid?
 2        A    Twice a month.
 3        Q    Was there a specific day of the month
 4   that you made payments?
 5        A    I believe so.
 6        Q    And what days of the month --
 7        A    I don't know.
 8        Q    -- did you make payments?
 9        A    I don't remember.
10        Q    Does the 1st and 15th sound --
11        A    Most likely.  That sounds familiar.
12        MR. DEATS:  Let's go off the
13   record a second.
14        (Lunch Break)
15        (Plaintiff's Exhibit No. 7 was
16        marked for identification)
17        (By Mr. Deats)  Mr. Smith, I'm
     handing you a document that's been labeled for
18   identification as Deposition Exhibit 7 and ask you to
19   look at it and tell me -- do you recognize it?
20        A    Yes.
21        Q    And what is Deposition Exhibit 7?
22        A    A Target brand pamphlet.
23        Q    Okay.  And do you recall whether or
24   not Jim's was provided a copy of this pamphlet by
0101
 1   Target?
 2        A    Yes, we were.
 3        Q    And, if you recall, how were you
 4   supposed to utilize this pamphlet in conducting your
 5   business?
 6        A    Prior to Building Services in
 7   Minneapolis -- before they took over from the
 8   field --
 9        Q    Uh-huh.
10        A    -- the field representatives -- they
11   were kind of in charge of brand.  They went to the
12   stores, they visited the stores with the contractor,
13   and they, you know, would assess, "This is what this
14   floor looks like.  The bathroom has problems," you
15   know.
16        So the Building Services people in the
17   field were your contact.  There was three of us.
18   There was the contractor, Building Services, and then
19   the store.  So the three of us worked it out in the
                        Page 42
```

Smith, Trent – Vol. I

```
20   field.
21        Well, when they took it in-house, now
22   you had stores calling Minneapolis and saying, "Hey,
23   my floors look like -- look terrible," and the store
24   -- all of a sudden it got harder, do you know what I
25   mean, to -- to assess what is brand.
0102
 1        You know, Minneapolis isn't tied in and
 2   doesn't know what that bathroom looks like and can't
 3   visit.  So they would -- they put this --
 4   they put a scorekeeping -- a scorecard together where
 5   you were assigned at the end of the month, a green
 6   score, a yellow score, or a red score --
 7        Q    Okay.
 8        A    -- to try to help alleviate these
 9   problems, trying -- the communication.
10        So the store manager would fill this
11   out at the end of the month.  He would give you a red
12   score -- then they divided it up between -- like you
13   would have interior -- you would have -- the
14   housekeeping would have five areas, maybe tile,
15   restroom, carpets, entrance, and then they would
16   assign us scores.
17        So that led to, "What is brand?  What
18   looks good?  What doesn't look good?"
19        So then they came up with this -- I
20   mean, this is dated '05, that they tried to tell us,
21   "Okay.  This is what you're supposed to be doing,
22   this -- if you're doing these things, then you should
23   be doing what we're asking."
24        Just communication, I guess.
25        Q    And if we look at Page 2 of Deposition
0103
 1   Exhibit 7, if you look on the right-hand side of that
 2   page, it actually has the brand maintenance ratings
 3   and indicates what they represent?
 4        A    Yes.
 5        Q    There is a green, yellow, and a red
 6   score?
 7        A    Yes.
 8        Q    And that was provided to you in
 9   connection with the monthly checks that were done by
10   Target?
11        A    Yes.
12        Q    Okay.
13        (Plaintiff's Exhibit No. 8 was
14        marked for identification)
15        (By Mr. Deats)  Now, you've mentioned
16   a monthly scorecard.  I'm handing you a document
17   that's been labeled as Plaintiff's Exhibit 8.
18        Does this represent an example of a
19   monthly checklist completed for one of your stores?
20        A    Yes.
21        Q    And would you have one of these filled
22   out for each of your stores each month?
23        A    We were to -- at this time, we were to
24   go to the store.  We would have a supervisor go to
25   the store at the end of the month and walk the store
0104
 1   with a store team leader, the manager of the store.
 2        And then they would assign us marks,
 3   give us any -- give us any feedback, and then we were
 4   to collect these, bring them back to Oklahoma City,
                        Page 43
```

Smith, Trent – Vol. I

```
 5   and then I -- I packaged them all up and sent them to
 6   Minneapolis.
 7        Q    Okay.  And when you say you sent them
 8   to Minneapolis, you meant to Target?
 9        A    Yes, yes.
10        Q    Specifically, to the Building Services
11   department?
12        A    Yes.
13        Q    And, then, did Target, in turn, give
14   you some sort of a score sheet or feedback with
15   regards to those monthly housekeeping checklists?
16        A    Yes.  They would send us a document
17   that had all of them together.  That document, yes.
18   (Indicating)
19        So they would download -- in the
20   beginning, we would just overnight these to them and,
21   then, they would sit up there and download -- they
22   would sit and give you all the scores, somebody would
23   type them all in.
24        And then it changed to where we --
25   they would send us a document and we would enter them
0105
 1   and download it or e-mail it to them.
 2        (Plaintiff's Exhibit No. 9 was
 3        marked for identification)
 4        (By Mr. Deats)  Okay.  I'm handing you
 5   a document that's been labeled as Deposition Exhibit
 6   9.
 7        Do you recognize this document?
 8        A    Yes.  This is --
 9        Q    And what is it?
10        A    This is a compilation all of our
11   stores from a document like this, where they would
12   assign us scores, and then they were input, and if
13   there were any comments, like "Clean walls in
14   restroom better" on Document 8, you would see it on
15   Document 9.  They would type it in out there to the
16   right, so that --
17        Q    Okay.
18        A    -- you could --
19        Q    In the "comments" section?
20        A    Yes.
21        Q    Okay.  And this document that's
22   Exhibit 9 -- was this prepared by Target or prepared
23   by Jim's Maintenance?
24        A    Target.
25        Q    And looking at the document, I also
0106
 1   notice that it has other things.  It indicates what
 2   the chemical budget is for the store --
 3        A    Yes.
 4        Q    -- correct?
 5        A    Yes.
 6        Q    And it indicates, I guess, the actual
 7   amount that you spent during this reporting period?
 8        A    Yes.
 9        Q    And, by the way, if you look in the
10   middle bottom of Page 1, does it have a date for this
11   report?
12        A    Yes.  August 12th, 2004.
13        Q    So this would be a report for when?
14   Say, July of 2004?
15        A    Yes.
                        Page 44
```

---

Smith, Trent - Vol. I

16      Q    And, in fact, if you look at this one
17 column, it indicates July --
18      A    Yes.
19           -- does it not?
20      A    Yes.
21      Q    And did you get this type of report on
22 a monthly basis?
23      A    Yes.
24      Q    And the comments on the right-hand
25 side, then, are based upon these monthly housekeeping
0107
1 checklists?
2      A    Yes.
3      Q    And, then, they have the stores listed
4 on the left-hand side, and, then, there are several
5 categories in which you have been rated; correct?
6      A    Yes.
7      Q    And those are overall, carpet, food,
8 tile, restroom, entrance?
9      A    Yes.
10      Q    Okay. And you received a rating on
11 those each month?
12      A    Yes.
13      Q    Do you know whether a score card was
14 posted in the store on the bulletin board for the
15 stores, indicating --
16      A    Yes. Yes, it was.
17      Q    And would it have been something like
18 Exhibit 8 or would it have been something like
19 Exhibit 9?
20      A    Actually, it would look -- it would be
21 that report.
22      Q    Okay.
23      A    On the front of Exhibit 7, they have
24 an example of it --
25      Q    Uh-huh.
0108
1      A    -- right there.
2      Q    Okay.
3      A    That is what would be posted.
4      Q    Okay. So let's turn that so the
5 camera can see it.
6      A    There would be a report that would be
7 provided to the individual stores and posted on the
8 bulletin board similar to what's at the bottom of
9 Page 1 of Deposition Exhibit 7.
10           (Plaintiff's Exhibit No. 10 was
11           marked for identification)
12      Q    (By Mr. Deats) I'll hand you a
13 document now you may or may not recall. It has been
14 labeled for identification purposes as Deposition
15 Exhibit 10.
16           It purports to be a copy of a series
17 of e-mails. The date in the lower right-hand corner
18 of Page 1 is July 16th, 2001.
19           Do you recall this e-mail?
20      A    Yes.
21      Q    What were the circumstances under
22 which you received this e-mail?
23           MR. PIZZO: Well, I'm going to
24 have to object. Is it actually e-mailed to --
25
0109
Page 45

---

Smith, Trent - Vol. I

1           THE WITNESS: Yeah, I'm on there.
2           MR. PIZZO: -- Mr. Smith?
3           MR. DEATS: Actually, this is
4 addressed to Ruth Talent, is it not?
5           MR. PIZZO: Well, his name is in
6 the "to." There's a whole bunch of people in there.
7           MR. DEATS: Okay.
8           MR. PIZZO: I suspect that there
9 is a Trent Smith in there somewhere.
10      Q    (By Mr. Deats) Okay. And you're
11 pointing, on the "to" line. The second-to-the-last
12 line under the "to" column, you see a Trent Smith; is
13 that correct?
14      A    Yes.
15      Q    So you did receive a copy of this?
16      A    Probably, yes.
17      Q    And, then, Ruth Talent's name is up in
18 the upper left-hand corner of the document; right?
19      A    Yes.
20      Q    Does that indicate possibly that it
21 was printed from her machine or that she received the
22 e-mail, too, if you know?
23      A    I guess. I don't know.
24      Q    Okay.
25      A    I don't know why her name is on there.
0110
1      Q    What do you recall about this e-mail?
2      A    Let me read it.
3           This was whenever they went from --
4 when they contracted from 200 -- 200 housekeeping
5 contractors to just this list right here, where it
6 says the "to." This is the group of 25 or so
7 contractors that were awarded stores in that change.
8      A    Yes.
9      Q    And so they're -- this is explaining,
10 "This is how you're going to interpret the -- the
11 start date and when they should -- incoming (sic)
12 contractor should have his stuff out by this time and
13 you can start moving your equipment in by this time."
14      Q    So this was given to you in
15 conjunction with the awarding of the 2001 contracts?
16      A    Yes.
17           (Plaintiff's Exhibit No. 11 was
18           marked for identification)
19      Q    (By Mr. Deats) I'm going to hand you
20 a document now that's been labeled for identification
21 purposes as Plaintiff's Exhibit 11.
22           It's a two-page exhibit, and ask you
23 to look at this and tell me, do you recognize this
24 document?
25      A    Yes.
0111
1      Q    What is it?
2      A    This is feedback from that round of
3 bidding in 2005.
4      Q    Okay. And when you say "feedback,"
5 feedback from whom to whom?
6      A    This is from Target -- this would be
7 from Michelle Moore's office, where we e-mailed this
8 -- this document -- this Excel spreadsheet document
9 with our bid, how much we were bidding, and what --
10 her -- the -- the notification, the competitive and
11 noncompetitive --
Page 46

---

Smith, Trent - Vol. I

12      A    Yes.
13      Q    -- that, you know -- this is my
14 document. I made this. I -- this is my document,
15 and then I put in -- that's Target's feedback on if
16 we were competitive on the bid or noncompetitive on
17 the bid.
18      Q    Okay. So you received a separate
19 document from Target, indicating whether you were
20 competitive or noncompetitive on the bids that you
21 had made for these various stores?
22      A    Yes. And so -- you can see the bid,
23 the dark -- that's what we turned in.
24      Q    Okay.
25      A    And, then, I was putting this
0112
1 together. I put -- that's what we were paid, was the
2 -- in 2005.
3      Q    Uh-huh.
4      A    That's what our current contract in
5 2005 -- that's what it was. So I was just marking
6 the difference so, in-house, Jim, Bryan, and I would
7 know what we're bidding and what -- you know, where
8 we're at -- where it stands with what we are currently
9 getting.
10      Q    And, then, the feedback that you got
11 back -- I see, in that right-hand column on Page 1 of
12 Exhibit 11, the word "competitive" and some
13 "noncompetitive" and others "very noncompetitive"?
14      A    Yes.
15      Q    Do you see, on Page 1, a listing for
16 Overland Park store?
17      A    Yes.
18      Q    And where was Overland Park located?
19      A    That is in Missouri -- Overland Park,
20 Kansas. No.
21           THE WITNESS: Overland Park is in
22 Kansas or Missouri?
23           MR. JIM FUNDERBURGH: Missouri.
24           THE WITNESS: Okay.
25           MS. MILLER: I would answer. The
0113
1 witness is asking questions of other people who are
2 not under oath.
3      Q    (By Mr. Deats) Just tell me what you
4 recall.
5      A    It's in the Kansas City market.
6      Q    Okay. Your 200-- had you been
7 cleaning that store in 2005?
8      A    Yes.
9      Q    And the price that you had been
10 charging was $18,975? Is that what shows in the
11 column under 2005?
12      A    That's what Target had been paying us.
13      Q    Okay. You made a new bid, did you
14 not, according to this document, of $16,667 --
15      A    Yes.
16           MR. PIZZO: Objection.
17      Q    (By Mr. Deats) Excuse me. 600 --
18 16,250?
19      A    Yes.
20      Q    Okay. And the feedback you got from
21 Target was that was very noncompetitive?
22      A    Yes.
Page 47

---

Smith, Trent - Vol. I

23      Q    That was even though it was more than
24 $2,000 less per month than you had charged
25 previously?
0114
1      A    Yes.
2      Q    Similarly with the Shawnee store, you
3 put in a bid of 15,833, had been receiving 17,407,
4 and were told that was noncompetitive?
5      A    Yes.
6      Q    As a practical manner -- matter, did
7 you feel, in this bidding process, that you could, in
8 fact, attempt to increase the amount you were
9 obtaining per store for your cleaning services?
10      A    (No verbal response)
11      Q    Did you understand my question?
12      A    There was an e-mail that was
13 sent to us that said, "You cannot bid more than your
14 last bid."
15      Q    Was that sent before or after the
16 first round of bidding?
17      A    Before.
18      Q    Okay. So before the first round of
19 bidding, you received an e-mail that said you could
20 not charge more than you currently were charging?
21      A    No. No. No. If I said that, "You
22 can't bid more than your previous bid."
23      Q    We -- there are others on here where
24 we bid a little bit more. Like we didn't -- Wichita
25 East, if you look at 92 --
0115
1      A    Uh-huh.
2      Q    -- we bid more.
3      A    And I don't know what round of bidding
4 this was. You know, I'm not sure if this was our
5 first, our second, or our final bid, what we turned
6 in here, and it's not marked.
7      Q    Okay.
8      A    So, no. You could bid more, and we
9 did.
10      Q    Okay. And, in each subsequent round
11 of bidding, you were allowed to increase your bid --
12      A    No.
13      Q    -- at that point?
14      A    You were not, no. Now, that was --
15 that was part of the rules of bidding, you cannot bid
16 more than your previous bid.
17      Q    Okay. As a practical matter, were you
18 able ultimately to achieve a price for a store that
19 was more than you had cleaned it the previous year?
20      A    I don't have. I don't -- I don't have
21 -- you would know if we had the contracts. I don't
22 -- you know, it would show.
23      Q    So we could compare the 2005 contract
24 with the prior contract and then we would know?
25      A    Yes. That's right.
0116
1      Q    As we sit here today, do you recall
2 actually achieving a higher price for a store than
3 you had received previously?
4      A    I don't know. We could have. I know
5 that we didn't get more than what we were -- net,
6 because when you're bidding, you're, you know --
7 you're trying to -- we didn't net more -- but that
Page 48

Smith, Trent - Vol. I

```
 8   was our own bid.
 9        Q    So the overall price that you were
10   able to achieve was something less than the price you
11   had done previously?
12        A    Yes.
13        Q    And that was at the end of the third
14   round of bidding when you actually received the
15   stores you were going to get?
16        A    That would be the 2005 contract, the
17   September 2005 contract.
18        Q    So the -- the end result for you of
19   this bidding process was to lower the overall amount
20   you were getting for cleaning Target stores?
21        A    Yes.
22        Q    Now, you mentioned that, in the Excel
23   spreadsheet that you were able to fill out, that you
24   were actually able to list the number of employees
25   you planned to use; is that correct?
```
Page 49

```
0117
 1        A    Yes.
 2        Q    Now, were there any limitations on the
 3   number of employees that you could list on this
 4   bidding sheet?
 5        A    No.
 6        Q    For example, had you ever received
 7   from Target any information about a minimum number of
 8   employees you were expected to use to clean a Target
 9   stores.
10        A    Just from store managers.
11        Q    And what had store managers told you?
12        A    That you had to have three people or
13   more in the store.
14        Q    And was that with regards to -- now,
15   there are Target stores and there are Super Target
16   stores; right?
17        A    Right.  That's regular-size Targets.
18        Q    Okay.  And what -- what is a Super
19   Target as opposed to a regular-size Target?
20        A    It has groceries.  It's the two
21   stores.
22        Q    And so you had been told, with regards
23   to regular Target, a minimum of three employees?
24        A    Yes.
25        Q    With regard to Super Targets, had
```

```
0118
 1   store managers ever indicated to you a minimum number
 2   of employees you were expected to use?
 3        A    Not as strongly, but five.  They
 4   wanted five people in the minimum.
 5        Q    As a practical matter, did you feel,
 6   in the bidding process of 2005, that you could list
 7   less than three employees --
 8        A    No.
 9        Q    -- to clean Target?
10        A    No.
11        Q    Did you feel like you could list less
12   than five employees to clean a Super Target?
13        A    No.
14        Q    Now, when you went through this
15   bidding process in 2005, the other 24 cleaning
16   contractors were allowed to bid on your stores, were
17   they not?
18        A    You could bid on any store -- any
```
Page 49

Smith, Trent - Vol. I

```
19   district.  They wanted you to bid by district.  Not
20   by individual store, but by district.  You could bid
21   by district.
22        Q    And you were aware that other cleaning
23   contractors might be bidding on your stores?
24        A    Absolutely.
25        Q    Did that have any impact on you and
0119
 1   your ability to create bids for the stores?
 2        A    It affected our bidding.
 3        Q    How did it affect your bidding?
 4        A    Well, where we are already owed a
 5   tremendous amount of money for equipment and had a
 6   large investment, we told low.  If we could even break
 7   even, it would be better than losing that store.
 8        Q    Okay.  Now, as you entered into the
 9   bidding process -- you indicated there were three
10   rounds of bidding?
11        A    Yes.
12        Q    When -- when you engaged in the first
13   round of bidding, were you told that that was a first
14   round of bidding?
15        A    Yes.
16        Q    Did you know, at the time you made
17   your first bids, that there might be subsequent
18   rounds of bidding?
19        A    Yes.
20        Q    And how did you find that out?
21        A    They told us, "This is Round 1 of
22   three rounds."
23        Q    Were you -- did they indicate to you
24   that it was any type of a practice round?
25        A    No, not the first time.  It ended up
0120
 1   being.
 2        Q    Toward the very end, like a week
 3   before -- we had already done the bids.  The bids,
 4   you know -- and this was the third one we're going to
 5   turn in, I believe, and everybody was really nervous.
 6   I mean, there was millions and millions of dollars at
 7   stake.
 8        Q    And somebody, on a conference call,
 9   said, "Okay.  Now when you receive these bids, what
10   day -- when will they be awarded," and Michelle, on
11   that -- on the conference call, said, "Well, as you
12   can see and if you read your 3rd packet, it says that
13   we may choose to accept these bids or we may not," or
14   something.
15        Q    So even with regards to the third
16   round of bidding, you didn't know if that was going
17   to be the final round?
18        A    No.  Now, she tipped us off, because
19   you would have thought anybody would have said,
20   "Well, yes," but because she backpedaled and said,
21   "we need your best bid.  We need your best bid,
22   because we could enforce this" or --
23        Q    Do you know what the purpose was of
24   not telling you when the final bidding was going to
25   occur?
0121
 1        A    I -- they were just -- it was maybe
 2   the first time they had done it, this reverse -- it
 3   was the first time with housekeeping they had done
```
Page 50

Smith, Trent - Vol. I

```
 4   it, but I don't know what they were doing.
 5        They just gathered a bunch of
 6   information from everybody on how many people you're
 7   going to use, how many district supervisors, how many
 8   stores, how they would be supervising.
 9        And they gathered a lot of
10   information, what potential insurance, what it was
11   going to cost them if they did enact this, I guess.
12   I don't know.
13        Q    But they -- they did not accept any of
14   those.
15        MR. DEATS:  Why don't we go off
16   the record a moment for the purpose of changing the
17   videotape.
18        (Short Break)
19        Q    (By Mr. Deats)  Ultimately, did this
20   process have the effect of forcing your prices down?
21        A    I guess -- yes.
22        MR. PIZZO:  You don't have your
23   mike on.  You had better ask that question again.
24        Q    (By Mr. Deats)  Ultimately, did this have
25   the effect of forcing your prices down?
0122
 1        A    Yes.
 2        (Plaintiff's Exhibit No. 12 was
 3   marked for identification)
 4        Q    (By Mr. Deats)  I'm handing you a
 5   document that's been labeled for identification
 6   purposes as Deposition Exhibit 12.
 7        You had indicated that you paid
 8   employees -- or paid the people that did the cleaning
 9   services for you primarily as -- by means of CashLynk
10   cards; correct?
11        A    Yes.
12        Q    Does this document relate to the
13   CashLynk cards?
14        A    Yes.
15        Q    What type of document is this?
16        A    I guess this is an account history of
17   an individual -- of one account.
18        Q    Up at the top left-hand corner of Page
19   1, it says "CashLynk Report"; correct?
20        A    Yes.
21        Q    And you can see, in the upper
22   right-hand corner, it says "Page 1 of 3.
23        So this would have been a report --
24   would this be the report of the use of an individual
25   CashLynk card or what?
0123
 1        A    Yes.  Yes.  Yes.
 2        Q    Did you receive one of these with
 3   regards to each of the CashLynk cards that you gave
 4   out each month?
 5        A    I -- I don't think that we printed one
 6   for each month, no.
 7        Q    Okay.
 8        A    You might go on there to look -- if
 9   somebody had a question, you could go on there and
10   pull this up and see -- see what happened.
11        Q    And you can see like the total amount
12   that's been deposited into that account; correct?
13        A    Yes.
14        Q    You can see a total amount that's been
```
Page 51

Smith, Trent - Vol. I

```
15   withdrawn from the account; correct?
16        A    Yes.  Yes.
17        Q    And -- and if you go down, you can
18   actually see the dates and the locations where
19   withdrawals were made; correct?
20        A    Yes.
21        Q    And how much was withdrawn and what
22   type of service fee was charged?
23        A    Yes.
24        Q    And so were -- did you have access to
25   records that would indicate this for each of the
0124
 1   people to whom you gave CashLynk cards?
 2        A    Jim's Maintenance record.
 3        Q    Okay.  And I -- I slip and say "you" a
 4   lot.
 5        A    Yeah.  If I needed this, I could go to
 6   Vickie's office and get on her computer and pull --
 7   or she could pull it up for me and show me that.
 8        Q    As we sit here today, does Jim's
 9   Maintenance still have access to all of these
10   records?
11        A    I do not know that.
12        Q    Okay.  But you have provided all of
13   the records that you have, both to the attorneys for
14   the defendants and to the attorneys for the
15   plaintiffs, have you not?
16        A    I suspect that to be the case.
17        Q    Okay.
18        A    That wasn't -- I wouldn't be the
19   person to ask --
20        Q    Do you know whether or not you have
21   complete records of all of the payroll transactions
22   that occurred during the last three or four years
23   that you were in operation?
24        A    I don't know that.  I would guess
25   that, but I don't -- I -- that's not my -- what I was
0125
 1   in charge of.
 2        Q    Okay.
 3        (Plaintiff's Exhibit No. 13 was
 4   marked for identification)
 5        Q    (By Mr. Deats)  I'm handing you a
 6   document that's been labeled for identification
 7   purposes as Plaintiff's Exhibit 13.
 8        Do you recognize this document?
 9        A    Yes.
10        Q    What is this document?
11        A    This is a payroll time sheet.
12        Q    Is this a Jim's Maintenance document?
13        A    Yes.
14        Q    Do you know who created this document?
15        A    I did.
16        Q    Now, you indicated earlier that
17   employees were paid on a daily basis; correct?
18        A    They were paid shift pay.  They were
19   paid twice a month.
20        Q    Okay.  And when you say "shift pay,"
21   you indicated a rate of "x" dollars per day?
22        A    Yes.
23        Q    And was this a method used by Jim's to
24   determine the number of days that an individual
25   employee worked?
```
Page 52

Smith, Trent - Vol. I
```
0126
 1        A    Yes.
 2        Q    And were these payroll time sheets
 3   maintained at each store -- Target store?
 4        A    Yes.
 5        Q    -- where Jim's provided services?
 6        A    Yes.
 7        Q    And the employees were expected to
 8   complete the time sheet to indicate the days that
 9   they had worked?
10        A    Yes.
11        Q    And, then, these time sheets were
12   turned in on a monthly basis, a bi-monthly basis,
13   what?
14        A    They were faxed into the payroll
15   office on the 1st and 16th.
16        Q    And then payroll was based upon these
17   records?
18        A    Yes.
19        Q    Do you know whether or not Jim's
20   Maintenance still has an accurate copy of all the
21   payroll time sheets for the last three or four years?
22        A    I do not know that.
23        Q    Other than these payroll time sheets,
24   did Jim's Maintenance utilize any other type of time
25   record to determine payroll?
0127
 1        A    No.
 2        Q    And who was responsible for faxing
 3   these records into the payroll office on the 1st and
 4   the 16th?
 5        A    The district supervisor was ultimately
 6   responsible for -- to make sure that it was done.
 7   You know, a guy might have eight stores that he
 8   supervises, and he would go around and check every
 9   day or -- you know, and make sure that these were all
10   up to date.
11              They couldn't just -- you know, you're
12   not supposed to fill it out on the last day of the
13   month, but keep these accurately filled out, and he
14   was responsible.
15              Now, the -- now, who faxed it in -- it
16   could have been the lead guy or it could have been --
17   almost 90 percent of the time, it was the district
18   supervisor who faxed them in.
19        Q    So let's talk a little bit about the
20   hierarchy at Jim's Maintenance.  You, obviously, had
21   the people in the central office that you have
22   already indicated; correct?
23        A    Yes.
24        Q    And, then, what was the next line of
25   supervision?
0128
 1        A    You had regional -- two regional guys,
 2   one handled the north, one handled the south, and,
 3   then, below them -- they had district supervisors
 4   underneath them, and each one of them had about eight
 5   stores.
 6        Q    Okay.  Now, the regional managers, who
 7   were they?
 8        A    Rob Mythen handled the north, which
 9   would be Oklahoma and Kansas and Missouri and
10   Arkansas, and, then, for a time period, it was
                        Page 53
```

Smith, Trent - Vol. I
```
11   Brandon Stewart handled Texas, New Mexico, and, then,
12   after Brandon, we had Alex.
13        Q    Okay.  Now, you say Brandon Stewart
14   handed -- handled Texas and New Mexico.  Would he
15   have been the person responsible for San Antonio and
16   Austin stores?
17        A    Yes.  He would have been the regional
18   manager.
19        Q    And do you know where Mr. Stewart is
20   located?
21        A    As far as I know, he lives in Dallas,
22   Texas.
23        Q    Do you know what Mr. Stewart is doing
24   these days?
25        A    I -- somebody told me he's working in
0129
 1   the car business.
 2        Q    And, if you know, approximately, how
 3   many district supervisors did Brandon Stewart have
 4   working for him?  Do you have any idea?
 5        A    Five to six.
 6        Q    And who were the district supervisors,
 7   that you recall, in San Antonio and Austin?
 8        A    Valdel was a -- a district supervisor
 9   for a while.  We had a -- I can't remember the names.
10        Q    Do you recall a woman by the name of
11   Elvia Riojas?
12        A    Yes.  Elvia was a supervisor for San
13   Antonio.
14        Q    And, as we sit here today, do you
15   recall any others?
16        A    Not off the top of my head.
17        Q    You -- you will have a chance to look
18   over your deposition, if you want, and amend it, and
19   if any other names occur to you --
20        A    Uh-huh.
21        Q    -- if you would just supplement your
22   deposition by writing those in.  There will be an
23   errata sheet for you to do that.
24        A    Okay?
25        Q    Okay.
0130
 1              MS. MILLER:  And I'm going to
 2   object to that.  That -- I mean, he has the right to
 3   read and sign, which I don't know that we actually
 4   discussed it prior to this, but he doesn't have the
 5   right to supplement his testimony or change his
 6   answers.
 7              So I think you have inaccurately
 8   instructed him on that.
 9        Q    (By Mr. Deats)  Okay.  well --
10              MR. PIZZO:  we will provide --
11        Q    (By Mr. Deats) -- would you --
12              MR. PIZZO:  We will provide the
13   names one way or the other.  If he or anybody else
14   that you ask the question for, if they come up with
15   the information, we will supply it to all parties.
16              MS. MILLER:  Certainly, we can
17   have that agreement --
18              MR. PIZZO:  Yeah.
19              MS. MILLER:  -- but it wouldn't
20   be reflective of him testifying to that --
21              MR. PIZZO:  Right.
                        Page 54
```

Smith, Trent - Vol. I
```
22              MS. MILLER:  -- in the deposition
23   transcript.
24              MR. PIZZO:  Not necessarily in
25   -- in an errata sheet or something, but we can do it
0131
 1   by e-mail or something to that effect.
 2        Q    (By Mr. Deats)  Do you recall an
 3   Austin district supervisor by name of Sam Salazar?
 4        A    Yes.
 5        Q    Do you know where Mr. Salazar is these
 6   days?
 7        A    No.
 8        Q    Now, you indicated that these Jim's
 9   Maintenance payroll time sheets were faxed in.  Do
10   you know what fax machines were used to fax these to
11   the Jim's Maintenance headquarters?
12        A    You could use Target's.  They -- they
13   were all -- we had -- all Targets have a fax machine
14   that we were allowed to use, or the district
15   supervisor -- every district supervisor had a fax
16   machine, also.
17        Q    Okay.  Now, looking at this as an
18   example, this is for the second half of June 2005;
19   right?
20        A    Yes, sir.
21        Q    So when --
22              MR. PIZZO:  Can -- can I ask you
23   just to clarify what store we're talking about?
24        Q    (By Mr. Deats)  And --
25              MR. PIZZO:  771.  I'm sorry.
0132
 1        Q    (By Mr. Deats)  The store we're
 2   talking about is 771; correct?
 3        A    Yes.
 4        Q    And that would be the store on
 5   Military Highway in San Antonio?
 6        A    On the south side of San Antonio.
 7   "Military" was.  I'm sorry.
 8              MR. PIZZO:  I didn't know what
 9   "Military" was.  I'm sorry.
10              THE WITNESS:  That's the street.
11              MR. PIZZO:  I'm not familiar
12   with --
13        Q    (By Mr. Deats)  So, when this payroll
14   would be turned in, it would be turned in sometime
15   after June 30th; correct?
16        A    On the 1st.
17        Q    And when would the employees be paid
18   for the work that was done the last half of June?
19        A    I believe that they were usually paid
20   within -- within 20 days, within 15 days.  I don't
21   know exactly.
22        Q    So payments for work done actually
23   lagged about -- a couple of weeks behind?
24        A    Yes.  They -- as soon as she received
25   it on the 1st, the day after they worked, she would
0133
 1   start processing it, and it took about -- you know,
 2   it took two weeks to get it done and then loaded.
 3              All these -- these would be loaded --
 4   it should say when the deposits were made.
 5        Q    Now, were employees paid a set amount
 6   for a half-month of work, or were they --
 7        A    No.  They were paid a daily rate, like
                        Page 55
```

Smith, Trent - Vol. I
```
 7   a shift pay.
 8        Q    So that daily -- so the amount they
 9   were paid for -- for a half-month pay period, then,
10   would depend on the number of days that --
11        A    Yes.
12        Q    -- in that pay period?
13        A    Yes.
14        Q    Now, was there any provision made for
15   the payment of overtime pay if an employee worked
16   more than 40 hours?
17        A    No.
18        Q    And why not?
19        A    They were expected to get their job
20   done and out of there around, you know, 6:30, 7:00 in
21   the morning.
22        Q    So employees were expected to be able
23   to perform the work they needed to perform in a
24   40-hour workweek?
25        A    Yes.
0134
 1        Q    Did Jim's become aware, at some point
 2   in time, that employees, in fact, were working more
 3   than 40 hours in a week?
 4        A    I don't know.
 5        Q    You, personally, were not aware of it?
 6        A    I, personally, was not aware of it,
 7   and it didn't matter.  They were being paid shift
 8   pay.
 9        Q    And when you say "they were being paid
10   shift pay," what do you mean by that?
11        A    They were being paid -- I don't
12   remember the exact numbers.  It might be $50 a day or
13   it may be $70 a day, and if they worked 10 days that
14   would be -- 10 times 10 -- $500.
15        Q    And who was responsible for setting
16   that daily rate?  Was that something that you did or
17   some other employee at Jim's?
18        A    I came up with the -- I guess, yeah.
19   I mean, I -- it was all of us.  It was a group, you
20   know, trying to figure out a budget.  The district
21   supervisor -- I would work with the district
22   supervisor and the regional supervisor and we would
23   try to set a budget and find out -- and people were
24   paid on their experience.
25        Q    Did you have occasional meetings with
0135
 1   your district supervisors?
 2        A    Yes.
 3        Q    Would you travel to their locations
 4   for those meetings, or did you have group meetings at
 5   the headquarters office?
 6        A    Both.
 7        Q    And how often did you bring your district
 8   supervisors up to the Oklahoma headquarters, would
 9   you say?
10        A    Three or four times a year.
11        Q    How often would you go into the field
12   to meet with them in the locations where they worked?
13        A    Six or seven times a year, maybe more.
14   You know, it depended on what was happening in their
15   market, if they were having difficulties.
16        Q    I want to go through a number of other
17   types of payroll records with you and see if you can
                        Page 56
```

Smith, Trent - Vol. I

```
18   tell me about them.
19            (Plaintiff's Exhibit No. 14 was
20            marked for identification)
21       Q   (By Mr. Deats)  This is Plaintiff's
22   Exhibit 14.  Do you recognize this document?
23       A   It appears to be a report from
24   one of our monthly -- you know, bi-monthly payments,
25   it looks like.
0136
1        Q   Okay.  And if we look -- I guess,
2    that, in the left-hand column, that's the number of
3    the CashLynk card assigned to the employee?
4        A   No.  I think it -- it's probably on
5    the right.
6        Q   Oh, okay.
7        A   Do you see -- beside the name.
8        Q   Yeah.  I sure do.
9        A   So it lists the employee across the
10   right, and, then, the CashLynk card next to that,
11   going left; right?
12       Q   That's what it appears to me.
13       Q   Okay.  And what do the other columns
14   represent?
15       A   I -- I don't know.
16       Q   You don't --
17       A   I'm guessing.  That far left one looks
18   like just a -- just a transaction number.
19       Q   Okay.  And, then, the next column
20   over, is that the amount of the deposit?
21       A   Yes.
22       Q   And, then, the next one over, that
23   says "cash" --
24       A   Uh-huh.
25       Q   -- what does that mean, if you know?
0137
1        A   I don't -- I don't know.  I guess that
2    means cash.  That it was -- that it wasn't a credit
3    or anything.
4        Q   And, then, a couple of columns over
5    there is a date.  Does that indicate the date of
6    deposit?
7        A   That's what it appears to me.
8        Q   And, then, the next column over
9    indicates that it was deposited for purposes of
10   payroll?
11       A   Yes.
12       Q   And what use, if any, did Jim's make
13   of these documents?  Just to keep track of how much
14   money you were depositing into employees' accounts?
15       A   Right.  And, I guess, if anybody
16   called, you could tell them, you know, what day and
17   how much was deposited.
18       Q   Do you know whether or not Jim's still
19   maintains all of these records?
20       A   I do not know.
21            (Plaintiff's Exhibit No. 15 was
22            marked for identification)
23       Q   (By Mr. Deats)  I'm handing you a
24   document that's been labeled for identification
25   purposes as Plaintiff's Exhibit 15.
0138
1        Q   Do you recognize this document?
2        A   Payroll check register.
```

Page 57

Smith, Trent - Vol. I

```
3        Q   Okay.  Is this a document that Jim's
4    used to keep track of payments to its employees?
5        A   This appears to be checks that were
6    cut, not -- not downloaded -- not -- not put on a
7    card.
8        A   This would have been prior to that or
9    people who were not on a card.
10       Q   Okay.  And so -- the date on this
11   particular payroll report -- and you can see it's
12   Page 1 of, possibly, a multi-page report -- is June
13   15 -- June 14, '04; correct?
14       A   Yes.
15       Q   And you believe that this would
16   represent people that were paid by check, rather than
17   by CashLynk card?
18       A   Yes.
19       Q   And you've already indicated that you
20   paid people by check during the first month of their
21   employment?
22       A   Yes.
23       Q   And with a check date of June 15th,
24   2004, would that indicate payment for the previous
25   pay period, or do you know?
0139
1        A   I'm guessing that that would be the
2    previous month, that was turned in on the list.
3        Q   So this might represent payment for
4    the period -- for the last half of May of 2004?
5        A   It may be May 16th to May 30th.  I
6    don't know.
7             (Plaintiff's Exhibit No. 16 was
8             marked for identification)
9        Q   (By Mr. Deats)  I'm handing you a
10   document that's been labeled for identification as
11   Plaintiff's Exhibit 16.
12       Q   Do you recognize this type of
13   document?
14       A   Yes.
15       Q   And what was this document used for?
16       A   It appears to be direct deposit.
17       Q   Would this, again, indicate a deposit
18   made into, for example, a CashLynk account?
19       A   Possibly.
20       Q   But you're not sure as we sit here
21   today?
22       A   No.  It doesn't say "CashLynk" on it.
23   I -- we may have tried another company out prior.
24   This is a little bit earlier than that one.  That one
25   is a June -- well, that was payroll.
0140
1        A   That's May of '04, on that one, and
2    this was January '04.  I -- I don't know.
3        Q   So you probably -- so it's possible
4    that this just represents the use of a different
5    company?
6        A   Possibly.
7            MR. PIZZO:  Can we go off the
8    record for a minute?
9            MR. DEATS:  Sure.
10           (Short discussion held off the
11           record)
12       Q   (By Mr. Deats)  So, again, this would
13   indicate deposits to CashLynk accounts?
```

Page 58

Smith, Trent - Vol. I

```
14       A   I believe so.  These -- these account
15   numbers all look very similar.  So it's to a card.
16       Q   And I notice that the amount is listed
17   in two separate places on each document.
18       Q   Do you know why that is?
19       A   No.
20       Q   Now, this audit report is dated
21   January 29th, '04; correct?
22       A   Yes.
23       Q   And it indicates a date of deposit
24   into each of these individual accounts of January
25   15th, '04?
0141
1        A   Yes.
2        Q   If you know, what time -- what pay
3    period would these payments cover?
4        A   I'm thinking this would have been the
5    last half of December of '03, like December 16th
6    through December 31st.
7             (Plaintiff's Exhibit No. 17 was
8             marked for identification)
9        Q   (By Mr. Deats)  I'm handing you a
10   document that's been labeled for identification
11   purposes as Plaintiff's Exhibit 17.
12       Q   Again, this is a payroll document
13   submitted pursuant to the order of confidentiality,
14   but do you recognize this document?
15       A   Yes.
16       Q   Is this a Jim's Maintenance document?
17       A   Yes.
18       Q   And how did Jim's Maintenance utilize
19   these documents?
20       A   Vickie would give us the amount that
21   we paid, the net pay, and then we could compare it to
22   what we had budgeted.
23           You know, under "Net Pay," it says
24   2300 for the first store --
25       Q   Uh-huh.
0142
1        A   -- for 174 Marbach.  We had budgeted
2    $2,100.  So the supervisor is over whatever that
3    difference is.  $200.  He would be over -- he's over
4    budget $200.
5        Q   Did this document -- this type of
6    document have any particular name?
7        A   Payroll report.
8        Q   No.  I don't know if it has a
9    particular name.
10       Q   But this was a document maintained
11   internally by Jim's Maintenance?
12       A   Yes.
13       Q   It was for purposes of keeping track
14   of employees' salaries?
15       A   Yes, budget.  Uh-huh.  Yes.
16       Q   And this purports to list a day/hour
17   rate; correct?
18       A   Yes.
19       Q   And was that the daily rate that you
20   were paying to the various employees?
21       A   Pretty much.  Cutting close.
22       Q   And then it has a column for gross
23   salary and a column for net pay, does it not?
24       A   Yes.
```

Page 59

Smith, Trent - Vol. I

```
25       Q   And I noticed that, with regards to
0143
1    each of the employees, the gross salary and the net
2    pay is the same; is that correct?
3        A   These all appear to be that way.
4        Q   Okay.  Did Jim's Maintenance consider
5    the individuals who worked, providing cleaning
6    services in the Target stores, to be employees of
7    Jim's?
8        A   Cleaners, daily cleaners.
9        Q   So did you consider them to be
10   independent contractors working for you, or what?
11       A   I didn't consider any of that.  They
12   were daily cleaners hired, as a shift pay.
13       Q   Okay.  And do you know whether or not
14   any provision was made for withholding taxes from
15   their pay?
16       A   I do not know.
17       Q   And looking in the lower left-hand
18   corner, you see a Target payroll, May 15, 200- --
19       A   '05.
20       Q   -- '5?
21       A   Uh-huh.
22       Q   Okay.  Does that indicate when this
23   payroll report was actually run?
24       A   No.  I don't think so.
25       A   I think that that was payroll on the
15th.
0144
1        Q   Okay.  And do you -- if the payroll
2    was made on the 15th, do you know what pay period
3    this would represent payment for?
4        A   It doesn't say.  I don't know.
5        Q   If payment was made on May the 15th,
6    2005, would you expect that it was a payroll for the
7    last half of April 2005?
8        A   Yes.
9            (Plaintiff's Exhibit No. 18 was
10           marked for identification)
11       Q   (By Mr. Deats)  I have handed you a
12   document that's been labeled for identification
13   purposes as 18.  It's labeled, at the top, "Payroll
14   YTD Reports."
15       Q   If you know, does "YTD" stand for
16   year-to-date?
17       A   I suspect.
18       Q   Okay.  Are -- are you familiar with
19   these particular payroll reports?
20       A   No.
21       Q   You have not seen these before?
22       A   No.
23       Q   I want to go back now and talk about
24   -- specifically about Target's involvement with
25   regards to the management of the people doing
0145
1    cleaning services for Jim's Maintenance.
2        A   We have already talked about the
3    contractor handbook.
4        Q   Was Jim's Maintenance required to
5    follow the guidance set forth in the contractor's
6    handbook in performing cleaning services for Target?
7        A   Yes.
8        Q   Did Jim's have any ability or
9    authority to deviate from the practices specified in
```

Page 60

Smith, Trent - Vol. I

```
10  the contractor's handbook if you thought another
11  practice might be more effective?
12       A    No.
13       Q    We also talked about a scope-of-work
14  document that was attached to the 2005 contract.
15            Do you recall that document?
16       A    Yes.
17       Q    I believe it was Plaintiff's Exhibit
18  5.  Did that document also control the manner in
19  which Jim's was to provide cleaning services for
20  Target?
21       A    Yes.
22       Q    Did Jim's Maintenance have any
23  authority to deviate from the requirements of the
24  scope-of-work?
25       A    No.
```
0146
```
 1       Q    In addition to those two documents,
 2  did Target, from time to time, put out special
 3  cleaning bulletins?
 4       A    Yes.
 5       Q    In what sorts of circumstances would
 6  Target put out special cleaning bulletins?
 7       A    Prior to Christmas, prior to
 8  Thanksgiving, prior to heavy back-to-school sales,
 9  prior to changing -- turnover -- changing their
10  seasonals.
11       Q    And when you had those special
12  cleaning bulletins, did they indicate additional or
13  different work that Jim's Maintenance was to perform?
14       A    They would send out a document -- an
15  example would be, prior to Christmas, you sit down
16  with your crew leader and you sit down with the store
17  team leader, the overnight person, who is in charge
18  of stocking the store -- about -- there's usually
19  about three or four Target managers, and you fill it
20  out -- the Target people fill it out, what time they
21  want you in the store, what time you're supposed to
22  do certain areas of the store.  You know what I mean?
23  Like seasonals or you're supposed to do the pharmacy
24  or you're supposed to do this, so that you could --
25  so they could know where you're at, what time you're
```
0147
```
 1  going to have lunch, what area of the store you're
 2  lunch, what area of the store you are supposed to be
 3  in, what time you're supposed to leave.
 4            And, then, they would have a -- a
 5  seasonal -- like whenever they want us to strip the
 6  store after Christmas, they want us to start with
 7  this area, do this one, move on to this area, and
 8  move around the store.  They know what I mean?
 9  It's a two-page document.
10       Q    Okay.  So very specific requirements
11  for how you were to conduct the cleaning services?
12       A    Yes.
13       Q    If you -- do you recall whether or not
14  Target put on any training seminars for the various
15  cleaning contractors, on how to conduct services?
16       A    Well, we would go to Minneapolis, we
17  went to Boston, Las Vegas, Orlando, to meet with
18  Target Building Services, and they would give little
19  seminars on best carpet cleaning methods, best vacuum
20  methods, team building training, and then they had --
```
Page 61

Smith, Trent - Vol. I

```
21  they hosted our regionals up to Target to go to a
22  carpet cleaning seminar.  They paid for them to go up
23  there.
24       Q    For your regional managers to go?
25       A    For regional managers.
```
0148
```
 1       Q    And did they put on these
 2  demonstrations, were these demonstrations for the
 3  purpose of instructing you on how you were to perform
 4  services under the contract?
 5       A    Yes.
 6       Q    And did they present -- did they have
 7  product presentations at these seminars?
 8       A    Yes.
 9       Q    And what was the purpose of the
10  product presentations?
11       A    Okay.  They would -- they had a
12  humongous, indoor carpet cleaning machine that they
13  wanted -- that they wanted to show everybody.
14            And when we're talking about how you
15  would do things, you understand I'm talking about how
16  Jim's Maintenance cleaning crews were to perform
17  services; right?
18       A    Yes.
19       Q    And would you go back, then, and
20  provide direction, through the supervisors, to your
21  cleaning crews on how they were to conduct services?
22       A    Yes.
23       Q    How often did these training seminars
24  occur?
25       A    Once a year.
```
0149
```
 1       Q    And we've already talked about the
 2  monthly housekeeping checklists that were used;
 3  correct?
 4       A    Yes.
 5       Q    And tell me what you know about that.
 6  When -- what impact, if any, did the use of the
 7  monthly checklists have on your cleaning operations?
 8       A    You were not supposed to get red three
 9  months in a row.
10       Q    What happened if you got red three
11  months in a row?
12       A    They had the ability to terminate your
13  contract.
14       Q    Okay.
15       A    They always have the ability to
16  terminate your contract.
17       Q    When you would get a red, what, if
18  any, steps would you need to take with regards to
19  that store?
20       A    They would ask that you go to the
21  store and walk the store with the STL, find out
22  specifically what the problem is, and come up with a
23  solution on what you're going to do to meet brand and
24  then e-mail it to them.
25            I had to respond -- every -- we got
```
0150
```
 1  e-mails, so they -- to help communicate, they set up
 2  an e-mail system where the store -- anyone in the
 3  store -- any Target employee could call in to a 1-800
 4  number and say, "Hey, the -- they're not doing this.
 5  They didn't do this today.  They didn't clean the
```
Page 62

Smith, Trent - Vol. I

```
 6  restrooms today."
 7            And, then, that would generate a work
 8  order, and that work order would come to me.  I would
 9  get a work order that said, "Work Order no. Blah,
10  Blah, Blah.  Store No. 771 called in at this time and
11  said that nobody cleaned the restrooms."
12       Q    Okay.  And what, if anything, were you
13  expected to do when you received that type of e-mail?
14       A    We had to respond.  I had to contact
15  the store, find out what the issue was, try to reach
16  that person.  If I can't reach that person, then
17  reach the store manager, find out what the situation
18  is.
19            I have to get ahold of my district
20  supervisor and they had to go to the store, walk it,
21  write down what the solution is going to be to make
22  sure that we pick up that restroom in the morning,
23  make sure that we don't do this again, and then they
24  would respond that back to me.
25            They would call me, I would type it
```
0151
```
 1  up, send it to the store -- send it to Minneapolis
 2  and copy the store.
 3       Q    So your first contact, when you got
 4  one of those e-mails, was to talk to somebody -- a
 5  manager at Target?
 6       A    That was -- yes.
 7       Q    And, then, after you talked to a
 8  manager in Target, you were expected to get with your
 9  supervisor and your cleaning crew and start providing
10  an action plan?
11       A    An action, yes.
12       Q    And that would go to both Target in
13  Minneapolis, Building Services, and, also, to the
14  store in question?
15       A    Yes.
16       Q    And, specifically, in the store in
17  question, the store manager?
18       A    You were to try to reach the person --
19  most of the time, it's the store manager or --
20  there's three key people in the store who handled it,
21  usually.
22       Q    And who were those three key people?
23       A    The -- the manager on duty -- the team
24  leader on duty, the overnight person who was in
25  charge of logistics -- I think they're called an ETL
```
0152
```
 1  -- and the store manager.
 2       Q    Okay.  And this procedure that
 3  you've outlined, with regards to the e-mails -- did
 4  this happen -- how often?
 5            Was it a regular occurrence, a
 6  very --
 7       A    Pretty regular occurrence.
 8       Q    -- occasional occurrence, or --
 9       A    I mean, you might get 20, 30 e-mails a
10  day.
11       Q    And, in each of those cases, you were
12  required to get with the store manager, get with
13  the --
14       A    Local supervisor, have them visit the
15  store, have them try to walk the store with the
16  person who called it in, and put an action plan
```
Page 63

Smith, Trent - Vol. I

```
17  together.
18       Q    And how often each day did that occur,
19  on average?
20       A    Well, the people who sent them in --
21  it's usually the overnight person.  So he would send
22  it in, you know, 6:00, 7:00 in the morning.  Most of
23  these came in before 9:00 a.m.
24       Q    And did you normally get one a day,
25  more than one a day, fewer than one a day?
```
0153
```
 1       A    It varied, but, you know, probably 10
 2  to 30, I would say.
 3       Q    Each day?
 4       A    A day, yes.  Overnight.  On heavy
 5  weekends -- Christmas would be heavier, you know.
 6       Q    Now, your cleaning crews are the Target
 7  stores were overnight cleaning crews; correct?
 8       A    Yes.
 9       Q    And when did the -- what was the start
10  time for your cleaning crew?
11       A    It was typically about 10:30.
12       Q    When you say "it was typically about
13  10:30," who sat the start time?
14       A    The store.
15       Q    That was a decision made by the
16  individual store?
17       A    Yes.
18       Q    And when you say "the store," do you
19  mean the Target managers at the store or do you mean
20  the Jim's Maintenance supervisor?
21       A    No, the store team leader.  The STL
22  for Target.  Some of them would want the person
23  before 10:00.  It depended on the store.  You know,
24  the store might be a small, low-volume store in
25  Lubbock -- not Lubbock, in Midland, and they would
```
0154
```
 1  want you there before 10:00, because that store
 2  already had all of their stuff picked up and their
 3  employees could leave.
 4       A    So the store that manager could get
 5  the Target people off the clock, the better.  So he
 6  wanted his people there --
 7       A    High-volume stores, they wanted them
 8  there later.  They wanted you to come in at 11:00 or
 9  midnight, you know, is when they wanted you in,
10  because they knew they could keep you longer.  You
11  know, it was better for them to --
12       Q    Okay.
13       A    -- for the person to come in later.
14       Q    But, in each case, it was Target that
15  would set the start time for your employees?
16       A    Each individual store.
17       Q    And did Jim's have any say-so in what
18  the start time was going to be for an individual
19  store?
20       A    No.
21       Q    How did Jim's cleaners get into the
22  stores at night?
23       A    They would knock and a key carrier
24  would let them in.
25       Q    And when you say "a key" --
```
0155
```
 1            MR. PIZZO:  I'm sorry.  I didn't
```
Page 64

Smith, Trent - Vol. I
2  hear that.
3              THE WITNESS:  A key carrier would
4  let them in.
5              MR. PIZZO:  Okay.
6         Q    (By Mr. Deats)  Who were the key
7  carriers?
8         A    The store team -- the team leaders.
9  There -- I don't know.  There might be four or five
10 people in each store.
11        Q    Okay.  And when you're talking about
12 the team leaders, are you, again, talking about
13 Target employees?
14        A    Yes.
15        Q    Did Jim's Maintenance employees or
16 supervisors have keys to any of the stores?
17        A    No.
18        Q    Did Jim's supervisors have any ability
19 to let employees into the store at night?
20        A    No.
21        Q    Were employees required to enter the
22 store at the same time or could they enter the store
23 at a different time?
24        A    No.  Altogether.
25        Q    And had to be let in the store by a
0156
1  Target employee?
2         A    Yes.
3              MR. PIZZO:  Would this be a good
4  stopping point for a short break?
5              MR. DEATS:  Sure.
6              (Short Break)
7         Q    (By Mr. Deats)  After the Jim's folks
8  were in the store, were they allowed to leave the
9  store before the end of their work period?
10        A    No.
11        Q    Do you know whether or not, in fact,
12 the Jim's people were locked into the store?
13        A    They were always locked -- the store
14 was always locked at night.
15        Q    Were Jim's cleaners allowed to leave
16 for any reason?
17        A    No.  I mean, unless there was a
18 medical emergency.
19              (Plaintiff's Exhibit No. 19 was
20              marked for identification.)
21        Q    (By Mr. Deats)  I'm going to hand you
22 a document that's been labeled for identification
23 purposes as Deposition Exhibit 19.
24        Q    Do you recognize this document?
25        A    Yes.
0157
1         Q    What is it?
2         A    This is a Target morning checklist.
3         Q    And this is a Target checklist that
4  was completed in Target Store 246 on August the 7th,
5  2004; correct?
6         A    Yes.
7              MR. PIZZO:  Could you identify
8  what store this is?
9              THE WITNESS:  Yeah.  I don't
10 know.  I don't think we had a 246.
11              MR. PIZZO:  Okay.
12              THE WITNESS:  They might have
Page 65

Smith, Trent - Vol. I
13 written down the wrong --
14              MR. DEATS:  It could be 296.
15              MR. PIZZO:  I'm just doing that
16 so we have a clean record as to what we're talking
17 about.
18              THE WITNESS:  It -- it -- it
19 appears to say "246."
20              MR. DEATS:  12467
21              MR. PIZZO:  Do you want to go off
22 the record for a minute?
23        Q    (By Mr. Deats)  So you don't recognize
24 the store number?
25        A    Not off the top of my head.
0158
1         Q    But do you recall whether or not your
2  crews used this same type of document?
3         A    Yes.
4         Q    Now, when, typically, were these
5  morning checklists filled out?
6         A    This was -- before we could leave, our
7  team would -- would put their names on and then they
8  would go to whoever would let them out of the store,
9  the key carrier, and -- and ask them to walk the
10 store with them, so that they could mark down the
11 things that they had checked off as being done or not
12 done, and then we would go back, work on it, and then
13 they would let us out.
14        Q    Okay.  Now, "they," you're talking
15 about a Target manager.  No -- Target
16 employees couldn't let you out.  It would have to be
17 -- only specific -- because they would have to maybe
18 take the alarm down, let you out, turn the alarm back
19 on.
20        Q    So was this something that was done
21 every day, every other day?  How often?
22        A    This was given to us at one of these
23 Target meetings.  Whenever we were given these books,
24 Target gave us this, and we used it -- some of the
0159
1  store managers didn't want to do it every day.  They
2  just wanted you -- you know what I mean?  To -- they
3  didn't want to mess with it.  They didn't want to
4  take time out and, you know, walk all of these things
5  and do all of this stuff.
6              But any store that was having problems
7  -- if we were getting bad scores, if it was red, we
8  required this, and Target -- Target would require
9  it --
10        Q    Okay.
11        A    -- if they were having problems.
12        Q    So a Target manager could decide not
13 to use it every day, but unless a Target manager made
14 that decision, was this document used every day?
15        A    Yes.
16        Q    And the walk-through that you've
17 described, was that done prior to the time that Jim's
18 cleaners could leave?
19        A    Yes.
20        Q    So this would have been done at the
21 end of the work period for the Jim's employees?
22        A    Yes.
23        Q    And if, for example, some of these
Page 66

Smith, Trent - Vol. I
24 areas were not cleaned to the satisfaction of the
25 Target manager conducting the review, what would
0160
1  happen?
2         A    They wouldn't let them out of the
3  store.
4         Q    And would they require them to redo
5  work that had already been done?
6         A    Yes.
7         Q    Or maybe to work that they had
8  neglected to do?
9         A    Many times it was work that had
10 already been done.  If they vacuumed an area and,
11 then, the unloading crew -- Target crew came in and
12 they were pulling stuff out of boxes, putting things
13 -- hanging things, a lot of debris, boxes, paper,
14 plastic would be on the floor, which they're supposed
15 to pick up and move to their next area.  So the store
16 manager would ask us to come around and clean up
17 again in that area, or maybe they would all take a
18 giant restroom break in the front restroom and --
19        Q    When you say "they would all take a
20 giant restroom break," who is that?
21        A    The Target stocking crew.
22        Q    Okay.
23        A    And the Target -- they may go to the
24 restroom and -- right before the store was to open.
25 So just, you know, 25 people in there would dirty up
0161
1  the bathroom.
2              Then the key carrier -- the key
3  carrier would be responsible when the STL got there
4  that morning.  So if we were gone and something
5  looked bad, the front mat or the restroom -- say he
6  walked right into the restroom and the restroom was
7  already -- it looked like a small army had already
8  been in there and used the restroom that morning, he
9  would be upset with the key carrier for -- "Why did
10 you let them out if they didn't do this before they
11 left?"
12        Q    And what if this -- was this morning
13 checklist normally done at the end of the shift?
14        A    This was before the shift -- when you
15 tried to leave.  When you felt you were finished --
16 you had already accomplished everything, Jim's
17 Maintenance people, then they would go to the store
18 to walk this and to get out.
19        Q    And were -- to your knowledge, were
20 the Jim's cleaners able to control when this morning
21 run-through was done?
22        A    No.
23        Q    Who made the decision about when the
24 morning run-through would occur?
25        A    Whoever that Target key carrier was
0162
1  that morning, and it would be -- there would usually
2  be three people in that store who worked overnight
3  and were typically assigned to that.
4         A    But anybody in the store could let you
5  out, only the key carrier.  So you would have to go
6  find them, wherever they were, in the back or
7  wherever they were in the store, and have them to
8  walk this with you and let you out.
Page 67

Smith, Trent - Vol. I
9         Q    Now, what if an area was not cleaned
10 to their satisfaction, but you had already worked a
11 complete shift?
12        A    Would that make a difference in
13 whether or not they would require you to stay?
14        Q    Yes.
15        A    How would it make a difference?
16        Q    They would tell them to go clean it
17 over again.
18        A    Even if that meant staying longer than
19 their normal shift?
20        A    Yes.
21        Q    Do you know how often that occurred?
22        A    All the time.
23        Q    Did you have any ability to keep the
24 Target key carriers who conducted these inspections
25 from holding over the Jim's employees?
0163
1         A    No.  Harlin Murray, the regional for
2  the south area -- his mantra was, "Well, if you
3  called" -- if a store manager called them and said,
4  "Hey, our front mats look terrible.  They didn't even
5  touch our restrooms last night," and Harlin would
6  say, "Well, why did you let them out"?
7         Q    And did Harlin give the Target
8  managers any instructions, that you're aware of --
9         A    "Do not let them out."
10        Q    -- with regards to letting the Jim's
11 employees go?
12        A    "Do not let them out until the job is
13 done.  They are paid to do the job, and if they
14 didn't do the job, don't let them out until it's
15 done."
16        Q    No matter how long it takes?
17        A    Yes.  He knows that the contract does
18 not say a time period, that -- that they are to be in
19 there until the job is done.
20        Q    Okay.  And I notice that, in the lower
21 right-hand corner of the document, there is a space
22 for a signature by the crew foreman; correct?
23        A    Yes.
24        Q    And that would have been a Jim's
25 Maintenance cleaner?
0164
1         A    Yes.
2         Q    With each store, did you have a crew
3  foreman?
4         A    You had a -- yes, a team leader.
5  Whoever -- out of the four or five people, there
6  would be one that was the team leader.
7         Q    So that person was more like a work
8  leader, as opposed to, say, a foreman?
9         A    Yes.
10        Q    And, then, there is also a signature
11 blank for -- it looks like it's "Target LOD"?
12        A    Leader on duty.
13        Q    And was it your understanding that
14 this document needed to be signed by the Jim's and
15 the Target representatives before employees could be
16 released?
17        A    Well -- I mean, just almost 90 percent
18 of them looked just like this.  You had -- our people
19 -- their job was to get the LOD's signature.  It
Page 68

Smith, Trent - Vol. I

20  didn't really matter.
21          As long as their names were filled in
22  and what time they got in and out, then they just
23  needed -- the key to this all being complete is
24  getting the Target LOD's signature.  So --
25      Q      Okay.
0165
1      A      I mean, if you looked at 100 of them
2  or 1,000 of them, very few would have the crew's, you
3  know, foreman's name.
4          As long as they put their names over
5  here, they're covered.  This was for -- the Target
6  LOD was the important --
7      Q      Then, in the lower left-hand side, I
8  notice that there is a grid marked "cleaning crew
9  sign-in/out log."
10          Do you see that?
11      A      Yes.
12      Q      And you see that there are three
13  employees' names written in and, then, a time in and
14  a time out completed?
15      A      Yes.
16      Q      Now, do you know whether or not this
17  time log was routinely completed on these morning
18  checklists?
19      A      Routinely.  Now, this -- this one --
20  it appears -- it appears, to me, they got it
21  backwards, that they really came in at 10:30 and they
22  really left at 6:30 --
23      Q      Okay.
24      A      -- if I were to look at the document
25  and try to ascertain what happened.
0166
1      Q      Now, did Jim's Maintenance routinely
2  receive these completed morning checklists?
3      A      No.  We -- we had them all
4  three-hole punched and they would leave them in their
5  logbook at the Target store.
6          Sometimes they were faxed in.  If
7  there was a problem -- if we had had two reds in a
8  row, we would say, "Okay.  Fax that in.  We want it
9  faxed in," but, typically, we would have our
10  supervisors go pick them up, you know, after they got
11  real thick.
12          Most of them were kept in the store.
13  Only problem stores --
14      Q      Do you know whether or not the morning
15  checklists were -- were maintained by Target?  Did
16  they --
17      A      They may have looked through --
18      Q      -- receive copies --
19      A      No.  No.  They may have looked through
20  the logbook, but, as far as I know, they did not keep
21  it.
22      Q      Did you utilize this cleaning crew
23  sign-in/sign-out log for purposes of your own record
24  keeping about the hours that the employees worked?
25      A      No.
0167
1      Q      Was it -- do you know whether it was a
2  Jim's Maintenance idea that the employees would
3  record the names and the times that they worked?
4      A      We -- this was just -- this is the --
Page 69

---

Smith, Trent - Vol. I

5  the exact document, as it was given to us.
6      Q      Who created this document?
7      A      You know, I don't know.
8      Q      Do you know whether or not Target
9  created the document?
10      A      I don't know.  It -- I don't know who
11  -- Target gave it to us, but it was pretty ugly.  You
12  know, it's not a very nice-looking -- it doesn't say
13  "Target," dot, dot, dot, anything on it, so I --
14      Q      Do you recall whether or not you
15  utilized this morning checklist throughout the time
16  that you did work for Target?
17      A      No.  We didn't forever.  Whenever we
18  were at a meeting -- I remember being handed the
19  document.  You know, they made copies and gave them
20  to all 25 contractors.
21          At a meeting, they gave us this to
22  help us, because -- the big thing that they were
23  excited about was it's in Spanish and English.  So
24  they gave it to everyone, handed them out.
25          MR. PIZZO:  I think we can
0168
1  stipulate that there's a copy -- I remember seeing
2  one in the contractor's handbook someplace.
3          MR. DEATS:  We're looking for one
4  and --
5          MR. PIZZO:  Okay.
6          MR. DEATS:  -- hopefully, we'll
7  find it in a second.
8      Q      (By Mr. Deats)  I'm handing you a copy
9  of Plaintiff's Exhibit 3, which is the contractor
10  handbook.
11      A      Uh-huh.
12      Q      And you will see that there is a
13  Target store morning checklist in the book, do you
14  not?
15      A      Yes.
16      Q      Does this refresh your memory as to
17  whether or not this was a document --
18      A      Yes.
19      Q      -- provided by Target?
20      A      It was provided to me from Target.  I
21  mean, I -- I'm certain that it was given it by Target.
22      Q      Okay.  By the way, there's also a copy
23  in the contractor handbook of the monthly checklist,
24  is there not?
25      A      This was in Spanish.  They gave
0169
1  us copies of that in English and in Spanish.
2      Q      Okay.  Now, did the use of the morning
3  checklists ever result in employees being held over
4  after a scheduled quit time?
5      A      Yes.
6      Q      And did that happen frequently,
7  infrequently, on what type of basis?
8      A      Frequently.
9      Q      And did that result in Jim's
10  Maintenance cleaners working more than the scheduled
11  number of hours?
12      A      Yes.
13      Q      Did you feel like Jim's Maintenance
14  had any control over the number of hours that
15  employees worked?
Page 70

---

Smith, Trent - Vol. I

16      A      No.
17      Q      Why not?
18      A      All we could do -- I could -- I could
19  -- they would complain to me that -- our people would
20  complain to their supervisor.
21          The supervisor would call me, "Hey,
22  you know, 771 has kept them late three days in a row,
23  and our guys have another part-time job that they
24  have got to get to across town, and this isn't
25  working.  You have to stop or they're
0170
1  going to quit."
2          And I would contact Minneapolis, "Hey,
3  they're keeping them a little bit late," and they
4  would have me go down, find out what -- "What's the
5  problem?  There must be a problem if they are not
6  getting done on time.  Get it fixed."
7          That would be about it.
8      Q      Okay.  But you didn't have --
9      A      As far as I know of, there has never
10  been an action from Minneapolis -- an e-mail or a
11  "Hey, don't keep them over" -- you know, keep them
12  late.
13      Q      Okay.  Did you have any ability or any
14  authority to override a Target manager who wanted to
15  keep employees after the normal quitting time?
16      A      No.
17      Q      Did you have any authority to tell
18  Target managers, "You can't keep my employees, say,
19  after 6:30"?
20      A      No.
21      Q      Did you have any ability to let
22  employees out the -- out of the store at the end of
23  the shift if the Target manager would not release
24  them?
25      A      No.  The problem is you have the store
0171
1  manager and then you have underlings, LODs, below
2  them.
3          The LODs are the ones letting them
4  out.  So the LOD -- it's a reflection on that young
5  man or their guys when that store looks like when the STL gets
6  there.
7      Q      Okay.
8      A      So they have nothing -- it doesn't
9  bother them at all to keep them until 9:00 or 10:00
10  or have them buff the front again or redo the
11  bathrooms before you leave.
12          It's not -- it wasn't a good situation
13  on them letting people out.  They had no incentives
14  to let them out on time.
15          Their incentive, actually, was to make
16  sure that that store looked fantastic when the door
17  opened, when the STL came in, that would -- it would
18  be a good reflection upon them.  They were in charge.
19      Q      Okay.  So that the record will be
20  clear, when you say "STL," you're talking about the
21  store team leader?
22      A      That is the manager of that specific
23  store.
24      Q      Okay.  That's the overall manager for
25  that Target store?
0172
Page 71

---

Smith, Trent - Vol. I

1      A      Yes.
2      Q      And, then, the LOD would be a manager
3  during a specific period of time?
4      A      The leader on duty at that time.
5  There was always an LOD at all times.
6      Q      And even for the overnight cleaning
7  crew, there was an LOD?
8      A      Yes.
9      Q      So there was always a Target manager
10  in the store while the cleaning crew worked?
11      A      No, not in small stores that did not
12  -- some stores -- rural stores or small-volume
13  stores, not Super Targets, they would actually lock
14  the doors.  They would leave at 10:00 and our people
15  would be in there until the store opened, and then
16  they would come and let them out.
17      Q      Okay.
18      A      So it wasn't -- it's not all the same.
19  In some Super Targets, there is a
20  person there 24 hours.
21      Q      Did the time that a Target LOD left
22  and the next Target LOD came on duty -- did that ever
23  affect when Jim's cleaners could leave the store?
24      A      I don't know how that would affect --
25      Q      Well, let's say that one LOD leave --
0173
1  lets them in at 10:00 and leaves and, then, the
2  next --
3          THE VIDEOGRAPHER:  Excuse me.
4  We've got a phone going again.
5          (Short Break)
6          (Reporter read back previous
7           question)
8      Q      (By Mr. Deats)  Were there situations
9  in which the time that the LO -- the next LOD came on
10  duty affect when Jim's cleaners were able to leave?
11      A      I don't believe so.  I don't see how
12  an LOD leaving at 10:00 at night affected the LOD
13  that came in at 6:00 in the morning, if that makes --
14      Q      Okay.  Well, did sometimes LOD not
15  come in at 6:00 morning, but, instead, came in at
16  8:00 in the morning?
17      A      Yes.
18      Q      And, in those situations, where you
19  had, say, a 10-hour gap there, might that affect when
20  the employees --
21      A      Yes.
22      Q      -- when Jim's cleaners would be able
23  to leave?
24      A      Yes.
25      Q      Simply because there was nobody to let
0174
1  them out of the store --
2      A      That's correct.  Yes.
3      Q      -- to run the morning checklist?
4      A      Yes.
5      Q      Now, do you know whether or not Target
6  managers directed the work of Jim's cleaners while
7  they were doing their work?
8      A      Yes.
9      Q      Okay.  Did that occur on a frequent or
10  infrequent basis?
11      A      Sometimes.
Page 72

Smith, Trent - Vol. I

12      Q       Okay.  Now, you mentioned that Target
13  sometimes had stockers stocking while the cleaning
14  crew was doing its work; correct?
15      A       Yes.
16              MR. PIZZO:  Stalk -- what was
17  that?
18              MR. DEATS:  Stockers.
19              MR. PIZZO:  What were they doing?
20              MR. DEATS:  Stocking the shelves.
21              MR. PIZZO:  Okay.
22              MR. BEARDALL:  S-t-o-c-k-e-r.
23              MR. PIZZO:  I thought there was
24  an "A" in there somewhere.
25      Q       (By Mr. Deats)  Now, did the -- were
0175
1   the stockers, if you know -- were those Target
2   employees?
3       A       Yes.
4       Q       And they did their stocking primarily
5   at night?
6       A       Yes.
7       Q       Did the stocking, on occasion,
8   interfere with or affect the cleaning services that
9   were being provided by the Jim's people?
10      A       Yes.
11      Q       In what sorts of situations did they
12  affect it?
13      A       Where -- what areas they were working
14  in, if they left a mess behind them, if -- if they
15  were -- if they were using the restroom in the
16  employee restroom or if they were using the restroom
17  in the customer restroom, we would have to reclean
18  that.
19              If they took their break, if they all
20  had lunch or a break -- you know, a morning breakfast
21  type thing in the food court, we would have to clean
22  that over again, filling up trash cans.
23              Just generally, people dirtying things
24  up behind them.
25      Q       So did -- were there occasions, then,
0176
1   in which stockers restocked particular areas of the
2   store after they had been cleaned by the cleaning
3   crew?
4       A       Yes.
5       Q       And that sometimes required the
6   cleaning crew to redo that area?
7       A       Yes.
8       Q       Which, in turn, affected the hours
9   that they spent cleaning the area?
10      A       Absolutely.
11      Q       Now, did Jim's maintain an on-site
12  supervisor for each of the stores that it cleaned?
13      A       No.
14      Q       So, in an all situation, was there a
15  supervisor to direct the work of the Jim's cleaners?
16      A       No.
17      Q       Now, is -- the work that's being
18  performed on the cleaners, that is, for lack of a
19  better word, labor-type work, is it not?
20      A       Some of it, yeah.  The -- the handling
21  of chemicals and wax and stuff, the -- the person in
22  charge of that is -- you just can't be anybody.
                        Page 73

Smith, Trent - Vol. I

23      Q       Okay.  But, in general, did Jim's
24  provide any type of training to cleaners before it
25  hired them and placed them in the stores, or was it
0177
1   on-the-job training, or what?
2       A       Mostly on-the-job.
3       Q       If a Target manager asked the cleaning
4   crew to reclean an area, say, because the stockers
5   had come in after them, did Jim's have any ability to
6   charge extra for having to clean a second time?
7       A       No.
8       Q       Did Jim's have any ability to charge
9   extra because additional hours of work would be
10  required?
11      A       No.
12      Q       Did Jim's have any ability to refuse
13  to redo work?
14      A       No.
15      Q       Are you aware of situations in which
16  Target managers asked Jim's employees to do work that
17  was outside the cleaning type work that they were
18  hired to do?
19      A       I can't think of anything.
20      Q       Okay.  You're not aware of a
21  situation?
22      A       Not aware of one.
23      Q       How many hours did you anticipate that
24  employees would need to work in a day to perform
25  cleaning services?
0178
1       A       Eight.
2       Q       As a practical matter, were the
3   employees generally able to do their jobs and be
4   released by the Target managers within eight hours?
5       A       Yes.  You could -- the job could be
6   done, yes.
7       Q       Do you know whether or not, at some of
8   the San Antonio and Austin stores, employees were
9   routinely being held over more than eight hours in a
10  day?
11      A       Yes.
12      Q       Is that "yes," they were being held
13  over?
14      A       Yes, they were being held over.
15      Q       Did -- and you were aware of that
16  situation, were you not?
17      A       Yes.
18      Q       Did you feel like you had any ability
19  to affect that situation?
20      A       No.
21              The best you could do is call
22  Minneapolis and complain?
23      A       Yes.
24      Q       And did that seem to have any effect
25  on the number of hours that your employees were
0179
1   required to work?
2       A       No.
3               (Plaintiff's Exhibit No. 20 was
4               marked for identification)
5       Q       (By Mr. Deats)  I'm handing you a
6   document that's been labeled Plaintiff's Exhibit 20.
7   It purports to be a Target overnight cleaning crew
                        Page 74

Smith, Trent - Vol. I

8   sign-in log.
9               Do you recognize this document?
10      A       Yes.
11      Q       Is this a document that was created by
12  Jim's Maintenance?
13      A       No.
14      Q       Is this a document that Jim's
15  Maintenance used in determining its payroll?
16      A       No.
17      Q       Is this a document that Jim's used to
18  determine which days and hours its employees worked?
19      A       No.
20      Q       Were Jim's Maintenance cleaning crews
21  required to maintain these sign-in logs?
22      A       Yes.  Target requires this.
23      Q       Okay.  Did Target create this
24  document?
25      A       Yes.
0180
1       Q       And do you know what use was made of
2   this document?
3       A       No.
4       Q       Was this document ever sent to you --
5   to Jim's Maintenance on a routine basis?
6       A       It was never sent.
7       Q       Where were these overnight cleaning
8   crews sign-in log maintained within the stores, if
9   you know?
10      A       They had a book -- a notebook similar
11  to that white one right there --
12      Q       Okay.
13      A       -- and it had these types of forms at
14  the front, and you would sign in -- there was a lot
15  of copies.  You would sign in, and it was kept --
16  when you walked in, usually the first counter beside
17  you, it was kept in a drawer right there.
18      Q       And do you know what use Target made
19  of the documents?
20      A       No.
21      Q       No, anybody at Target explain to you
22  why they required the overnight cleaning crew to
23  utilize this sign-in log?
24      A       They wanted a copy of who was in the
25  building and who -- at all times, and what time they
0181
1   were in and out.
2       Q       Okay.  And were these notebooks that
3   you're talking about -- where they maintained in the
4   customer service area?
5       A       Sometimes.  Not generally.  Generally
6   they were in a -- in a drawer.
7       Q       Do you know whether or not they were
8   sometimes maintained in the manager's office?
9       A       No.  I don't think so.
10              Customer service -- Super Targets,
11  when you come in, they had a counter -- a
12  receptionist at the Super Targets, and it was kept at
13  that -- at that counter, on the entrance and exit.
14      Q       And I may have asked you this, but did
15  Target indicate to you why they wanted this --
16      A       They wanted to know who was in the
17  store at all times and what time they came in and
18  came out.
                        Page 75

Smith, Trent - Vol. I

19      Q       Okay.  And was this supposed to be
20  something that was -- accurately reflected the time
21  in and the time out for the employees?
22      A       They said that they -- well, I mean,
23  it -- you don't know what's official.  I mean, an
24  official report of what this was for, but they told
25  me that it was so -- you know, if there was a fire,
0182
1   if there was an emergency, they had to know who was
2   in the store, what time they came in, if they were
3   still in there, or what time they left, but this had
4   to be accurate -- they really beat it into our heads
5   this has to be done.
6               You're not going to find a Target
7   across the country that does not have this.  They
8   want to know who's in there, what time they got in
9   there.
10              If the fire department needed to know
11  who was in the store, Target would be able to tell
12  them exactly who was in the store.
13      Q       Now, looking at Page 2 of Deposition
14  Exhibit 20, you can see that it looks like someone
15  with the same handwriting has filled in all the names
16  and the times of entry and the times of leaving;
17  correct?
18      A       Yes.
19      Q       Okay.  Was this a document, to your
20  knowledge, where the employees were individually
21  required to sign in, or was someone just required to
22  notate their names and times of -- times in and times
23  out?
24      A       The rule is, individually, they were
25  supposed to sign in and sign out.
0183
1       Q       But, as a practical mater, perhaps
2   that didn't always occur?
3       A       That's -- yes.  If one of them --
4   whoever -- usually the low man on the totem pole or
5   if he had good handwriting -- whoever had good
6   handwriting, they would have sign it.
7               But we got a lot of calls -- Target
8   would get upset about that.  They would call and say,
9   "Jose signed everybody in again today."
10              "Okay," and I would tell the
11  supervisor to go over there and make sure that
12  they're all individually signing in.
13      Q       So you actually got feedback from
14  Target when your -- when your folks were not
15  appropriately keeping the sign-in logs?
16      A       Yes.
17      Q       They would contact me and say, "They
18  wrote down that they got here at 10:30.  They didn't
19  really get here at 10:30.  They got here at 10:45."
20      A       Were you aware of situations in which
21  employees recorded a time out that was earlier than
22  the time they were actually allowed to leave?
23      A       No.  I don't remember anybody doing
24  that.
25      Q       Now, were your employees generally
0184
1   allowed any type of a meal break during the day?
2       A       Yes.
3       Q       And what was your understanding of the
                        Page 76

Smith, Trent - Vol. I

4   length of the meal break that was provided to your
5   crews?
6       A   We trained for 15 -- two 15-minute
7   breaks and a 30-minute lunch or dinner.
8       Q   Were the 15-minute breaks considered
9   on-the-clock breaks?
10      A   No.
11      Q   Okay. Now, do you know whether or not
12  the employees were always able to take those breaks?
13      A   No. Whenever they got into the store
14  and they were directed by the Target team on what
15  time they were to take those breaks, where they were
16  to take them, because they kind of coordinated it,
17  where their breaks would be, what time their people
18  would take their breaks, what time our people would
19  take our breaks, where --
20      Q   Okay.
21      A   -- how long would break.
22      Q   So Target managers, then, actually
23  directed your people as to the time and locations
24  where they were to take breaks?
25      A   Yes.
0185
1       Q   And that happened -- and that was a
2   decision that was made by the Target managers?
3       A   LOD.
4       Q   Did you have any control over when and
5   how breaks and lunch --
6       A   No.
7       Q   -- were to be taken?
8           MR. PIZZO:  I'm sorry. His last
9   answer, did you get a -- I think it was LOD.
10          THE REPORTER:  I did -- I got it.
11          MR. PIZZO:  Okay.  I'm sorry.  I
12  didn't mean to interrupt, Counsel.
13      Q   (By Mr. Deats) Let's talk about
14  hiring and firing of Jim's employees.  Did Target
15  have any control over who Jim's hired to work as the
16  cleaning crew?
17      A   They would provide us with input, the
18  store manager.
19      Q   What type of input would the store
20  manager provide about hiring decisions?
21      A   They would observe them and then tell
22  us, "Hey, this guy is not working out.  You could
23  just tell by the way he walks in the door he's not
24  coming to work.  The last guy we had, boy, he came to
25  work like he was on fire, but this guy, you can just
0186
1   tell he's not into it," and, then, "Look at the way
2   the tile looks."  Just a bunch of feedback, personnel
3   feedback.
4           "We don't like this guy.  We want this
5   guy gone.  We want a whole new crew.  We want our old
6   crew."
7       Q   So, perhaps, you made the initial
8   hiring decision, but you would hear from the Target
9   managers quickly thereafter if an employee
10  was not working out?
11      A   Their feedback on how they were
12  working out.
13      Q   And did the Target people have any
14  authority with regards to your decision to hire
Page 77

Smith, Trent - Vol. I

15  people -- excuse me, with your decision to fire
16  people?
17      A   They could call us and ask us to --
18  that they didn't want anybody -- a person in the
19  store any more.
20      Q   Okay. Now, is that how they would put
21  it to you, that, "We don't want this person in our
22  store any more"?
23      A   Yes.
24      Q   Did Target ever require you to fire
25  employees?
0187
1       A   Yes.
2       Q   In what circumstances would Target
3   managers require you to fire employees?
4       A   Oh, if they felt that -- if one of
5   their female employees were nervous that somebody was
6   looking at them and he had been watching them when he
7   was vacuuming and they felt uncomfortable around him,
8   they wouldn't want him back in the store.
9           I had a girl that was fired in San
10  Antonio for -- that we had to fire for eating a
11  hamburger.  It was her birthday, and the Target food
12  court lady made her a hamburger and gave it to her,
13  and the STL fired the person who made the hamburger
14  and then called us and told us that we had to let our
15  girl go.
16      Q   Okay.  So it was -- did you know this
17  particular employee -- or, excuse me --
18      A   kind of, sort of, yeah.  Marie, I
19  think, was her name.
20      Q   Her name was Marie?
21      A   Yes.
22      Q   And it was her birthday?
23      A   Yes.
24      Q   And had she asked the food court
25  employee to make her a hamburger?
0188
1       A   No.
2       Q   The employee just chose to do that and
3   gave her the hamburger?
4       A   Yes.
5       Q   And you're saying that the Target
6   manager fired the Target employee?
7       A   Yes.
8       Q   And then called you and required you
9   to fire Maria?
10      A   And Maria was not allowed to work in
11  any Target stores again.
12      Q   Did you object, or anything like
13  that --
14      A   I heard --
15      Q   -- you got this instruction?
16      A   Yes.  I heard that and thought, "That
17  sounds ridiculous," because Maria had been there a
18  long time.  She was a -- a daytime person.  So she
19  worked with a lot -- went in and out with all the
20  Target people.
21          So I called Margaret and said, "Hey,
22  is there anything we can do?  This sounds like a
23  misunderstanding," and she was adamant, you know,
24  "What part of 'no' do you not understand?  She is not
25  allowed in a Target store ever again.  She -- that is
Page 78

Smith, Trent - Vol. I
0189
1   theft."
2       Q   So even though you objected and felt
3   like there must be some sort of misunderstanding, you
4   were not allowed to keep that employee?
5       A   Yes.
6       Q   And that employee was not allowed to
7   work in any Target store?
8       A   Yes.
9       Q   And, as a practical matter, did you
10  have any positions available that didn't involve
11  working in Target stores at that point in time?
12      A   We had Mervyn's, but I don't think we
13  had any openings.
14      Q   Okay.  So, as a result of that, you
15  were required to fire the employee?
16      A   Yes.
17      Q   How often, on average, would you say
18  that Target would require you to fire an employee?
19      A   I don't know.  I mean, if a
20  crew was not performing, the store looked bad, they
21  would -- adamant, they wanted a different crew in
22  there.
23      Q   Were there ever situations in which
24  you were required to fire an entire crew?
25      A   Yes.
0190
1       Q   Did that happen -- do you recall any
2   specific instances in which you were required to fire
3   an entire crew, any stores or --
4       A   I don't have one off the top of my
5   head, no.
6       Q   And the reason -- what would be the
7   reason that they might require you to fire an
8   employee crew?
9       A   Performance, that the store did not
10  look very good.
11      Q   And would that be -- include the crew
12  leader in those cases?
13      A   Yes.
14      Q   Now, when they told you to fire an
15  employee -- and by "they," I mean the Target managers
16  -- did they ever give you instructions about whether
17  you could move them to a different Target location?
18      A   No.
19      Q   Okay.  Do you -- you mentioned a
20  minute ago that -- that you were told that Maria
21  couldn't work in any Target store; correct?
22      A   Yes.
23      Q   Did that ever happen with regards to
24  other Jim's folks that you were required to let go?
25      A   Yes.  We moved crews sometimes.  You
0191
1   might move somebody -- I remember we moved somebody
2   from 1204 to another store, and 1204 was upset, "We
3   want our crew back.  We didn't like these guys.  We
4   want our guys back."
5       Q   Now, you indicated that one reason you
6   might be required to fire an employee was because
7   they were looking at somebody funny.
8           Can you remember other types of
9   situations in which Target managers would ask you to
10  fire employees?
Page 79

Smith, Trent - Vol. I

11      A   No, I can't.
12      Q   What about theft, as an example?  Did
13  Target have policies regarding employee theft?
14      A   Yes.
15      Q   And what sort of policy did Target
16  have, if you recall, about employee theft?
17      A   They would call us and tell us that
18  our crew is stealing and we need to get rid of them,
19  they're not allowed in the store any more.
20      Q   Would they require you to fire
21  employees in situations where they only thought they
22  might be stealing?
23      A   Yes.
24      Q   Were you allowed to argue those
25  decisions with the Target managers or --
0192
1       A   Now, when you say you would get these
2   calls did you get them from individual store managers
3   or did you get them from Minneapolis?
4       A   No.  From store managers.
5       Q   So store managers had authority over
6   firing decisions with regard to Jim's cleaning crews?
7       A   Yes.
8       Q   We've talked a little bit about this.
9   I know that you had a chemical budget for each store,
10  did you not?
11      A   Yes.
12      Q   Now, with regards to the cleaning
13  equipment that you used, you indicated that, when you
14  got a new store, you were required to provide new
15  equipment?
16      A   We were expected to.
17      Q   And you obtained that equipment by
18  leasing equipment?
19      A   Lease purchase.
20      Q   So you lease it and, at the end of a
21  lease period, you have the option to pay?
22      A   Pay a dollar and you own it.
23      Q   Okay.  So they're really sort of
24  purchased on credit plans, then?
0193
1       A   Yes.
2       Q   And do you know whether or not Jim's
3   had to borrow money in order to make those lease
4   purchases of equipment?
5       A   I would suspect that.
6       Q   But you don't know?
7       A   But I don't know.
8       Q   Now, did Target specify a company that
9   you were to lease this equipment from?
10      A   No.  They recommended Tennant scrubbers
11  and Tennant cleaning equipment.
12      Q   As a practical matter, did you do all
13  of your leasing from Tennant?
14      A   Most of it.  Almost -- well, 99
15  percent of it.
16      Q   Did Target specify the brands of
17  cleaning equipment you were to use?
18      A   They -- yes, which scrubber they
19  wanted, a 5680 -- Tenant 5680 --
20      Q   Okay.
21      A   -- which is $6,000.  That's the
Page 80

Smith, Trent - Vol. I
```
22  majority of --
23       Q    Okay.  And I guess you had machines
24  that you used for waxing --
25       A    Buffers.
0194
1        Q    -- and machines that you used for
2   stripping?
3        A    Yes.
4        Q    Okay.  And did they specify the type
5   of equipment you were to use in those cases, too?
6        A    No.  They might have recommendations,
7   but Tenant was for the scrubber, for the carpet
8   extractor, and the carpet cleaning equipment.
9        Q    Okay.  Is Tenant the brand of the
10  machine or simply the company that provides the
11  equipment or both?
12       A    It's the manufacturer --
13       Q    Okay.
14       A    -- and the brand name.
15       Q    What about the products -- the
16  disposable products that you used in the Target score
17  -- stores?  For example, toilet paper, paper towels,
18  soap that comes from soap dispensers.
19            Who provided those supplies?
20       A    Target.
21       Q    Did -- were you required to use Target
22  brand products for those kinds of things?
23       A    Target ordered and supplied all of
24  that.
25       Q    And when you say "Target ordered and
0195
1   supplied," how did Target go about ordering and
2   supplying those types of paper products?
3        A    The products that you said, we did not
4   control.  They took care of.
5        Q    Okay.
6        A    One -- one of their employees was
7   in charge -- some of them would order six months'
8   worth of product, some of them would order one month
9   worth of product.
10            We didn't have anything to do with the
11  disposable products.
12       Q    Your only job was to make sure that
13  the products, once delivered to the store, were
14  re-supplied?
15       A    Yes.  And we would notify them.  We
16  might leave a note on somebody's desk, "Hey, we're
17  getting low on toilet paper.  Hey, we're getting low
18  on brown paper towels."
19       Q    Did these paper products -- were they
20  actually Target brand products that you used.
21       A    I do not know.  I -- I don't know.
22       Q    Okay.  Do you know whether or not, for
23  example, you might pull toilet paper off the shelves
24  if you were running low?
25       A    That would be an extreme, extreme,
0196
1   rare case, but, happens, yes.  We would not go
2   without a customer having toilet paper.
3        Q    And did you ever see the bills for
4   these products?
5        A    Not for the products that you're
6   talking about.
7        Q    Okay.  And did they count against your
```

Smith, Trent - Vol. I
```
7   chemical budget in any way?
8        A    Not the products you're talking about.
9        Q    Okay.  Of course, there were some other
10  cleaning products.  Wax, for example, and things of
11  that nature.  Windex, I guess, or some type of glass
12  cleaner.
13       A    Who --
14       Q    Hundreds of products.
15       A    Yeah.
16       Q    Who was responsible for ordering the
17  non-paper products?
18       A    I was.
19       Q    Okay.  And did those products count
20  against your chemical budget?
21       A    Yes.
22       Q    And who did you order those products
23  from?
24       A    In the beginning, it was Target, and
25  then Target turned it over to a company called Xpedx,
0197
1   that distributes as a giant distribution facility.
2   So you would turn it in to them.
3        Q    Okay.  You would turn in your supply
4   orders to them?
5        A    Yes.
6        Q    And were all of the products that you
7   used, the wax, et cetera -- were they actually Xpedx
8   products, or was Xpedx simply the delivery service?
9        A    I believe them to be the delivery
10  service.
11       Q    Okay.  And did Target place any
12  controls over the types of these cleaning supplies
13  that you were to use?
14       A    Yes.  They provided you a list of
15  items, with a code, that you could order only those
16  -- Target-approved stuff.
17       Q    Okay.  So, for example, if you wanted
18  to use Windex, as opposed to some other type of glass
19  cleaner, did you have that option?
20       A    No.
21       Q    So Target actually controlled the
22  types of products that you were to use?
23       A    All of the products.
24            (Plaintiff's Exhibit No. 21 was
25            marked for identification)
0198
1        Q    (By Mr. Deats)  I'm handing you a
2   document that's been labeled as Deposition Exhibit
3   21.
4            Do you recognize this document?
5        A    Yes.
6        Q    Do you recognize this document?
7        A    This is a document that I put together
8   a long time ago.  This is an old one.  '03, is that
9   what this says?  No, that's not '03.
10       A    I think this was '01, when this was
11  made.  Yeah.
12            This says '03.  Target lists "3," but
13  this is just -- that was just the third time I put it
14  together, updated it.
15       Q    Now, where did you get these products
16  and these numbers that are listed for each of these
17  products?
```

Smith, Trent - Vol. I
```
18            MR. DEATS:  -- handbook that you
19  provided.
20            MR. PIZZO:  Let's identify at
21  least what -- what tab section it's in.
22            MR. DEATS:  It's the first tab
23  after the "supply order process" tab.
24            MR. PIZZO:  That's all I need to
25  know.
0199
1        Q    (By Mr. Deats)  And it consists of
2   four pages labeled Pages 6 through 9, and this
3   specifically indicates the brands that are to be
4   used, does it not?
5        A    Yes.
6        Q    And they actually have Xpedx's order
7   numbers?
8        A    Yes.
9        Q    So you ordered supplies directly from
10  Xpedx?
11       A    Yes, I did.
12       Q    And, then, they would be delivered to
13  the individual target stores on Xpedx trucks?
14       A    Yes.
15       Q    And did you receive the bill for these
16  shipments?
17       A    No.
18       Q    Well, what happened -- how did Xpedx
19  get paid for these deliveries?
20       A    Xpedx charged Target, I guess.
21       Q    So, to your understanding, Xpedx
22  billed Target directly for delivery of these
23  supplies?
24       A    Yes.
25       Q    And, then, on the monthly reports that
0200
1   you got, it was -- there was an indication of how
2   much of your chemical budget you had actually used?
3        A    Yes.
4        Q    So Target made periodic reports to you
5   on how you were doing vis-a-vis your budgeted amount?
6        A    Yes.
7        Q    And you had no authority to deviate
8   from the types of products that they required you to
9   use?
10       A    No.
11       Q    If you failed to use all of the money
12  allotted to you in your budget, were you able to
13  pocket or keep that money?
14       A    No.  It meant nothing to us.
15       Q    What happened if you went over your
16  budgeted amount?
17       A    They told us that they had the
18  authority to charge us if we went over.
19       Q    And to subtract it from the amount
20  that they otherwise owed you under the contract?
21       A    Yes.
22       Q    And did you have any authority over
23  the amount of your chemical budget?
24       A    No.
25       Q    What if you felt that you could save
0203 ... 
```

Smith, Trent - Vol. I
```
18            A    These -- this was when Target was
19  handling the distribution.  All of the supplies were
20  coming through Target's distribution, on a Target
21  truck, at this time, in '01.
22       Q    Okay.
23       A    So Target -- yeah.  They gave us a
24  list of all the things that we could order, and this
25  is not all of it.
0199
1            There was a much larger list.  I
2   condensed it down to just the products that Jim's
3   Maintenance would use.
4            Our people didn't need to see three
5   pages of --
6        Q    So this was a list that you created
7   from a larger list that was supplied to you by
8   Target?
9        A    Yes.
10       Q    The reason is a larger list is
11  because of the pad size.  You see scrubber size, pad
12  size, that goes on and on for different size
13  machines.
14       Q    I'm showing you a document -- and I
15  don't think we need to mark it as an exhibit, because
16  it's a document that comes from the contractor
17  handbook.
18            I'll hand it to you.  Do you recognize
19  this multi-page document?
20       A    Yes.
21       Q    And what's its --
22            MR. PIZZO:  Can we least --
23       Q    (By Mr. Deats)  And what's it --
24            MR. PIZZO:  Why don't we at least
25  identify it?
0200
1            MR. DEATS:  I'm going to.
2        Q    (By Mr. Deats)  What's its title?
3        A    It's a "Target Housekeeping Supplies
4   Order Form."
5        Q    And let's hold it up and let the
6   camera focus on it.
7        A    (Complies)
8        Q    And is this the larger form that you
9   were talking about a moment ago, that you extracted
10  the housecleaning supplies from, understanding
11  that --
12       A    Pretty much.  Pretty much.  This is
13  actually an Xpedx part number.  Right after this,
14  they switched over to using Xpedx to distribute all
15  of these products.
16       Q    Uh-huh.
17       A    So Xpedx -- Target was handling too
18  much stuff, I guess.  They didn't like sending it
19  through their trucks, so they shipped -- they let
20  these guys start handling it.
21            MR. PIZZO:  Are there Bates stamp
22  numbers on those pages?
23            MR. DEATS:  There are not Bates
24  stamps numbers on these pages.  We provided these to
25  the defendant in discovery.  It was a copy of the
0201
1   contractor --
2            MR. PIZZO:  Right.
```

**Page 85**

```
14        Q    what if you felt like you could use a
15   cheaper supplier, other than Xpedx, and save money in
16   that manner?  were you allowed to consider doing
17   that?
18        A    No.
19             MR. DEATS:  Let's go off the
20   record.  Could we take a short break?
21             (Short Break)
22             (Plaintiff's Exhibit No. 22 was
23             marked for identification)
24             (By Mr. Deats)  Mr. Smith, I have
25   placed in front of you a document marked for
0204
 1   identification as Plaintiff's Exhibit 22.  It's a
 2   copy, that was made during the break, of the Target
 3   housekeeping supplies order form that I was asking
 4   you questions about.
 5        Q    Do you recognize it as such?
 6        A    Yes.
 7        Q    And it is, approximately, a four-page
 8   document that appears in the contractor handbook;
 9   correct?
10        A    Yes.
11        Q    After the tab marked "supply order
12   process?
13        A    Yes.
14        Q    Okay.  Now, at the start of the
15   deposition, you were talking about some Service
16   Merchandise stores that Jim's was providing cleaning
17   services for.
18             Was that the same sort of setup,
19   overnight cleaning crews, or was that different?
20        A    No.  It was a morning service.
21        Q    And like -- approximately, how many
22   hours a day did your cleaning crews work the the
23   Service Merchandise stores?
24        A    I'm not sure.  It was just a few
25   hours, a couple of hours.
0205
 1        Q    And you had, approximately, how many
 2   stores that you provided cleaning services for?
 3        A    I do not know.
 4        Q    Would it have been 10, less than 10?
 5        A    No.  More than that.
 6        Q    You talked, also, about some stores
 7   that you said were sort of losers, in terms of
 8   whether or not you were able to make a profit, and
 9   you were talking specifically about west Texas
10   stores.
11             Do you recall whether or not there was
12   a target store in Midland that you provided services
13   for?
14        A    Yes.
15        Q    Did you consider the Midland store to
16   be one of those that was difficult to show a profit
17   on?
18        A    Absolutely.
19        Q    Did you have any sort of established
20   workweek for periods -- for purposes of the Fair
21   Labor Standards Act, the federal law that governs
22   minimum wage and overtime?
23             For -- for example, did your workweek
24   start on Sunday and end on Saturday?  Did you ever
```

Page 85

**Page 86**

```
25   establish a specific workweek?
0206
 1        A    No.
 2        Q    So you didn't really have an official
 3   workweek; correct?
 4        A    Seven days a week.
 5        Q    Okay.  Now, almost all of your income
 6   -- with the exception of this one little cleaning
 7   contract you had at that vocational school, all of
 8   your income came from Target, did it not?
 9        A    After Service Merchandise shut down,
10   which might have been 2000, 2001.
11        Q    And, approximately, what percentage
12   would you say of your total budget was devoted to
13   paying the salaries of your workers?
14        A    I would say, out of our budget,
15   probably 70 percent.
16        Q    And that 70 percent, would that
17   include the salaries you paid to your managerial
18   staff?
19        A    That would include all of the cleaning
20   -- cleaners --
21        Q    Okay.
22        A    -- and this -- and the supervisors
23   would probably be included in that, most of them.
24   Not the regional people, and probably -- it would go
25   up from there if you added everybody in.
0207
 1        Q    And, then, the remaining percentage of
 2   your budget would be devoted to payment for
 3   equipment, payment for products, payment for other
 4   types of overhead?
 5        A    Insurance, vehicles, gas, all the
 6   supervisor expenses.
 7        Q    Okay.  Was there any way that you
 8   would be able to meet payroll in a given month if you
 9   failed to receive the payments from Target?
10        A    No.
11        Q    Do you feel like Target was aware of
12   your ability to meet payroll without receiving those
13   payments from Target?
14             MR. PIZZO:  Object to the form.
15             MS. MILLER:  Object to the form.
16        Q    (By Mr. Deats)  In your opinion, based
17   on your knowledge of the relationship with Target, do
18   you have an opinion about whether or not Target was
19   aware that you -- of your ability to meet payroll
20   without receiving payments from them?
21             MS. MILLER:  Object to the form.
22        A    I -- I -- I know that, when we took
23   over the contract -- when we started working for
24   Target, it was -- I mean, they paid that month,
0208
 1   because they knew -- and they -- they would tell you,
 2   "Hey, this is your" -- you know, "This is a good
 3   deal, you know.  We're -- we're very nice to do this
 4   for this month and our people get paid this month.
 5   You don't have to, you know, finance it for two
 6   months to get started."
 7        Q    Okay.  So they specifically told you,
 8   when they set up the first payment plan, that they
 9   were doing that to enable you to pay without having
```

Page 86

**Page 87**

```
10   to borrow money to finance?
11        A    Yes.
12        Q    Do you have an opinion about whether
13   or not Target was aware that you would be unable to
14   meet your final payroll without receiving that final
15   payment from Target?
16        A    I would suspect they -- I would
17   suspect that.
18        Q    Okay.  You would suspect that they
19   knew you would not be able to meet payroll?
20        A    I don't know.  It seems, just
21   mathematically, that you wouldn't be able to do that.
22   I don't know.
23             Yeah, I would -- yes, they probably
24   knew.
25        Q    Now, your cleaning crews that worked
0209
 1   in Target stores, they pretty much perform the
 2   same tasks every day, day in and day out?
 3        A    Pretty much.
 4        Q    They pretty much cleaned Target stores
 5   according to the framework that Target established in
 6   the contractor's handbook and these other things
 7   we've have talked about; right?
 8        A    Yes.
 9        Q    And that really didn't vary from day
10   to day or from week to week, did it?
11        A    Not much.
12        Q    Okay.  There were some variations, for
13   example, during holiday periods, things like that?
14        A    Yes.  During strip-outs, during major
15   things.  Say you spent 80 percent of your time doing
16   the same thing, vacuuming, emptying the trash, wipe
17   down the bathrooms, and then 20 percent of your time
18   might be doing something -- a project.
19        Q    Okay.  And those projects were usually
20   at the direction of Target, were they not?
21        A    (No verbal response)
22        Q    Holiday schedules --
23        A    Yeah.
24        Q    -- back-to-school schedules?
25        A    I mean, they -- it's in the book --
0210
 1   yeah, it's in the contractor handbook.
 2        Q    Okay.  And the type of work that your
 3   cleaning crews were doing really didn't require much
 4   supervision, did it?
 5        A    I mean, once they learned the work,
 6   they pretty much did the same jobs over and over
 7   again?
 8        Q    What, now?
 9        A    Once they learned the work, what was
10   expected of them, they pretty much did the same work
11   over and over again, didn't they?
12        A    Yes, kind of.  But they're working in
13   a store, underneath Target's LOD.  You know what I
14   mean?
15             To work around -- it's different every
16   night, kind of, on where they were going to be, what
17   they were going to be doing, what the -- the stocking
18   crew, what they would be doing.
19             So it wasn't the same every night.
20        Q    And it was different because of
```

Page 87

**Page 88**

```
21   decisions made by the Target manager; right?
22        A    Yes.  Yeah.  We didn't have a
23   supervisor in the store.
24        Q    The training conferences that you
25   talked about attending, did Target require your
0211
 1   attendance at these conferences?
 2        A    Yes.
 3        Q    Did Target personnel lead the meetings
 4   at these conferences?
 5        A    Yes.
 6        Q    Did Target pay your expenses for
 7   attending the meetings?
 8        A    No, not for these.  Whenever we sent
 9   our regional people up, they paid for their trip to
10   learn carpet cleaning techniques.
11        Q    Okay.  And was attendance at these
12   meetings mandatory?
13        A    Yes.
14        Q    At the stores where Jim's provided
15   cleaning services for Target, did any other companies
16   provide cleaning services?
17        A    I'm sorry.  What was the question?
18        Q    Where -- where Jim's was assigned a
19   store to clean, was Jim's entirely responsible for
20   cleaning that store?
21        A    Yes.
22        Q    You didn't do it along with other
23   contractors?
24        A    No.
25        Q    You didn't do it along with -- with
0212
 1   Target employees?
 2        A    No.
 3        Q    Okay.  But the store had to be cleaned
 4   each night; right?
 5        A    Every night.
 6        Q    And had to be cleaned according to
 7   Target's specifications?
 8        A    Yes.
 9        Q    So the work -- the cleaning work that
10   was done by Jim's crews was an integral part of the
11   Target operation, was it not?
12        A    Absolutely.
13        Q    One of the four things that Target is
14   founded on -- one of them is clean, shiny stores.
15             And you indicated, in fact, that it
16   reflected badly on the target managers if the store
17   was not cleaned properly; right?
18        A    Absolutely.
19        Q    It was one area in which they were
20   evaluated on their performance; right?
21        A    Yes.
22        Q    Now, did Target, as a practical
23   matter, sort of set a maximum number of workers you
24   could hire to put into a store?
25        A    No.
0213
 1        Q    So, you had "X" amount of money for a
 2   store, right --
 3        A    Yes.
 4        Q    -- that you were paid?
```

Page 88

Smith, Trent – Vol. I

```
 6        A      And did that, in and of itself, create
a lid on the number of employees you could --
 8        A      Yes.
 9        Q      -- pay and still meet your budget?
10        A      Yes.
11        Q      So, to that extent, at least, did
Target set a maximum number of employees you could
hire to clean the store?
14              MS. MILLER:  Object to the form.
15        Q      (By Mr. Deats) Go ahead and answer.
16        A      Yes.
17        Q      And when Target hired you to clean a
store, you got one of these contracts that would have
an initial term of, say, three years or something
like that; right?
21        A      Yes.
22        Q      And, basically, the -- Jim's
Maintenance cleaning crews, once that contract was
assigned, just worked on a -- sort of an ongoing and
indefinite basis for Target, did they not?
0214
 1        A      A three-year contract.
 2        Q      And even after the three-year term, it
extended month to month unless it was terminated;
correct?
 5        A      Yes.
 6        Q      So the Targets really were -- I mean,
excuse me, the contracts really were of indefinite
duration, were they not?
 9              MS. MILLER:  Object to the form.
10        Q      (By Mr. Deats) Go ahead and answer.
11        A      I -- I suspect.
12        Q      And Target -- excuse me, Jim's crews
were expected to clean the stores night after night,
month after month, year after year; right?
15        A      Yes.
16        Q      Did Target managers have the authority
to decide when workers would do specific tasks, like
stripping or waxing the floors?
19        A      Yes.
20        Q      Do you recall whether or not Target
ever required Jim's Maintenance to upgrade or change
the types of equipment that were being used in the
store?
24        A      No.  We had good equipment.  Whenever
25 -- it was a requirement when we took over Oklahoma.
0215
 1 They were very upset with the current contractor and
they wanted new equipment in all the stores.
 3        Q      And you mentioned that they indicated
specific brands of a certain type of waxing and
stripping equipment that they wanted used; right?
 6        A      Yes.
 7        Q      Did they ever say, for example, "Well,
you're using the Trenton 2000.  We want you to
upgrade to the Trenton 2500," or anything like that?
10        A      I can't remember specifically.
11        Q      Okay.  You may not have knowledge of
this, and if you don't, please say so.  Was Jim's
Maintenance well capitalized, enough that it would be
able to make payroll even if Target failed to pay for
a period?
16        A      No.  Absolutely not.  Very slim
                          Page 89
```

Smith, Trent – Vol. I

```
17 margins.
18        Q      So you had to get paid in order to
make payroll?
20        A      Well, it's a service industry.  It's
not highly capitalized.  Your -- I mean, it's
payroll.  Most of your payment is paying people.
You're providing people.
24        Q      Do you recall any instance in which
Jim's supervisors were required by Target to work a
0216
 1 shift at one of the stores in San Antonio?
 2        A      Where supervisors were locked in the
store?
 4        Q      Yes.
 5        A      It happened.  I don't remember
specific instances, but, yes, Brandon had spent many
nights where they wanted him in there.
 8              MR. PIZZO:  Who?
 9              THE WITNESS:  Brandon Stewart,
our regional --
11        Q      (By Mr. Deats) Brandon Stewart was
your regional manager?
13        A      Jimmy Funderburgh had been put in
there, too.
15        Q      Okay.  And who is Jimmy Funderburgh?
16        A      That's Jim's son in Dallas.
17        Q      And did Jimmy Funderburgh work for
Jim's Maintenance?
19        A      Yes.
20        Q      What position did he hold, if you
know?
22        A      He was kind of overseeing the south.
23        A      Along with Brandon Stewart?
24        A      Yes.
25        Q      And so Jimmy Funderburgh and Brandon
0217
 1 were required to go and work a shift in the San
Antonio store?
 3        A      Yes.
 4        Q      And they were actually locked in the
store?
 6        A      Yes.
 7        Q      And do you recall who made them do
that?
 9        A      The store manager required them to --
they probably had a specific thing that they wanted
done.  They wanted that restroom stripped out or they
wanted something -- carpets cleaned and they didn't
want them to leave.  They wanted to get it done.
14        Q      Okay.  You mentioned that clean and
shiny stores was one of the four principles that
Target was founded upon.
17        Q      How did you learn that that was one of
the four principles?
19        A      At Target training.  We -- when we
went up, I believe, for this one, the -- the CEO
spoke to us, the CFO.  Each one of them would talk
about the importance of how the stores looked, and
one of them just explained to us the four things that
Target was founded on.  One of them was clean, shiny
stores.
0218
 1              MR. DEATS:  I pass the witness.
                          Page 90
```

Smith, Trent – Vol. I

```
 2              THE WITNESS:  Thank you.
 3              MR. PIZZO:  Can we take a break?
 4              (Short Break)
 5
 6                    CROSS EXAMINATION
 7 BY MS. MILLER:
 8        Q      Mr. Smith, my name is Shannon Miller,
and I represent Target in this case.
10              You and I met this morning; is that
correct?
12        A      Yes.
13        Q      Do you understand that you're still
under oath, even though a different attorney is
questioning you?
16        A      Yes.
17        Q      You and I have not met before today;
is that correct?
19        A      We have not.
20        Q      You mentioned earlier this morning
that you had met with Mr. Craig Deats, who represents
the plaintiffs in this lawsuit?
23        A      Yes.
24        Q      When was it that you had that meeting?
25        A      Two months ago, maybe.
0219
 1        Q      Where were you when you had the
meeting?
 3        A      At Phil's office.
 4        Q      When you say "Phil," are you referring
to Phil Hurtt?
 6        A      Hurtt, yes.
 7              THE WITNESS:  Was that your --
I'm sorry.
 9              MR. HURTT:  Yes.
10              THE WITNESS:  I believe it was
Phil Hurtt's office.
12        Q      (By Ms. Miller) Thank you.
13        A      The other people who were at that
meeting, can you review that with me again?
15        A      The gentleman in the white shirt, over
there.  (Indicating)
17        Q      And you're pointing to Justin Tullius,
who is --
19        A      I believe so.
20        A      -- a recent law graduate.
21        Q      And who else?
22        A      Jim Funderburgh, Bryan Funderburgh,
Phil, and Craig.
24        Q      Was Mr. Beardall, Bill Beardall, who
is sitting here, at that meeting?
0220
 1        A      No.
 2        Q      And was there a Mr. Joe Berra at that
meeting?
 4        A      No.
 5        Q      Was anybody recording what was
discussed at that meeting?
 7        A      I don't know.
 8        Q      But you weren't -- nobody had like a
tape recorder out in front or something --
10        A      I don't remember.  I don't think so.
11        Q      Did Mr. Deats or anybody compensate
you for the time that you met with them?
                          Page 91
```

Smith, Trent – Vol. I

```
13        A      No.
14        Q      How long did the meeting last?
15        A      Maybe an hour, maybe two hours.
16        Q      I believe you testified earlier that
you discussed employment at the meeting.  Can you be
more specific for me?
19        A      I don't remember what --
20        Q      What did you all talk about at the
meeting?
22        A      I guess about -- about the same stuff
we talked about today.
24        Q      Did Mr. Deats go over a series of
questions and answers with you?
0221
 1        A      Did you talk about the employment of
the plaintiffs, the people who have been sued in this
lawsuit by Jim's?
 4        A      I don't -- we didn't talk about
anybody specifically.  We looked over forms, the same
forms, you know, what is this form, what is this
form, what's this do.  (Indicating)
 8        A      And when you say "forms," you kind of
motioned to the exhibits that have been entered in
your deposition earlier.
11        Q      Is that the forms that you're talking
about?
13        A      Yes.  A few of those.  Not all of
those, but a few.
15        Q      Are there any forms that you went over
with Mr. Deats that you don't -- you haven't seen
today?
18        A      No.
19        Q      What did Mr. Deats tell you was the
reason for the meeting?
21        A      I don't remember.
22        Q      Were you at all surprised that an
attorney for people who are suing Jim's Maintenance
was meeting with you?
0222
 1        A      Yes.  Yeah.
 2        Q      But you didn't -- did you ask any
questions about that?
 4        A      I think -- yes, "Why am I here?"
Yeah, I think I asked that.
 6        A      I don't remember the answer, though.
 7        Q      Okay.
 8        A      It would have been the smart thing to
ask, but --
10        Q      Did you sign a statement -- a written
statement that day?
12        A      I don't believe so.
13        Q      Have you, since that time, talked to
Mr. Deats by telephone or e-mail?
15        A      No, ma'am.
16        Q      Have you talked to Mr. Justin Tullius
by e-mail or telephone since that meeting?
18        A      No, ma'am.
19        Q      What did Mr. Tullius -- let me ask
this.  Did -- Mr. Tullius talk at the meeting
that you had?
22        A      No.
23        Q      Did Mr. Deats also question Mr. Jim
                          Page 92
```

Smith, Trent - Vol. I
24 Funderburgh and Mr. Bryan Funderburgh at that
25 meeting?
0223
1     A     I think so. We were all there. I
2 can't say "no." I -- I don't -- can you ask it
3 again?
4     Q     Sure. You and I've talked about Mr.
5 Deats questioning you at that meeting?
6     A     Yes.
7     Q     And my question is: Did he also
8 question Mr. Jim Funderburgh?
9     A     I don't remember.
10    Q     And did he also question Mr. Bryan
11 Funderburgh?
12    A     I don't know.
13    Q     Did Mr. Deats discuss with you that if
14 he were to recoup some kind of award for the
15 plaintiffs in this case that he would give you some
16 of that money?
17    A     No, ma'am.
18    Q     And is anybody paying you for your
19 testimony today?
20    A     No, ma'am. Phil bought my lunch.
21    Q     Were Ruth Talent and Vickie Stover at
22 that meeting?
23    A     No.
24    Q     How about Joyce Funderburgh? Was she
25 at that meeting?
0224
1     A     No.
2     Q     Are you related to Jim Funderburgh by
3 marriage?
4     A     No.
5     Q     I asked that in a very confusing way.
6     A     Yeah.
7     Q     Are you related, in any way, to --
8     A     I am married --
9     Q     -- Jim Funderburgh?
10    A     No.
11    Q     Is there -- are you married to Bryan's
12 wife's sister?
13    A     Yes.
14    Q     Okay.
15    A     Yes. Yes. I am married to formerly
16 Keri Newman. He's married formerly to Chris Newman.
17 So we're married to sisters.
18    Q     How long have you been married?
19    A     13 years.
20    Q     Did you know Bryan Funderburgh or Jim
21 Funderburgh prior to your marriage?
22    A     Yes.
23    Q     And did you know them through dating
24 who became your wife or --
25    A     Bryan and I did not date, but we -- we
0225
1 -- we went to high school together. Bryan is two
2 years older than I am, and we went to high school
3 together.
4     Q     Okay.
5     A     And I have been married 14 years. So,
6 please, change that.
7     Q     The address -- home address that you
8 gave, do you run the business that you and Bryan have
Page 93

Smith, Trent - Vol. I
9 together out of your home?
10    A     No. We use that mailing address.
11    Q     And could you give it to me one more
12 time? I don't think I got it right.
13    A     5921 Holzman, H-o-l-z-m-a-n, Avenue,
14 Choctaw, C-h-o-c-t-a-w, Oklahoma, 73032.
15    Q     Thank you.
16    Q     And what is the name of that business?
17    A     The business that we have is Sycamore
18 Development.
19    Q     And could you spell Sycamore, please?
20    A     S-y-c-a-m-o-r-e.
21    Q     Are there any other employees of
22 Sycamore development, other than you and Bryan?
23    A     No.
24    Q     How long has Sycamore Development been
25 in business?
0226
1     A     I think probably 2001 is when we
2 incorporated.
3     Q     Were you incorporated in the State of
4 Oklahoma?
5     A     Yes.
6     Q     So while you were employed by Jim's
7 Maintenance, you were also running this business with
8 Bryan?
9     A     Yeah. Just on the side.
10    Q     And did you ever utilize the Jim's
11 Maintenance office to conduct Sycamore Development
12 business?
13    A     Yes. I mean -- yeah.
14    Q     Have you ever -- and Bryan ever had
15 any other business together, other than Sycamore
16 Development?
17    A     No.
18    Q     Do you have a sales background?
19    A     Yes.
20    Q     I believe you testified that you
21 graduated from OU in '92 with a degree in business;
22 correct?
23    A     Yes.
24    Q     What was the first job you had after
25 college?
0227
1     A     Baroid Drilling Fluids, Houston,
2 Texas.
3     Q     And what did you do for them?
4     A     Mud engineer.
5     Q     The job you had most close in time
6 before you started working with Jim's, where was
7 that?
8     A     I worked for a company called Case of
9 Champions.
10    Q     Case of Champions?
11    A     Three words.
12    Q     Where is that located?
13    A     Here, in Oklahoma City.
14    Q     And what do they do?
15    A     Decorate sports atmospheres.
16    Q     I'm going to need some more help with
17 that. What do you mean by "sports atmosphere"?
18    A     We decorated sports restaurants, bars,
19 university locker rooms.
Page 94

Smith, Trent - Vol. I
20    Q     What was your job with them?
21    A     I don't know. Part owner, I guess.
22    Q     Who was the other owner of that
23 business?
24    A     Colby Greenhall and Paxton Gray.
25    Q     Were you in charge, at Case of
0228
1 Champions, of any kind of accounts for that company?
2     A     Sales, yes.
3     Q     How long had you done that?
4     A     One year.
5     Q     Did you know Harlin Murray from before
6 you talked to him about Jim's Maintenance doing some
7 Target work?
8     A     No.
9     Q     And I believe you testified you called
10 a Target store?
11    A     Uh-huh.
12    Q     Who -- who did you speak with at the
13 Target store you called?
14    A     I don't remember.
15    A     Actually, to reach Harlin -- what did
16 I do? I called a store in like North Carolina and I
17 asked, "Who is in charge of your cleaning services,"
18 and they gave me Jim Jeravik, which is just below
19 Mike Bell I later find out.
20    A     And I called Jim Jeravik -- I just
21 asked the store manager for the phone number, how to
22 reach him. They gave me Jim Jeravik's phone number.
23 I reached him. He asked me a couple of quick
24 questions, "Where do you guys work, what do you do,"
25 blah, blah, blah?"
0229
1     A     "Okay. Here's Harlin Murray's name.
2 He's in Texas, he's got some stores opening," and he
3 gave me the phone number to -- to reach Harlin
4 Murray.
5     Q     Did you know anybody at that Target
6 store in North Carolina that you called?
7     A     No, ma'am.
8     Q     How did you choose a North Carolina
9 Target store to call?
10    A     It was just soliciting -- I don't know
11 if we knew that stores -- they were adding stores in
12 North Carolina or -- but just -- that's the way I
13 would reach everybody. You call the store, "Hey,
14 who's in charge of your cleaning," and then go from
15 there. They give you a name, they may or may not
16 pick up the phone and ask you to call another store,
17 and just try to follow up on who's in charge where.
18    Q     Okay. And I guess the way you said
19 that -- had you called other Target stores before the
20 North Carolina one told you about Jim Jeravik?
21    A     No. I don't think so.
22    Q     Okay. Well, you said this is the way
23 you do it. I was trying to --
24    A     All stores. When I call Barnes &
25 Noble -- I'm basic, as an -- an account rep, trying to
0230
1 contact stores. You call a Wal-Mart, you just call a
2 local Midwest City store, "Who cleans your store?
3 Who's in charge of it," and then they'll -- they'll
4 give you your regional person, typically, who's in
Page 95

Smith, Trent - Vol. I
5 charge.
6     Q     Before you -- Jim's Maintenance
7 started doing Target work, did anybody from Jim's go
8 to Minneapolis, where the headquarters are?
9     A     No, ma'am.
10    Q     When you started working at Jim's
11 Maintenance, had there been somebody in your job just
12 prior to you coming? Did you replace somebody?
13    A     Not that I know of.
14    Q     Did you, personally, ever hire a Jim's
15 cleaner?
16    A     I don't think so.
17    Q     Throughout the day, you have testified
18 a number of times that -- you have started it with,
19 "Well, I speculate this" or "It appears that it is
20 this."
21    A     Am I correct that, when you say
22 something like that, that means you don't really know
23 for sure, that you're just guessing?
24         MR. DEATS: Objection, form.
0231
1     A     (By Ms. Miller) You can answer.
2     A     Now, how was it used.
3     Q     Sure. You -- do you recall earlier
4 today that you said, "I speculate that's what
5 that is"?
6     A     I suspect. I suspect a lot.
7     Q     "Suspect," sure.
8     A     I suspect.
9     Q     When you say you suspect something,
10 does that mean you know it for sure or are you
11 guessing?
12         MR. DEATS: Objection, form.
13         THE WITNESS: When I say -- I would
14 guess -- I suspect, when I say "suspect," that I'm
15 meaning "yes," but I don't know for sure.
16         (By Ms. Miller) Don't know for sure.
17 Thanks.
18    A     And I -- I -- I feel guilty if I would
19 say -- I need to learn to say I believe" whenever
20 I think "I think that's right," but I really probably
21 need to say "I don't know.
22         But most of the time "I suspect"
23 probably means "yes," but I'm not sure.
24         Does that answer your question?
25         THE WITNESS: Object to that
0232
1 answer?
2         MR. BEARDALL: I suspect.
3         THE WITNESS: You suspect that's
4 right?
5         (By Ms. Miller) Who, at Jim's, was
6 actually in charge of hiring the cleaners?
7     A     Supervisors, regional supervisors. I
8 mean, I remember I -- I interviewed the supervisors,
9 and -- and Bryan was the director of operations. So
10 he filled those jobs.
11    Q     Okay. I want to make sure I'm clear.
12 Bryan Funderburgh --
13    A     Yes, ma'am.
14    Q     -- was the director of operations?
15    A     That was kind of his title.
16    Q     Was he also -- did he have other
Page 96

Smith, Trent - Vol. I

16  titles with Jim's Maintenance?
17      A    Yes, ma'am.
18      Q    Okay.
19      A    In a small company -- I mean, you
20  could be in charge of many things.
21      Q    Did you have a title, other than
22  account representative, at Jim's?
23      A    Account representative?  No.  Pretty
24  much -- I mean, I might have done other things, but,
25  no, that was pretty much always what it was.

0233
1       Q    How were you paid by Jim's?
2       A    A monthly fee.
3       Q    Was that a set monthly fee?
4       A    Yes.
5       Q    How much was that?
6       A    I -- $8,000 a month.
7       Q    Did that ever change during your
8   employment with Jim's?
9       A    Yes.  Whenever we had a pay cut, it
10  got cut.
11      Q    What was the lowest monthly fee you
12  would get?
13      A    Lowest?  In the beginning, it started
14  at $3,000 a month.
15      Q    And when did it increase to $8,000 a
16  month?
17      A    As I -- as we gathered more Target
18  stores, as our -- as our sales increased.
19      Q    When Service Merchandise -- when you
20  stopped cleaning for Service Merchandise, that was
21  because they went out of business; correct?
22      A    Yes.
23      Q    And when you stopped cleaning -- when
24  Jim's Maintenance stopped cleaning for Marr's Music,
25  that was because they went out of business?

0234
1       A    I believe so.
2       Q    Right.
3       A    I don't think there are Marr's out
4   there any more.
5       Q    When those contracts went away, did
6   you do anything to try to get business, other than
7   the Target business?
8       A    We picked up some small Barnes & Noble
9   accounts, but we really -- no.  I -- we weren't in a
10  position to add new accounts.  We had millions of
11  dollars in loans on equipment, and we -- we needed to
12  kind of grow through that.  We needed to -- we needed
13  to kind of absorb that business.  We had all of our
14  people in the field.  All of our resources --
15  everything was max'd out.
16      Q    To go out and pick up 30 or 40 Home
17  Depots or Lowes was not an option.  You couldn't
18  finance all the equipment that you needed.
19      Q    Did anybody from Target tell you that
20  you couldn't clean for another retailer?
21      A    No, ma'am.
22      Q    Where were the Barnes & Nobles that
23  you cleaned?
24      A    Houston -- Houston and Chicago.
25      Q    Did you -- Jim's Maintenance also

Page 97

---

Smith, Trent - Vol. I

1   clean for Ross --
2       A    Yes.
3       Q    -- stores?
4       A    Yes.  But those -- yes, they did.  I
5   didn't handle that, like I didn't handle the Service
6   Merchandise.  Those were kind of already in place
7   before I came on board.
8       Q    Did you handle the Barnes & Noble?
9       A    Yes.  Yeah.  They were so minor.  I
10  think it was two -- two or three stores in Chicago
11  and two stores in Houston.
12      Q    The school that Jim's Maintenance
13  cleaned at the same time as Target, what was the name
14  of that school?
15      A    EOC Tech Center.  It stands for
16  Eastern Oklahoma County.  It's in Choctaw, Oklahoma.
17      Q    And were you responsible for bringing
18  in that account?
19      A    I think so.
20      A    Bryan Funderburgh was in charge of
21  hiring the supervisors and the regional --
22      Q    Yes.
23      Q    -- personnel?
24      A    You didn't have any responsibility for
25  that?

0236
1       A    No, not for hiring any of those.
2       A    And, again, you didn't have any
3   responsibility for hiring any of the cleaners who
4   actually cleaned the stores?
5       A    No.
6       Q    How many times have you been in a
7   Target store at night with the cleaners?
8       A    Probably less than a dozen times.
9       Q    Have you ever been in a Target store
10  in Texas at night with the cleaners?
11      A    Yes.
12      Q    What cities?
13      A    San Antonio.
14      Q    What store?
15      A    1785 and 1204.
16      A    On Oklahoma City, T-44; Kansas City,
17  1756 and 1757.
18      Q    When were you at 1785 at night?
19      A    That would have been in 2001, right
20  after its opening.
21      Q    What was the purpose of your being
22  there?
23      A    Training.  Training new people, carpet
24  cleaning.
25      Q    You, yourself, went and trained the

0237
1   cleaners on --
2       A    Kind of both.  I was being trained to
3   know what was going on and training them.
4       Q    And did you ever go back to 1785, or
5   was it just that one time in 2001?
6       A    Just that one time.
7       Q    1204, how many times did you go there
8   at night with the cleaners?
9       A    Probably five or six times.
10      Q    Do you remember what years that was?
11      A    That would have been right when we

Page 98

---

Smith, Trent - Vol. I

12  took that over -- had taken it over, in 2000 -- when
13  was the first contract -- whenever the first
14  contracts -- right after we took the store over,
15  after it had opened.
16      If you found the opening date, it
17  would be immediately afterward.
18      Q    And was your purpose the same as when
19  you were at 1785 for training?
20      A    No.  It was cleaning.  We were having
21  hard times getting people and getting the store
22  clean.  So I was staying, to try to help organize
23  what was going on and how we were going to get all of
24  that done and work around the Target people.
25      Q    More of an operations mission than

0238
1   training mission.
2       A    And T-44, which is in Oklahoma --
3       Q    City.
4       A    -- when did you go there?
5       A    Probably 2002.  They sent a Johnson's
6   wax person down, and he trained Jim, Bryan, myself, I
7   think maybe Rob Mython on carpet cleaning techniques.
8       Target had a specific Johnson's rep
9   that sold them all their products, and then he would
10  come and help you -- he would provide training to
11  show you how to use his products, use more of his
12  products.
13      MS. MILLER:  Okay.  The
14  videographer -- it's -- it's off; is that right?
15      THE VIDEOGRAPHER:  It's off now.
16      (Short Break)
17      (BY MS. MILLER)  Mr. Smith, other than
18  in 2002, to see a presentation by a Johnson's
19  representative, did you ever spend any time in T-44?
20      A    At night, no.
21      Q    I believe you said you were at
22  T-1756 --
23      A    Yes.
24      Q    -- at night --
25      A    Yes.

0239
1       Q    -- is that correct?
2       A    Yeah.  Those were overnights, working
3   on tile issues.  They had problems with their tile,
4   and I was working overnight, trying to figure out
5   what was going on, what our people were doing and
6   what's happening in there.
7       Q    And when was that that you were in
8   1756 at night?
9       A    In '03, 2003.
10      Q    How are you sure it's '03?
11      A    Because we didn't have them in '02, so
12  I -- I'm pretty sure it was -- right when we took
13  them over, the tile was in bad shape.
14      Q    You testified that you were at T-1757
15  at night?
16      A    Same reason as 56.  Same store
17  concept, same tile, same --
18      Q    And same time frame, 2003?
19      A    Yes, ma'am.
20      Q    Other than T-44, T-1756, T-1757,
21  T-1785, and T-1204, have you spent any time at night
22  in a Target store with the cleaners?

Page 99

---

Smith, Trent - Vol. I

23      A    I can't remember any specific -- any
24  other specific times right now.
25      Q    Mr. Deats asked you quite a few

0240
1   questions about what goes on at a Target store at
2   night, when Jim's cleaners are there, and you gave
3   him a lot of answers.
4       Q    What were you basing that testimony
5   on?
6       A    Being in a store --
7       MR. DEATS:  Objection, form.
8       THE WITNESS:  Being in a store
9   overnight and seeing what they were doing.
10      Q    (By Ms. Miller)  Okay.  And -- and
11  those times that you've been in a store overnight are
12  the ones that we just -- just discussed and --
13      A    There were more than those, but I
14  can't remember specifically, because I can remember
15  -- picture all those stores at night, in the dark,
16  and working with those crews, opening stores.
17      A    Austin -- I've been in many stores at
18  night in Austin, when we took over the Austin stores,
19  T-334, T-1061.
20      Q    When we took over that market, I was
21  in those stores at night.
22      Q    Do you remember what year it was that
23  Jim's Maintenance took over the Austin market, as you
24  call it?
25      A    I think 2001.

0241
1       A    I was in T-44 for a week.  I forgot
2   that.  I was in -- when we took over the T-44 store
3   from -- from the previous contractor, I was -- I was
4   in that store for a week -- in, I'm sorry.
5       It was Norman, the Norman store.
6   T-46, I think.  I was assigned that one individual
7   store when we took it over, to make sure that we had
8   a good, smooth transition, for a week.  So I worked
9   with the crew in there.
10      Q    And what year was that?
11      A    That would have been I guess
12  2001, right when we took over T-46, Norman, Oklahoma.
13      A    T-334, how --
14      A    That's in Austin.
15      Q    Do you remember how long --
16      A    That's an Austin store.
17      Q    Thank you.
18      Q    Do you remember how long you -- how
19  often you visited there
20      A    Three or four --
21      Q    -- overnight?
22      A    Three times -- three nights, maybe.
23      Q    In 2001?
24      A    Right when we took it over.  So I
25  believe that was 2001, maybe 2002.

0242
1       Q    How about T-1061, in Austin?
2       A    Two nights.
3       Q    So am I correct, based on your
4   testimony earlier today, to Mr. Deats, about visits
5   to stores that happened in 2001 and 2002?
6       MR. PIZZO:  Object to the form.
7   It doesn't state testimony -- misstates testimony.

Page 100

Smith, Trent – Vol. I

```
 8              THE WITNESS:  I -- to my
 9  knowledge of being in the stores at night, and I -- I
10  -- I can't remember any more.
11              A.  Well, I suspect, but I know I
12  was in other stores overnight to help with their
13  cleaning needs and operations side.
14         Q.   (By Ms. Miller)  Who let you in the
15  store at night?
16         A.   The store manager.
17         Q.   I'm going to show you what was marked
18  earlier today as Plaintiff's Exhibit 1.  Had you seen
19  that document before today?
20         A.   Yes.
21         Q.   When?
22         A.   I don't know.  I mean, I suspect I saw
23  it back in 2001.
24         Q.   You say you suspect you saw it.  Do
25  you know if you saw it in 2001?
0243
 1         A.   Yes.  I would have looked it over.
 2         Q.   I'm going to show you what was marked
 3  earlier as Plaintiff's Exhibit 2.  Had you seen that
 4  document prior to today?
 5         A.   Now, this one -- any -- any -- any
 6  contract subsequent to this, I would have probably --
 7  surely, I would have been looking over all the
 8  numbers.
 9              I would have been in charge of taking
10  these numbers, putting them in an Excel spreadsheet,
11  and adding them up for a month.
12              Other than that, I couldn't guarantee
13  you that I read through the rest of it.
14         Q.   And you recognize the signature on the
15  first page of Plaintiff's Exhibit 2 as Bryan
16  Funderburgh's signature; correct?
17         A.   Yes.
18         Q.   But you, yourself, were not
19  responsible or you did not have the authority to sign
20  for contracts for Jim's Maintenance?
21         A.   No.
22         Q.   You were asked some questions earlier
23  today on Plaintiff's Exhibit 2, on Page Bates Stamped
24  No. 14, that is entitled "Contractor's Procedure
25  Regulations."
0244
 1              Had -- had you reviewed these prior to
 2  today?
 3         A.   At that time -- I mean, I would have
 4  thought I would have read that back in 2001, yes.
 5         Q.   Okay.  Please read No. 3 for me, into
 6  the record.
 7         A.   "Contractor's employees will, at all
 8  times, be under the direct control of a supervisor or
 9  crew leader, who is responsible for ensuring that
10  contractor's employees perform their duties according
11  to the standards set forth in the agreement and
12  contractor handbook."
13         Q.   What do you understand that to mean?
14         A.   That our supervisor would make sure
15  that the people in the stores understood all their
16  responsibilities and performed their duties.
17         Q.   And you agree with me that it says
18  that the -- the contractor's employees will, at all
```
Page 101

Smith, Trent – Vol. I

```
19  times, be under direct control of a supervisor or a
20  crew lead; correct?
21         A.   Yes.
22         Q.   Not just some of the time?
23         A.   Yes.
24         Q.   Okay.  The crew lead cleaner that you
25  had in the Target stores, did that person satisfy
0245
 1  that part of the -- of the contract with Target?
 2         A.   I would not think so.
 3         Q.   So Jim's Maintenance did not fulfill
 4  that portion of the contract with Target?
 5         A.   I --
 6              MR. DEATS:  Objection, form.
 7              THE WITNESS:  I would think that
 8  the store manager did not look to our crew leader as
 9  the supervisor.  He looked -- I mean, the person that
10  the store manager called the supervisor was our
11  supervisor that had -- a district supervisor, had
12  eight stores.
13         Q.   (By Ms. Miller)  The district
14  supervisor being a Jim's employee?
15         A.   Yes.
16         Q.   Would you read for me No. 4, please?
17         A.   "Contractor will provide an
18  English-speaking/reading supervisor at the store
19  during all shifts, with the exception of maid/matron
20  coverage, where supervision is not required at all
21  times, and during the scheduled monthly
22  walk-through."
23         Q.   And did you -- Jim's Maintenance
24  always provide an English-speaking/reading supervisor
25  at the store during all -- all shifts?
0246
 1         A.   We had a reading supervisor.  So
 2  whenever we had our morning walk-through shift -- the
 3  checkout sheet, it's written in English and Spanish.
 4  So that was created -- that form was created and
 5  given to us to address that, that if you had a
 6  supervisor, they could look at that morning
 7  walk-through sheet and then they could both
 8  understand.
 9         Q.   Did Jim's Maintenance provide an
10  English-speaking supervisor at all times, all shifts,
11  for cleaning Target stores?  Yes or no?
12         A.   No.
13         Q.   And you called it a reading
14  supervisor.  Did you all designate a certain cleaner
15  as the reading supervisor?
16         A.   Yes.
17         Q.   Who was in charge of designating that
18  person?
19         A.   The district supervisor would make
20  sure that the cleaning crew -- the crew leader
21  understood the form, the morning walk-through sheet,
22  so that they could, you know, read -- as long as they
23  could read Spanish, they could do it.
24         Q.   If the Target manager said something
25  in English to the Spanish-speaking Jim's crew, how --
0247
 1  how would they know what the manager was saying?
 2         A.   If they were talking about carpet or
 3  tile or restrooms, it was just communication.
```
Page 102

Smith, Trent – Vol. I

```
 4              If -- if he started talking about how
 5  the Rangers were doing, there was no communication at
 6  all.
 7         Q.   Well, how -- how would the Jim's crew
 8  know it was talking about carpet or not?
 9              MR. DEATS:  Objection, form.
10              THE WITNESS:  I don't know.
11  Industry -- just by being familiar with the industry,
12  cleaning carpet every day.  There --
13         Q.   (By Ms. Miller)  The Jim's employees?
14         A.   Yes.
15         Q.   Were you going to say something?
16         A.   There was a lot of poor communication
17  going on.
18         Q.   What do you mean by that?
19         A.   That not very many people that clean
20  stores at night speak English, maybe less than one
21  percent.
22              Total speculation on my part, but --
23         Q.   I was about to ask you if you had done
24  a statistical study.
25         A.   No.  No.
0248
 1         Q.   Were you in charge of leasing the
 2  equipment to be used in the Target stores?
 3         A.   No.  I kind of located the equipment
 4  and priced the equipment, and Jim and Bryan handled
 5  all of the financial.
 6         Q.   How did you go about locating the
 7  equipment?
 8         A.   Calling reps that sold equipment
 9  lines.
10         Q.   But you, personally, never executed
11  the lease or did anything along those lines?
12         A.   No, ma'am.
13         Q.   I believe you testified that in 2001
14  -- and we're referring still to the document that was
15  marked earlier today, Plaintiff's Exhibit 2 -- that
16  Target changed the process on who was assigned to
17  clean certain stores and they took away the bid
18  process of it.
19              Is -- is that what you testified to?
20         A.   Yes, ma'am.
21         Q.   Now, who told you -- who from Target
22  told you that?
23         A.   Chris Carlson was in charge of the
24  Building Services department that we were working
25  with.
0249
 1         Q.   Was Chris Carlson based out of
 2  Minneapolis?
 3         A.   Yes.
 4         Q.   What was it that Chris explained to
 5  you at this time, in 2001?
 6         A.   There was nothing explained.  These
 7  stores were assigned to us.  We didn't bid on them or
 8  -- they -- they shot us a price, "Can you clean --
 9  what markets would you be interested in," that was
10  asked, and we said we would be interested in Texas,
11  West Texas, Oklahoma, Kansas, and they invited us up
12  to Minneapolis, and they gave us the pricing that
13  they had come up with, on a trip to Minneapolis.
14         Q.   Okay.  Who is the "they" that invited
```
Page 103

Smith, Trent – Vol. I

```
15  you?
16         A.   Chris Carlson.
17         Q.   Anybody else?
18         A.   There was another person there, but I
19  don't remember who it was.
20         Q.   Do you remember what -- what job they
21  held with Target?
22         A.   I -- I don't remember Chris Carlson's
23  title.
24         A.   No.  I'm sorry.  You said there was
25  Chris Carlson and another person; is that correct?
0250
 1         A.   I believe it to be Mike Hannasch.  He
 2  was assisting him during this change.
 3         Q.   Hannasch, do you know how to spell
 4  that?
 5         A.   H-a-n-n-a-s-c-h.
 6         Q.   And do you --
 7         A.   That's close.
 8         Q.   Do you know Mike's job with Target?
 9         A.   They -- these guys -- he was on a
10  special assignment to help straight -- to help --
11  help -- this was a big change, and they were just
12  kind of -- Mike Hannasch was temporarily assigned to
13  work with Chris Carlson to go through this change.
14         Q.   And you said they asked you what
15  markets you were interested in.  When you say "they,"
16  are you referring to Chris Carlson and Mike Hannasch?
17         A.   Yes.
18         Q.   And did they ask you, Trent Smith,
19  personally, or somebody else at Jim's Maintenance?
20         A.   I don't remember.
21         Q.   And do you know what at Jim's
22  Maintenance came up with the response to that
23  question of what markets you were interested in?
24         A.   That would have been all three of us,
25  Bryan, Jim, and Trent.
0251
 1         Q.   And I probably just heard you wrong
 2  earlier.  I thought you said you weren't interested
 3  in the Kansas market, but you -- you told Target that
 4  you were interested in the Kansas market; correct?
 5         A.   The Kansas City market was not on this
 6  list.  We -- we did not -- we said that we were
 7  interested, I guess.  We put that on there, that we
 8  -- they asked us what areas were we strong in and
 9  what areas could we clean.  We -- or would we be
10  interested.
11              We sent a work item there identifying
12  some states and regions.  They sent us back an
13  e-mail, letting us know about the Oklahoma, Texas,
14  West Texas, that we were going to pick up some
15  stores.  We were all very excited.
16              And so we set up a meeting.  We went
17  up to Minneapolis.  They asked us some questions about
18  how much money do we make, what kind of -- how much
19  -- what's the profit percentage that you require, a
20  bunch of weird questions.
21              And then he slipped us a piece of
22  paper that had these stores, not including the Kansas
23  stores.  He slipped us a sheet of paper that had all
24  the prices on these and said, "We would like you to
25  clean these areas for this price."
```
Page 104

Smith, Trent - Vol. I

0252
```
 1      Q    Okay.  And who is the "he" that you
 2  say slipped you the paper?
 3      A    Chris Carlson.
 4      Q    And, then, about a -- and, then, he
 5  said, "I need to know" -- you know, he gave us a
 6  deadline, "You need to let us know if you accept this
 7  or not."
 8            and, then, about a week later, he
 9  contacted us and said, "Would you be interested in
10  taking these Kansas City stores," that -- another
11  company had declined the Kansas City stores.
12      Q    And do you know the name of the other
13  company who had declined the Kansas City stores?
14      A    It was Alex Dinverno.
15      Q    Was that the name of the company or
16  that was --
17      A    No.  That's the individual that owns
18  the company.  It's on the e-mail, but I -- I can't
19  remember -- Prestige.
20      Q    Did you just say Prestige?
21      A    I think it's Prestige.  If Prestige is
22  based in Texas, that's who it was.  I think it was
23  Prestige.
24            Yes, it's Prestige Maintenance USA.
25  He declined the Kansas City market.
```

0253
```
 1      Q    Okay.  And do you know that -- when
 2  Alex Dinverno declined the -- these stores, was he
 3  able to clean other Target stores?
 4      A    Oh, yeah.  Many.  He took over St.
 5  Louis.  He -- he had stores in Chicago.  He was
 6  awarded many stores.
 7            This was during the changeover, when
 8  they went from 200 housekeeping contractors down to
 9  25, at this time.
10      Q    And did Chris require you to accept
11  the Kansas City stores as a condition for keeping the
12  other stores?
13      A    Okay.
14      Q    When he communicated with you about
15  the Kansas City stores, did he communicate with you,
16  Trent, directly, or was it to Jim or Bryan?
17      A    You know, he -- he communicated to all
18  of us, all three of us.  We would send an e-mail.  We
19  went and visited him together, you know.  I don't
20  remember him sending one e-mail to one of us or an
21  individual.
22      Q    Did anybody force Jim's Maintenance to
23  -- from Target -- did anyone from Target force Jim's
24  Maintenance into signing this contract and taking
25  these stores?
```

0254
```
 1      A    No.  The only discussion on forcing
 2  anything was that -- whenever this started, you take
 3  the good with the bad.  The rural stores, like
 4  Hutchinson, Kansas, you had to take that.
 5            You couldn't take a portion of a
 6  district.  They wanted you to take the whole thing,
 7  because we tried to get out of one store in western
 8  Kansas, and he -- he -- that wouldn't work with what
 9  they were doing.
10            They were giving these -- they were
```
Page 105

---

Smith, Trent - Vol. I
```
11  trying to save money by district.  If they got
12  everybody and the economy's to scale in one district,
13  they could get it lower than having two people.
14      Q    Okay.  And when you said "he" earlier,
15  are you talking about Chris Carlson?
16      A    Yes.
17      Q    And anyone from Target tell you that,
18  when you took over the Oklahoma stores -- cleaning
19  the Oklahoma stores, that you had to have new
20  equipment?
21      A    Yes.
22      Q    Who?
23      A    Harlin Murray.
24      Q    What area did Harlin Murray work over?
25      A    He had San Antonio, Austin, West
```

0255
```
 1  Texas, and Oklahoma at that time.
 2      Q    Did Mr. Murray tell you what kind of
 3  equipment you had to -- to buy?
 4      A    It's on a list.  There is a Target
 5  list of preferred equipment.
 6      Q    Right.  My -- my question was:  Did
 7  Mr. Murray tell you what kind of equipment you had to
 8  buy?
 9      A    No, ma'am.
10      Q    When Murray said "new," did you take
11  him to mean new equipment or -- like brand new, out
12  of the factory, or just replace the equipment that
13  the old contractor had been using?
14      A    They were adamant they wanted new
15  equipment.  One reason being -- it was -- it was
16  obvious that equipment that was in Oklahoma was
17  atrocious.  It was terrible what the previous
18  contractor had, and whenever it was -- he pointed
19  out, when we visited each store, "Look at this
20  scrubber.  It's all taped together.  We want all new
21  equipment.  Get rid of it."
22            So it was a big point when we took
23  over Oklahoma.
24      Q    Okay.  So Mr. Murray said, "We want
25  new equipment.  We all -- we want new equipment"?
```

0256
```
 1      A    Yes.
 2      Q    The -- what did you refer to these --
 3  the first part of the contract, these sheets, what
 4  did you refer to these as?
 5      A    Where the pricing --
 6      Q    Pricing.
 7      A    The pricing -- the pricing is on the
 8  front, you know, two or three, four -- well, eight
 9  sheets that has the monthly pricing.
10      Q    Okay.  And you said you, yourself,
11  worked with those sheets?
12      A    I took all of those numbers and put
13  them on spreadsheets and added them up and divided
14  them up and --
15      Q    Okay.  Just for ease of reference,
16  with my questioning, I was just trying to figure out
17  what you, yourself, called these pieces of paper.
18      A    Contract.
19      Q    Contract.
20            Okay.  Can we agree to call them the
21  contract pricing sheets?
```
Page 106

---

Smith, Trent - Vol. I
```
22      A    Contract pricing sheets.
23      Q    The contract pricing sheets, did they
24  accurately reflect the payments that Target made to
25  Jim's for cleaning these stores?
```

0257
```
 1      A    Yes.
 2      Q    So there was never a situation where
 3  the contract would say Target would pay you a certain
 4  amount a month -- per month for a particular store
 5  that they didn't pay you that particular amount?
 6      A    Only the last bill.
 7      Q    Have you ever talked to Mike Bell
 8  directly?
 9      A    No.
10      Q    To your knowledge, did anybody from
11  Jim's Maintenance ever have an attorney review the
12  contract that was entered into?
13      A    I do not know.
14      Q    Okay.  I'm going to switch back to
15  what was marked earlier today as Plaintiff's Exhibit
16  1.  I'm going to get you to look to -- I'm referring
17  to -- it's Bates Stamp No. 03992 J, and I'm
18  specifically looking at Paragraph 4.
19            You testified earlier that you had
20  specifically and thoroughly reviewed this contract.
21  I'm going to ask you some questions about this
22  particular provision, so if you need to take a chance
23  -- a second to reread it, that's fine.
24      A    Okay.
25      Q    What was your understanding of that
```

0258
```
 1  provision?
 2      A    Of -- of all of Paragraph 4?
 3      Q    Yes, sir.
 4      A    That they did not want -- they wanted
 5  you to --
 6            MR. DEATS:  I'm going to object
 7  as to form.
 8            THE WITNESS:  I -- I don't know.
 9  They wanted you to follow all the
10  laws, that we were responsible to follow all laws,
11  and they didn't work for Target.
12      Q    (By Ms. Miller)  Who is the "they"?
13      A    That the cleaners did not work for
14  Target.
15            Subject to Target's right of
16  inspection -- not of Target, "All personnel of
17  contractor used to perform services under this
18  agreement shall be employees of contractor and not of
19  Target."
20      Q    When -- I know you, yourself, never
21  hired a cleaner personally, but when Jim's
22  Maintenance hired cleaners, did they hire them as
23  Target employees?
24      A    No.
25      Q    Do you know where anybody with Jim's
```

0259
```
 1  Maintenance would have gotten the idea that the
 2  cleaners were hired as Target employees?
 3      A    Other than being directed by Target
 4  and working for Target -- I mean, working under
 5  Target's direction, no.
 6            I mean, we never said, "You work for
```
Page 107

---

Smith, Trent - Vol. I
```
 7  Target."
 8      Q    You never told a cleaner that?
 9      A    We never -- no.
10      Q    What was the primary business of Jim's
11  Maintenance?
12      A    Cleaning, housekeeping.
13      Q    For?
14      A    For Retailers, Target stores.
15      Q    And other retailers, other than
16  Target, correct --
17      A    Some.
18      Q    -- that we've discussed?
19      A    Yes.
20      Q    You testified that, after 2001, the
21  prices went down, and I -- I assumed you meant that
22  Target started paying less for particular stores?
23      A    Yes.
24      Q    How was that communicated to -- to
25  Jim's Maintenance?
```

0260
```
 1      A    They sent a letter that said, "This
 2  contract is null and void," and sent a new contract
 3  out.
 4      Q    You're talking about in 2005?
 5      A    I don't think so.  It was right after
 6  they -- I think it was 2003.
 7            There's another contract after this
 8  one, with these same stores, where they -- they cut
 9  all the -- almost all the stores.  Prices were cut.
10      Q    But it was another contract that Jim's
11  Maintenance had to sign to enter --
12      A    The same thing.
13      Q    Nobody from --
14      A    Oh, there's lots of contracts like
15  this.  Whenever they would add -- say, another store
16  opened in Kansas City, they would eliminate this one,
17  send out a new one, just like this, with this one --
18  with another -- all of this printed up, with this on
19  the end.  (Indicating)
20            Does that make sense?
21      Q    So you would get another one every
22  time, because you might add one store.  You might add
23  one store three times in a year, in March, in July,
24  in August, whenever they're doing their openings.  So
25  this contract would be void, they give you another
```

0261
```
 1  one.
 2      Q    And were these stores that were
 3  opening in the districts that you were already
 4  servicing?
 5      A    Yes, ma'am.
 6      Q    And did you ever have these stores cut from
 7  the stores you were cleaning?
 8      A    No.  Only stores that closed.
 9            After this, we were awarded New Mexico
10  and Arkansas and other parts of Missouri.
11            (Defendant's Exhibit No. 1 was
12  marked for identification)
13      Q    (By Ms. Miller)  I'm going to show you
14  what's been marked as Defendant's Exhibit 1.
15            MS. MILLER:  Oh, I didn't get
16  enough.
17            MR. PIZZO:  Thank you, Counselor.
```
Page 108

Smith, Trent - Vol. I

18 at it together.
19         MS. MILLER:  You'll have to look
20 at it together.
21         THE WITNESS:  Those two were
22 closed.
23    Q    (By Ms. Miller)  Have you ever seen
24 what's been marked as Defendant's Exhibit 1 before
25 today?
0262
1    A    I don't remember.  No.  I don't think
2 so.
3    Q    Okay.  You were referring, a little
4 while ago, about when things changed, you got
5 notices.
6         Is this the type of document that
7 you're talking about?
8    A    No.  That's not what I was referring
9 to.
10   Q    While we're on this one, just so that
11 I understand, "these two stores," you're talking
12 about T-45 and T-174?
13   A    Those were both closed.  They were
14 replaced with new stores.  So they would send this
15 out to cut those, you know -- whenever they added
16 stores, I don't remember seeing anything like this.
17        I think we got a new -- a full -- it
18 seemed like we got a full document, everything added
19 up, because they would send us a new billing
20 arrangement.
21        But this is -- this is whenever they
22 closed one.  I don't know if they have one for
23 whenever they open them.
24   Q    Okay.  And who, from Target, was
25 sending the new contracts when the changes would take
0263
1 place?
2         A    I guess, a long time ago, it was Mike
3 Bell, which he wasn't really doing it.  He was just
4 -- well, it has his name, so I must -- he must have
5 been in charge of it.
6         But Debra Darsow was the person -- I
7 think that's her name.  It's on another contract.
8    Q    And do you know what Debra Darsow's
9 job with Target was?
10   A    No.  Building Services.
11   Q    Did you ever talk to Debra Darsow
12 yourself?
13   A    Insignificantly, questions.  Maybe
14 once in five years.
15   Q    So, yes, you've talked to her once
16 personally?
17   A    Yes, I talked to her.
18   Q    When the change happened that you have
19 described, about how Target changed the way that it
20 communicated with the cleaning contractors -- I
21 believe you said they took it from the field to
22 corporate?
23   A    Yes.
24   Q    Is that an accurate description of
25 what happened?
0264
1    A    Yes.
2    Q    You said that STLs, the store team
3 leaders, were frustrated with that.  How -- how did

Page 109

---

Smith, Trent - Vol. I

3 you know that?
4    A    They were -- after the change had
5 occurred and we reported to Minneapolis, was assigned
6 this contract to us, instead of the field, like a
7 Harlin Murray, the stores just didn't know who to
8 communicate with.
9         There was more -- Building Services in
10 the field was -- they all kind of lifted their hands
11 and said, "We're -- okay.  Well, obviously, this
12 isn't up to us any more.  We didn't negotiate these
13 contracts.  We didn't hire these contractors.  I
14 didn't pick them for Kansas City.  I picked somebody
15 else."
16        They were taken -- it was their turf
17 and it was taken away from them.  So there was -- the
18 stores didn't know who to turn to for help.
19        They had always called their regional
20 Building Services person, and now he was not the
21 person to go to.
22   Q    Okay.  Did you talk to an STL, anybody
23 in person, to come up with this opinion about --
24   A    Yes.
25   Q    -- their thoughts?
0265
1    A    Who?
2    A    Mark Chada in Norman.
3    Q    Any other STLs?
4    A    Nothing specific.
5    Q    Do you -- do you recall if you talked
6 to any STL other than Mark Chada?
7    A    Yes.  Yes.  I don't remember their
8 names.
9    Q    And were these STLs in Oklahoma?
10   A    And DTLs.  You can put that.  The
11 district team leads are over the STLs.  They probably
12 have eight stores or something.
13        They would call us in, we would have
14 meetings, and they would say, "What's going on?
15 Where do we get relief here?  And who are we supposed
16 to contact now?"
17        It was not a -- it was not Jim's
18 Maintenance or Oklahoma specific.  It was Target.  It
19 was just a big change that they went through on who
20 -- who reported to who.
21   Q    And who are the DTLs that you spoke to
22 about this?
23   A    It was Chris in Kansas City, Ted in
24 Austin, Ken in Oklahoma City.
25        I can't remember the names of the
0266
1 other team leaders.
2    Q    You testified earlier that, when
3 Target reduced the monthly rate for the stores, you
4 took a pay cut.
5         Did Target ever pay you directly?
6    A    No.
7    Q    What did you mean by that?
8    A    Jim's Maintenance cut my pay.
9    Q    Were you paid based on a percentage of
10 the Target contracts?
11   A    No.
12   Q    And you testified that, early on, you
13 didn't have the means to go out and get other

Page 110

---

Smith, Trent - Vol. I

14 business.
15        How about four years later?  What --
16 why weren't you making efforts to go out and get
17 other business?
18   A    Well, it didn't all happen at one time
19 in 2001.  This was just -- I don't know how many
20 stores this is.  One, two, three, four, five, six,
21 seven, eight, nine, 10, 11 -- that's just 33 stores.
22        After this, we added another 50
23 stores.  At one time, we were over 80.
24        So by just adding districts -- adding,
25 you know, six stores in New Mexico, you -- you -- we
0267
1 didn't have the resources.
2         I mean, we didn't have the people.  We
3 didn't have the money.  We didn't have the credit to
4 go out and absorb that many more loans to pay for
5 that expansion.
6         It costs a lot of money to -- to take
7 over markets.
8    Q    Okay.  In 2005, when the -- you said
9 the process changed again?
10   A    Yes.
11   Q    Did you receive notification that you
12 were losing certain contracts with -- with -- you
13 were losing certain Target stores and certain Mervyn
14 stores?
15   A    No, not until after the contracts were
16 awarded.
17   Q    Is that what you meant?  Because they
18 were awarded in September '05.
19   A    Okay.  In September of '05 you -- you
20 learned --
21   A    That's when we were notified -- well,
22 before then.  You'd notified a month or so before
23 that, so that you can get ready for that date.
24   Q    And, in September of '05, did you lose
25 some of the stores that you were servicing?
0268
1    A    Yes.
2    Q    Do you have an idea of how many?
3    A    No.  Probably 10.  We lost as many as
4 we picked up, pretty much.
5    Q    Are you -- are you certain about that?
6    A    It's pretty close.
7    Q    Okay.  So you're --
8    A    I don't think it's way off.
9    Q    So you're saying you stayed -- after
10 September of '05, you stayed in the 80-plus range of
11 stores?
12   A    Or high seventies, something like
13 that.
14   Q    Well, how about Mervyn stores?
15   A    Mervyn's was sold, so we started
16 subbing -- they hired a company in Houston, and we
17 started going through a company in Houston to clean
18 those stores.
19   Q    And, at some point, did you lose that
20 Mervyn's work?
21   A    Yes.
22   Q    When was that?
23   A    I don't remember.  I don't remember if
24 those stores closed or if they -- I don't know when

Page 111

---

Smith, Trent - Vol. I

25 they're open.  I don't know why --
0269
1    Q    And when you lost those Mervyn stores,
2 did you think to go out and try to get some other
3 work to fill what you had lost there?
4    A    No.
5    Q    Why not?
6    A    I don't know.
7    Q    You don't have any idea?
8    A    No.  We didn't have the money to go do
9 it.  I know that.  We were -- we -- these were very
10 skinny contracts, and there's not much profit there.
11        In 2005, the bid process -- who told
12 you that it was going to change from what you called
13 the assignment of stores to a bid process?
14   A    Ted Fischer.
15   Q    And did Ted communicate directly with
16 you?
17   A    Through Bryan -- to Bryan.
18   Q    To Bryan?
19   A    I guess the e-mails would go to Bryan.
20 We would have conference calls, and Bryan and myself
21 would be on them.
22   Q    And who was on the line from Target?
23   A    Ted Fischer.  He had taken Chris
24 Carlson's place.
0270
1    Q    Have you ever had a conversation with
2 Ted Fischer just by yourself?
3    A    Yes.
4    Q    Any conversations with Michelle, who
5 you referred to earlier, the Target employee?
6    A    She came to a meeting in Las Vegas.
7    Q    And does Moore sound correct for her
8 last name?
9    A    Yes.  Its Michelle Moore.
10        There was a show in Las Vegas, and she
11 came to that.
12   Q    Was it a show like a -- like the
13 Johnson's rep kind of show?
14   A    No.  No.  This was -- it's an industry
15 show, industry cleaning, housekeeping show, and,
16 then, Target -- we would have meetings -- like we had
17 a meeting in the Las Vegas Convention Center for a
18 couple of hours, to go over things, and he invited
19 Michelle.
20        She didn't come to that meeting, but
21 she was there as we walked around.  We would all walk
22 together, through the show, with Ted Fischer, all of
23 us following him, and looking at the new products,
24 new cleaning techniques.
25   Q    Okay.  And the "he" that you were
0271
1 talking about was Ted Fischer?
2    A    Ted Fischer.
3    Q    And this was Jim's Maintenance and
4 other cleaning contractors?
5    A    All of them, the other 24.
6    Q    Did anyone at Target tell you how to
7 come up with the bids that you put on the stores in
8 2005?
9    A    No, other than you must bid by
10 district.  That's about the -- and then there was a

Page 112

Smith, Trent – Vol. I

```
10  packet.  There were several pages in there of things
11  you needed to fill out, but nobody communicated to us
12  verbally or anything like that.
13       Q     You testified earlier about some
14  feedback that you got once you started the bid
15  process.
16             Was that same feedback provided to the
17  other contractors --
18       A     I --
19       Q     -- cleaning contractors?
20       A     Yes.  I would believe so.
21       Q     Did you see any of that other
22  feedback?
23       A     No.
24       Q     They only gave you feedback directed
25  at your particular bids?
```

0072
```
 1       A     What you bid on, yes.
 2       Q     Okay.  If you were not awarded a bid,
 3  was it communicated to you which ones did receive it?
 4       A     No.
 5       Q     Jimmy Funderburgh's job, what was
 6  that?
 7       A     He oversaw the southern region.
 8       Q     Okay.  And was Texas in the southern
 9  region?
10       A     Yes.
11       Q     And did -- I may have this wrong.  Did
12  Bryan Funderburgh have the northern?
13       A     Yes.
14       Q     So anything specific to Texas, Jimmy
15  Funderburgh was in charge of?
16       A     Yes.
17       Q     You testified earlier that there was a
18  financial hardship for the cleaning contractors when
19  Target changed the time frame in which it paid on the
20  contracts.
21             Were you ever given access to other
22  contractors' financial records?
23       A     No.
24       Q     You were not in charge of payroll;
25  correct?
```

0073
```
 1       A     No.
 2       Q     I'm not correct?
 3       A     Well, I mean, I -- I didn't pay,  I
 4  didn't like load the cards.  I didn't do all of that.
 5       Q     That was --
 6       A     I -- I mean, I -- I set up the pay
 7  schedules.  All those forms, I created those, put
 8  those together, distributed them to the field, so --
 9       Q     And when they came back from the
10  field, who did they go to?
11       A     They didn't come back from the field.
12  We got --
13       Q     The payroll time sheets?
14       A     Payroll time sheets came in, she would
15  pay it.  She would get me the information on what we
16  did, you know, and then I would take it all and let
17  the supervisors know, "This is where you're over
18  budget.  This is where we need to make changes."
19       Q     Okay.  But when the payroll time
20  sheets came in --
```

Page 113

---

Smith, Trent – Vol. I

```
21       A     Yes.
22       Q     -- to Jim's corporate office who did
23  they go to?
24       A     Vickie.
25       Q     Vickie.  Is Vickie's last name Stover?
```

0074
```
 1       A     I believe so.
 2             She would pay those -- pay that off
 3  those time sheets.
 4       Q     And is Vickie the best person to
 5  testify about payroll practices?
 6       A     She paid the people.  I mean, she
 7  punched the cards in.  She typed it all up.
 8             She wasn't in charge of any of that,
 9  but she -- that's what she did.
10       Q     Did anyone direct her in how much to
11  pay a particular person?
12       A     Yes.
13       Q     Who?
14       A     I guess that would be Bryan -- Bryan
15  and Jimmy ultimately.
16             We would hire somebody and the
17  regional -- they would go over -- Bryan would go over
18  with the regional.  "These are what your budgets are
19  for all your districts."
20             The regional would go over with the
21  districts, "This is what your budget is for each
22  store," and then they hired them and said, "Okay.  I"
23  -- I mean -- so, really, the district supervisor
24  might hire the person and say, "This is going to be
25  my lead guy.  My budget is $2,300.  I'm going to pay
```

0075
```
 1  him $700.  I'm going to pay this guy 600 and this guy
 2  500."
 3             So who's responsible for that -- I
 4  mean, it goes all the way up to all of us, but the --
 5  the district supervisor is who we would call to make
 6  changes, "Hey, this guy is making too much.  Maybe
 7  you can transfer him to another store," or something,
 8             who hired, who made those decisions --
 9  the regional would have been -- is responsible for
10  how much money we were spending.  So he would -- does
11  that answer your question?
12       Q     So the -- but the district
13  supervisor --
14       A     Enforced --
15       Q     -- determined how much a particular
16  cleaner was going to make?
17       A     He had a budget to stay within, and he
18  could make those decisions within that budget.  He
19  could appeal to his, you know, regional manager and
20  say, "Hey, this guy is really good.  I know my budget
21  is this, but this is a difficult store and a
22  difficult STL.  Can we pay him a little bit more on
23  this budget, and then I cut back over here?  I really
24  don't need that much at this store.  It's really
25  easy."
```

0076
```
 1             So who made those decisions?  The
 2  district supervisor asked the regional supervisor if
 3  that would be okay.
 4       Q     And the regional supervisor had the
 5  authority to okay that?
```

Page 114

---

Smith, Trent – Vol. I

```
 6       A     As long as it was within budget, yes.
 7       Q     Did you ever review the report that
 8  Price-Waterhouse completed?
 9       A     No.
10       Q     When Price-Waterhouse were there, at
11  Jim's, did you talk to the individuals?
12       A     Yes.
13       Q     And what did you talk --
14       A     Casually, just casually.
15       Q     Did they interview you in any
16  capacity?
17       A     I don't think so.
18       Q     Did you help prepare for the audit?
19       A     No.
20       Q     Did you ever instruct anybody to
21  remove documentation from files?
22       A     Nothing -- no, nothing like that
23  happened.
24       Q     You deny doing that?
25       A     I deny doing that, yes, and deny
```

0277
```
 1  knowing of anything like that was done.
 2       Q     You didn't review the report that
 3  Price-Waterhouse completed, but did anybody ever
 4  communicate to you what their findings were?
 5       A     No.
 6       Q     Did you have a guess or a speculation
 7  as to what they found?
 8       A     No.  They didn't -- I wasn't
 9  communicated any of that.
10       Q     I just didn't know.  Sometimes you
11  were able to speculate on what Target might think or
12  do.  I just didn't know if you had --
13       A     No.
14       Q     -- any speculation on that.
15             MR. DEATS:  Objection, form.
16       Q     (By Ms. Miller)  Plaintiff's Exhibit
17  3, which is the contractor handbook, have you -- did
18  you ever review this page by page?
19       A     No.
20       Q     I'm going to show you what was marked
21  earlier today as Plaintiff's Exhibit 4.  Had you
22  reviewed that prior to today?
23       A     I have seen this.
24       Q     My question was:  Had you reviewed
25  that prior to today?
```

0278
```
 1       A     Reviewed?  No, I had not reviewed
 2  this.  Even when it came the first time, I did not
 3  review it.
 4             I looked at these numbers -- what did
 5  we call them?  The contract pricing sheets.  I
 6  reviewed the contract pricing sheets and put those in
 7  the forms and divided those up.
 8       Q     Let me show you what was marked as
 9  Plaintiff's Exhibit 5 earlier today.  Had you
10  reviewed that --
11       A     Yes, ma'am.
12       Q     -- prior to today?
13       A     Yes, ma'am.  That would be something I
14  would have reviewed.
15       Q     I'm going to show you what was
16  previously marked as Plaintiff's Exhibit 7 today.
```

Page 115

---

Smith, Trent – Vol. I

```
17  Did -- tell me again what you called this.
18       A     Brand guide brochure.
19       Q     Okay.  And am I correct that the brand
20  guide speaks to contractors other than housekeeping
21  or cleaning contractors?
22       A     It speaks to several, like the
23  landscaping.  It's to help the STL know -- the con --
24  they don't expect the store manager to review this
25  book for all of these contractors.
```

0279
```
 1             So they kind of broke it down on the
 2  highlights of what -- for the STL to understand,
 3  "Okay.  Mr. STL, this is what Building Services is
 4  responsible for.  This is what your contractor is
 5  responsible for.  This is what your team members are
 6  responsible for," in a highlighted fashion, to just
 7  help break it down on landscaping.
 8             So that would help them score -- help
 9  them score red light, green light, yellow for these
10  different areas.
11       Q     Okay.  And who from Target explained
12  that to you?
13       A     This would have been -- Chris Carlson
14  come up with this.
15       Q     Am I correct, Jim's Maintenance did
16  not do landscaping?
17       A     No, ma'am.  No landscaping, no parking
18  lot.
19       Q     Signage?  Did you all do signage?
20       A     No signage.
21       Q     Okay.  So this brand booklet covered
22  things other than what Jim's Maintenance was
23  responsible for; correct?
24       A     Yes.  I don't know what the percentage
25  of that booklet is, but a large percentage of it is
```

0280
```
 1  housekeeping, but there are other things.
 2  Refrigeration is in there.
 3       Q     Let me show you what was previously
 4  marked as Plaintiff's Exhibit 8, the monthly
 5  housekeeping quality checklist.
 6             Did you, yourself, ever review -- were
 7  you ever in a Target store where a Target manager was
 8  completing this form?
 9       A     Yes.
10       Q     Okay.  And what store was that?
11       A     T-46.
12       Q     The one in Norman?
13       A     Yes.
14       Q     On how many occasions were you in the
15  Target store when the Target manager --
16       A     To do a walk-through?
17       Q     Yes.
18       A     Probably 20.
19       Q     Who -- you said -- you testified that
20  you sent these to Target.  Who at Target did you send
21  them to?
22       A     Building Services.
23       Q     Who at Building Services?
24       A     Becky.
25       Q     Is Becky's last name Nielsen?
```

0281
```
 1       A     Yes.
```

Page 116

Smith, Trent – Vol. I

2    Q    Do you know what Becky's job was?
3    A    She worked for Ted Fischer.  Now, this
4 -- this was -- this was not forever.  She didn't do
5 this for a long time.
6        We started off doing this and then
7 just keeping copies.  This -- this was all being
8 developed.  They were just kind of making it up as
9 they went.
10       They came out with this, and we
11 started leaving them inside of the book, the big
12 book, like this, that was in the Target stores.
13 (Indicating)
14       And then they decided they wanted to
15 score them up in Minneapolis.  So then they asked us
16 to send them to them.  We did that for maybe a year.
17       Then they asked us, "Okay.  Quit
18 sending these to us.  Just e-mail your scores," and
19 they would send us a form.  The form that had all the
20 stores, like an Excel, and you would just mark them.
21 And I would e-mail it to them.
22       Then they would compile them all and
23 send them out to everybody.  Then they changed that,
24 and they had this store manager start downloading it
25 into a system.
0282
1       Maybe that's what they were trying to
2 ultimately get to and stumbled along until they had
3 that ready.
4    Q    Okay.  And did you, yourself, package
5 them up to send them to Target, or did somebody else
6 in Jim's Maintenance office do that?
7    A    I don't remember.
8    Q    Let me show you what was previously
9 marked as Plaintiff's Exhibit 9.  Did you create that
10 exhibit?
11    A    No.  This is last.  This is 2004.
12    Q    Okay.  Did you ever create anything
13 that looks like Plaintiff's Exhibit 9?
14    A    Yeah.  I mean, I -- I would -- I would
15 take this and create -- I didn't create this one.
16 This is a Target report.
17       I -- I would change it around to our
18 districts and give it to our people, so, you know,
19 our guy would have his stores.
20    Q    Okay.  So you would --
21    A    Create --
22    Q    -- reformat --
23    A    Reformat, yes.  I didn't create --
24    Q    -- the report?
25    A    -- that report.
0283
2    Q    Did this report come to you at Jim's
3 or was it sent --
4    A    This was --
5    Q    -- to somebody else?
6    A    This was sent to me.
7    Q    And how did you receive it?
8    A    By e-mail.
9    Q    What was your e-mail address at --
10    A    Trent@JimsMaintenance.com.
11    Q    No apostrophe after the "M," before
12 the "S"?
13    A    No, no apostrophe.

---

Smith, Trent – Vol. I

13    Q    Have you ever seen a brand score card
14 posted in a Target store?
15    A    Not this one.  It would be the scores
16 -- this -- this report here.  I don't know if you
17 guys have it.  It's called a brand maintenance score
18 card, and it was by district.
19       So this -- this report would be posted
20 in between the restrooms, above the water fountain,
21 in the back of the store.
22    Q    I'm going to show you what was
23 previously marked as Plaintiff's Exhibit 11.  This is
24 a document you created?
25    A    I created that.
0284
1    Q    Okay.  With the bids that you came up
2 with in 2005 on the particular stores?
3    A    Yes.
4    Q    Okay.  And am I correct that this
5 plus/minus column shows whether or not the bid was
6 over or under what you had received for that store in
7 2005?
8    A    Yes, ma'am.
9    Q    Okay.  And you controlled whether or
10 not you were bidding something higher or lower;
11 correct?
12    A    Yes.  I don't know what this form was
13 on -- do you know on what round?
14    Q    On this -- there were two bid --
15 bidding processes and, then, there were three rounds
16 in each one.
17       So this document doesn't -- I didn't
18 have it marked.  I don't know what this means.  This
19 could have been the first one, it could have been the
20 last one.  I don't know.
21       This was just in-house, for our
22 managers to be able to figure out, you know, what was
23 -- because our bidding strategies -- this was for
24 bidding strategies, is what this was.
25    Q    Let me show you what was previously
0285
1 marked as Plaintiff's Exhibit 12.  Had you seen that
2 document before today?
3    A    Not that document.  I have seen
4 documents similar to this, but I have not seen that
5 document.
6    Q    And did Jim's Maintenance have a
7 practice of printing out the CashLynk reports that
8 reflected where somebody made withdrawals?
9    A    No, ma'am.  This was only kind of on
10 demand, if somebody called and had a question.  We --
11 we made all of this available.  If anybody called,
12 "Hey, I'm missing," blah, blah, blah, then we would
13 look it up and find out, try to track down what
14 happened.
15    Q    And did you, yourself, look the
16 information up?
17    A    No.
18    Q    Who would do that?
19    A    Vickie.
20    Q    Did you ever look up anything on
21 CashLynk?
22    A    Just like over her shoulder.  I never
23 sat down at her computer and did it myself.

---

Smith, Trent – Vol. I

24    Q    I might go in there and say, "Okay.
25 We've got to get to the bottom of this," and start
0286
1 looking up these and trying to figure out what
2 happened.
3       So I did not do it by myself.
4    Q    Did you provide any documents to Craig
5 Deats at the meeting that you had with him, that we
6 discussed earlier?
7    A    Not that I know of.  I did not.  I --
8 I don't think we did.
9    Q    Let me show you what was previously
10 marked as Plaintiff's Exhibit 15.  Had you seen that
11 document prior to today?
12    A    Not specifically.
13       MR. DEATS:  I'm sorry.  What
14 document were you looking at?
15       MS. MILLER:  Sorry.  Plaintiff's
16 Exhibit 15.
17    Q    (By Ms. Miller)  Who would have been
18 responsible for that type document at Jim's
19 Maintenance?
20    A    In '04, it might have been -- probably
21 Vickie.  I don't know.
22       I don't know, actually, who was -- who
23 did it at that time, who -- who would print that off
24 or why they needed it.
25    Q    Let me show you what was previously
0287
1 marked as Plaintiff's Exhibit 13.  You testified that
2 you, yourself, created that document?
3    A    Yes.
4    Q    Did anybody from Target require you to
5 use that type form?
6    A    This has nothing to do with Target.
7    Q    Did anyone from Target tell you to use
8 shift pay to pay your employees?
9    A    No.
10    Q    My understanding of your testimony
11 about shift pay was that you paid your employees by
12 the day; is that correct?
13    A    Yes.
14    Q    You -- if you paid them by the day,
15 why did you -- did you ever think about how many
16 hours they were actually working during a day?
17    A    No.  We trained them to work eight
18 hours a day.
19    Q    Who is the "we" that trained them?
20    A    Jim's Maintenance management.
21    Q    Who, specifically, at Jim's
22 Maintenance management?
23    A    Trent Smith, Bryan Funderburgh, and
24 regional managers.
25    Q    And how many cleaners did you,
0288
1 yourself, personally train?
2    A    Not very many.
3       (Defendant's Exhibit No. 2 was
4       marked for identification.)
5    Q    (By Ms. Miller)  Let me show you
6 what's been marked as Defendant's Exhibit No. 2.
7       Have you seen that document before
8 today?

---

Smith, Trent – Vol. I

9    A    No, ma'am.
10    Q    And it is entitled "Jim's Maintenance
11 Shift Pay Policy."  Take your time to read over it,
12 but I'm trying to figure out if -- if that shift pay
13 policy document reflects -- accurately reflects what
14 you think of when you say "shift pay."
15    A    Pretty much, yes.
16       MR. DEATS:  Shannon, can we go
17 off the record for a second?
18       MS. MILLER:  Sure.
19       (Short Break)
20    Q    (By Ms. Miller)  Mr. Smith, you
21 testified that this -- this, Defendant's Exhibit 2 --
22 you had not seen this document before, but this
23 accurately reflected your understanding of shift pay
24 when you say that word?
25    A    Yes.
0289
2    Q    Okay.
3    A    10:30 to 6:00, yeah.  That looks about
4 right.
5    Q    And, up at the top, it has got "Jim's
6 Commercial Cleaning Services, Ltd., Established
7 2003."
8       Did -- did this change their
9 corporate structure at some point, change the name of
10 the company?
11    A    I don't know about that.  I --
12 whenever I came on, I -- I had three create this --
13 we paid to have this logo created.
14       And they had been using Jim's
15 Maintenance, Jim's Commercial Cleaning, this and
16 that, and I was just trying to establish a logo,
17 and --
18       So the things that are underneath it,
19 I don't know about.  I'm not sure about.
20    Q    Okay.  And as far as the shift pay
21 policy was concerned, is this the entirety of that
22 policy?
23    A    You know, I don't know.  I think that
24 that -- I'm not sure.  It looks like it sums it up,
25 but they wanted to make sure that everybody
0290  understood, to sign that when they hired them.
2    Q    Okay.  You described a process earlier
3 of a target manager having an issue with something
4 not being cleaned appropriately in the store and they
5 would send you -- or call you -- call a 1-800 number
6 and you would get --
7    A    An e-mail.
8    Q    -- word of that?
9    A    A work order.
10    Q    A work order.
11    A    It would generate a work order.
12    Q    Was that referred to as BSOC?
13    A    Yes.
14    Q    Okay.
15    A    Yeah, but that -- you know, that
16 wasn't the whole five years we were doing this.  This
17 was towards the end, maybe 2003, when BSOC started.
18 I don't know.
19    Q    Yes, BSOC, B-S-O-C.
19    Q    Do you know what that acronym stands

Smith, Trent - Vol. I

```
20   for?
21        A    No.  I would guess it starts with
22   Building Services.
23             MR. BEARDALL:  Could we ask for a
24   spelling of that?
25             MS. MILLER:  Yes.
0291
 1        Q    (By Ms. Miller)  Can you spell the
 2   letters that make --
 3        A    B-S-O-C, I believe.
 4             MR. PIZZO:  I think he already
 5   did that.
 6             THE WITNESS:  I did it too
 7   fast --
 8             MR. PIZZO:  You have to wake up
 9   over there.
10             THE WITNESS:  I did it too fast
11   for you guys.
12        Q    (By Ms. Miller)  Would Jim's cleaners
13   ever come into a store where the store was open to the
14   public?
15        A    A cleaner?
16        Q    Correct.
17        A    No.  Only if they got there before
18   10:00, you know, a few minutes early, but, no, they
19   did not go to --
20        Q    And do you know how they entered the
21   store if they got there before the store closed to
22   the public?
23        A    Before the store -- they would go
24   through the front doors, unless it was a Super
25   Target.  Super Target has a separate entrance for --
0292
 1   for employees and for our people to go through.
 2        Q    And, yes, you're -- you're pointing at
 3   a page on --
 4        A    The brand maintenance guide -- this
 5   was created by BSOC, B-S-O-C, Building Services
 6   Operations Center, and they put this 800 number and
 7   e-mail address for people to contact them.
 8        Q    Okay.  I just want to make sure the
 9   record is clear.  You're -- you're pointing to a page
10   of Plaintiff's Exhibit 7; correct?
11        A    Yes.
12        Q    I'm going to show you what was
13   previously marked as Plaintiff's Exhibit 19, "Target
14   Morning Checklist."
15             Who at Target required Jim's to use
16   this?
17        A    We were given this, as a tool, by
18   Chris Carlson.
19        Q    Did Chris Carlson tell you that you were
20   required to use that?
21        A    No.  He said, "This is a tool that you
22   could use on the" -- this was when English speaking
23   was a big problem, when some stores were saying, "Oh,
24   you've got to have an English-speaking person in
25   here," and Target was trying to come up with -- well,
0293
 1   Building Services was trying to come up with
 2   something that would work for the stores and the
 3   contractors.
 4             Then, they went to all of them
                    Page 121
```

Smith, Trent - Vol. I

```
 5   carrying cell phones, so that you could call in a
 6   phone number to an English-speaking person and then
 7   the store manager could talk on our phone to an
 8   English-speaking person, who could translate it to
 9   our cleaning crew, to try to address the
10   communication issue.
11        Q    And just so I'm clear, no one from
12   Target told you that you were required to use this
13   morning checklist?
14        A    That's correct.
15             You know, I think Becky did ask for
16   that whenever we were having bad -- when the stores
17   were red, she would ask, "Are they doing the morning
18   checklist?"
19             That was pretty much standard protocol
20   for the first round of -- if -- if a store didn't
21   look good, if somebody had complaints, she would ask
22   immediately, "Are they doing the morning checklist,"
23   and you say, "Well, no.  Let me make sure that
24   they're back on that."
25             So I would call that required.
0294
 1        Q    Did anybody say to you, "You have to
 2   use this form"?
 3        A    Not in those words.
 4        Q    You testified that you -- that you
 5   anticipated that the cleaners would work eight hours
 6   each day?
 7        A    Yes.
 8        Q    If that was the case, why didn't you
 9   calculate their shift pay by the hour instead of the
10   day?
11        A    We didn't really need it by the hour.
12   We just paid by the day.  It was easier.
13        Q    Let me show you what was previously
14   marked as Plaintiff's Exhibit 20.  Did anyone from --
15   and just so we're clear, this was a Target document;
16   correct?
17        A    Yes, ma'am.
18        Q    Did anyone from Target ever explain to
19   you that they kept these logs for security and asset
20   protection purposes?
21        A    No, not for asset protection.  I
22   thought -- I thought -- it was explained to me -- I
23   could have been wrong, but I thought it was for
24   emergencies, that they wanted to know who was in the
25   store, at what time, in case the police or in case
0295
 1   the fire department came in.
 2        Q    I don't know if that falls under the
 3   same --
 4        A    The notebook, where you said these
 5   were -- these logs were maintained, were there places
 6   for other contractors to sign in?
 7        A    No.  That was a separate one.  There
 8   -- there were two notebooks --
 9        Q    Okay.
10        A    -- two very similar-looking notebooks,
11   but the other one was for vendors that -- like Frito
12   Lay.  The Frito Lay guy, he would come in, he would
13   sign his name, he would put his time, and then, you
14   know, he would go in the store and stock during the
15   day and then he would leave, or the milk guy would
                    Page 122
```

Smith, Trent - Vol. I

```
16   come in or the Coca-Cola guy, but that was in a
17   different book.
18             This was -- because our book was thick
19   and had a bunch of junk in it.  So this was the
20   cleaning crew book.  The other book was a different
21   book.
22        Q    Okay.  When you say it was your book,
23   you mean it was a Jim's Maintenance book?
24        A    Yes.
25        Q    And did --
0296
 1        A    Well, you know, some were -- some were
 2   -- when we got there, they had some books, but we
 3   were required to -- I mean, I made books that said
 4   "Jim's Maintenance" on the front.  It said "Jim
 5   Maintenance," and we tried to get them in all the
 6   stores.
 7             So I guess you could say they were our
 8   books.  Most of them -- the majority of them were
 9   ours.
10        Q    And, again, you put those books
11   together?
12        A    We were required to do that.  We were
13   required -- Target had to have their cleaning crew
14   sign-in log in the front of that.
15             Plus, they would take pictures,
16   whenever we brought a new person in, they would take
17   a picture, a photo, they would stick it inside the
18   front.  They had -- you know, it was their stuff
19   inside of the book.
20        Q    What do you mean by "their stuff"?
21        A    Target's stuff.  Their asset
22   protection guy would put -- he would take a picture
23   of the crew and put it inside the book.
24        Q    Okay.  And did you maintain the
25   payroll time sheets in that book?
0297
 1        A    Yes, ma'am.
 2        Q    Okay.  So that was a Jim's document
 3   maintained --
 4        A    That's our book.  It was in the back
 5   of it, yes.
 6        Q    Okay.
 7        A    The number one thing in the front was
 8   the Target -- you know, who was in there and who not
 9   -- who was not.  That was in the front.
10        Q    Did the cleaners have ID --
11        A    Yes.
12        Q    -- badges?
13        A    All cleaners had a Jim's Maintenance
14   ID badge.
15        Q    Did they have any type of Jim's
16   Maintenance uniform that they used?
17        A    Most of them had T-shirts.
18        A    And they said "Jim's" on them, the
19   T-shirts?
20        A    Yes.
21        Q    What color were they?
22        A    Different colors.  Some were white,
23   some were blue.
24             The main thing they had to have to
25   identify themselves was a badge.
0298
                    Page 123
```

Smith, Trent - Vol. I

```
 1        Q    Did you ever personally fire a
 2   cleaner?
 3        A    No.
 4        Q    When you testified earlier about
 5   having to fire people, you were talking about
 6   somebody else doing the firing; correct?
 7        A    Directing other people to fire --
 8        Q    Okay.
 9        A    -- yes, ma'am.
10             (Defendant's Exhibit No. 3 was
11             marked for identification.)
12        Q    (By Ms. Miller)  I'm going to show you
13   what's been marked as Defendant's Exhibit 3.  It's a
14   two-page document.
15             MR. WILEY:  The second and third
16   page are exactly the same, so --
17             MS. MILLER:  Oh, I'm sorry.
18             No, no, no.  The official Exhibit
19   1 has one -- okay.
20        Q    (By Ms. Miller)  Have you seen this
21   document before?
22        A    Yes.
23        Q    Did you create this document?
24        A    Pretty much.  It was manipulated a
25   little bit, but, yes, I created that.
0299
 1        Q    Okay.  Tell me what you mean by "it
 2   was manipulated a little bit."
 3        A    I -- I mean, they got on here and put
 4   "Target 1944" and changed the font.  I didn't have it
 5   like that.
 6             But I -- this is -- this is to slide
 7   into the front of one of these books.  That's a front
 8   page that would slide in here, just like that.
 9   (Indicating)
10        Q    Are you talking about the Jim's
11   notebook --
12        A    This --
13        Q    -- that we've --
14        A    Yes.
15        Q    -- referred to earlier today?
16        A    That we put in all the stores.
17        Q    Okay.
18        A    This one page --
19        Q    The one page --
20        A    -- would go up front.
21        Q    Oh, it was the cover for it?
22        A    It was the cover for this book.
23        Q    Okay.
24        A    For a -- not this book, but the book
25   that we put in the store.
0300
 1        Q    And the second page, have you seen
 2   that document before?
 3        A    That's a sign-in log.  Now, we kind of
 4   went to that one.  That other one was official, but
 5   Target would not -- I mean, they -- they didn't --
 6   those weren't -- like a new store, they might have a
 7   book of these, a -- you know, a rip-out page.
 8        A    They might -- they'll provide these,
 9   but then they're not -- you know, then they run out
10   and they're out.  They don't reorder these.  They
11   don't pay attention to these too much.  So then we
                    Page 124
```

Smith, Trent – Vol. I

12  ended up using those.
13      Q   Okay.  And did you create the second
14  page of Defendant's Exhibit 3?
15      A   I don't know.  Maybe.  I don't know.
16  It doesn't look familiar.  I don't think I did that.
17      Q   Do you know if somebody from Jim's
18  created it?
19      A   Oh, you know, I don't know where we
20  got that.  We may have got that out of somebody
21  else's book, then copied it, because it was in
22  Spanish and thought it would work better.
23      That -- it works -- yeah.  It's not a
24  Target form, I don't think.  That's not -- it is not
25  Target for sure.

0301
1      It worked as this whenever Target ran
2  out of those.  You had to have something in there to
3  name the people who was in the store.  (Indicating)
4  It's confusing.
5      Q   You testified that there was a Jim's
6  cleaner who was fired for eating a hamburger.  Who
7  was the -- what store was that?
8      A   1785.
9      Q   And do you know who the STL was at
10  that store --
11      A   Margaret --
12      Q   -- at that time.
13      A   I don't remember.  Margaret.  I think
14  she's still an STL down in San Antonio or Austin,
15  somewhere.
16      Q   Was she actually an STL or was she
17  another level of --
18      A   No.  No.
19      Q   -- Target manager?
20      A   She was the STL.
21      Q   Did you talk to Margaret directly
22  about this cleaner?
23      A   Yes.
24      Q   And what was the cleaner's name?
25      A   Maria.  I don't remember her last

0302
1  name.
2      Q   Okay.
3      A   She was a day porter.
4      Q   And tell me what you mean by that.
5      A   They don't have day porters any more.
6  whenever the stores first opened -- like this was a
7  Super Target in San Antonio.  It was the first Super
8  Target, I believe, in San Antonio, or the second one.
9      It was very busy, so they would hire a
10  day porter to walk around during the daytime.  She
11  had a Jim's Maintenance vest on, and she would clean
12  the bathrooms.
13      If they would have a spill in aisle
14  blah, blah, she would go take care of that.
15      They were busy at that time, and they
16  had the funds to have a housekeeper.
17      Q   But that was a Jim's Maintenance
18  employee?
19      A   Yes.
20      Q   And did you pay the cleaners to do the
21  day porter job?
22      A   Yes, and billed Target -- well, it was

Page 125

Smith, Trent – Vol. I

23  part -- actually, it was part of the contract.  That
24  was part of the contract.

0303
1      A   You provided a day porter, at that
2  time, for Super Targets.  Then they did away with
3  that.
4      Q   They did away with it altogether or
5  did away with it once the store got up and running?
6      A   Both.  They -- they would allow a day
7  porter for the first two weeks of a grand opening of
8  a Super Target, but they eliminated -- later
9  eliminated.  There are no day porters in Target.  It
10  was a big waste.
11      So now there is no day porters in
12  Target any more.
13      Q   Why are we talking about this?  I'm
14  sorry.  I didn't mean --
15      A   The -- you said there was a whole crew
16  fired at one point.  Which store was that?
17      MR. DEATS:  Objection, form.
18      THE WITNESS:  I don't remember.
19  There was a store in Albuquerque where we -- the STL
20  called and said, "I want this crew gone."
21      Q   (By Ms. Miller)  Do you know the STL's
22  name?
23      A   No.
24      Q   Did you communicate directly with that
25  STL about that particular crew?

0304
1      A   Yes.
2      Q   Did the STL explain why they did not
3  want that crew at the store any more?
4      A   Performance.
5      Q   Did you move that crew to another
6  store?
7      A   No.
8      Q   Was there a particular reason why you
9  didn't?
10      A   No.  I kind of agreed with them.
11      Q   Was there ever a time that you would
12  move a cleaner to another store?
13      A   Sometimes.
14      Q   And who would make that decision?
15      A   The district supervisor would say,
16  "Hey, we can move -- this person can ride with this
17  person" and it's not as easy as all of them driving
18  to the stores so there might be, "Hey, she has moved
19  over here to this apartment complex, she can ride
20  over here and then I've got a person -- he's got a
21  cousin that can do this, this and this."
22      A   The district supervisor was in charge
23  of that and then he would run it through his
24  regional.
25      Q   On the chemical budget, you testified

0305
1  that, if you went over the budget, somebody from
2  Target would communicate that to you; is that
3  correct?
4      A   Well, it was communicated every
5  month --
6      Q   Okay.
7      A   -- back to you, where you were with

Page 126

Smith, Trent – Vol. I

8  your budget.
9      Q   And is that via that Plaintiff's
10  Exhibit 9 --
11      A   Yes.
12      Q   -- the brand score card report?
13      A   Yes.
14      Q   If you went over budget, did Target
15  ever, in fact, charge you for it?
16      A   Not that I know of.
17      Q   I -- I take it you have never been
18  employed by Target directly; is that correct?
19      A   Correct.
20      Q   And were you ever in charge of
21  completing a performance review for an STL?
22      A   No.
23      Q   Did you ever see a performance review
24  for an STL?
25      A   No.

0306
1      Q   So you're -- you're not aware of what
2  factors an STL is reviewed by --
3      A   No.
4      Q   -- correct?
5      A   Yes.  That's correct.
6      (Defendant's Exhibit No. 4 was
7  marked for identification)
8      Q   (By Mr. Deats)  Let me show you what's
9  been marked as Defendant's Exhibit 4.
10      A   Yes.
11      Q   This is a four-page document.  Do
12  you recognize that document?
13      A   Yes.
14      Q   What is the first page of Defendant's
15  Exhibit 4?
16      A   Application and badge sheet might be
17  what we would call that.
18      Q   And did you create that document?
19      A   I don't remember.  Probably.
20      A   No.  I don't know.  I don't know if I
21  did that one or not.
22      Q   Okay.  But am I correct -- that is an
23  application for employment with Jim's Maintenance;
24  correct?
25      A   Yes.
1      I did not make this.

0307
2      Q   The second page of Defendant's Exhibit
3  4, have you seen that before?
4      A   Yes.
5      Q   And what is that?
6      A   Request for criminal record check.
7      Q   And did you conduct criminal record
8  checks on the Jim's Maintenance employees?
9      A   No, I did not.
10      Q   Did -- do you know if anybody else did
11  on Jim's behalf?
12      A   I don't know if they did or not.  I
13  wasn't in charge of that.
14      Q   Did -- who was in charge of that?
15      A   I guess -- I don't know.  Bryan,
16  maybe.
17      Q   And the third page of Defendant's
18  Exhibit 4, do you recognize that?
18      A   Contract Initial Agreement.

Page 127

Smith, Trent – Vol. I

19      And I -- I appreciate that you can
20  read the title of it.  My question was:  Do you
21  recognize that document?
22      A   This -- that's the first time I have
23  seen this document.
24      Q   Okay.  And the last page of
25  Defendant's Exhibit 4, have you seen that document

0308
1  before?
2      A   That's just -- yes.  Yeah, that's
3  standard, I guess.
4      Q   What is that?
5      A   I-9.
6      Q   And that's --
7      A   I think.
8      Q   Is it a -- that may be --
9      A   This is a W-9.
10      Q   Is it a W-9?
11      A   It says Form W-9, that I can read.
12      Q   Did Jim's Maintenance -- Jim's
13  Maintenance completed W-9 for the cleaners?
14      A   I suspect -- I don't know.
15      Q   Did you have any responsibility for
16  providing tax information to the cleaners?
17      A   No, ma'am.
18      Q   Who did?
19      A   I -- I don't know.  I defer that to
20  Bryan or Jim.
21      Q   All right.  Well, let's go to Page 3
22  of Defendant's Exhibit 4.  And I know you said you
23  had never seen it before, but, please, take your time
24  to read it.
25      A   Okay.

0309
1      In fact, if you would, would -- would
2  you read the first sentence that starts here?
3      A   "This is a contract/initial agreement
4  between subcontractor and contractor, Jim's
5  Maintenance, to be paid for piecework services
6  rendered by subcontractor for contractor, Jim's
7  Maintenance.  Services are performed on a daily basis
8  between the hours of 10:00 p.m. and 6:00 a.m. seven
9  days per week, at rate of $750 per two-week" -- can I
10  continue on?
11      Q   No.  Thank you.
12      A   And do you understand what that means?
13      A   Yes.  I think I -- yeah.
14      Q   And what does that provision mean to
15  you?
16      A   That means that they were shift pay
17  and they were hired for a period of two weeks -- I
18  mean, not really a shift, like a day, but seven days
19  per week, at a rate of -- yeah.  I see what they did.
20      It's not really supposed to be 750 per
21  two weeks.  It's probably supposed to be seven days
22  per week, at rate of blank per day, is what it was
23  probably meant to be, but I'm just speculating there.
24      Q   And do you understand that provision
25  to mean that Jim -- Jim's was hiring the cleaners as

0310
1  independent contractors or subcontractors?
2      A   That's what we hired -- yeah.  I mean,
3  I think so.

Page 128

```
                    Smith, Trent - Vol. I
4       Q        And did you understand that to violate
the contract with Target --
6             MR. PIZZO:  Object to the form.
7       Q    (By Ms. Miller) -- that prohibited
subcontracting the work?
9       A    No.
10            MR. PIZZO:  Object to the form on
the basis of a legal conclusion.
12       Q    (By Ms. Miller)  Okay.  And -- well,
let's look at Plaintiff's Exhibit 4, and if you
would, look at Page 11, which is a document Bates
stamped Target ESOP 0140.
16            If you would, look at Paragraph 24.
You don't have to read it aloud, but read it to
yourself.
19       A    (Complies)
20       Q        what do you understand that provision
on Plaintiff's Exhibit 4 to mean?
22       A        That they do not want to
subcontracting out without prior approval.
24       Q    Okay.  And would that be the contradictory
with Jim's Maintenance requiring its cleaners to
0311
1   complete an independent or subcontractor agreement?
2             MR. DEATS:  Objection, form.
3       Q    (By Ms. Miller)  You can still answer.
4       A    I don't think so.
5       Q    How -- how are those consistent?
6             MR. DEATS:  Objection, form.
7       Q    (By Ms. Miller)  You can still answer.
8       A    There are companies that subcontract
out -- I don't -- I don't know.  We -- I mean, I
don't understand the language.  I'm not an attorney.
I don't understand --
12       Q        Do you know --
13       A        -- the difference.
14       Q        Do you know what "subcontracting"
means?
16       A        From those two -- I don't know what's
acceptable subcontracting and what is not.
18       Q        You didn't understand what was
acceptable under Target's contract with Jim's, or you
don't understand what "subcontracting" is at all?
21       A        There are various terms for
subcontracting, hiring another company to do
something.
24       A    I don't know.  We didn't hire -- you
know, we hired -- we hired these people and
0312
1   subcontracted them out individually to do -- perform
2   services.
3       Q    Okay.  And my understanding is -- is
4   that practice consistent with the contract that you
5   had with Target, that prohibited --
6             MR. DEATS:  Object to the form.
7       Q    (By Ms. Miller) -- subcontracting?
8       A    It may have contradicted.
9             MS. MILLER:  I would like to take
a two-minute break.
11            (Short Break)
12       Q    (By Ms. Miller)  The packet that we
13   were just looking at, marked Defendant's Exhibit 4,
14   do you know who was in charge of maintaining those
                    Page 129
```

```
                        Smith, Trent - Vol. I
15   type documents for Jim's?
16       A    Ruth filed them.  You know, she put
17   them in the file.
18       A        I would say Bryan was responsible for
19   making sure that that -- Jim had a role in that, on
20   -- on getting the -- the CPA, I believe, to draw that
21   up.  It looks like CPA language.
22       Q    Okay.  And -- and when you said "the
23   CPA to draw it up," you're talking about Page 3 of
24   Defendant's Exhibit 4?
25       A    Yes.
0313
1       Q        Do you know who Jim's Maintenance's
2   CPA was?
3       A    I can't remember.
4       Q        Do you know if Jim's Maintenance
5   provided workers comp benefits if a cleaner were to
6   get hurt on the job?
7       A    I don't know that.
8       Q    At any point were you made aware of
9   Jim's cleaners complaining about their pay?
10       A        No.
11            About the way they were paid or the
pay?  No.
13       A    In fact, they loved being paid on
14   those cards, those  debit cards -- those paycheck
15   cards.
16       Q    Okay.  When you say "they," who are
you talking about?
18       A    Cleaners.
19       Q    Did you have conversations with these
20   cleaners where they expressed --
21       A        Just supervisors.
22       Q    And which supervisor told you
23   that they loved getting paid by the cards?
24       A        The -- whenever they were -- these
25   cards -- when they were deposited, on whatever day
0314
1   that was -- I think it says in here.  Paid on the
2   10th and 25th.
3       A    They -- it was available that day, on
4   the 10th.  It's not like the check was cut on the
5   10th and then mailed to the supervisors or mailed to
6   their homes, lost, and then -- so, instead of going
7   through the mail, losing checks, when we moved to
8   issuing them a card, they got their money on the 10th
9   and on the 25th.
10       Q        So that was the positive of that.
11       A        And -- and tell me, again, the name of
12   the Jim's supervisor you say you spoke to about this.
13       A    Oh, Andy Ramirez --
14       Q    Do you know where -- is he --
15       A    Andy Mython.
16       Q        Andy Ramirez, was he in the --
17       A    He was in the southern region.
18       Q    In Texas; is that correct?
19       A    Yes.  Uh-huh.
20       Q    And do you know where he is today?
21       A    No.
22            (Defendant's Exhibit No. 5 was
23            marked for identification)
24       Q    (By Ms. Miller)  I'll show you what's
25   been marked as Defendant's Exhibit 5.  Have you seen
                    Page 130
```

```
                        Smith, Trent - Vol. I
0315
1   Defendant's Exhibit 5 before today?
2       A        I -- probably.  This e-mail to me,
3   so, yes, I would have read it.
4       Q    Okay.  And what was your understanding
of this e-mail?
5       A    Let me read the bottom here.
6       Q    Okay.  What's the question?
7       A        First of all, who did you receive that
e-mail from?
10       A    That is from Becky Nielsen to me.
11       Q    Okay.  And -- and what is Becky
telling you in that e-mail?
13       A    She is basically --
14            MR. DEATS:  Objection, form.
15       Q    (By Ms. Miller)  You can go ahead and
answer.
17       A    She forwarded an e-mail.  She received
18   an e-mail from a -- the ETL, the logis -- well, the
19   logistics guy from 1785.
20            He sent it to Richard Sloan, which
21   Richard Sloan is in Building Service.  He's a field
22   guy.
23            He doesn't have anything to do with
24   this, so he just forwarded it to Becky, it looks
25   like.
0316
1       Q        what was the subject matter of this
e-mail?
3       A    Well, this guy -- this logistics guy
4   at 1785 is a very busy person, supervising our crew,
5   as it appears, and thinks that people weren't paid,
6   he thinks that people's pay were cut, he thinks that
7   we're not doing a very good job taking care of our
8   scrubber, and he thinks that we're not doing a very
9   good job taking care of our buffer.
10       Q    Okay.  So that e-mail from Becky
was --
12            THE VIDEOGRAPHER:  Excuse me.
We've got a phone.
14            (Short Break)
15       Q    (By Ms. Miller)  Read me the first
16   sentence of Becky's e-mail to you.
17       A    Trent:  Here is the e-mail that
18   precipitated my e-mail to you concerning the alleged
19   nonpayment of workers.
20       Q    Did you receive other e-mails from
21   Becky about alleged nonpayment?
22       A    Yes.  She would send something similar
23   to this.  She was copying -- if somebody sent this to
24   her, she would forward it to us, "Hey, what's going
on here??"
0317
1       Q    Okay.  So, at some point, you were
2   made aware of Jim's cleaners complaining about their
pay?
4       A    Oh, well, yes.  I mean, like this --
5   there were mistakes -- we had 300 workers, and if
6   somebody, you know, started on -- in May, the
7   thought they -- at the end of May, on the 30th, when
8   the other crew -- the rest of the crew was paid, they
9   think, "Hey, how come I didn't get paid?"
10            Well, because we just turned it in on
                    Page 131
```

```
                        Smith, Trent - Vol. I
11   the 16th.  It's got to be processed and it will be
12   paid.
13            So there was always confusion on how
14   much -- "why wasn't I paid?"
15       A    "Well, you're new.  You will get yours
16   at this time, we mailed you the check," answering
questions like that, yes.
18            (Defendant's Exhibit No. 6 was
19            marked for identification)
20       Q    (By Ms. Miller)  I'm going to show you
21   what's been marked as Defendant's Exhibit 6.  Do you
22   recognize that?
23       A    It's from me to Ruth.
24       Q    And were you forwarding her, Ruth, an
25   e-mail that you had received from Ted
0318
1       A        It appears that Ted Fischer sent it to
2   all of the cleaning companies, all 25 of us, or
3   whatever.
4       Q    Okay.  And were you forwarding this
5   e-mail to Ruth Talent that you had received from Ted
6   Fischer at Target?
7       A    Yes, "Ruth, will you print this out
for Jim to sign?"
9       Q    Okay.  And what was the subject matter
of Ted Fischer's e-mail to you?
11       A    I -- illegal workers, it looks like.
12       A    I'm sorry.  I will have to share with
13   you.  We don't have enough copies.
14       A    "In light of the recent Wal-Mart
15   settlement with the federal government regarding the
16   employment of illegal workers by its cleaning
17   contractors, I want to reiterate our expectations of
you."
19       Q    Okay.  And had an attachment of a
20   certification.  Did you ever -- and I know we don't
21   have it here.
22            did you ever complete any kind of
23   certification of compliance with laws on behalf of
24   Jim's Maintenance?
0319
1       A    I don't believe so.  I don't think so.
2       Q    You testified earlier today that Jim's
3   Maintenance had declared bankruptcy; is that correct?
4       A    No.  I shouldn't have said that.
5       A    We were bankrupt.  "Bankruptcy" seems
6   like a very formal government, legal term.  So
7   "bankrupt" would be more of a general "we don't have
8   any money" term.
9            So "bankruptcy," I need to take back.
10            THE WITNESS:  Craig, can you fix
that for me?
12       Q    (By Ms. Miller)  And has any type of
13   cleaning services replaced Jim's Maintenance?
14       A    For Target?
15       Q    No.  Just as Jim's Maintenance.
16       A    No.
17       Q    Did you ever say to another Jim's
18   Maintenance employee that you preferred mexicans
19   because they did their jobs and kept their mouth shut
20   and didn't cause trouble?
21       A    No.
                    Page 132
```

Smith, Trent - Vol. I

22      Q   Completely did not say that?
23      A   No.  That doesn't -- I didn't say
24 that.
25          MS. MILLER:  I'll pass the
0320
1 witness.
2          MR. PIZZO:  Do you want to go me
3 first or do you want to go next?
4          MR. DEATS:  You can.
5          MR. PIZZO:  Okay.  A couple of
6 questions.
7                CROSS EXAMINATION
8 BY MR. PIZZO:
9      Q   You met with, I think, Mr. Deats and
10 one of his associates a couple of months ago; right?
11      A   Yes.
12      Q   Okay.  Had you -- did you know about
13 the Target lawyers meeting with the Jim's people
14 sometime last year or months ago?
15      A   I don't -- probably.
16      Q   Were you there --
17      A   I don't remember.
18      Q   -- when the -- I think maybe it was
19 these two lawyers here.  I don't know.
20      A   No.
21      Q   I wasn't there.
22      A   No.
23      Q   When they were copying everything?
24      A   Yeah.
0321
1      A   Yeah.  No.  I knew they were down
2 there, copying a bunch of stuff, but I -- I didn't
3 know --
4      Q   Okay.  Do you know that they were
5 talking to Jim and some employees of Jim's
6 Maintenance?
7      A   No.  I'm not aware of any of that.
8      Q   Well, they didn't ask you about their
9 meeting with Jim's.  They just asked about your
10 meeting.
11      A   Okay.
12      Q   Okay.  I just wanted to be fair that
13 they also had meetings with Jim's.
14      A   Okay.
15      Q   And it may have been some other
16 lawyers for Target.  I don't know if it's these two
17 sitting across the table from me or not, but -- so
18 your job, really, was to try to service Target; is
19 that right?
20      A   I was -- yeah.  That's pretty much.
21      Q   Okay.  And you don't work for Jim's
22 any more; correct?
23      A   Correct.
24      Q   When is the last time you worked for
25 Jim's Maintenance?
0322
1      A   Probably April of '06.
2      Q   Did you get fired or terminated or
3 laid off or whatever?
4      A   No.  I told Jim -- he didn't have to
5 fire me.  I quit.
6      Q   Did you say --

Page 133

Smith, Trent - Vol. I

7      A   I did it, so he didn't have to say it.
8      Q   But I didn't get my last paycheck, either, so --
9      A   How did you communicate with Target?
10      Q   You, apparently, mentioned that you talked to people
11 on the phone; is that right?
12      A   Yes.
13      Q   Okay.
14      A   Phone and e-mail --
15      Q   E-mail?
16      A   -- communication.
17      Q   And you've talked to people in
18 person --
19      A   Yes.
20      Q   -- with Target, as well?
21      A   Yes, I have.
22      Q   Okay.  And about the bidding process,
23 you said, real early in this deposition, that you
24 only can lower your bid.
25          Now, I'm a little bit confused, and --
0323
1 and what I may be understanding -- and correct me if
2 I'm wrong -- is that when you do the first bid, it
3 can be lower than what you're currently paid, or it
4 could be higher, but once you do the first bid, then
5 every bid after that has to be lower?
6      A   Yes.
7      Q   Is that correct?  Am I --
8      A   Yes.  Your initial bid -- you can
9 never go higher than your initial bid.  Not what
10 you're contracted at currently, but your initial bid.
11      Q   Okay.  But your initial bid can be
12 higher or lower than what you're contracted with?
13      A   Yes.  Yes.
14      Q   Okay.
15      A   That's correct.
16      Q   Okay.  I'm going to go real quick
17 through the organizational chart, because I don't
18 know if I quite understand it, for Jim's.
19          There's the officers, which were Jim
20 and Bryan and some other people, apparently; right?
21          Jim and Bryan and Jimmy, maybe?
22      A   I don't know --
23          MR. JIM FUNDERBURGH:  Joyce.
24          THE WITNESS:  -- if Jimmy was an
25 officer.
0324
1          MS. MILLER:  And --
2          THE WITNESS:  Joyce -- Joyce was
3 an officer.
4          MR. PIZZO:  Hold on, Jim.  You
5 can't talk right now.
6      Q   (By Mr. Pizzo)  And, then, where were
7 you in that --
8      A   I was right below them.
9      Q   Okay.  Then, below them would be who
10 -- or below you, I'm sorry, would be, what, regional
11 people?
12      A   Yes.
13      Q   And who were the regional people?
14      A   In the north, it was Rob Mythen, and
15 in the south, it was Brandon Stewart, who was later
16 replaced with Alex Ramirez.
17      Q   Okay.  And, then, underneath regional

Page 134

Smith, Trent - Vol. I

3          Target withheld final payment.
4          If they would have paid the last bill,
5 then we would have -- we had plans to go on, but then
6 we owed everybody under the sun when we didn't get
7 our final payment.
8      Q   Do you know whether Jim filed
9 bankruptcy personally or not?
10      A   I do not know that.
11          MR. PIZZO:  I pass the witness.
12          Anything?
13          MR. HURTT:  No.
14          MR. PIZZO:  We'll pass the
15 witness.
16
17             REDIRECT EXAMINATION
18 BY MR. DEATS:
19      Q   Did Target, to your knowledge, ever
20 show any interest in reviewing your pay records or
21 the records showing the hours that your employees
22 were working?
23      A   Target did not.
24      Q   Do you have Defendant's Exhibit 4 in
25 front of you?
0328
1      A   Yes.
2      Q   If you know, were any of the documents
3 reflected in Defendant's Exhibit 4 -- were they
4 shared with Target?
5      A   They were shared with
6 Price-Waterhouse, I believe.
7      Q   So you would have shared with
8 Price-Waterhouse documents like Page 3 of Deposition
9 Exhibit 4?
10      A   I do not know.  I did not provide them
11 with anything.
12          I believe -- they came in.  They were
13 supposed to look at 50 employees' files.  So they
14 could have looked at this -- I mean, a personnel
15 file.
16      Q   And were these documents maintained in
17 the employee files?
18      A   Yes.
19      Q   So if Price-Waterhouse looked, for
20 example, at Page 3 of Deposition Exhibit 4, they
21 would have seen that employees were scheduled to work
22 10:00 p.m. to 6:00 a.m., seven days per week,
23 according to the document; correct?
24      A   Yes.
25      Q   After the audit by Price-Waterhouse,
0329
1 did anyone at Target contact you to request that you
2 change your employment practices in any way?
3      A   Not that I know of.  They would have
4 contacted me.
5      Q   Now, you mentioned that you had been
6 in several stores while overnight cleaning crews were
7 doing their work, in the past; correct?
8      A   Yes.
9      Q   And you tried to identify a lot of
10 those for Ms. Miller.
11      A   I tried to quickly come up with it.
12      Q   In addition to that, did you receive
13 routine reports from your district supervisors about

Page 136

Smith, Trent - Vol. I

18 is district people?
19      A   Each one of those guys had district
20 supervisors that had about eight stores each.
21      Q   Okay.  And, then, underneath the
22 district people were supervisors?
23      A   Were stores.  They -- yeah.
24      Q   Well, they were the leads?  Is that
25 what you called them?
0325
1      A   Yeah.  You would have a crew leader in
2 each store.
3      Q   Okay.  And underneath that, of course,
4 is the workers; right?
5      A   Right.
6      Q   Okay.  And, then, Bryan and Jimmy were
7 kind of the officers that would kind of watch the
8 different regions; right?
9      A   One was responsible for the north and
10 one was for the south?
11      A   Yes.  Uh-huh.
12      Q   Okay.  Do you know why the -- Target
13 would put all of these documents -- a lot of these
14 documents in Spanish?
15      A   Because -- I mean, total speculation
16 on my part, but 99 percent of the employees that
17 clean Targets are Spanish people.
18      Q   Do you know when Target last did their
19 own in-house cleaning?
20      A   I don't know.  Mike Bell said
21 that they had tried it in the '70s, or something,
22 in a conversation I had with him.
23      Q   But you did have some conversations --
24      A   Well, I mean, just socially, we would
25 see him in -- at these meetings, and he explained
0326
1 that -- and he was familiar with Oklahoma City.
2          I was -- I was just -- Jim was talking
3 to him more in depth.  I was just standing there.
4      Q   Were you the go-to guy from Target?
5 If they wanted to really talk with somebody about
6 some issue at Jim's, were you the person they would
7 contact, as opposed to Bryan or Jimmy?
8      A   Yes.  I was their --  Yes.  I was their
9 representative.
10      Q   Okay.
11      A   All these e-mails have me on them.
12 Bryan was like an owner.
13      Q   Several of these guys have owners.  Do
14 you know what I mean?  That they would -- I'm
15 pointing to Defendant's Exhibit 6, that has all the
16 e-mails of the 20 or so cleaners.
17          Some of them have a lead guy, who is
18 in charge of representing Target to them.
19      A   Okay.
20      Q   So Bryan signed the contracts.
21      A   Okay.  Yeah.  Why did you leave Jim's?
22 what was the reason?
23      A   Jim couldn't pay me any more.  Total
24 speculation on my part, but I believe he did not have
25 the funds to pay me any more.
0327
1      Q   And that was because of what reason,
2 if you know?

Page 135

Smith, Trent - Vol. I
```
14   what was happening in the stores that they
15   supervised?
16          A      (No verbal response)
17          Q      Did supervisors tell you what was
18   going on in the stores?
19          A      No, not -- not -- not written, not in
20   any written form.  They don't have e-mail.  They --
21          Q      And I'm not talking about --
22          A      -- didn't send --
23          Q      -- written form.
24          A      -- fax anything in.  They --
25          Q      Did you talk to your district
0330
 1   supervisors?
 2          A      Yes.  I spoke -- and I would -- I
 3   flew out there and I -- we would visit stores.  I
 4   would fly in, we would hit two or three or four or
 5   five stores, and then I would go visit the next
 6   district supervisor, hit two or three, four, five
 7   more stores.
 8          Q      And did -- if you had a problem, for
 9   example, that a store manager was holding over
10   employees after their normal quitting time, are these
11   the sorts of reports that you routinely received from
12   your district supervisors?
13          A      Those are the comments, yes.
14          Q      And those were reports that you
15   received from the district supervisors in the normal
16   course of your business as a manager for Jim's
17   Maintenance, were they not?
18          A      That is correct.
19          Q      Do you know who sent the Johnson's
20   representative to Jim's Maintenance to train you on
21   the proper way to deal with the floors?
22          A      Chris --
23          MS. MILLER:  Object to the form.
24          THE WITNESS:  -- Carlson.
25          Q      (By Mr. Deats)  I'm sorry.
0331
 1          A      Chris Carlson.
 2          Q      You were asked about whether or not
 3   many of the employees were able to speak English.
 4          Do you know whether or not some of the
 5   Target managers were able to speak Spanish?
 6          A      Some in Texas.
 7          Q      And was that more -- I'm sorry.  You
 8   said --
 9          A      In -- in the southern regions, where
10   there are more Hispanic people.
11          Q      For example, in San Antonio and
12   Austin, you had more Target managers that spoke
13   Spanish, didn't you?
14          A      That's correct.  This guy who sent
15   that e-mail, he speaks Spanish.  That's why he was
16   supervising that group.
17          Q      And you indicate that, during the
18   bidding process that occurred in '05, you were asked
19   some questions by Target.
20          Specifically, I believe you testified
21   they asked "how much do you make" and "what is your
22   profit margin"?
23          A      Yes.
24          Q      Do you recall being asked those kinds
                        Page 137
```

Smith, Trent - Vol. I
```
25   of questions by Target in '05?
0332
 1          A      '05?  I don't think it was in '05.  It
 2   was when we went --
 3          Q      In connection with the negotiation of
 4   the '05 contract.
 5          A      No.  They did not ask it then.
 6          Q      When do you recall them asking those
 7   questions?
 8          A      They asked it in '01, whenever we --
 9   would it be that contract?  Is that the one -- '01?
10          Q      The '01 contract is --
11          A      Yeah.
12          Q      -- Plaintiff's Exhibit --
13          A      It was prior to this one here,
14   Plaintiff's Exhibit 2.  We went up here and Chris
15   Carlson asked us -- was asking us about our business,
16   "how many supervisors do you have, how many do they
17   -- how many stores do they cover," just gathering all
18   kinds of information, and, then, asked us, "what is
19   your profit margin?"
20          He asked -- I mean, I was told by two
21   other contractors that he was -- he asked the same
22   questions.  Everybody who came in -- there were
23   meetings.  We -- there were -- there were three or
24   four that day.
25          When we came in to sign in, we could
0333
 1   see there was another contract before us scheduled
 2   and there were contractors after us.
 3          So all of the subcontractors -- the 25
 4   that were awarded stores, all came and all had the
 5   same meeting with Chris Carlson and Mike Hannasch,
 6   and were asked, I -- the same questions.
 7          I was not there.  I'm not a fly on the
 8   wall, but after talking to other subcontractors,
 9   they said they were asked -- "Did he ask you how much
10   profit you make?"
11          "Yes, he asked me how much profit I
12   made."
13          A      A specific one was the guy in -- one
14   of these -- one of the subs is a publicly-traded
15   company, and he had to identify that, "we are a
16   publicly-traded company, and we always -- we must
17   require a 15-percent profit margin," or something
18   like that.
19          Q      Do you have defendant's Exhibit 2 in
20   front of you?
21          A      Yes.
22          Q      Now, this was a maintenance shift pay
23   policy that was implemented by Jim's Maintenance?
24          A      Apparently, yes.
25          Q      And did you play any role in
0334
 1   implementing this policy?
 2          A      No.
 3          Q      As a practical matter, was Jim's able
 4   to hold to this policy with regards to the Target
 5   stores that it cleaned?
 6          A      I suspect that that's -- that was what
 7   we did.  I didn't draw this paper up or have people
 8   sign it, I --
 9          Q      I understand.
                        Page 138
```

Smith, Trent - Vol. I
```
10          A      I don't even know how old it is.
11          Q      But my question -- you look at the
12   first bullet point, "Target work shift begins at
13   10:30 p.m. and ends at 6:00 a.m."?
14          A      Yes.
15          Q      Did Jim's really have control of when
16   the work shift --
17          A      No.
18          Q      -- began?
19          A      No.
20          Q      Did Jim's really have control of when
21   the work shift ended?
22          A      No, not at all.
23          Q      Who was making those decisions?
24          A      Target.
25          Q      If Jim's was unable to meet the
0335
 1   requirements of its shift pay policy, what was the
 2   reason for that inability?
 3          A      Target managers.
 4          Q      And was that on a frequent
 5   or infrequent basis, that Target managers were taking
 6   steps that prevented implementing this policy?
 7          A      Frequent.
 8          Q      And when it happened that Target
 9   managers interfered with your ability to keep to this
10   policy, did you have any ability to control that?
11          A      No.
12          Q      You were asked whether or not you
13   personally fired cleaners, and you said that you did
14   not.
15          Did you direct others in your company
16   to fire cleaners?
17          A      Yes.
18          Q      And did you do that at the behest of
19   Target managers?
20          A      Yes.
21          Q      Defendant's Exhibit 5 is a copy of a
22   complaint that you got from a Target manager.  Did
23   you get complaints from Target managers on more than
24   one occasion?
25          A      Oh, yes.
0336
 1          Q      This is what you were talking with me
 2   earlier about, that you got, oftentimes, multiple
 3   complaints in a single day?
 4          A      Yes, but -- but those were through
 5   BSOC mostly.  I'm saying those were work orders.
 6          This guy did not follow the proper
 7   procedure.  He went through Building Services, his
 8   local guy.  His local guy forwarded it to me, Becky.
 9          Becky forwarded it to me, "what's
10   going on with this?  Get this taken care of."
11          Q      But you got other complaints from
12   Target managers frequently?
13          A      Thousands.
14          Q      Do you -- do you recall whether or not
15   you had multiple complaints from your employees with
16   questions about when and how they were paid?
17          A      No, not -- not -- ask -- ask the
18   question again.
19          Q      This particular -- Defendant's Exhibit
20   5 --
                        Page 139
```

Smith, Trent - Vol. I
```
21          A      Yes.
22          Q      -- is a pay complaint?
23          A      Yes.
24          Q      Was that type of pay complaint
25   received by you frequently?
0337
 1          A      Yes.  This is a -- you know, one of a
 2   kind -- you get these all the time from a new person
 3   starting, when are they paid, "I supposed -- how
 4   come I don't have a card?  They have a card.  How
 5   come I didn't get paid on the 1st?"
 6          "Because you just turned your
 7   paperwork in."
 8          "Oh, you shorted me a paycheck."
 9          "No.  We paid you for your very first.
10   Now, you're getting paid -- you know, you will get
11   paid in -- as it's turned in again."
12          These are just -- these are minor --
13   this isn't very -- I mean, this is a good example of
14   -- of not very big problems.
15          This guy drives me nuts, this -- this
16   logistics guy.  He -- this was not the only e-mail.
17   He sent e-mails all the time.
18          I mean, most of these are explainable.
19   Target shows, walking around, leaving black marks, so
20   our guys -- which we had a good crew.  You would go
21   down there and visit.  This store just looked
22   fantastic.  If you looked at the records and saw the
23   scores that 1785 got, they would be all green.  The
24   store looks good.
25          This guy is a problem, the logistics
0338
 1   guy, in this situation.  So --
 2          Q      Do you recall the name of the
 3   logistics guy?
 4          A      Jim might be able to.
 5          Q      There is a name, Oscar, with a line
 6   drawn --
 7          A      Oscar.  Oscar.  Oscar.
 8          Q      Does that ring a bell?
 9          A      I don't think this was Oscar.  It
10   might have been.  Oscar worked there.  Yeah, it may
11   be Oscar.
12          Q      And was Oscar a Target employee?
13          A      Yes.  Oscar is a Target employee.
14          Oscar was in charge of one area, but
15   the other, I think, who wrote this, is the -- is --
16   is -- was the other guy.  I don't think it was Oscar
17   who wrote that.
18          MR. DEATS:  Pass the witness.
19          MS. MILLER:  It's my turn.
20          MS. PIZZO:  Is it my turn.
21          MS. MILLER:  It's my turn, I
22   think.
23
24                  RECROSS EXAMINATION
25   BY MS. MILLER:
0339
 1          Q      While we're on defendant's Exhibit 5,
 2   did you get pay complaints from -- or complaints that
 3   Jim's cleaners were making about their pay through
 4   Target -- through e-mails from Target, or did you get
 5   those from a different source?
                        Page 140
```

Smith, Trent - Vol. I

```
 6      A    Most of the time through Target.
 7      Q    And they were generally sent by
e-mail?
 8      A    Yes.
 9      Q    And this was different from the 10 to
10  30 BSOC work orders you would get a day?
11      A    Yes.  No, those were not 10 to 30
12  payroll problems.
13           Those were, "They didn't clean the
14  bathroom.  They didn't pick up the front.  They
15  didn't empty the trash."
16      Q    If I may -- we don't have an extra
17  copy.
18      A    Yes.
19      Q    Did you consider pay complaints to be
20  little matters?
21      A    I would have said something
22  like this -- I would fax it down to Brandon, and I
23  would say, "Look into this."
24           And, then, it looks like he faxed it
25  back, "Jesus Huerta says he did not" -- I can read --
0340
 1  so this was from Brandon, telling us what happened,
 2  answering this.
 3      Q    Okay.  The Price-Waterhouse-Cooper's
 4  audit that took place, that was in March of 2006; is
 5  that correct?
 6      A    Probably.
 7      Q    Well, it was just prior to the
 8  contract ending with Target; correct?
 9      A    Yes.
10      Q    Did the Johnson's representative come
11  to Jim's Maintenance headquarters or to a Target
12  store?
13      A    Both.
14      Q    How many employees -- cleaners, that
15  is, would you say you directed to be fired?
16      A    I don't know.
17      Q    I mean, you've -- you've told us about
18  the -- I'm not trying to be flippant, but the
19  cheeseburger person and the crew --
20      A    Yes.
21      A    -- in Albuquerque.
22      Q    Any others come to mind?
23      A    I need some time to think about it.
24      A    Probably 30 or 40 people.
25
0341
 1           (Short Break)
 2      Q    (By Ms. Miller)  Was there anything
 3  that prevented Jim's from having different cleaners
 4  clean a particular Target store in a particular week?
 5      A    So -- and that may be confusing, but
 6  my understanding from your testimony was there would
 7  be -- the same crew would clean a store for a
 8  particular week?
 9      A    Yes.
10      Q    Okay.  That -- the same three people,
11  if you will, would clean the store for the entire
12  week?
13      A    Sometimes.
14      Q    Was there anything that prevented
15  Jim's from having a different set of three people
16  complete the cleaning for the week?
                                        Page 141
```

Smith, Trent - Vol. I

```
17      A    No.
18      Q    Did you talk to Mike Bell personally,
19  ever?
20      A    I was around -- it was a social
21  atmosphere, and he was talking to Jim and I was
22  around.  He wasn't talking to me, I don't believe.
23      Q    And I must --
24      A    It was three or four years ago.  He's
25  a neat guy.  I stood beside him.  He -- I was
0342
 1  listening.
 2           Jim can go into, "I said that Target
 3  experimented in cleaning stores in the '70s, and you
 4  can ask Jim more about that --"
 5      Q    Okay.
 6      A    -- or you don't have to.
 7      Q    And, Mr. Smith, you have been great
 8  and it's been long day, but my question was:  Did you
 9  ever talk to Mike Bell, personally?  Yes or no?
10      A    Yes.
11      Q    Okay.  When did you talk to him
12  personally?
13      A    At this meeting.  (Indicating)
14      Q    And you're pointing to --
15      A    I'm sorry.  June 11th through 13th,
16  2002, in Minneapolis.
17      Q    Okay.  You testified that 99 percent
18  of the individuals who clean Target stores are
19  Hispanic.
20           On what are you basing that statement?
21      A    That maybe one percent are not.
22      Q    Are you familiar with all of the
23  individuals who clean Target stores?
24      A    No.
25      Q    Okay.  So you don't really know that?
0343
 1      A    Just all the owners.
 2      Q    I'm sorry?
 3      A    I'm familiar with all of the people
 4  who own and clean stores in this time period.
 5      Q    Okay.  And this is for one particular
 6  region of the country, not the Target stores across
 7  the country; correct?
 8      A    No.  That's all the -- every -- these
 9  -- all the Target stores in the country are cleaned
10  by these guys, in 2005.  These are all the cleaners.
11  (Indicating)
12      Q    And you know the -- and you're
13  referring to Defendant's Exhibit 6.
14           You're saying that you know the owners
15  of every single one of the cleaning contractors
16  that's listed here and you know the composition of
17  all of their work force, such that you could testify
18  that 99 percent of the people who clean Target stores
19  are Hispanic?
20           MR. DEATS:  Objection, form.
21           THE WITNESS:  No.  I -- I would
22  just bet that that's the case.
23      Q    (By Ms. Miller)  Were you aware that
24  the attorney for Jim's Maintenance, Phil Hurtt, was
25  present the entire time that my colleague, David
 1  Wiley, and I were at Jim's Maintenance, making copies
                                        Page 142
```

Smith, Trent - Vol. I

```
 2  that were responsive to the subpoena we issued?
 3      A    I apologize.  I -- I -- I didn't catch
 4  the question.
 5      Q    Okay.  Were you aware that Phil Hurtt,
 6  who is present today, the counsel for Jim's
 7  Maintenance, was present the entire time that my
 8  colleague, David Wiley, and I were present at Jim's,
 9  looking through documents for -- pursuant to the
10  subpoena?
11      A    I'm not aware of that.
12      Q    Okay.  We didn't see you up there that
13  day; correct?
14      A    No.  No.
15      Q    Okay.
16      A    I was not there.  I don't know -- I
17  heard that they were up there.  That's all.  I was
18  not there.
19      Q    And you said you resigned your
20  employment with Jim's Maintenance?
21      A    kind of.  Yes, I resigned.  I said --
22      Q    Are you still employed with Jim's
23  Maintenance?
24      A    No.  No.
25      Q    Were you fired from Jim's Maintenance?
0345
 1      A    No.  No.
 2      Q    Did you quit your employment with
 3  Jim's Maintenance?
 4      A    I guess, yeah.  I said, "Jim, I'm
 5  going to quit.  You don't have to fire me."
 6      Q    When did that happen?
 7      A    I don't remember.  Sometime in May --
 8  April, May.  Pretty unofficial.
 9      Q    Okay.  We didn't have
10  anything else.
11           MR. PIZZO:  Around the horn we go
12  again.
13           RECROSS EXAMINATION
14  BY MR. PIZZO:
15      Q    Two questions.  Do you know why people
16  that worked for Jim's Maintenance is complaining
17  about wages to Target?
18      A    No.
19      Q    Did they think they were working for
20  Target, maybe?
21           MS. MILLER:  Object to the form.
22      Q    (By Mr. Pizzo)  Do you know?
23      A    I don't know.  I know that some had
24  very close relationships with our people.
25      Q    But doesn't -- when -- when somebody
0346
 1  has got a problem, you go to your employer, don't
 2  you?
 3      A    Yes.
 4      Q    Okay.  But they were going to pay --
 5  about pay issues and they're talking to Target
 6  people; is that right?
 7           MS. MILLER:  Object to the form.
 8      Q    (By Mr. Pizzo)  Is that right?
 9      A    Yes.
10      Q    Okay.  Do you know when Target
11  Corporation decided to go hire this big accounting
12  firm called Price-Waterhouse and audit the company
                                        Page 143
```

Smith, Trent - Vol. I

```
13  called Jim's Maintenance?
14      A    No.
15      Q    Have you got an opinion about it?
16           MS. MILLER:  Object to the form.
17           THE WITNESS:  I don't, no.  They
18  -- they notified us that they were going to send
19  Price-Waterhouse out to all the companies.
20      Q    (By Mr. Pizzo)  Do you think they were
21  doing this just -- and they already had planned to
22  terminate Jim's?  They were just using this as a
23  subterfuge?
24           MS. MILLER:  I'm going to object
25  to the form.
0347
 1           THE WITNESS:  Yes.
 2           MR. PIZZO:  Okay.  That's all the
 3  questions I have.
 4           MR. DEATS:  I have nothing
 5  further.
 6           MS. MILLER:  And I -- sorry.  I
 7  do.
 8           FURTHER RECROSS EXAMINATION
 9  BY MS. MILLER:
10      Q    Your testimony was that you were
11  informed that Target sent Price-Waterhouse out to
12  audit all of its cleaning contractors; correct?
13      A    I believe so.
14      Q    Okay.  So your attorney's questioning
15  about the idea that it was set up as a subterfuge to
16  fire Jim's and only Jim's --
17      A    No.
18      Q    -- wouldn't make sense, would it?
19      A    I believe --
20           MR. DEATS:  Object, form.
21           THE WITNESS:  They fired many
22  people.  They were narrowing it down.  They went from
23  25 contractors to five.
24      Q    (By Ms. Miller)  You said they went
25
0348
 1  from 25 contractors to five after the
 2  Price-Waterhouse-Cooper's audit?
 3      A    Yes.
 4      Q    How -- how do you know that?
 5      A    Just from talking to these guys.
 6      Q    Your knowledge is from talking to
 7  other cleaning contractors, not from anybody at
 8  Target; correct?
 9      A    Correct.  All former cleaning
10  contractors.
11           MS. MILLER:  I don't have
12  anything else.
13           MR. DEATS:  Nothing further.
14           MR. PIZZO:  Nothing further.
15           I don't know about read and sign.
16  Do you want to read it?
17      A    You have a right to when it's
18  written out and you can make changes and all that.
19  I would recommend you read and
20  sign it, but that's up to you.
21           MR. WILEY:  Could we get a little
22  more clarification?  You have the right, if something
23  is incorrect, misspelled, mis -- you can't change
                                        Page 144
```

Smith, Trent - Vol. I

```
24  your testimony.
25          THE WITNESS:  Okay.
0349
 1          MS. MILLER:  You can't add to
 2  your testimony.
 3          THE WITNESS:  Okay.
 4          MR. DEATS:  It's inaccurate to
 5  say he can't supplement his testimony if he remembers
 6  something in addition.
 7          If that's what you're suggesting,
 8  you're just wrong.
 9          THE WITNESS:  What's they
10  question?
11          MR. PIZZO:  They're going to send
12  you --
13          THE WITNESS:  Oh, they're going
14  to mail it to me?
15          MR. PIZZO:  Yeah.
16          MS. MILLER:  Yeah.
17          MR. PIZZO:  Then you can make
18  changes --
19          MS. MILLER:  And then you have a
20  certain amount of time to --
21          MR. PIZZO:  There's a sheet of
22  paper that you can -- it's called an errata sheet,
23  that you can make changes if you think they did it
24  wrong.
25          THE WITNESS:  I'm aware of that
0350
 1  fact now.  Thank you.
 2                  * * * * *
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0351
 1                  J U R A T
 2          I, Trent Smith, do hereby state under oath
 3  that I have read the above and foregoing deposition
 4  in its entirety and that the same is a full, true and
 5  correct transcription of my testimony so given at
 6  said time and place, except for the corrections
 7  noted.
 8
                         Page 145
```

Smith, Trent - Vol. I

```
 9
10
11          TRENT SMITH
12
13
14          Subscribed and sworn to before me, the
15  undersigned Notary Public in and for the State of
16  Oklahoma, on this, the _____day of_____,
17  2007.
18
19
20          _____
21          NOTARY PUBLIC
22  My Commission Expires: _____
23  My Commission Number: _____
24
25  Reported by:  Kim Glover, CSR, RPR, RMR
0352
 1          C E R T I F I C A T E
 2
 3  STATE OF OKLAHOMA )
 4                    )  SS.
 5  COUNTY OF OKLAHOMA )
 6          I, KIM GLOVER, Oklahoma Certified Shorthand
 7  Reporter, certify that Trent Smith was by me sworn to
 8  testify the truth; that the deposition was taken by
 9  me in stenotype and thereafter transcribed, and is a
10  true and correct transcript of the testimony of the
11  witness; that the deposition was taken on the 27th
12  day of August, 2007, at 10:00 a.m., in the City of
13  Oklahoma City, County of Oklahoma, State of Oklahoma;
14  that I am neither attorney for nor relative of either
15  of said parties, or otherwise interested in the event
16  of said action.
17          IN WITNESS WHEREOF, I have hereunto set my
18  hand and official seal on this, the 5th day of
19  September, 2007.
20
21
22          _____
            Kim Glover, CSR, RPR, RMR
            Oklahoma Certified Shorthand Reporter,
23          CSR #201
24
25
26
0353
 1          E R R A T A   S H E E T
 2
 3  WITNESS: TRENT SMITH
 4  STYLE: IZTEP -vs- TARGET
 5  REPORTER:  KIM GLOVER, CSR, RPR, RMR
 6
 7  PAGE   LINE         CORRECTION AND REASON
 8  ____   ____   _____
 9  ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
                         Page 146
```

Smith, Trent - Vol. I

```
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____
25  ____   ____   _____
0354
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                         Page 147
```