IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **JUAN ISIDRO ITZEP, et al.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **Civil Action No:  SA-06-CA-568-XR** |
| | ) | |
| **TARGET CORPORATION** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

On this date, the Court considered Defendant Target Corporation's Motion for Summary Judgment on its cross-claims against Jim's Maintenance & Sons, Inc. (docket no. 82), and the Response and Reply thereto.  After careful consideration, the Court grants in part and denies in part the motion.

**I. Procedural Background**

Plaintiffs Juan Itzep and others originally brought this suit on June 29, 2006 against Defendants Target, Jim's Maintenance & Sons, Inc. d/b/a Jim's Maintenance, Jim's Commercial Cleaning Services, and James Funderburgh for alleged violations of the Fair Labor Standards Act. According to the Third Amended Complaint, Plaintiffs "are women and men who have performed cleaning and maintenance work on the overnight shift at Target stores in the San Antonio and Austin areas."  Third Am. Compl. ¶ 1.  Plaintiffs "allege that Defendants Target and Jim's Maintenance violated federal overtime laws by failing to pay the plaintiffs any overtime wages, even though the plaintiffs, along with many other similar workers, have routinely been required to work approximately 55-70 hours a week, laboring seven days a week with only one day off every other week."  *Id.*  Plaintiffs allege violations of the FLSA in that they were not paid overtime wages and

1

that their wages "were so low they fell below the federal minimum wage." *Id.*  Plaintiffs allege that they "have been employed by Defendants as non-exempt workers engaged in routine nightly cleaning and maintenance activities at Target stores located in the San Antonio and Austin areas." *Id.* ¶ 10. Plaintiffs further alleged that "[a]s a matter of economic reality, the Plaintiffs were jointly employed by Target and by Jim's Maintenance." *Id.* ¶ 13.  For purposes of Plaintiffs' claims, "the 'relevant period' is defined as that period commencing three years prior to the date this lawsuit was filed, and continuing thereafter." *Id.* ¶ 8.

Target answered on August 3, 2006, while Jim's and Funderburgh defaulted. *See* docket nos. 7 (Target Answer), 29 (November 2, 2006 entry of default).  Target denied that it employed Plaintiffs in any manner, that it controlled or was otherwise responsible for payment of Plaintiffs' wages, and denied "any and all other allegations asserting liability or wrongdoing on the part of Target." Docket no. 47 ¶ 1.

On December 26, 2006, Jim's and James Funderburgh answered in the instant action, and the default was vacated.  Docket nos. 43, 44.  Jim's and James Funderburgh denied that Jim's employed Plaintiffs in any manner, that it controlled or was otherwise responsible for payment of Plaintiffs' wages, and denied any and all allegations asserting liability or wrongdoing on the part of Jim's.  Docket no. 43 ¶ 1.  Jim's admitted that it "had an independent contractor relationship with all of the plaintiffs and that these plaintiffs contracted to do work of cleaning of the stores listed in paragraph 10(a) of Plaintiffs' Third Amended Complaint." *Id.* ¶ 10.  In its "Nineteenth Defense," Jim's asserted "that the co-defendant Target Corporation is the employer for all the plaintiffs and is therefore responsible for all liabilities and obligations under the Fair Labor Standards Act" and that "Target Corporation on occasion required the plaintiffs to work more than forty (40) hours per week

2

contrary to their independent contractor agreement with Defendant Jim's Maintenance." *Id.* at 6.

On January 18, 2007, Target asserted cross-claims against Jim's Maintenance and James Funderburgh for indemnification, breach of contract, and equitable piercing of the corporate veil. Docket no. 48.  Target alleged that Jim's and Funderburgh entered into two Building Services Service Agreements for the provision of housekeeping services at certain Target stores, including stores in Texas.  Target alleged that the contracts required Jim's to comply with laws regarding overtime and minimum wage, required Jim's to indemnify Target for any and all claims relating to or resulting from any claims by Jim's employees or any wrongful act of Jim's, and prohibited Jim's from subcontracting its work.  Target further alleged that Jim's violated the contract by subcontracting the services provided to Target (specifically, by treating its employees as independent contractors rather than employees) and by failing to comply with wage and overtime laws.

Jim's and Funderburgh answered the cross-claims on January 29, 2007, arguing that the contract was illegal, that Target was the employer of the cleaning crews, and asserting the affirmative defenses of duress, undue influence, "reformation of the contracts," unconscionability, failure of consideration, release, limitations, waiver, estoppel, contributory negligence, fraud, and accord and satisfaction.

On January 26, 2007, James Funderburgh filed for bankruptcy protection in the Western District of Oklahoma in Case No. 07-10192-NLJ.  *See* docket no. 54.  On March 9, 2007, this Court received notice of Funderburgh's bankruptcy.  This Court held a hearing on March 13, 2007, and noted that the automatic bankruptcy stay stayed all claims against Funderburgh.

On December 17, 2007, Target filed a Motion for Summary Judgment on Plaintiffs' FLSA claims against it and a Motion for Summary Judgment on its cross-claims against Jim's

Maintenance.  Docket nos. 81, 82.  Plaintiffs also moved for partial summary judgment on the issue of whether Target and Jim's Maintenance[1] were their joint employers.  Docket no. 85.

On February 14, 2008, this Court issued an order on Target's Motion for Summary Judgment on Plaintiffs' FLSA claims and on Plaintiffs' Motion for Summary Judgment.  The Court granted summary judgment in favor of Plaintiffs on the issue of whether Jim's Maintenance was the Plaintiffs' employer, but found that fact issues remained on the issue of whether Target was a joint employer of the Plaintiffs.  Docket no. 135.

On May 1, 2008, the parties mediated.  Plaintiffs and Target reached a preliminary resolution, but the cross-claims between Target and Jim's Maintenance were not resolved.  Docket no. 136.  On May 6, the Court was notified that Defendant Jim's Maintenance & Sons, Inc. filed for bankruptcy on May 1, 2008 (Case No. 5:08-bk-11823) and Jim's Commercial Cleaning, Inc. filed for bankruptcy on May 2, 2008 (Case No. 5:08-bk-11827) in the Western District of Oklahoma.  Docket no. 137.  Accordingly, any claims against these Defendants were automatically stayed under 11 U.S.C. § 362, and the Court dismissed Target's pending motion for summary judgment on its cross-claims against Jim's Maintenance without prejudice.  Docket no. 138.  Plaintiffs voluntarily dismissed their claims against the bankrupt Defendants without prejudice to pursuing the claims in the bankruptcy proceedings.  Docket no. 144.  In addition, Plaintiffs voluntarily dismissed their claims against Target pursuant to the settlement.  Docket nos. 136, 145.

On December 16, 2008, this Court administratively closed the case because all remaining claims in the case were stayed due to the bankruptcy.

---

[1] The motion collectively referred to Jim's Maintenance & Sons, Inc. d/b/a Jim's Maintenance and Jim's Commercial Cleaning Services as "Jim's Maintenance."

4

On January 21, 2009 the bankruptcy court lifted the automatic stay as to the cross-claims asserted by Target against James Funderburgh, ordering that Target was "allowed to pursue its cross-claims already asserted" in this case. On February 18, 2009, the Bankruptcy Court granted Target's motions for relief from the automatic stay with regard to its claims against Jim's Maintenance and Jim's Commercial Cleaning, Ltd. The Trustee filed appeals of both orders in Oklahoma district court (docketed as 5:09-CV-438 and 5:09-CV-439).

On February 24, 2009, Target moved to reopen this case and asked the Court to take under advisement the summary judgment motion it had filed on the cross-claims against Jim's Maintenance. Docket no. 147. Jim's and Funderburgh opposed the motion, and moved for the case to be transferred to the Western District of Oklahoma, where it could be consolidated with another pending case. On June 15, 2009, this Court denied the motion, concluding that the decision where the cross-claims should be heard was best decided by the district court handling the identical, but earlier filed *Fuentes* case. After the *Fuentes* court declined to hear the case, Target filed a re-urged motion to reopen this case and consider the pending motion for summary judgment. This Court granted Target's motion, and denied Jim's subsequent reurged motion to transfer venue.

On January 28, 2010, the Oklahoma district court affirmed the Bankruptcy Court's Order granting Target's motion to lift the automatic stay as to Target's cross-claims against Jim's Maintenance and Jim's Commercial Cleaning, Ltd. 5:09-CV-438, 5:09-CV-438 (W.D. Okla.). The Trustee has appealed the district court's judgment in those cases, but no stay is in place pending appeal. Thus, there are no barriers to this Court's ruling on the pending motion.

## II. Issues

Target's motion seeks summary judgment on its cross-claims against Jim's Maintenance for

breach of contract and indemnification.  Target's motion asserts, in general, that Jim's Maintenance breached its contract with Target by failing to comply with the provisions requiring it to hire its cleaners as employees rather than independent contractors, failing to pay its cleaners for overtime, and otherwise failing to comply with its contractual obligations concerning the employment of its cleaners, that these breaches caused FLSA claims to be asserted against Target, and that Jim's Maintenance is contractually obligated to indemnify Target.  In its response, Jim's Maintenance argues that it did not breach the contract by hiring independent contractors or by failing to pay overtime, that Target is not entitled to indemnification, and that the indemnification clause is void under Minnesota law as against public policy.

### III. Factual Background

The evidence indicates that Trent Smith, who worked for Jim's as a sales associate, contacted Target in 2000 to discuss providing cleaning services for a new Target store being built in Selma, Texas.  Smith depo at 16.  Jim's submitted a bid for the work.  J. Funderburgh Dep. at 31.  Target and Jim's (by Bryan Funderburgh, President) signed a contract in June 2000.  Smith Dep. Ex. 1  The term of the contract was to commence on July 9, 2000 and expire on July 8, 2003, except that Target could cancel the contract without cause on thirty days' written notice or for cause on three days' notice.  The contract was for daily service at Target store T-1024 in Selma, Texas.  *Id.*  The Floor Maintenance Specifications (Exhibit A to the contract), provided the Contractor (Jim's) "with a detailed list of specifications and expectations."  Under the Contractor's Duties section of Exhibit A, it stated that services would be performed when the Target store is closed, that Contractor shall provide as many labor hours as needed to maintain the agreed upon standards, that Contractor's employees will at all times be under the direct control of a supervisor whose responsibility it is to

6

insure that the maintenance employees perform their duties according to the standards of Exhibit A, that Contractor would provide an English-speaking/reading supervisor at the store during all shifts and during scheduled walk-throughs, and that "Contractor's supervisor will be an employee of the Contractor."  In the Security Regulations, Exhibit B to the contract, it stated that "[u]nder no circumstances can any alarmed door be opened or overnight personnel be permitted to enter or leave the building without the presence of a Target Executive."

Target acknowledges that the terms of the contract were, generally speaking, not negotiated. Jim's bid on and was awarded additional Target stores.  *See*, *e.g.*, Fisher Dep. Pl. Ex. 2 (January 2001 Data Sheet and contract for nine stores); Fisher Dep. Pl. Ex. 3 (January 2001 Data Sheet and contract for ten stores).

In 2001, Target decided to reduce the number of cleaning contractors it used to approximately twenty-five companies, and to assign stores to cleaning contractors by geographical regions.  Pl. Ex. 10.  Jim's was selected as the cleaning contractor for its region, and beginning in approximately October 2001, was offered and accepted contracts to clean a substantial number of additional stores. Target and Jim's entered into a contract (the "Building Services Service Agreement"), which was signed by Bryan Funderburgh on October 15, 2001, had an initial term of August 1, 2001 to August 1, 2004, which could be extended thereafter until terminated, and covered forty-eight stores in Oklahoma, Kansas, Missouri, and Texas.  Smith Dep. Pl. Ex. 2; Fisher Dep. Pl. Ex. 4 (hereinafter referred to as the "2001 contract").  The terms of the contract were not negotiated, and Target set the price it would pay per store, as determined by a specific formula created by Target.  J. Funderburgh Dep. at 40; Fischer II Dep. at 6.  At this point, Target made up most of Jim's Maintenance's business.  J. Funderburgh Dep. at 41.

7

The 2001 contract provided:

1. Services.  During the term of this Agreement, Contractor agrees to perform the Services described in the Contractor Handbook (hereinafter the "Services"), for the Target locations listed in the Data Sheet as and when requested by Target, and to provide all tools, labor, supervision and products necessary to perform the Services (except for any tools, equipment and products to be provided by Target pursuant to the Data Sheet or Contractor Handbook).

The Contractor Handbook may include Scope of Work documents, Contractor Expectations, Security Regulations.  The Contractor Handbook is incorporated by reference into this Agreement and may be updated by Target from time to time.  Any changes made by Target to the Contractor Handbook will be effective thirty days after notice to Contractor, unless during this thirty day period Contractor gives Target written notice setting forth its reasonable objections to specific changes.  Target and Contractor will endeavor to resolve Contractor's objections to the satisfaction of both parties, or Target may terminate this Agreement as provided in Section 2.

2. Termination.  Unless sooner terminated in accordance with this Agreement, this Agreement shall have an initial term as set forth in the Data Sheet, and shall thereafter be extended until terminated at any time by either party by giving written notice to the other party not less than thirty calendar days prior to the effective date of termination. The foregoing notwithstanding, Target may terminate this Agreement without cause at any time even during the initial term by giving thirty (30) days' prior written notice to Contractor. . .

Target may also terminate this Agreement for cause at any time in the event Contractor, if in Target's sole reasonable opinion, fails to perform or otherwise breaches this Agreement.  Such failure or breach may include, but not be limited to, any failure by Contractor to provide any of the Services when scheduled, any failure by Contractor to provide a sufficient number of adequately trained personnel to perform Services when scheduled, or any failure by the employees or agent of Contractor to observe applicable Target regulations.  Such termination for cause shall be effective upon the earlier of the date of receipt by Contractor of the notice of termination or a date which is three (3) business days from and after the date of mailing of such notice of termination.

3. Payment. . . .

4. Independent Contractor. Target and Contractor intend to create an independent contractor relationship.  As such, Target is interested only in the results of Contractor's performance and not the specific method or manner of performance. Therefore, while Contractor agrees to perform the Services in accordance with and

to Target's standards and specifications, Contractor retains sole and exclusive control over the method and manner in which the Services are performed.  All Services performed pursuant to this Agreement are subject to Target's right of inspection and must meet with Target's approval.  *All personnel of Contractor used to perform Services under this Agreement shall be employees of Contractor and not of Target. Contractor shall comply with all applicable federal, state and local laws regarding compensation, eligibility and conditions of employment*.  Contractor shall, at the commencement of the term and from time to time as may be required by Target, provide a written, notarized Certification Statement to Target that all employees of Contractor, any subcontractor working on Target premises, and all agents, servants, independent contractors or anyone else related to Contractor to meet Contractor's obligations under this Agreement are properly documented to legally work in the United States.  The form of certification is included in the Contractor Handbook.

Contractor shall pay all federal, state and local payroll, social security, unemployment and other taxes, contributions and premiums required to be withheld or paid with respect to its employees, and shall file all returns incident to such taxes, contributions and premiums.  Target shall have no obligation to provide Contractor or any of Contractor's employees with any employee benefits provided for employees of Target.  Contractor may not claim benefits from Target under applicable workers' compensation laws for injuries sustained by Contractor or its employees while providing Services.

. . . .

In the event any court or administrative tribunal or agency with appropriate jurisdiction determines than an employment relationship has been or will be established by the performance of this Agreement, this Agreement shall immediately cease and Contractor shall reimburse and indemnify Target for expenses of any nature, including, but not limited to, tax withholding and insurance claims in the nature of unemployment compensation and/or workers' compensation, imposed by any level of government.

....

7. Indemnification. Except as provided herein, Contractor agrees to assume responsibility for all injuries or damages to persons or property which relate to or arise out of Contractor's performance of Services, Contractor's failure to perform its obligations under this Agreement, or the negligence or wrongful acts of Contractor or its agents or employees. *Contractor, to include his agents, servants, employees, assigns, independent contractors, or anyone else retained by Contractor for the performance of Contractor's obligations under this Agreement, shall defend, indemnify and hold harmless Target, its agents and employees, from and against (1)*

9

*any and all claims, suits, losses, damages, judgments or expenses (including attorney's fees incurred in responding to claims or suits) which relate to, arise out of, or are asserted or incurred as a result of, Contractor's performance of Services, Contractor's failure to perform its obligations under this Agreement, or the negligence or wrongful acts of Contractor or its agents or employees; or (2) any claims made by Contractor's employees arising out of the performance of Services; provided, however, that the foregoing indemnity obligation shall not apply to any injury, damage or loss caused by the sole negligence of Target.* The obligations under this paragraph shall survive the termination of this Agreement.

Contractor shall, at its expense, be responsible for the defense of any claims or suits for which it is obligated to indemnify Target and shall, in connection with such defense, provide Target with counsel reasonably satisfactory to Target. Target shall have the right at its option and at its own expense, to defend (with or without Contractor) any such actions, claims, demands and suits. Target shall cooperate with Contractor, as Contractor reasonably requires, in such defense. Upon request, Contractor shall advise Target of the current status of any action, claim, demand or suit being defended by Contractor in accordance herewith.

If any claims are made against Target as a result of the work or as a result of any actions or failures to act by the Contractor, or if Target reasonably believes that such claims will be made, Target may withhold from the amount otherwise due or to become due under this Agreement such amount as Target reasonably determines may be necessary to cover such claims and to cover any costs which Target reasonably anticipates may be incurred in connection with defending against such claims. The foregoing right to withhold payment shall not be Target's exclusive remedy and shall be in addition to any other remedies which Target may have under this agreement or at law or in equity.

...

17. Assignment.  Contractor shall not subcontract for Services Contractor is to provide under this Agreement with[out] Target's written approval. . . .

2001 contract (emphasis added).

The contract also states that it is governed "in all respects by the laws of the State of Minnesota." 2001 Contract ¶ 13.  Further, paragraph 14 provides that, if Contractor "breaches any of its obligations" under the Agreement, Target "may undertake any one or more of the following remedies," including terminate the agreement, cure or begin to cure the breach and invoice

Contractor or set off from amounts due, fine Contractor, set off damages, and sue Contractor for damages and/or specific performance, or for any other remedy available at law or in equity.

The 2001 Contract incorporated the Contractor's Handbook and other documents, which included the following provisions:

• The Services shall be performed during the hours designated by Target and on the days of the week set forth in the Data Sheet ["7 Day(s) per Week"], unless otherwise directed by Target.

• Contractor shall provide as many labor hours as needed to achieve Target's expectations, as outlined in the Contractor Handbook and Housekeeping Expectations documents, and as provided by Target's Building Services and Contract Services Teams.

• Contractor's employees will at all times be under the direct control of a supervisor or crew lead, who is responsible for insuring that Contractor's employees perform their duties according to the standards set forth in the Agreement and Contractor Handbook.

• All Contractor housekeeping employees must use the main Target team member entrance when entering or exiting the store. Overnight (lock-in) housekeeping employees must enter the store together at the designated start time, to avoid arming the doors more than once a night.

• Under no circumstances can any alarmed door be opened or overnight personnel be permitted to enter or leave the building without the presence of a Target executive. An emergency exit door may be opened for authorities, in the event of an emergency (such as fire or medical).

• Store policy dictates that all contract services personnel shall enter and exit through [the employee entrance] and be checked in and out by the [manager on duty].

• All personnel should sign in and out on the log book at the employee entrance.

• Overnight cleaners must wait at [employee entrance] desk for [manager on duty] to check in-check out at all times.

Over the next few years and during the initial three-year term of the 2001 contract, Jim's store contracts increased to approximately eighty stores. Smith Dep. at 80; Fisher Dep. Pl. Ex. 10 (Data Sheet printed 9/2/2004). James Funderburgh testified that, because Jim's had to borrow

money to purchase new equipment each time it was assigned a new Target store and because Target made up almost all of Jim's Maintenance's business, Jim's was, as a practical matter, "tied to Target" and had no bargaining power.  J. Funderburgh at 49.

In March 2005, Target sent an email to all its contractors regarding "compliance expectations."  Smith Dep. Def. Ex. 6.  It stated, "we expect that you are maintaining properly completed I-9 records and seeking re-verifications when required; and that you are maintaining proper payroll records establishing your compliance with compensation laws. . . .  We also expect that you have taken adequate steps, including audits, to ensure that you are paying and treating your employees completely in compliance with federal and state compensation and taxation laws.  Please also let me remind [you] that you are prohibited from subcontracting any of the work we assign to you."  The email asked Target contractors to return a signed and notarized certification to Target by April 8.  Jim's returned the certification, dated March 31, 2005, which stated that Jim's certified that all Jim's "employees will be paid and treated in accordance with all federal, state and local laws applying to their employment relationship with me or my company, including those with regard to overtime, minimum wage, and meal periods and rest breaks."  Smith Dep. Def. Ex. 9; J. Funderburgh Dep. at 163; J. Funderburgh Dep. Def. Ex. 9.

In the Fall of 2005, Target changed its contract procedure to a competitive bidding process.  Smith Dep. at 64-65; J. Funderburgh Dep. at 51.  Target cancelled all cleaning contracts and opened the bidding for its stores.  Fisher Dep. Pl. Ex. 11 (August 2, 2005 letter from Target terminating contract).  Contractors could bid on as few or as many districts as they desired to service.  Under the revised bidding process, Jim's was awarded sixty-eight stores in Arkansas, Kansas, Missouri, New Mexico, Oklahoma, and Texas.  This was fewer stores than it had previously cleaned, and Jim's was

12

receiving less per store on average.  J. Funderburgh Dep. at 54.  After the bidding, Target and Jim's

signed a new contract in August 2005.  Pl. Ex. 4; Fisher Dep. Pl. Ex. 12.  Jim's did not negotiate the

terms of the contract, and Jim's had no input into the language of the contract or its attachments.

J. Funderburgh Dep. at 57.  Target also changed the timing of its payments, causing Jim's to have

to borrow money to make payroll in early 2006.  J. Funderburgh Dep. at 62.  The 2005 contract term

commenced on September 2, 2005 and ended on September 2, 2008.  Pl. Ex. 4 to Smith Dep. ("2005

contract").

        The terms of the 2005 contract were similar to those in the 2001 contract.  The 2005 contract

did not incorporate the Contractor Handbook, but did incorporate a Scope of Work, which set forth

cleaning expectations.  Target retained the ability to terminate the Agreement without cause at any

time by giving thirty-days' written notice and could terminate for cause at any time upon three days'

notice.  Contractor agreed to perform "Housekeeping Services," described in further detail in the

Scope of Work, which was incorporated into the Agreement and could be updated by Target "from

time to time." The "independent contractor" and "indemnification" provisions remained substantially

the same.  The 2005 contract contained a new paragraph entitled "Subcontracting," which stated:

> Contractor shall not subcontract for Services that Contractor is to provide under this
> Agreement without Target's prior written approval.  Any approved Subcontractor
> must execute an agreement that is substantially similar to this Agreement and that
> complies with all applicable state and federal requirements.  In the event that Target's
> approval is given, the following provisions apply:  A Subcontractor is a person or
> entity who has a direct contract with the Contractor to perform Services for the
> locations listed in Section 4 above.   Contractor shall not contract with any
> Subcontractor who is not acceptable to Target.  Contractor shall make no substitution
> for any Subcontractor previously selected without first getting Target's approval.
> Contractor shall provide such information as Target may require from time to time
> regarding its Subcontractors.
>
>       By an appropriate written contract, Contractor shall require each

Subcontractor, to the extent of the Services to be performed by the Subcontractor, to be bound to Contractor by the terms of this Agreement, and to assume toward Contractor all obligations and responsibilities which the Contractor by the Agreement assumes toward Target. Such contract shall preserve and protect Target's rights under the Agreement with respect to the Services to be performed by the Subcontractor, so that the subcontracting thereof shall not prejudice such rights. Contractor shall make available to each proposed Subcontractor copies of those portions of the Agreement to which Subcontractor shall be bound.

To the extent that Contractor is obligated to provide its own Compliance Certification to Target, Contractor shall require each Subcontractor to provide Contractor a written, notarized certification statement that Subconctractor shall comply with all applicable federal, state and local laws regarding compensation, eligibility and conditions of employment including all wage and hour, minimum wage and overtime laws, and that all employees of Subcontractor, and all agents, servants, independent contractors or anyone else related to Subcontractor to meet Contractor's obligations under the Agreement are properly documented to legally work in the United States. The form of Subcontractor Compliance Certification shall be provided by Target. Contractor shall provide Target copies of such completed Subcontractor Compliance Certifications received from its Subcontractors from time to time as may be requested by Target.

Nothing in this Agreement shall create any contractual relationship between Target and any Subcontractor.

2005 contract ¶ 24.

In November 2005, Target notified Jim's that, through PriceWaterhouse Cooper (PWC), it would be conducting wage, hour, and employment eligibility audits of its vendors' employee records. J. Funderburgh Dep. at 66; Fisher Dep. at 197.[2] PWC conducted an on-site audit of the employee records maintained by Jim's in late March 2006. PWC sent a draft and final report to Target in April 2006. Fischer Dep. Pl. Ex 18, 19. The report states that "[t]he objective of PricewaterhouseCoopers' services was to gain an understanding of Jim's Maintenance & Sons Inc

_____

[2] Target has provided evidence that, just before the PWC audit, Bryan Funderburgh directed his administrative staff to remove from the personnel files the independent contractor agreements entered into by each of the cleaners and area supervisors. Tallant decl. ¶ 6; Stover decl. ¶ 5. Bryan Funderburgh denies doing this.

('Vendor') polic[i]es related to the processes/transactions bulleted below, and to review the vendor's compliance with those policies and applicable laws and regulations.  PricewaterhouseCoopers' services included inquiry with management and testing of a selected sample of employee files and company documents."   The processes/transactions bulleted were new hire processing, HR management, hours recorded and worked, payroll calculation, termination, training, and other (e.g. subcontracting).  Section 2.2 of the Report noted that exempt employees were not compensated the minimum requirement of $455 per week, and that "[m]anagement expressed unawareness to the Federal Law compensation requirement for salaried employees, and is currently consulting their attorney to remedy any potential underpayment."

Section 2.3 stated that "[a]ccording to management, the work schedule is verbally communicated to employees by their respective supervisors and based on variable store starting time requests.  Currently a schedule form is being implement providing guidance regarding entry and exit times, meal and break duration and total shift hours."  Section 2.4 noted that 46 out of 50 sampled files lacked W-4 forms and "no deductions are made to employee's income for tax purposes."  Section 2.5 noted recordkeeping deficiencies, including inconsistencies between Jim's payroll time sheet and Target's sign-in log at two stores.  Section 3.1 noted record keeping deficiencies for time records, including that: discrepancies were found between vendor's payroll timesheets and vendor's formalized and documented policies and procedures; timesheets are not signed by employees or supervisors; the record of an employee working on any particular day is denoted by a dash/cross/tick in a checkbox; there is no record of the time that employees are starting and finishing work; "in essence the employees are paid on a daily basis [where] actual hours worked are not recorded or taken into account when determining compensation."  It also noted that the timesheets did not

15

reconcile with the formalized policies and procedures, and that it was unclear whether the formal policies and procedures were used in practice. Section 4.2, titled "Recording Overtime," stated "Refer to section 3.1, Time Recorded. Due to the inconsistent time record keeping, unable to complete this step." Section 7.1, entitled "Subcontracting," stated "Management stated no subcontractors are used for Target, however there are numerous anomalies which warrants further investigation; lack of deductions for tax purposes, the use of W-9 forms instead of W-4 forms and inconsistencies between names across Target security sign in sheets and vendor's payroll records."

Target decided to terminate the contract with Jim's based on information contained in the PWC review, and began looking for contractors to take over the stores. Fisher II Dep. at 67. Ted Fisher, who made the recommendation to terminate, stated that he was particularly concerned about the lack of W-4's in 46 out of 50 test files, and the fact that Jim's was not complying with the applicable laws regarding compensation (section 2.2 of the report). Fischer Dep. I at 235-237.

Target sent a letter to Bryan Funderburgh of Jim's Maintenance dated May 22, 2006, notifying him that it was "terminating the Agreement in its entirety for cause." Pl. Ex. 39; Fisher Dep. Pl. Ex. 15. Fisher also personally telephoned Jim's to terminate the contract. Target withheld approximately $496,000 due to Jim's, asserting its rights under the indemnification portion of the contract, which permitted Target to withhold funds if it reasonably believed that claims would be made against Target as a result of "any actions or failures to act by the Contractor." Fischer Dep. II at 38.[3] Jim's Maintenance was unable to pay the cleaning crews their last paycheck, and ceased doing business shortly thereafter due to lack of funds. J. Funderburgh Dep. at 7. As noted, Jim's

_____

[3] Target was aware of claims made by certain Jim's cleaners, including Isidro Juan Itzep. Pl. Ex. 36 (April 28, 2005 letter from attorney for Jim's to Target regarding unpaid wage claims).

16

Maintenance and James Funderburgh both declared bankruptcy.

## IV. Analysis

As noted, Minnesota law applies to disputes concerning these contracts.  Summary judgment is inappropriate where terms of a contract are at issue and the terms are ambiguous or uncertain. *Bank Midwest, Minn., Iowa, N.A. v. Lipetzky*, 674 N.W.2d 176, 179 (Minn. 2004).  But if terms of the contract may be given their plain and ordinary meaning, construction of the contract is a matter for the court and summary judgment may be appropriate.  *Id.*  And whether a contract is ambiguous is a question of law. *Murray v. Puls*, 690 N.W.2d 337, 343 (Minn. App. 2004).  When interpreting a contract, certain principles apply: (1) language must be given its plain and ordinary meaning; (2) a contract term must be read in the context of the entire contract so as not to lead to a "harsh and absurd result"; and (3) a contract should be interpreted to give meaning to all its provisions. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).

### A. Breach of Contract – Use of Subcontractors

The evidence is undisputed that Jim's Maintenance had always hired its cleaners as independent contractors, and hired all of the cleaners for Target stores as independent contractors on shift pay.  J. Funderburgh Dep. at 75, 81, 129; Smith Dep. at 308-312 & Def. Ex. 4; Tallant Decl. ¶ 5, Stover Decl. ¶ 4.  Target contends that Jim's was not authorized to use subcontractors to provide its standard cleaning services, and that its hiring of its cleaners as independent contractors violated the contracts.

Though acknowledging that the initial contract in 2000 defined the term "Contractor" to include, among others, "independent contractors," Target asserts that the "contracts in effect during the relevant time period are more precise."  Target points out that the contract applicable between

17

October 2001 and September 2005 states that "[a]ll personnel of Contractor used to perform Services under this Agreement shall be employees of Contractor and not of Target." Target also points to the provision in the contract in effect from September 2005 forward, which states that "[a]ll persons used by Contractor to provide Services under this Agreement shall be employees only of Contractor and shall not in any way be employed, including directly or jointly, by Target." Further, Target notes that even Jim's acknowledges that the contracts require Target's prior written approval for Jim's to subcontract for services that Jim's is to provide. Target asserts that "Jim's Maintenance's executives admitted that their actions in hiring the cleaners as subcontractors rather than employees contradicted the contract." Citing J. Funderburgh Dep. at 207, 218; Smith Dep. at 311-12.

Jim's contends that it was not a breach of contract to hire its cleaners as independent contractors, because the contract acknowledges that Jim's may hire independent contractors to perform the work. Jim's points to paragraph 11 of the 2005 contract, which refers to the Contractor "to include its agents, servants, employees, assigns, independent contractors, or anyone else retained by Contractor for the performance of Contractor's obligations under this Agreement," and paragraph 16, which refers to the "Contractor and its employees and agents" as being subject to security checks and regulations. Further, Jim's notes that paragraph 24 provides that the Contractor could subcontract with Target's prior written approval, but the formality of prior written approval was waived by Target, which "well knew of the arrangement Jim's Maintenance had with its workers."

The contract states that Jim's "shall not subcontract for Services that Contractor is to provide under this Agreement without Target's prior written approval," and "[a] Subcontractor is a person or entity who has a direct contract with the Contractor to perform Services for the locations listed in Section 4 above." Approved Subcontractors were required to "execute an agreement that is

18

substantially similar to this Agreement and that complies with all applicable state and federal requirements." Further, "[b]y an appropriate written contract, Contractor shall require each Subcontractor, to the extent of the Services to be performed by the Subcontractor, to be bound to Contractor by the terms of this Agreement, and to assume toward Contractor all obligations and responsibilities which the Contractor by the Agreement assumes toward Target" and "Contractor shall require each Subcontractor to provide Contractor a written, notarized certification statement that Subcontractor shall comply with all applicable federal, state, and local laws regarding compensation, eligibility and conditions of employment including all wage and hour, minimum wage and overtime laws, and that all employees of Subcontractor, and all agents, servants, independent contractors or anyone else related to subcontractor to meet Contractor's obligations under the Agreement are properly documented to legally work in the United States." Further, other provisions of the Contract relating to the relationship between Target and Jim's state that "[a]ll persons used by Contractor to provide Services under this Agreement shall be employees only of Contractor and shall not in any way be employed, including directly or jointly, by Target."

Looking at the contract as a whole, as it must, the Court finds that Jim's did not breach the anti-subcontracting provisions of the contract by hiring its cleaning personnel as independent contractors. As discussed below, Jim's treatment of its employees as independent contractors was a violation of applicable wage and hour laws, and thus breached the contract in that regard, but it was not a breach of the contract's anti-subcontracting provisions.

The contract's anti-subcontracting provisions are unambiguous and are intended to prevent the Contractor from subcontracting with another company to provide housekeeping services without Target's written approval; they do not purport to control the Contractor's relationship with its

19

cleaners.  Section 7 of the 2005 contract, which was not filled out, could have specifically addressed whether Jim's could hire its individual cleaners as independent contractors.  It stated that it was to be filled out only if the Services to be provided were being provided in the State of California.  Next to "Independent Contractors," two different options could be checked.   The first stated that "Contractor shall not use independent contractors and warrants and represents that all persons providing Services under this Agreement shall be Contractor's employees"; the second stated that "[t]he total number of persons who shall be utilized by Contractor as independent contractors shall be _____. These persons' local, state, and/or federal contractor license identification numbers are as follows: ...."  Further, whether Jim's could treat its cleaners as independent contractors was encompassed within the intended scope of the clauses requiring Jim's to comply with applicable employment laws.  The fact that the contract contained these additional provisions indicates that the general anti-subcontracting provision was not intended to reach the issue of whether Jim's could hire its individual cleaners as independent contractors.

Further, the provision that persons used by Contractor to perform services would be employees only of Contractor was not an express requirement that the Contractor hire all personnel as employees rather than as independent contractors, but was simply part of the "independent contractor" provisions of the contract included to make clear that the Contractor was an independent contractor of Target and that its personnel would not be employees of Target.  Again, there was no express requirement, apart from the provisions requiring Jim's to comply with applicable laws, that Jim's could not hire its individual cleaning personnel as independent contractors as opposed to employees.  Thus, Target's motion for summary judgment on this issue is denied.

**B. Breach of Contract – Failure to Pay Overtime/FLSA Violations**

The 2001 contract required Jim's to "comply with all applicable federal, state and local laws regarding compensation, eligibility, and conditions of employment."  2001 contract ¶ 4.  The 2005 contract specified that Jim's would "be exclusively responsible with regard to such persons [used by Jim's to provide Services] for compliance with all immigration and work authorization laws, and all other federal, state and local laws related to the employment relationship including, but not limited to, compensation, benefits, workers compensation, and wage and hour requirements."  2005 Contract ¶ 5.  Further, Jim's "agree[d] to comply with all federal, state and local laws, regulations and requirements applicable to employment of persons providing Services including, but not limited to, laws regarding immigration compliance, work authorization, compensation, overtime, minimum wage, the provision of meal and break periods, and prohibitions against discrimination and harassment."  *Id.*

In its February 2008 Order, this Court held as a matter of law that Plaintiffs were employees of Jim's.  Accordingly, Jim's was obligated to comply with the FLSA.  The FLSA does not prevent employees from working overtime, but does require that they be paid at least one and one-half their regular rate for overtime work.  The relevant section of the FLSA provides as follows:

> [N]o employer shall employ any of his employees who in any workweek engaged in commerce or in the production of goods for commerce ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). The regulations[4] address "day rates" and "job rates" similar to Jim's shift pay

---

[4] The regulations are intended to "constitute the official interpretation of the Department of Labor with respect to the meaning and application of the maximum hours and overtime pay requirements contained in section 7 of the Act." 29 C.F.R. § 778.1.

policy.  29 C.F.R. § 778.112, entitled "day rates and job rates," provides:

> If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek.

Thus, as an employer of the cleaning crews, Jim's was obligated to pay overtime to its cleaning crews, but it is undisputed that it did not do so.  In its Response to Plaintiffs' Motion for Summary Judgment, Jim's states "Jim's Maintenance does not dispute the proposition that it should have paid overtime when its cleaners worked more than 40 hours a week. Jim's Maintenance does not dispute the fact that it did not in fact pay the required overtime wages."

Despite admitting that Plaintiffs should have been paid overtime wages, Jim's contends that it did not breach the contract.  Rather, it asserts that Target is responsible for the overtime violations. It asserts that, under the contract, Jim's was to have control of its workers and specify their work schedules, and that, on paper, Jim's was to function as an independent contractor.  In reality, Jim's argues, Target called the shots, "to the point where Jim Funderburgh felt that he was just a labor recruiter and paymaster for Target."  Thus, Jim's argues, it was Target that breached the contract, not Jim's, because Jim's did not require its cleaners to work overtime, and any overtime they did work was at Target's insistence, since Target "completely controlled when the work began and when the workers were allowed to go home."  Jim's contends that "Target treated the workers as employees, but required unpaid overtime, for which it is now being held liable."  Citing *Carlson Real Estate Co. v. Soltan*, 549 N.W.2d 376, 379-80 (Minn. App. 1996),[5] Jim's argues that "[s]ince

---

[5] *Carlson* provides that, under general contract law, a party who first breaches a contract is usually precluded from successfully claiming against the other party because the first breach serves

Target interfered with Jim's Maintenance's ability to function as an independent contractor, it breached the contract and cannot complain that Jim's Maintenance subsequently breached the contract." Jim's asserts that, some days, workers were kept for twelve hours, but Jim's only paid them the eight hours "it had requested" of the workers since Target "forced the overtime."

Jim's also argues that it was providing the service contemplated by the contract, that Target knew Jim's was using subcontractors but overlooked it and waived the requirement that it now insists permitted it to terminate the contract. Jim's states that cleaning supervisor Elvia Riojas complained to Target managers about workers having to stay late and having to work overtime without being paid for it, that Target store managers were aware that Jim's cleaning crew workers were working seven nights a week, and Target managers and corporate officials were "well aware of frequent complaints about pay problems experienced by Jim's Maintenance cleaning workers." Jim's states that individual workers would complain to Target, and Target managers would intervene on their behalf by contacting the Jim's head office. Thus, Jim's argues, Target acquiesced in the alleged breach, and permitted Jim's to continue using subcontractors to perform the work, fully aware that the workers complained that they were not being paid overtime. Citing *Krogness v. Best Buy Co.*, 524 N.W.2d 282, 286 (Minn. App. 1994), and *Appollo v Reynolds*, 364 N.W.2d 422, 424 (Minn. App. 1985), Jim's contends that "[t]he course of conduct of the parties, with both parties acknowledging the way the workers were paid and the number of hours they worked, became a new agreement." Jim's asserts that Target terminated the contract without cause, and intended to create a scapegoat for Target's violation of the FLSA.

Target denies that it breached the contract at any time, arguing that Jim's allegations are

as a defense against the subsequent breach.

factually and legally incorrect.  Target contends that the first breach occurred when Jim's hired all of its cleaners as independent contractors and then paid them by the shift, rather than as employees entitled to overtime.  Target further asserts that Jim's did not have a policy prohibiting overtime – on the contrary, its "Shift Pay Policy" merely provided that "employees" were not supposed to work more than an eight-hour shift or more than a six-day workweek without written approval from Jim's (but that six eight-hour shifts already entails working overtime).  Target also contends that it did not mandate that anyone work overtime, and the allegation is only that Target required cleaning crews to stay behind their regular shift quitting times.  Target asserts that, "[w]hile the practical result may have been that plaintiffs went into overtime, nothing legally or contractually prohibited Jim's Maintenance from using 'split crews' or otherwise managing its workforce so that none of its employees worked more than 40 hours per week."  Target argues that it did not require or compel Plaintiffs or any other Jim's cleaner to work overtime, and Jim's cannot escape its contractual obligations through its re-characterization of events.

Target also refutes Jim's assertion that an implied contract was created, arguing that *Krogness* recognizes that, under Minnesota law, no implied contract can exist when the written contract addresses the same subject matter.  *Krogness*, 524 N.W.2d at 286 (citing *Reese Design, Inc. v. I-94 Hwy. 61 Eastview Ctr. P'ship*, 428 N.W.2d 441, 446 (Minn. Ct. App. 1988)).  Target asserts that the contracts "unequivocally provided that Jim's Maintenance was responsible for paying all compensation, including overtime, due its employees" and because the written contracts covered the subject matter at issue, Jim's "cannot evade its contractual obligations by claiming that Target had implicitly changed the terms of those contracts."

The undisputed summary-judgment evidence shows that Jim's failed to comply with the

24

FLSA in many respects. Jim's hired its cleaning crew personnel as independent contractors rather than employees, and had always operated that way. J. Funderburgh Dep. at 208, 131.[6] It is also undisputed that Jim's utilized a "shift pay" policy, which stated that an employee could not work over an eight-hour work shift or over six days per workweek without written approval from Jim's Maintenance. J. Funderburgh Dep. Def. Ex. 2. It is undisputed that Jim's did not pay by the hour, did not keep track of the actual hours that its personnel worked, and instead kept track only of days worked. J. Funderburgh Dep. at 77, 211 ("We w[ere] not paying by the hour. We were paying by shift pay."). Jim's paid its cleaners by shift, regardless of how many hours an individual actually worked, and never paid overtime. Smith Dep. at 97-98, 125-26, 133-34, 287-89 & Ex. 2; J. Funderburgh Dep. at 213. Jim's had no policy or method for payment of overtime, and there were no provisions made for payment of overtime pay if an employee worked more than forty hours because "they were expected to get their job done" and perform their work in a forty-hour workweek. Smith Dep. at 133; J. Funderburgh Dep. at 81.

Jim's contract with Target required daily cleaning services at every store. The evidence indicates that the cleaning crews worked a regularly scheduled shift typically starting at 10 or 11 p.m. and ending at 7 or 8 a.m., as determined by the Target store managers. Pl. Ex. 202 at 30-32, Pl. Ex. 211 at 24. Jim's did not control when the shifts started or when Jim's employees were allowed to leave. The undisputed evidence is that the cleaners were locked into the store and could not leave until the Target store manager allowed them to leave.

---

[6] James Funderburgh testified that his "CPA had a lawyer draw up" the contract/initial agreement that Jim's entered with its cleaners in 1982, and that the IRS and U.S. Labor Board audited his employment practices, including shift-pay, in 1991 and approved it. J. Funderburgh Dep. at 129, 225.

Jim's argument is essentially that Target caused the breach and thus cannot complain of it. Though Target caused the cleaners to work overtime to some extent because it sometimes required cleaning crews to stay beyond the regular shift-time end, Jim's controlled how many workers were sent to a store, which days they worked, and set the cleaners' pay.[7] Jim's was contractually obligated to provide enough man hours to complete its contractual obligations, and could have avoided overtime by providing more cleaners per shift or having cleaners work fewer days per week. Although Jim's shift-pay policy did not permit cleaners to work more than six days in a week, this policy would have resulted in at least two different crews cleaning a particular Target store, and thus Jim's could have used split crews to avoid overtime.  Though James Funderburgh stated that it would not have been possible to use a split crew (where a team of three work four days, and then a different team of three work three days) because "you would have to find people that would work three days a week" and because "Target managers ... wanted the same guys working at least five to six days a week," he acknowledged that there was no legal or contractual reason Jim's could not use split crews.  J. Funderburgh Dep. at 214.  Even if Target managers wanted "the same guys" working at least five to six days per week, as Funderburgh testified, that would still require more than one crew per store since Jim's contracted to clean seven days per week.  If Jim's had to use different cleaners for one or two nights of the week, such that two different crews were needed for a store, there is no reason it could not use split crews in such a way as to avoid overtime.  But the Plaintiffs' undisputed evidence is that the cleaners often worked seven days per week, and that some cleaners

---

[7] The undisputed evidence is that Target sometimes asked for more cleaners, but never fewer. Target required a minimum number of cleaners per store (three for a regular Target and four for a super Target), but there is no evidence that Target set a maximum number.  *See, e.g.*, Riojas Dep. at 26; 128; J. Funderburgh Dep. at 85.

got only one day off every fifteen days.  Pl. Ex. 228 at 47; Pl. Ex. 211 at 37-38; Pl. Ex. 25 (Jim's October 2005 payroll timesheet showing cleaners working 14 and 15 days in a pay period).  Jim's payroll timesheets showed cleaners were sometimes working fifteen days straight.  Pl. Ex. 25 (September 2005 payroll timesheet showing cleaners working fifteen days).  Some workers never had a day off during their employment.  Pl. Ex. 206 at 30; Pl. Ex. 214 at 50.  This was due to Jim's actions, not Target's.

Further, as noted, working overtime is not itself a violation of the FLSA.  Rather, it is the *failure to pay* overtime wages that is a violation.  Target did not cause the failure of Jim's to pay appropriate overtime wages; the evidence is undisputed that the failure to pay overtime was a knowing, voluntary choice made by Jim's.  *See, e.g.*, Riojas Dep. at 57-59.  Jim's agreed under the contract to be responsible for payment of overtime wages, but knowingly refused to pay overtime. Jim's was solely responsible for payment of its cleaners, and the undisputed evidence shows that it was Jim's, not Target, that was responsible for the failure to pay overtime wages in violation of the FLSA, regardless of who caused the employees to work overtime hours.  It is undisputed that Jim's controlled the Plaintiffs' payroll, and that it knowingly chose to not pay overtime.  Pl. Ex. 103 at 135-139.

Further, the evidence shows that Target did not acquiesce in Jim's breach of the contract. The undisputed summary judgment evidence shows that Target repeatedly reminded its contractors, including Jim's, of their contractual obligations to comply with compensation laws.  Target requested, and Jim's provided, certifications that Jim's was treating its employees and paying its employees in accordance with all federal, state, and local laws applying to the employment relationship, including those related to overtime, minimum wage, and meal periods and rest breaks.

*See* Pl. Ex. 32 (Jim's Nov. 4, 2004 certification); Pl. Ex. 33 (Target email reminding Jim's of its obligations and requesting certification); Pl. Ex. 34 (Jim's certification).[8]  The undisputed summary-judgment evidence also shows that, when Target was made aware of a complaint by a Jim's cleaner that they were not being paid appropriately, Target contacted Jim's, reminded Jim's of its obligation under the contract to comply with wage and hour laws, and directed Jim's to remedy any deficiency. *See, e.g.*, Pl. Ex. 35 (April 26, 2006 email from Becky Nielsen of Target to Jim's); Riojas Dep. at 102, 120.  Thus, though Target may have sometimes been aware of certain complaints by Jim's workers, there is no evidence that Target knew that none of Jim's workers were being paid overtime wages as a matter of policy.  Further, the undisputed evidence is that Target took steps to enforce Jim's obligations under the contract when these complaints were brought to its attention.  Though ignoring a provision in a contract may constitute a waiver,[9] there is no evidence that Target ignored the provisions of the contract such that they were waived.  And though parties with an express contract may "leave that agreement behind and so conduct themselves that a new contract must be implied from their behavior,"[10] there is no evidence to support Jim's assertion that the parties created an implied contract in place of the terms of the written agreements.

In sum, the Court finds that Jim's breached the contract when it failed to comply with the FLSA, that Target did not breach the contract and thus excuse Jim's breach, and that Target did not

---

[8] Though Target reminded its contractors of their obligations, James Funderburgh testified that Target never inquired in any way about whether Jim's was using subcontractors. J. Funderburgh June 4, 2010 Dep. at 241.  Thus, there is no evidence that Target knew before the PWC audit that Jim's was violating the FLSA as a matter of course.

[9] *Appollo v. Reynolds*, 364 N.W.2d 422 (Minn. App. 1985).

[10] *Krogness v. Best Buy, Inc.*, 524 N.W.2d 282, 286 (Minn. App. 1994).

waive the provisions of the contract or otherwise create an implied contract with different terms.

**C. Indemnification**

Target seeks indemnification pursuant to the contractual indemnification provision, which states in relevant part:

> Except as provided herein, Contractor agrees to assume responsibility for all injuries or damages to persons or property which relate to or arise out of Contractor's performance of Services, Contractor's failure to perform its obligations under this Agreement, or the negligence or wrongful acts of Contractor or its agents or employees. Contractor, to include his agents, servants, employees, assigns, independent contractors, or anyone else retained by Contractor for the performance of Contractor's obligations under this Agreement, shall defend, indemnify and hold harmless Target, its agents and employees, from and against (1) any and all claims, suits, losses, damages, judgments or expenses (including attorney's fees incurred in responding to claims or suits) which relate to, arise out of, or are asserted or incurred as a result of, Contractor's performance of Services, Contractor's failure to perform its obligations under this Agreement, or the negligence or wrongful acts of Contractor or its agents or employees; and (2) any claims made by Contractor's employees arising out of the performance of Services; provided, however, that the foregoing indemnity obligation shall not apply to any injury, damage or loss caused by the sole negligence of Target.[11]

In its cross-claims, Targets seeks a judgment (a) ordering Jim's to indemnify and hold Target harmless for any judgment, loss, damage, or expenses assessed against Target in this lawsuit; (b) ordering Jim's to indemnify and hold Target harmless for any expenses, including attorney's fees, that Target incurs through the course of defending itself in this lawsuit; and (c) award Target its costs and expenses, including attorney's fees, incurred in bringing the cross-claim. Cross-claim ¶ 21.

Jim's argues that Target is not entitled to indemnification. Jim's raises four main arguments in support of its position. First, Jim's argues that the indemnification clause applies only to claims

---

[11] This provision is from the 2001 contract. The 2005 contract's Indemnification is substantially similar – the proviso states "provided, however, that the foregoing indemnity obligations shall not apply to any injury, damage or loss to the extent such injury, damage or loss is caused by the sole negligence of Target."

for "injuries or damages to persons or property," which the Plaintiffs' claims are not.  Second, Jim's argues that the claims were caused by Target, and thus it is not entitled to indemnification.  Third, Jim's argues that its duties were not triggered because Target did not tender the defense to Jim's.  And fourth, Jim's argues that the indemnification clause is void as against public policy.

### 1. Scope of the Indemnification Provision

Minnesota law recognizes the validity of indemnification agreements by which one may recover indemnity where there is an express contract between the parties containing an explicit understanding to reimburse for liability of the character involved.  *Tolbert v. Gerber Indus.*, 255 N.W.2d 362, 366 (Minn. 1977).  However, agreements seeking to indemnify the indemnitee for losses occasioned by its own negligence or wrongful conduct are not favored and are strictly construed.  *Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 791 (Minn. 2005).  The rules governing the requisites, validity, and construction of contracts apply to indemnity agreements.  *Am. Druggists' Ins. Co. v. Shoppe*, 448 N.W.2d 103, 104 (Minn. App. 1989).

The contract section entitled "Indemnification" requires Jim's Maintenance to indemnify Target from and against "(1) any and all claims, suits, losses, damages, judgments or expenses . . . which relate to, arise out of, or are asserted or incurred as a result of, [a] Contractor's performance of Services,[12] [b] Contractor's failure to perform its obligations under this Agreement, or [c] the negligence or wrongful acts of Contractor or its agents or employees; or (2) any claims made by Contractor's employees arising out of the performance of Services."  The "indemnity obligation shall not apply to any injury, damage or loss caused by the sole negligence of Target."  Target relies only

---

[12] The term "Services" means "the tasks or projects to be performed for Target" and include "housekeeping" as described in further detail in the Scope of Work.

on the first clause, and does not rely on the second clause covering "any claims made by Contractor's employees." Target asserts that Jim's failed to perform its obligations under the contract because it was contractually obligated to use employees, not subcontractors, and to pay them all wages due, and that Plaintiff's FLSA claims stem from Jim's failure to meet these obligations under the agreement and its wrongful acts.

Jim's asserts that the Plaintiffs' lawsuit is outside the indemnification clause because the first sentence of the indemnification provision provides that "Contractor agrees to assume responsibility for all injuries or damages to persons or property which relate to or arise out of Contractor's performance of Services, Contractor's failure to perform its obligations under this Agreement, or the negligence or wrongful acts of Contractor or its agents or employees," and Plaintiffs' suit is not for personal injury or property damage. Thus, Jim's position is that all the following indemnification provisions are limited by the first sentence of the indemnification section to "injuries or damages to persons or property." Target asserts that Jim's was "contractually obligated to use employees, not subcontractors, and to pay them all wages due, including any overtime pay" and "plaintiffs' FLSA claims stemming from the failure of Jim's Maintenance to meet these obligations fall within the ambit of the indemnification clause."

The Court concludes that the first sentence of the indemnification provision does not limit the scope of the specific indemnification provisions contained in the second sentence as Jim's contends. In the first sentence, Jim's agrees generally to "assume responsibility for all injuries or damages to persons or property which relate to or arise out of" its performance of Services, failure to perform its obligations, or its negligence or wrongful acts. In the second sentence, Jim's agrees to indemnify Target for "claims, suits, losses, damages, judgments or expenses" that relate to, arise

31

out of, or are asserted or incurred as a result of its performance of Services, failure to perform its obligations, or negligence or wrongful acts, as well as claims made by Jim's employees arising out of the performance of Services.  Thus, the second sentence plainly has a broader scope than the first, and is not expressly or implicitly limited by the first sentence.

The indemnification sought by Target falls within the first and second clauses of the second sentence – Target seeks indemnification for "claims, suits, losses, damages, judgments or expenses" arising out of, related to, or asserted/incurred as a result of  Jim's failure to perform its contractual obligations (breaches, described above) and its wrongful acts.   Thus, the indemnification claims are within the indemnification clause.

2. Alleged fault of Target

Jim's contends that Target was wholly at fault for the non-payment of overtime wages to Jim's workers, because Target forced the cleaners to work overtime, against the policy of Jim's, and Target became the employer who owes overtime.   Jim's notes that the indemnification provision provides that it "shall not apply to any injury, damage or loss caused by the sole negligence of Target."   Jim's contends that the reason the workers were required to work overtime without pay is that Target refused to allow them to leave the store when their shift was concluded.

As previously discussed, the summary judgment evidence indicates that it was not just the fact that Target sometimes required cleaners to stay beyond their shift ending time that resulted in Plaintiffs working overtime, and that Jim's was at fault for the FLSA violations.  As discussed, the evidence is that Jim's could have prevented its employees from working overtime, and to the extent Plaintiffs worked overtime without being paid their FLSA overtime wages, Jim's Maintenance was at  fault for the nonpayment, not Target.  Jim's conduct was both a failure to perform its contractual

obligation and a "wrongful act" under the indemnification provisions, and thus Target is seeking

indemnification based on Jim's conduct, not Target's, and the proviso does not apply.  Thus, "[t]he

purpose of the indemnity agreement is to hold [Jim's] responsible for any losses incurred by [Target]

due to the fault of [Jim's], an acceptable application of the remedy of indemnity."  *Howard Homes,*

*Inc. v. Keeler Stucco, Inc.*, 2007 WL 4234628 (Minn. App. 2007).

      3. Target's failure to tender the defense

      Jim's further argues that Target is not entitled to indemnity because it has not established that

it tendered the defense of this action to Jim's and that Jim's refused to defend.  Jim's asserts that

Target has never called upon Jim's to defend this action, and thus has waived its claimed right to

indemnity.  Target responds that the duties of defense and indemnification are different from each

other.  Citing *Western National Mutual Insurance Co. v. Westling Manufacturing, Inc.*, 2003 WL

23024479 (Minn. App. 2003), Target asserts that "[t]he duty of defense arises upon the tender of the

defense of an arguably covered claim," whereas "the duty of indemnification becomes fixed when

it is established that there is a covered liability."  Target "recognizes that to obligate Jim's

Maintenance to pay for the cost of its defense, it was required to first tender the defense to Jim's

Maintenance" but asserts that "the duty to indemnify Target for any damages, judgments, etc. is a

separate provision and, as both contracts include severability clauses . . . even if the duty-to-defend

provision is unenforceable, Target would still be entitled to indemnification."

      Under Minnesota law, a defendant's failure to tender the defense precludes an award of

attorney's fees for the defense.  *Jack Frost, Inc. v. Engineered Building Components Co.*, 304

N.W.2d 346 (Minn. 1981); *Hill v. Okay Constr. Co.*, 252 N.W.2d 107, 121 (Minn. 1977) (noting that

"tender of the defense of that action to the other party is generally a condition precedent to obtaining

indemnification for attorneys fees incurred in that defense"). Further, filing a cross-claim against a co-defendant for indemnity does not amount to tender of the defense. *Logefeil v. Logefeil*, 367 N.W.2d 114, 116 n.1 (Minn. App. 1985). Thus, as Target acknowledges, Target acknowledges did not tender the defense and may not "obligate Jim's Maintenance to pay for the cost of its defense."

However, the Court agrees with Target that duty to defend and the duty to otherwise indemnify are separable, and thus the failure to tender the defense precludes only an award of the costs of the defense. The contract requires Jim's to indemnify Target with regard to "any and all claims, suits, losses, damages, judgments or expenses (including attorney's fees incurred in responding to claims or suits)," and thus Target may still seek indemnification for other liabilities pursuant to the contractual indemnification provision.

4. Public Policy

Jim's also contends that, as interpreted by Target, the indemnity clause is void under Minnesota law. Jim's argues that, because of the vast disparity in the parties' bargaining power and Jim's need for the income from the contract, the one-sided indemnification clause is void as against public policy. Jim's asserts that Target violated the FLSA, and any contract relieving it of the consequences of its violation of the FLSA is against public policy and void under Minnesota law. Jim's relies on *Bunia v. Knight Ridder*, 544 N.W.2d 60 (Minn. App. 1996), and *Zerby v. Warren*, 210 N.W.2d 58 (Minn. 1973).

In *Zerby*, a case in which a minor died from sniffing glue, the Minnesota Supreme Court held that the glue retailer could not assert an indemnity claim against the glue manufacturer based on an indemnification clause placed in the order form because the agreement would relieve the retailer "of the consequences of the violation of the public duty imposed by" state law, which made it a crime

34

to sell glue to a minor. *Zerby*, 210 N.W.2d at 64. The court noted that, "if the contract relieves a person from negligence in the discharge of an absolute duty imposed by law for the protection of others, it is void." *Id.*

In *Bunia*, a Minnesota court of appeals invalidated an exculpatory clause under which a newspaper carrier, employed as an independent contractor, agreed to defend, indemnify, and hold harmless the newspaper from any claim, loss, damage or injury to the person or property of the newspaper carrier. Characterizing the exculpatory clause as being "in the nature of a contractual (or express) assumption of the risk," the court noted that such contractual assumption of risk clauses in first-party claims are "almost universally rejected in the employment context." *Bunia*, 544 N.W.2d at 63. It noted that such exculpatory clauses exempting employers from liability for negligence toward their employees are generally void because of the disparity in bargaining power and the economic necessity that forces the employee to accept the employer's terms and "the general policy of the law which protects him against the employer's negligence and against unreasonable contracts of employment." *Id.* Thus, when the independent contractor newspaper carrier slipped on ice and snow outside the newspaper's distribution facility and sued the newspaper for negligence, the court found that the plaintiff was "in circumstances nearly identical to that of an employee," contracted for income that was essential, and was in a position of inferior bargaining power, rendering her contractual assumption of the risk invalid. *Id.*

Importantly, the *Bunia* court invalidated that portion of the contract that required the carrier to indemnify and hold the newspaper company harmless from any claim, loss, damage, or injury to the person or property of the carrier, but it did not expressly invalidate the carrier's agreement to protect the newspaper from third-party claims, described as "any and all liabilities, claims, demands,

35

suits, costs, charges, and expenses incident to any claim made against the Company arising out of [carrier's] obligation under this Agreement" because that provision was not at issue.  Discussing this latter third-party claim indemnification provision, the court noted that such "provisions are common in commercial contracts and are often upheld."  *Bunia*, 544 N.W.2d at 64.  However, it also noted that third-party claim indemnification agreements "still face severe hostility," that "Minnesota law is by far the most restrictive" of such agreements, and that it was "reluctant to let parties contractually invade tort law to undermine its deterrent and compensatory objectives."  *Id.*

Target responds that Jim's cases are distinguishable on their facts, and that "[f]or years prior to contracting with Target, Jim's Maintenance had contracted with several other national retailers, including Service Merchandise, Ross Dress-for-Less and Barnes & Noble bookstores" and it is "disingenuous to contend that Jim's Maintenance was some type of powerless pawn at the hands of Target."  Further, Target contends that the cases cited by Jim's are inapplicable because *Bunia* addresses exculpatory clauses whereby an employer claims exemption from any liability towards its employees for its own negligence, not an indemnification clause relating to actions brought by third parties.  Target notes that "the law generally treats independent contractors differently from employees" and that the indemnity clause is not void as against public policy under Minnesota law.

Minnesota law is clear that indemnification agreements are unenforceable if they are contrary to public policy.  *Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 791 (Minn. 2005) ("We also will not enforce an indemnification clause if it is contrary to public policy").  Jim's argues that the disparity of bargaining power and the fact that Jim's was dependent upon Target for its continued existence render the indemnification clause against public policy and unenforceable.  As exemplified by the cases discussed above, Minnesota courts have invalidated exculpatory clauses in the first-party

36

context (*i.e.*, when the indemnitor is agreeing to release, hold harmless, or indemnify the indemnitee for the indemnitee's negligence) when there is a disparity of bargaining power and the indemnitor is contracting for a necessary or public service, which is a service subject to public regulation or of practical necessity for some members of the public. *Beehner v. Cragun Corp.*, 636 N.W.2d 821, 828 (Minn. App. 2001). There is a disparity of bargaining power when (1) a service is necessary or is unavailable elsewhere; (2) there is a compulsion to participate; and (3) there is no opportunity to negotiate. *Beehner*, 636 N.W.2d at 827.

The Minnesota Supreme Court has noted that the enforceability of exculpatory and indemnification clauses are examined under different standards. *Yang*, 701 N.W.2d at 792 n.6. Jim's has not cited any case applying the exculpatory clause rule from first-party contracts to an indemnification agreement covering third-party claims. Rather, with regard to indemnification agreements in the third-party context, Minnesota courts hold that "[a]greements seeking to indemnify the indemnitee for losses occasioned by its own negligence are not favored by the law" and that contracts relieving a person from negligence in the discharge of an absolute duty imposed by law for the protection of others are void. In this case, Target is seeking indemnification from Jim's based on Jim's failure to perform certain obligations under the contract and Jim's wrongful acts. Such an indemnification is not contrary to public policy under Minnesota law.

Neither party expressly addresses whether the FLSA itself preempts an indemnification action in these circumstance. In *LeCompte v. Chrysler Credit Corporation*, 780 F.2d 1260 (5th Cir. 1986), the Fifth Circuit held that an employer could not sue for indemnification from its supervisory, middle-management employees who were allegedly responsible for the FLSA violations. The Court held that reliance on state law, "applied as a de facto amendment to the Fair Labor Standards Act,

would conflict with its mandate" insofar as the FLSA has no cause of action for indemnity by an employer against employees who violate the Act.  *Id.* at 1264.  It reasoned that "[c]reation of a state-law based indemnity remedy on behalf of employers would not serve the congressional purpose of creating and maintaining minimum standards of employment through the national economy" but, "[o]n the contrary, an employer who believed that any violation of the overtime or minimum wage provisions could be recovered from its employees would have a diminished incentive to comply with the statute and might be inclined to close its eyes, as [Defendant] did here, to the excessive zeal of middle-management personnel." *Id.* The Court further reasoned that allowing indemnification from employees would "deprive them of overtime compensation to which the federal statute otherwise entitles them." *Id.*

In *Barfield v. Madison County, Mississippi*, 212 F.3d 269 (5th Cir. 2000), the Court considered whether Madison County could seek indemnification from the Sheriff in his individual capacity under Mississippi common law.  The Sheriff's employees sued the County and the Sheriff in his individual capacity, and the County filed a cross-claim for indemnification against the Sheriff, alleging that he was a joint employer and individually responsible for the unpaid overtime.  The district court ruled that both Madison County and the Sheriff were employers for FLSA purposes. The district court then found that Madison County violated the FLSA by failing to pay overtime, but also found that it was entitled to indemnification from the Sheriff in his individual capacity under Mississippi common law permitting indemnification between joint tortfeasors.  On appeal, the Sheriff argued that the FLSA preempts Mississippi common law indemnification and that the district court misapplied Mississippi law. The Fifth Circuit agreed with the latter argument, finding that Mississippi common law would not permit indemnification from an employee to an employer.

Given its resolution of the state-law issue, it did not decide the preemption question, though it noted

that there was a "substantial question of federal preemption."  In a footnote, it stated:

> [A]lthough we do not decide the matter, there is a bona fide question whether the
> FLSA permits the application of a state-law based indemnity remedy benefitting
> employers. *See LeCompte v. Chrysler Credit Corp*., 780 F.2d 1260, 1264 (5th Cir.
> 1986) (refusing to apply a state-law cause of action for indemnity, in context of
> defendant employer's counterclaim against two of plaintiff-employees suing for
> FLSA overtime, because it would conflict with goals of FLSA and "would deprive
> them [counter-defendants] of overtime compensation to which the federal statute
> otherwise entitles them"); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132,
> 144 (2d Cir. 1999) ("[T]he FLSA's remedial scheme is sufficiently comprehensive
> as to preempt state law" with respect to contribution or indemnification claims by
> employers.).

*Id.* at 272 n.4.  In the *Herman* case cited by the Fifth Circuit, the Second Circuit held that the FLSA

did not provide for contribution or indemnification between co-employers.  The court found that the

employer seeking indemnification, as an employer, was "outside of the statute's intended protection,

regardless of the status of the party from whom he seeks contribution."  *Herman*, 172 F.3d at 143.

The court cited four reasons for finding no right of contribution or indemnification under the FLSA:

(1) the text of the FLSA makes no provision for contribution or indemnification; (2) the statute was

designed to regulate the conduct of employers for the benefit of employees, and it cannot therefore

be said that employers are members of the class for whose benefit the FLSA was enacted; (3) the

FLSA has a comprehensive remedial scheme, which strongly counsels against judicially engrafting

additional remedies; and (4) the Act's legislative history is silent on a right to contribution or

indemnification.  The court continued:

> Yet, even if the FLSA does not authorize contribution or indemnification, appellant
> declares these claims may nonetheless be prosecuted under New York law. This view
> of the law is flawed because the FLSA's remedial scheme is sufficiently
> comprehensive as to preempt state law in this respect. In addition, federal courts
> recognize a right to contribution under state law only "in cases in which state law

39

supplie[s] the appropriate rule of decision." Northwest, 451 U.S. at 97 n. 38, 101 S.Ct. 1571.  Here, federal law, not state law, supplies the appropriate rule of decision because the instant claim has been brought solely pursuant to the FLSA.

*Id.*

Each of these cases deals with common-law indemnity, and not contractual indemnity.  One district court has applied *Herman* to a claim for contractual indemnity between joint employers, finding it was not permitted.  *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311 (S.D.N.Y. 2001).

The *Gustafson* court held:

> Defendants argue, however, that the indemnification claim in this action involves a contractual obligation and is therefore distinguishable from *Herman*. According to defendants, their request for indemnification is "purely one for damages for breach of contract by a third party" and, unlike *Herman*, does not arise under the FLSA. Defendants also argue that JAG was required by contract to comply with any applicable federal and state laws.  If the Company is liable under the FLSA for failure to pay overtime wages, defendants argue that it is a result of JAG's breach of its contractual obligation to comply with this law.
>
> Defendants' attempt to characterize their claim as a request for breach of contract damages rather than an action for indemnification under the FLSA is unpersuasive. Whether or not JAG breached a contractual obligation, defendants' attempt to recover damages from JAG for overtime violations is an attempt to receive indemnification for FLSA liability. As *Herman* makes clear, "there is no right to contribution or indemnification for employers held liable under the FLSA."  Even assuming JAG were found culpable for FLSA violations as plaintiff's "co-employer," the right to indemnification is still absent. *See id.* at 143 (explaining that "regardless of the status of the party from whom [the employer] seeks contribution" no right to indemnification exists for employers under the FLSA). Furthermore, allowing defendants to obtain indemnification from JAG contradicts the policies of the FLSA. As *Herman* explains, "the [FLSA] was designed to regulate the conduct of employers for the benefit of employees ...." Allowing indemnification in cases such as this would permit employers to contract away their obligations under the FLSA, a result that flouts the purpose of the statute. We therefore hold that the Company has no right to indemnification for damages assessed under the FLSA.

*Gustafson*, 171 F. Supp. 2d at 327-28.  Another district court, however, has concluded that indemnification between co-employers does not violate the FLSA or public policy.  In *Varnell,*

*Struck & Associates, Inc. v. Lowe's Companies, Inc.*, Civ. No. 5:06cv68, 2008 WL 1820830 (W.D.N.C. 2008), the court reasoned:

> To enter into an agreement to have [a co-employer] defend and indemnify Lowe's is no more offensive to public policy than to allow Lowe's to obtain insurance coverage for such risk.  Further, an agreement to defend and indemnify is not an avoidance of liability for Lowe's inasmuch as it would remain obligated to the employees on any judgment they may obtain.  It would be up to Lowe's to secure from [the co-employer] reimbursement. Thus, if [the co-employer] were insolvent, the employees would lose nothing.

In this case, Plaintiffs alleged that Target was their joint employer, and Jim's asserts that Target was Plaintiffs' employer, but the Court has found that fact issues remain on this question.  Of course, if Target is not an FLSA employer, then there would be no public policy argument against permitting Target to recover indemnification from Jim's for Jim's conduct.

If Target is a joint employer, it is a more difficult question.  The FLSA regulations provide that, under the FLSA, "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek.  In discharging the joint obligation each employer may, of course, take credit toward minimum wage and overtime requirements for all payments made to the employee by the other joint employer or employers." 29 C.F.R. § 791.2.  The Court finds that the FLSA does not preempt a contractual agreement between joint employers concerning the allocation of risk and obligation under the FLSA.  Though both employers are liable under the FLSA to any aggrieved employee, the regulations themselves contemplate that the final allocation of wages paid may be determined between two joint employers.  The Court does not find it repugnant to public policy for the employers to contractually allocate the liability.  Accordingly, the Court finds that the FLSA does not preempt application of the indemnification agreement in this

case.

## Conclusion

Target's Motion for Partial Summary Judgment on its Cross-Claims (docket no. 82) is

GRANTED IN PART and DENIED IN PART as discussed herein.

Target shall notify the Court whether it intends to pursue its remaining claim against James

Funderburgh no later than **June 22, 2010**.

SIGNED this 4th day of June, 2010.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE